1   Adam R. Fox (State Bar No. 220584)
2   Adam.Fox@ssd.com
    SQUIRE, SANDERS & DEMPSEY (US) LLP
3   555 South Flower Street, 31st Floor
    Los Angeles, CA 90071
4   Telephone:   +1.213.624.2500
    Facsimile:   +1.213.623.4581
5   David S. Elkins (State Bar No. 148077)
6   David.Elkins@ssd.com
    SQUIRE, SANDERS & DEMPSEY (US) LLP
7   600 Hansen Way
    Palo Alto, CA 94304
8   Telephone:   +1.650.856.6500
    Facsimile:   +1.650.843.8777

9   [Additional Counsel Identified On Signature Page]

10  Attorneys for Plaintiffs
    WESTERN SUGAR COOPERATIVE, MICHIGAN SUGAR
11  CO., C & H SUGAR CO., INC., UNITED STATES
    SUGAR CORPORATION, AMERICAN SUGAR
12  REFINING, INC., THE AMALGAMATED SUGAR
    COMPANY LLC, IMPERIAL SUGAR CORPORATION,
13  MINN-DAK FARMERS COOPERATIVE,
    THE AMERICAN SUGAR CANE LEAGUE U.S.A., INC
14  AND THE SUGAR ASSOCIATION, INC.

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17  WESTERN SUGAR COOPERATIVE, a          Case No. CV11-3473 CBM (MANx)
    Colorado cooperative, MICHIGAN
18  SUGAR COMPANY, a Michigan             **FIRST AMENDED COMPLAINT**
    corporation, and C & H SUGAR         **FOR DAMAGES AND**
19  COMPANY, INC., a Delaware            **INJUNCTIVE RELIEF FOR**
    corporation, UNITED STATES SUGAR     **FALSE ADVERTISING**
20  CORPORATION, a Florida corporation,  **IN VIOLATION OF**
    AMERICAN SUGAR REFINING, INC.,       **(1) THE LANHAM ACT**
21  a Delaware corporation, THE          **(15 U.S.C. §1125(a)), AND**
    AMALGAMATED SUGAR COMPANY            **(2) CALIFORNIA'S UNFAIR**
22  LLC, a Delaware limited liability    **COMPETITION LAW**
    company, IMPERIAL SUGAR              **(CAL. BUS. & PROF. CODE**
23  CORPORATION, a Texas corporation,    **§17200, *ET SEQ.*)**
    MINN-DAK FARMERS
24  COOPERATIVE, a North Dakota
    Cooperative Association, THE          **JURY TRIAL DEMANDED**
25  AMERICAN SUGAR CANE LEAGUE
    OF THE U.S.A., INC., a Louisiana Non-
26  Profit Corporation, and THE SUGAR
    ASSOCIATION, INC., a Delaware
27  corporation,

28

FIRST AMENDED COMPLAINT

COPY

1    Adam R. Fox (State Bar No. 220584)
     Adam.Fox@ssd.com
2    SQUIRE, SANDERS & DEMPSEY (US) LLP
     555 South Flower Street, 31st Floor
3    Los Angeles, CA  90071
     Telephone:  +1.213.624.2500
4    Facsimile:  +1.213.623.4581

5    David S. Elkins (State Bar No. 148077)
     David.Elkins@ssd.com
6    SQUIRE, SANDERS & DEMPSEY (US) LLP
     600 Hansen Way
7    Palo Alto, CA  94304
     Telephone:  +1.650.856.6500
8    Facsimile:  +1.650.843.8777

9    [*Additional Counsel Identified On Signature Page*]

10   Attorneys for Plaintiffs
     WESTERN SUGAR COOPERATIVE, MICHIGAN SUGAR
11   CO., C & H SUGAR CO., INC., UNITED STATES
     SUGAR CORPORATION, AMERICAN SUGAR
12   REFINING, INC., THE AMALGAMATED SUGAR
     COMPANY LLC, IMPERIAL SUGAR CORPORATION,
13   MINN-DAK FARMERS COOPERATIVE,
     THE AMERICAN SUGAR CANE LEAGUE U.S.A., INC
14   AND THE SUGAR ASSOCIATION, INC.

15            UNITED STATES DISTRICT COURT

16          CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17  WESTERN SUGAR COOPERATIVE, a Colorado cooperative, MICHIGAN SUGAR COMPANY, a Michigan corporation, and C & H SUGAR COMPANY, INC., a Delaware corporation, UNITED STATES SUGAR CORPORATION, a Florida corporation, AMERICAN SUGAR REFINING, INC., a Delaware corporation, THE AMALGAMATED SUGAR COMPANY LLC, a Delaware limited liability company, IMPERIAL SUGAR CORPORATION, a Texas corporation, MINN-DAK FARMERS COOPERATIVE, a North Dakota Cooperative Association, THE AMERICAN SUGAR CANE LEAGUE OF THE U.S.A., INC., a Louisiana Non-Profit Corporation, and THE SUGAR ASSOCIATION, INC., a Delaware corporation, | Case No. CV11-3473 CBM (MANx)  **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR FALSE ADVERTISING IN VIOLATION OF (1) THE LANHAM ACT (15 U.S.C. §1125(a)), AND (2) CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §17200, *ET SEQ.*)**  **JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT

1

            Plaintiffs,

2            vs.

3    ARCHER-DANIELS-MIDLAND
     COMPANY, a Delaware corporation,
4    CARGILL, INC., a Delaware corporation,
     CORN PRODUCTS INTERNATIONAL,
5    INC., a Delaware corporation, THE
     CORN REFINERS ASSOCIATION,
6    INC., a Delaware corporation, PENFORD
     PRODUCTS CO., a Delaware
7    corporation, ROQUETTE AMERICA,
     INC., a Delaware corporation, and TATE
8    & LYLE INGREDIENTS AMERICAS,
     INC., a Delaware corporation,
9
            Defendants.
10

11       Western Sugar Cooperative, Michigan Sugar Company, C&H Sugar

12   Company, Inc., United States Sugar Corporation, American Sugar Refining, Inc.,

13   The Amalgamated Sugar Company LLC, Imperial Sugar Corporation, Minn-Dak

14   Famers Cooperative, The American Sugar Cane League of the U.S.A., Inc. and The

15   Sugar Association, Inc. hereby allege as follows.

16                                      **PROLOGUE**

17       1.      Since researchers first synthesized it for commercial use within the

18   processed food industry in the late 1960s, the use and consumption of high-fructose

19   corn syrup—or "HFCS"—has become nearly ubiquitous in American beverages

20   and food.  In recent years, scientists and other observers noted that this dramatic

21   growth in the use of HFCS, which increased by over 1000% between 1970 and

22   1990, bears a strong temporal relationship to the growth in American obesity.  After

23   some researchers began to publish hypotheses based on testing of a potential causal

24   relationship between the dramatic, concurrent rises in HFCS consumption and

25   obesity, HFCS sales began a steady and sustained decline.

26       2.      Consumers increasingly seek to avoid food and drink containing HFCS

27   given the emerging science linking it to possible nutritional and health problems,

28   including obesity but also extending to a wide range of metabolic conditions.  Other

FIRST AMENDED COMPLAINT

1   consumers avoid HFCS out of a desire to confine their diets to natural foods and

2   fulfill their desire for sweeteners to sugar from cane and beet plants.  Responding to

3   consumer preferences, more and more food manufacturers have replaced HFCS

4   with sugar—and at the same time promote their products' use of "real sugar" or the

5   absence of HFCS.

6          3.      The HFCS industry has not taken the decrease in sales lightly.  Instead,

7   the Corn Refiners Association ("CRA") and its member companies (collectively

8   "Defendants") have crafted a publicity campaign to revitalize and rebrand HFCS.

9   This ongoing, evolving effort has already manifested in a variety of different

10  strategies, including the promotion of HFCS as "natural," and the assertions of

11  equivalence between HFCS and sugar—such as "sugar is sugar," "your body can't

12  tell the difference" and claims that HFCS is "nutritionally the same as table sugar."

13  Defendants have even pursued the more drastic approach of attempting to eliminate

14  HFCS from the lexicon.  Several now refer to it in advertising and pricing sheets as

15  "corn sugar" and are seeking to obtain United States Food and Drug Administration

16  ("FDA") approval to substitute "corn sugar" for "high fructose corn syrup" on

17  ingredient labels.

18         4.      Seeking to co-opt the goodwill of "sugar" and even changing the

19  HFCS name by calling it a kind of sugar to sidestep growing consumer sentiment is

20  paradigmatically false and misleading advertising for several reasons.

21         5.      First, "corn sugar" is already the FDA-approved name of a distinct

22  sweetener made from corn starch, and has been for decades.  Seeking to appropriate

23  the name of an existing, vastly different sweetener sends to the consuming public a

24  literally false message about the nature of the product being advertised and sold,

25  and misleads them in a manner that will cause confusion.

26         6.      Second, Defendants' re-branding efforts promoting HFCS as

27  "natural"—despite the absence of any naturally occurring fructose in corn or corn

28  starch and the fact that HFCS is a man-made product that did not even exist in

1  commerce until the late 1960s—is also literally false and misleads consumers in a

2  manner that will cause confusion.

3        7.     Third, Defendants' assertions that HFCS or "corn sugar" is

4  nutritionally the same as the real sugar from cane and beet plants and handled in the

5  same way by the body are also literally false and mislead consumers in a manner

6  that will cause confusion.  Scientific studies demonstrate clear molecular

7  differences between HFCS and sugar and clear differences in how the human body

8  processes them.  Additionally, scientific studies demonstrate an increasingly likely

9  link between consumption of HFCS and a variety of health problems, principally

10  obesity, elevated cholesterol and triglycerides, diabetes but also extending to other

11  metabolic disorders.

12        8.     Defendants' representations equating HFCS with real sugar—such as

13  "sugar is sugar," "your body can't tell the difference" and "nutritionally the same as

14  table sugar"—misleads the consuming public in light of the emerging science

15  showing otherwise and the resultant uncertainty (at best) as to the truth of

16  Defendants' statements that HFCS is no different from sugar.

17        9.     Defendants' resort to such literally false and misleading statements

18  harms consumers, harms the makers of real sugar and harms any dialogue based on

19  the truth.  This lawsuit seeks to put an end to the deception.

20                              **JURISDICTION AND VENUE**

21        10.     The Court has jurisdiction over the subject matter presented by this

22  Complaint because it includes a claim of false advertising under the Lanham Act,

23  15 U.S.C. §§1051, *et seq*., including 15 U.S.C. §1121, which expressly provides

24  that claims arising thereunder are subject to federal subject matter jurisdiction.  The

25  Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338.

26  The Court has subject matter jurisdiction over the state law claim because it arises

27  from the same nucleus of operative facts underlying the Lanham Act claim, and 28

28

1    U.S.C. §1367 authorizes the Court to exercise supplemental jurisdiction over all

2    other claims so related.

3        11.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because

4    a substantial part of the events or omissions giving rise to Plaintiffs' claims

5    occurred in this district and because defendants are subject to personal jurisdiction

6    in this District.

7                            **PARTIES**

8                            *Plaintiffs*

9        12.    Plaintiff C & H Sugar Company, Inc. ("C&H"), a sugar producer,

10   refiner and distributor, is a corporation organized under the laws of the State of

11   Delaware, having a principal place of business at 830 Loring Avenue, Crockett, CA

12   94525.

13       13.    Plaintiff Michigan Sugar Company ("Michigan Sugar"), also a sugar

14   processor, producer and distributor, is a non-profit agricultural cooperative

15   corporation organized under the laws of the State of Michigan, having a principal

16   place of business located at 2600 South Euclid Avenue, Bay City, MI 48706.

17       14.    Plaintiff Western Sugar Cooperative ("Western Sugar"), also a sugar

18   processor, producer and a distributor, is a cooperative organized under the laws of

19   the State of Colorado, having a principal place of business at 7555 East Hampden

20   Avenue, Suite 600, Denver, CO 80231.

21       15.    Plaintiff United States Sugar Corporation ("U.S. Sugar"), also a sugar

22   processor, producer and distributor, is a corporation organized under the laws of the

23   State of Florida, having a principal place of business at 111 Ponce de Leon Avenue,

24   Clewiston, FL 33440.

25       16.    Plaintiff American Sugar Refining, Inc. ("American Sugar"), also a

26   sugar processor, producer and distributor, is a corporation organized under the laws

27   of the State of Delaware, having a principal place of business at 1 Federal Street,

28   Yonkers, NY 10705.

17.     Plaintiff The Amalgamated Sugar Company LLC ("Amalgamated"), also a sugar processor, producer and distributor, is a limited liability company organized under the laws of the State of Delaware, having a principal place of business at 1951 S. Saturn Way, Suite 100, Boise, ID 83709.

18.     Plaintiff Imperial Sugar Corporation ("Imperial"), also a sugar processor, producer, refiner and distributor, is a corporation organized under the laws of the State of Texas, having a principal place of business at 8016 Highway 90A, Sugar Land, TX 77478.

19.     Plaintiff Minn-Dak Farmers Cooperative ("Minn-Dak"), also a sugar processor, producer and a distributor, is a cooperative association organized under the laws of the State of North Dakota, with a principal place of business at 7525 Red River Road, Wahpeton, ND 58075.

20.     Plaintiff The American Sugar Cane League of the U.S.A., Inc. (the "American Sugar Cane League") is a non-profit corporation Louisiana organized under the laws of the State of Louisiana, with a principal place of business located at 206 East Bayou Road, Thibodaux, LA, 70301.  The American Sugar Cane League is a trade association comprised of 450 sugar cane growers and eleven (11) raw sugar refiners, all located in Louisiana.  Its principal missions on behalf of its members include research, legislative activity, product promotion, consumer education and public relations.  Each member of the American Sugar Cane League competes against the members of the CRA in the sweetener industry.  Preventing the public from being misinformed about sugar is germane to the American Sugar Cane League's purpose.

21.     Plaintiff The Sugar Association, Inc. ("The Sugar Association") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 1300 L Street, NW, Suite 1001, Washington, DC 20005.  The Sugar Association is a trade group comprised of eleven (11) member companies, each of whom is a grower and/or producer of sugar in the United States.  Part of The

1   Sugar Association's mission is to promote the consumption of sugar as part of a

2   healthy diet and lifestyle through the use of science and research.  Preventing the

3   public from being misinformed about sugar is germane to The Sugar Association's

4   purpose.  Each member of The Sugar Association competes in the sweetener

5   industry against the members of the CRA.

6                                   ***Defendants***

7         22.      Defendant The Corn Refiners Association, Inc. ("CRA") is a Delaware

8   corporation with a principal place of business located at 1701 Pennsylvania Ave.

9   NW, Suite 950, Washington, DC 20006.  The CRA is a national trade association

10  that represents the interests of the corn refining industry, including, among other

11  things, the promotion of HFCS.  The CRA Board of Directors includes decision-

12  making members from each of the other Defendants.

13        23.      Defendant Archer-Daniels-Midland Company ("ADM") is a Delaware

14  corporation with a principal place of business located at 4666 Faries Parkway, Box

15  1470, Decatur, IL 62525.  ADM is a CRA member, and two of its employees or

16  agents are members of CRA's board of directors.

17        24.      Defendant Cargill, Inc. ("Cargill") is a Delaware corporation with a

18  principal place of business located at PO Box 9300, Minneapolis, MN 55440-9300.

19  Cargill is a CRA member, and two of its employees or agents are members of

20  CRA's board of directors.

21        25.      Defendant Corn Products International, Inc. ("Corn Products") is a

22  Delaware corporation with a principal place of business located at 5 Westbrook

23  Corporate Center, Westchester, IL 60154.  Corn Products is a CRA member, and

24  two of its employees or agents are members of CRA's board of directors.

25        26.      Defendant Penford Products Co. ("Penford") is a Delaware corporation

26  with a principal place of business located at 1001 First St. SW, Cedar Rapids, IA

27  52404.  Penford is a CRA member, and two of its employees or agents are members

28  of CRA's board of directors.

1   27.   Defendant Roquette America, Inc. ("Roquette") is a Delaware

2   corporation with a principal place of business located at 1417 Exchange St.,

3   Keokuk, IA 52632.  Roquette is a CRA member, and two of its employees or agents

4   are members of CRA's board of directors.

5   28.   Defendant Tate & Lyle Ingredients Americas, Inc. ("Tate & Lyle") is a

6   Delaware corporation with a principal place of business located at 2200 East

7   Eldorado St., Decatur, IL 62525.  Tate & Lyle is a CRA member, and two of its

8   employees or agents are members of CRA's board of directors.

9   **FACTUAL BACKGROUND**

10   ***What Is High-Fructose Corn Syrup?***

11   29.   High-fructose corn syrup, or HFCS, is a nearly ubiquitous commercial

12   sweetener used in a variety of products, with soft drinks among the best known.

13   Despite the presence of "corn" in the product's full name, HFCS is not a natural

14   product—one cannot simply extract it from an ear or stalk of corn.  Rather, corn

15   yields corn starch, which is commonly used in kitchens as a thickening agent.  Corn

16   starch can be turned into corn syrup, which, as its name implies, is a class of

17   viscous liquids containing various amounts of dextrose, also known as glucose.

18   Corn starch can also be turned into "corn sugar," which the FDA identifies as a

19   foodstuff "produced by the complete hydrolysis of corn starch with safe and

20   suitable acids or enzymes, followed by refinement and crystallization."[1]  Corn sugar

21   is almost 100% dextrose.

22   30.   The only sweetener that may be labeled simply as "sugar" is the natural

23   sucrose found in sugar cane and sugar beet plants.[2]  Sucrose is an organic

24   disaccharide consisting of equal parts glucose and fructose chemically joined by a

25   type of covalent bond known as a glycosidic bond.  Humans have used sugar for

26   millennia to sweeten food and drink.

27
28

---

[1] 21 C.F.R. 184.1857.
[2] 21 C.F.R. 184.1854.

SQUIRE, SANDERS &
DEMPSEY (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071

-7-          FIRST AMENDED COMPLAINT

31.    HFCS is a man-made product.  It has been commercially available only since the late 1960s, when Japanese researchers discovered a method of enzymatically transforming some of the glucose in corn syrup into fructose, which does not naturally occur in the plant.  The glucose and fructose that primarily comprise HFCS are monosaccharides, lacking the glycosidic molecular bond found in the organic sucrose molecule.  Free fructose is highly soluble in water and makes bread crusts browner, cookies softer and everything sweeter.[3]  As a result, over the past 40 years HFCS has rapidly become a staple in food and beverage production, particularly in the United States.

### The Rise of HFCS Mirrors the Rise of the Obesity Epidemic

32.    At least as early as 2003, the United States Surgeon General, testifying before a House subcommittee, warned of "a health crisis affecting every state, every city, every community, and every school across our great nation.  [¶]  The crisis is obesity.  It's the fastest-growing cause of disease and death in America."[4]

33.    The obesity epidemic in the United States has received considerable attention over the past few years—with good reason.  In 1970, about 15 percent of the United States population met the definition for obesity.  Since 1970, obesity rates have skyrocketed, as shown in the chart below.



---

[3] E. Neilson, *The Fructose Nation*, 18 J. Am. Soc. Nephrology 2619 (2007) ("Neilson").
[4] http://www.surgeongeneral.gov/news/testimony/obesity07162003.htm.

FIRST AMENDED COMPLAINT

SQUIRE, SANDERS &
DEMPSEY (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071

*Overweight and Obesity Statistics*, U.S. Dept. Health & Human Servs., Nat'l Insts. Health (Feb. 2010) (http://win.niddk.nih.gov/publications/PDFs/stat904z.pdf). From 1980 to 2002 alone, obesity rates doubled; about one-third of the adult population was deemed obese as of 2006.[5]

34.    Although many factors have been identified as potential causes of the obesity epidemic, one major nutritional aspect that has come under scrutiny is the commercial use of HFCS, which experienced its rapid ascent during the same time period.  Indeed, from 1970 to 1990, consumption of HFCS increased over 1000%, "far exceeding the changes in intake of any other food or food group.  HFCS now represents > 40% of caloric sweeteners added to foods and beverages and [as of 2004 was] the sole caloric sweetener in soft drinks in the United States."[6]

35.    The existence of an association between the obesity epidemic and the meteoric rise in HFCS consumption has increasingly been the focus of attention by medical, health and food science researchers and by consumers.  In 2004, a landmark scientific report articulated the association in, among other things, the stark terms that appear below:

> The increased use of HFCS in the United States mirrors the rapid increase in obesity.  The digestion, absorption, and metabolism of fructose differ from those of glucose. . . .  Hepatic metabolism of fructose favors de novo lipogenesis. In addition, unlike glucose, fructose does not stimulate insulin secretion or enhance leptin production. Because insulin and leptin act as key afferent signals in the regulation of food intake and body weight, this suggests that dietary fructose may contribute to

---

[5] C. Ogden, et al., Prevalence Of Overweight And Obesity In The United States, 1999–2004, 295:13 J. Am. Med. Ass'n 1549–55 (2006).
[6] G. Bray, et al., Consumption Of High-Fructose Corn Syrup In Beverages May Play A Role In The Epidemic Of Obesity, 79 Am. J. Clinical Nutrition 537 (2004) ("Bray").

increased energy intake and weight gain.  Furthermore, calorically sweetened beverages may enhance caloric overconsumption.  Thus, the increase in consumption of HFCS has a temporal relation to the epidemic of obesity, and the overconsumption of HFCS in calorically sweetened beverages may play a role in the epidemic of obesity.[7]

36.    The precise role of HFCS in the obesity epidemic, as well as its contribution to a variety of health problems, is still the subject of scientific debate.  Nevertheless, numerous researchers have identified as part of the likely problem the added fructose in the human diet, estimated to have "increased nearly 30% between 1970 and 2000."[8]  It is noted that "[f]ructose is metabolized differently than glucose," and as a result can lead to insulin resistance (a precursor to diabetes), increased hypertension, and accelerated endothelial dysfunction, which can aggravate heart disease.  "What we end up with is a familiar caloric additive provoking a new spate of metabolic dysfunction."[9]

37.    Although some have sought to spread the blame to reach sugar as well as HFCS, the results of a Princeton University study published in 2010 provide evidence that sucrose and HFCS have different effects on the body.[10]  Researchers observed that rats fed HFCS-55 (the kind commonly used in sweetened beverages) gained "significantly more body weight" than those fed sucrose—despite each control group consuming the same calories.  "This increase in body weight with HFCS was accompanied by an increase in adipose fat, notably in the abdominal region, and elevated circulating triglyceride levels.  Translated to humans, these

---

[7] Bray, *supra* note 6, at 537.
[8] *Id.*
[9] Neilson, *supra* note 3, at 2619.
[10] M. Bocarsly, et al., High-Fructose Corn Syrup Causes Characteristics Of Obesity In Rats: Increased Body Weight, Body Fat And Triglyceride Levels, Pharmacol. Biochem. Behav. (2010) (the "Princeton study").

1  results suggest that excessive consumption of HFCS may contribute to the
2  incidence of obesity."

3      38.    Observing that "HFCS is different than sucrose in many ways," the
4  Princeton study identified several important differences between the two sweeteners
5  that may account for the study's results and conclusion recited above.  Among other
6  noted differences:

7      • The fructose content of HFCS-55 is slightly higher than in sucrose;[11]

8      • Fructose is absorbed further down the intestine than glucose, with
9        much of its metabolism in the liver, where it is converted to a precursor
10       to the backbone of the triglyceride molecule;

11     • The free fructose in HFCS is metabolically broken down before it
12       reaches the rate-limiting enzyme that prevents the unregulated increase
13       in glycerol and fatty acids that are absorbed by adipose tissue; and

14     • HFCS bypasses the insulin-driven satiety system, suppressing "the
15       degree of satiety that would normally ensue with a meal of glucose or
16       sucrose, and this could contribute to increased body weight."[12]

17     39.    The Princeton study is not alone in observing these distinctions
18  between HFCS and sucrose; other researchers have observed and published
19  scholarly articles about such differences.  Indeed, even those researchers who have
20  published testing suggesting alternative conclusions have readily admitted that the
21  comparative analysis of HFCS and sucrose (at a minimum) remains the subject of
22  debate and further analysis.

23  //

24  //

_____

25  [11] An even more recent publication by researchers from the University of Southern California
26  demonstrated that tested beverages sweetened with HFCS had a mean fructose content higher
    than 55%, with several major brands apparently produced with HFCS that is 65% fructose.  *See*
    Ventura, et al., Sugar Content of Popular Sweetened Beverages Based on Objective Laboratory
27  Analysis: Focus on Fructose Content, Obesity J. (Oct. 2010).
    [12] Princeton study, *supra* note 10, at 105.
28

*The HFCS Backlash Causes Sales To Drop*

40.    As the sampling of scientific literature shown above demonstrates, HFCS has become the focus of a maelstrom of events and serious research requiring a reassessment of its use:  the obesity epidemic's rise and concurrent rise in HFCS consumption; scientific research pointing to HFCS's likely role in obesity and other health problems; and an overall consumer preference for natural, as opposed to man-made, foodstuffs.

41.    Consumer concerns regarding the presence of HFCS in food and drinks is palpable.  For example, market research firm The NPD Group, Inc., in a 2008 survey of consumer food safety concerns, reported that 58% of those surveyed listed HFCS as a food safety concern—just under the level of concern about mad cow disease (65%) and ahead of consumer concern over the use of bovine growth hormone in milk-producing cows (54%).[13]

42.    Growing consumer concern about and reassessment of HFCS has already led a growing number of food and beverage producers to replace it with sugar.  For example, on May 17, 2010, www.msnbc.com reported:

> ConAgra Foods Inc. has removed high fructose corn syrup from its Hunt's brand ketchup.  Shoppers have been shying away from high-fructose corn syrup due to health concerns, and it was consumer demand that drove the changes, said Hunt's brand manager Ryan Toreson.  Hunt's is the latest brand to make the shift.  PepsiCo Inc. removed all high-fructose corn syrup from sports drink Gatorade and replaced it with cane sugar.[14]

//

//

---

[13] http://www.npd.com/press/releases/press_090330.html.
[14] http://www.msnbc.msn.com/id/37189171/ns/business-consumer_news/.

43.     Food and beverage producers switching from HFCS to sugar are doing so with consumer preferences and concerns in mind, as shown by the promotion of "real sugar" and/or the absence of HFCS in products, as the examples here show.

   

44.     The growing concern over HFCS has thus led to its decreased sales. Since the United States Surgeon General's testimony to Congress in 2003 warning of the rising obesity epidemic, sales of HFCS have declined 11%.[15]

### The CRA's $50 Million Campaign To Remake HFCS Into "Corn Sugar"

45.     Evidently alarmed by the growing vilification of HFCS and resulting drop in sales, HFCS producers—led by the CRA, acting as the other Defendants' agent—attempted to turn consumer sentiment around beginning in June 2008. According to the New York Times, the CRA, working with its ad agency DDB and a team at Ogilvy Public Relations, had by May 2010, already "plowed more than $30 million over the last two years into an ad campaign called 'Sweet Surprise' that highlights what it says are vague and unsubstantiated opinions."[16]

//

//

//

---

[15] UDSA Economic Research Service, Corn Sweetener Supply, Use, and Trade, Table 30: U.S. High Fructose Corn Syrup (HFCS) Supply and Use, by Calendar Year.
[16] http://www.nytimes.com/2010/05/02/business/02syrup.html?ref=corn&pagewanted=all.

46.     The CRA's "Sweet Surprise" campaign features a website dedicated to the re-branding effort (www.sweetsurprise.com), Internet banner advertising, exhibitions at professional organizations, TV commercials and print ads, such as the one at right.  The campaign attempts to recast HFCS as a natural product, nutritionally identical and directly comparable to sugar.  As the ad to the right claims, HFCS is "natural, nutritionally the same as table sugar and has the same number of calories."



47.     Despite the CRA's "Sweet Surprise" campaign, HFCS sales continued to slump into the second half of 2010.  The CRA and its members thus re-doubled their re-branding effort.  While continuing to label HFCS as "natural" and "the same as sugar"—despite not being found in nature and despite the clear molecular differences between the two—CRA and its members sought to change consumers' attitudes by obtaining FDA approval to change the product's name so that consumers will no longer see "high fructose corn syrup" listed as an ingredient on food and drink labels.  Rather, consumers would see the name of a different sweetener:  "corn sugar."

48.     Impatient for this approval, the CRA and several of the Defendants have already jumped the gun, calling HFCS "corn sugar" in advertising and in pricing sheets for their food ingredient customers.  On information and belief, the CRA and other Defendants have thereby added to their investment to rebrand HFCS so that their total expenditure thus far is equal to or greater than $50 million.

49.     Corn sugar and HFCS are not the same.  The FDA and food industry have long recognized corn sugar as dextrose in crystalline form, derived from corn starch.  HFCS, on the other hand, is a processed syrup mixture created by enzymatically converting dextrose into varying amounts of fructose, the percentage of which can be controlled according to the preferred industrial use (e.g., HFCS-42, HFCS-55 and HFCS-90, containing 42%, 55% and 90% fructose, respectively).  HFCS likewise has long been known by its name in the food industry.  Indeed, the corn-refining industry itself proposed the name "high fructose corn syrup" to the FDA in a 1977 petition.  The FDA approved that label in 1983, and reaffirmed it in 1996 as part of the FDA's comprehensive review of sugar and syrup sweeteners.[17]

50.     Despite having proposed the FDA-approved label for HFCS over thirty years ago, Defendants, acting through the CRA, submitted a "citizen's petition" to the FDA on September 14, 2010 to change the name of HFCS.  Acknowledging that FDA regulations provide that "corn sugar" is the approved label for a real and distinct corn starch product, Defendants' petition asks that the FDA radically change that agency's long-standing labeling system for sugars and syrups.  In particular, Defendants want the FDA to allow them to appropriate the name of the authentic corn sugar product so that they can re-label HFCS as "corn sugar."  Defendants did not make their request to more closely associate their product with corn.  Rather, Defendants' request seeks to appropriate the goodwill of natural sugar.

51.     Defendants' pending FDA petition received considerable media scrutiny when submitted,[18] and the FDA has received a large volume of public comments regarding the petition—approximately 10-1 against the change.

[17] 48 Fed. Reg. 5,716 (Feb. 8, 1983); 61 Fed. Reg. 43,447 (Aug. 23, 1996).
[18] See for example *A New Name for Corn Syrup*, N.Y. Times (Sept. 14, 2010), http://well.blogs.nytimes.com/2010/09/14/a-new-name-for-high-fructose-corn-syrup/#; *Corn Refiners Left with Bitter Taste Over Sugar*, Financial Times (Sept. 17, 2010), http://www.ft.com/cms/s/0/fcf19a16-c280-11df-956e-00144feab49a.html#axzz1JvvLCdly; *"Corn Sugar" Makers Hope You'll Buy the New Name*, NPR (Sept. 19, 2010),

(continued on next page)

52.     Defendants, however, were not content to proceed through FDA or other formal channels to obtain approval to use their desired "corn sugar" label. Rather, they simply appropriated the name at the same time they submitted their petition to the FDA and began using it in advertising and other documentation.  In other words, despite recognizing the need for FDA approval to re-brand HFCS, Defendants simply started using "corn sugar" without waiting for such approval.[19]

53.     CRA admitted as much in its recent "reply to comments" letter submitted to the FDA on April 4, 2011.  The CRA states that:

> When CRA filed its citizen petition, it conducted a nation-wide high profile campaign in connection with the petition.   This campaign has garnered more than 1.6 billion impressions in major broadcast and print media. *CRA is also continuously running national, educational television commercials that equate HFCS and corn sugar. These commercials have earned in excess of 2 billion impressions since September 2010.*  (Emphasis added.)

54.     In short:

- HCFS is a man-made product not found in nature;
- Science shows that HFCS and real sugar are chemically different, and emerging science strongly suggests the body processes HFCS differently than it does real sugar;
- Despite the need for FDA approval (that they have not received) to re-label HFCS and despite the decades-old use of the FDA-approved name "corn sugar" for a completely different product, the Defendants have begun re-branding HCFS as "corn sugar";

http://www.npr.org/templates/story/story.php?storyId=129971532.

[19] To ensure the absence of any misunderstanding, Plaintiffs' claims are not based on the CRA's citizen petition to the FDA.  Plaintiffs' claims are exclusively based on Defendants' advertising and related documents and statements, as alleged herein.

- Consumer attitudes have been and are changing about the consumption of HCFS, resulting in food manufacturers increasingly using sugar in place of HCFS; and

- HFCS sales have consequently been in decline for several years.

Given these facts, Defendants' representations—that HFCS is a "natural" product, metabolically the same as real sugar (e.g., "your body can't tell the difference" and "nutritionally the same as table sugar") and that it is simply "corn sugar"—are literally false and/or misleading.  Moreover, given their knowledge of the foregoing facts, the false and/or misleading nature of Defendants' representations demonstrates their recklessness and/or deliberate and malicious intent to mislead the consuming public about HFCS and real sugar to (i) obscure from the consuming public the connection between the emerging health concerns associated with HFCS and that very product, (ii) stem the decline of HFCS sales from which the CRA's members have been suffering, and (iii) divert sales from Plaintiffs, the American Sugar Cane League's members and The Sugar Association's other members to CRA members—who directly compete with and are acting through the CRA to compete unfairly against Plaintiffs, the American Sugar Cane League's members and the Sugar Association's other members.

55.     The changed focus of Defendants' re-branding effort is further evident from the promotional statements on the CRA's www.corn.org and www.sweetsurprise.com websites (with emphases added):

- *"It is important that consumers recognize added sugars in the diet. Despite its confusing name, <u>high fructose corn syrup</u> is simply <u>corn sugar</u> - or an added sugar in the diet."*

- *"High fructose corn syrup is simply a kind of corn sugar. It has the same number of calories as sugar and is handled similarly by the body."*

- *"High fructose corn syrup is simply a kind of corn sugar that is handled by your body like sugar or honey."*
- *"Whether it's corn sugar or cane sugar, your body can't tell the difference. Sugar is sugar."*

56.     At about the same time that Defendants submitted their petition to the FDA, ADM, Cargill, Corn Products and Tate & Lyle also began using "corn sugar" as a synonym for HFCS in their marketing materials, including their price lists.

## FIRST CLAIM FOR RELIEF

### VIOLATIONS OF SECTION 43(A) OF THE LANHAM ACT – FALSE ADVERTISING BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

57.     Plaintiffs reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 56 above as if set forth in full here.

58.     Defendants have made and continue to make literally false and/or misleading representations of fact in their advertising and/or promotion in commerce regarding HFCS.  As detailed above, Defendants' false and/or misleading representations of fact generally fall into one of the following categories.

59.     The first category of Defendants' false and/or misleading representations of fact stems from their unilateral appropriation of the label "corn sugar"—"in excess of 2 billion impressions since September 2010"—when that label has long been used for a recognized form of sugar in crystalline form with no fructose.  Defendants have done so in defiance of the FDA's regulatory scheme for labeling for sweeteners and syrups.  In particular, Defendants' use of the label "corn sugar" falsely suggests to consumers that HFCS is or is similar to the actual corn sugar product, when in fact the two products are wholly different.

60.     The second category is comprised of Defendants' false and/or misleading representations of fact that HFCS is a "natural" product.  These

1    representations falsely assert that HFCS is found in nature, when in fact it is a man-

2    made product that did not exist for commercial consumption before the late 1960s.

3        61.    The third category is comprised of Defendants' false and/or misleading

4    representations of fact that HFCS is nutritionally and metabolically the same as

5    sugar, i.e., "sugar is sugar" and "your body can't tell the difference." These

6    representations are literally false or, at best, reckless and misleading in light of the

7    irrefutable molecular differences between the free-floating monosaccharides

8    fructose and glucose in HFCS and the bonded disaccharide sucrose. The noted

9    representations are likewise literally false or, at best, reckless and misleading in

10   light of scientific studies and analyses, such as those published by Bray, Neilson

11   and the Princeton study, to name just a few. These studies demonstrate a likely

12   causal link between HFCS consumption and obesity, hyperlipidemia, hypertension

13   and other health problems that is not equally presented by the consumption of

14   sucrose.

15       62.    Moreover, the false and/or misleading nature of these representations

16   are demonstrated by past statements of the CRA and some of its members

17   themselves—when it suited them to distinguish HFCS from sugar. For example,

18   the CRA trumpeted (at a hearing in an antidumping investigation conducted by the

19   government of the United Mexican States in the late 1990s) the fundamental

20   physical, chemical and molecular differences between HFCS and sugar.

21       63.    Defendants' false and/or misleading representations of fact violate

22   Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)). Defendants have made and

23   are making these false and/or misleading representations of fact in interstate

24   commercial advertising and/or promotion—in this district and elsewhere—and the

25   effects of Defendants' acts throughout the United States are intended to and do fall

26   upon Defendants in this district and elsewhere.

27       64.    As a result of the foregoing, Plaintiffs have been damaged in an

28   amount that will be ascertained according to proof. Plaintiffs' damages include

1   actual damages in the form of price erosion and lost profits stemming from

2   artificially reduced demand caused by Defendants' false and misleading advertising

3   (whether or not consumer demand has been retained by or driven to HFCS or other

4   competitive sweeteners); the disgorgement of any profits that Defendants unfairly

5   realized, retained or gained through their unlawful conduct; the monetary

6   expenditures that Defendants have made on their false and misleading rebranding

7   campaigns and that Plaintiffs have made and will be required to make on corrective

8   advertising and education to inform the consuming public of the truth; and the costs

9   of this action.

10      65.     Because Defendants made and continue to make their false and/or

11   misleading representations of fact about HFCS in intentional disregard of their

12   falsity and/or misleading nature, Plaintiffs are entitled to an award of enhanced

13   damages under Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)).  Moreover,

14   this is an exceptional case for which the Court should award Plaintiffs' their

15   reasonable attorneys' fees.

16      66.     Defendants' activities have caused and will cause irreparable harm to

17   Plaintiffs for which they have no adequate remedy at law.  In particular,

18   Defendants' past and continuing false and/or misleading representations of fact, as

19   alleged above, are causing irreparable harm, continuing to the foreseeable future,

20   and are a serious and unmitigated hardship.  Plaintiffs will continue to suffer

21   irreparable injury to their goodwill, rights and businesses unless and until

22   Defendants and any others in active concert with them are enjoined from continuing

23   their wrongful acts.

24                    **SECOND CLAIM FOR RELIEF**

25   **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200**

26                **BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

27      67.     Plaintiffs reallege and incorporate by this reference each and every

28   allegation contained in paragraphs 1 through 66 above as if set forth in full here.

68.     California's unfair competition law (the "UCL"), codified in California Business & Professions Code §§17200, *et seq.*, in pertinent part prohibits unfair competition arising from any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.  Defendants' activities alleged above constitute (i) unlawful business acts and/or practices and (ii) unfair, deceptive, untrue and/or misleading advertising under the UCL.

69.     Defendants' violation of Lanham Act section 43(a) (15 U.S.C. §1125(a)), as set forth in the foregoing First Claim for Relief, constitutes an unlawful business act or practice under the UCL.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) (observing the Ninth Circuit's consistent holding that an action for unfair competition under the UCL is "substantially congruent" to a claim under the Lanham Act) (citations omitted); *Kelley Blue Book v. Car-Smarts, Inc.*, 802 F. Supp. 288-89 (C.D. Cal. 1992) (holding that when a plaintiff establishes a Lanham Act violation based on a likelihood of confusion, an independent UCL claim is also established) (citations omitted).

70.     As also alleged above, Defendants have made false and/or misleading representations of fact about HFCS in at least print, Internet and television advertising.  In so doing, Defendants have violated the UCL's prohibition against unfair, deceptive, untrue and/or misleading advertising, independent of Defendants' Lanham Act violations.

71.     Defendants' activities have caused and will cause irreparable harm to Plaintiffs for which they have no adequate remedy at law.  In particular, Defendants' past and continuing false and/or misleading representations of fact, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  Plaintiffs will continue to suffer irreparable injury to their goodwill, rights and businesses unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

a.   That the Court enjoin Defendants from continuing to make false and/or misleading representations of fact about HFCS;

b.   That Defendants pay Plaintiffs damages for the harms they have suffered and continue to suffer as a result of Defendants' false and/or misleading advertising, promotion and/or marketing, reflecting a disgorgement of illicit gains from such advertising, promotion and/or marketing, and providing a corrective advertising award as permitted by law;

c.   That this Court award Plaintiffs three times any damages award pursuant to 15 U.S.C. §1117;

d.   That this case be found to be exceptional within the meaning of 15 U.S.C. §1117;

e.   That the Court award Plaintiffs their costs and expenses of suit, including all reasonable attorneys' fees they have incurred and will incur in this matter;

f.   That the Court award Plaintiffs prejudgment and post-judgment interest; and

g.   That the Court grant Plaintiffs such other and further relief as the Court deems just and proper.

SQUIRE, SANDERS &
DEMPSEY (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071

-22-          FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

      Plaintiffs hereby demand a trial by jury as to all issues so triable.

3

May 23, 2011                     Respectfully submitted,

4

                            SQUIRE, SANDERS & DEMPSEY (US) LLP

5

6

                       By: */s/ Adam R. Fox*
                           Adam R. Fox
                           David S. Elkins

7

8

                     Attorneys for Plaintiffs
                     WESTERN SUGAR COOPERATIVE, MICHIGAN

9

                     SUGAR CO., C & H SUGAR CO., INC., UNITED
                     STATES SUGAR CORPORATION, AMERICAN SUGAR

10

                     REFINING, INC., THE AMALGAMATED SUGAR
                     COMPANY LLC, IMPERIAL SUGAR CORPORATION,
                     MINN-DAK FARMERS COOPERATIVE, THE

11

                     AMERICAN SUGAR CANE LEAGUE U.S.A., INC AND
                     THE SUGAR ASSOCIATION, INC.

12

13

*Additional Counsel for Plaintiffs:*

14

James P. Murphy (*Pro Hac Vice* pending)
James.Murphy@ssd.com

15

John A. Burlingame (*Pro Hac Vice* pending)
John.Burlingame@ssd.com

16

SQUIRE, SANDERS & DEMPSEY (US) LLP
1201 Pennsylvania Ave., N.W., Ste. 500

17

Washington, DC  20004
Telephone:  +1.202.626.6793

18

Facsimile:   +1.202.626.6780

19

20

21

22

23

24

25

26

27

28

SQUIRE, SANDERS &
DEMPSEY (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071

      FIRST AMENDED COMPLAINT

## PROOF OF SERVICE

I, Consuelo Lopez, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 555 S. Flower Street, 31st Floor, Los Angeles, CA  90071.  On May 23, 2011, I served the within document(s):

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR FALSE ADVERTISING IN VIOLATION OF (1) THE LANHAM ACT (15 U.S.C. §1125(a)), AND (2) CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §17200, *ET SEQ.*)**

**JURY TRIAL DEMANDED**

☒       by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

Gail J. Standish
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA  90071-1543

Dan K. Webb
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, CA  60601-9703

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 23, 2011, at Los Angeles, California.

/s/ *Consuelo Lopez*
Consuelo Lopez

LOSANGELES/325892.2