1  Adam R. Fox (State Bar No. 220584)
   Adam.Fox@ssd.com
2  SQUIRE, SANDERS & DEMPSEY (US) LLP
   555 South Flower Street, 31st Floor
3  Los Angeles, CA 90071
   Telephone:   +1.213.624.2500
4  Facsimile:   +1.213.623.4581

5  David S. Elkins (State Bar No. 148077)
   David.Elkins@ssd.com
6  SQUIRE, SANDERS & DEMPSEY (US) LLP
   600 Hansen Way
7  Palo Alto, CA 94304
   Telephone:  +1.650.856.6500
8  Facsimile:   +1.650.843.8777

9  [Additional Counsel Identified On Signature Page]

10 Attorneys for Plaintiffs WESTERN SUGAR COOPERATIVE,
   MICHIGAN SUGAR CO., C & H SUGAR CO., INC., UNITED
11 STATES SUGAR CORPORATION, AMERICAN SUGAR
   REFINING, INC., THE AMALGAMATED SUGAR COMPANY
12 LLC, IMPERIAL SUGAR CORPORATION,
   MINN-DAK FARMERS COOPERATIVE,
13 THE AMERICAN SUGAR CANE LEAGUE U.S.A., INC AND
   THE SUGAR ASSOCIATION, INC.

14

15                   UNITED STATES DISTRICT COURT

16                  CENTRAL DISTRICT OF CALIFORNIA

17 WESTERN SUGAR COOPERATIVE, a        Case No. CV11-3473 CBM (MANx)
   Colorado cooperative, MICHIGAN
18 SUGAR COMPANY, a Michigan           **SECOND AMENDED
   corporation, and C & H SUGAR        COMPLAINT FOR DAMAGES
19 COMPANY, INC., a Delaware           AND INJUNCTIVE RELIEF FOR
   corporation, UNITED STATES SUGAR    FALSE ADVERTISING
20 CORPORATION, a Florida corporation, IN VIOLATION OF
   AMERICAN SUGAR REFINING, INC.,      THE LANHAM ACT
21 a Delaware corporation, THE         (15 U.S.C. §1125(a))**
   AMALGAMATED SUGAR COMPANY
22 LLC, a Delaware limited liability   **JURY TRIAL DEMANDED**
   company, IMPERIAL SUGAR
23 CORPORATION, a Texas corporation,
   MINN-DAK FARMERS
24 COOPERATIVE, a North Dakota
   Cooperative Association, THE
25 AMERICAN SUGAR CANE LEAGUE
   OF THE U.S.A., INC., a Louisiana Non-
26 Profit Corporation, and THE SUGAR
   ASSOCIATION, INC., a Delaware
27 corporation,

28                Plaintiffs,

SQUIRE, SANDERS &
DEMPSEY (US) LLP
155 South Flower Street, 31st Floor
Los Angeles, CA 90071

COPY

SECOND AMENDED COMPLAINT

1      vs.

2      ARCHER-DANIELS-MIDLAND
       COMPANY, a Delaware corporation,
3      CARGILL, INC., a Delaware corporation,
       CORN PRODUCTS INTERNATIONAL,
4      INC., a Delaware corporation, THE
       CORN REFINERS ASSOCIATION,
5      INC., a Delaware corporation,
       ROQUETTE AMERICA, INC., a
6      Delaware corporation, and TATE &
       LYLE INGREDIENTS AMERICAS,
7      INC., a Delaware corporation,

8                    Defendants.

9

10         Western Sugar Cooperative, Michigan Sugar Company, C&H Sugar

11    Company, Inc., United States Sugar Corporation, American Sugar Refining, Inc.,

12    The Amalgamated Sugar Company LLC, Imperial Sugar Corporation, Minn-Dak

13    Famers Cooperative, The American Sugar Cane League of the U.S.A., Inc. and The

14    Sugar Association, Inc. (collectively "Plaintiffs") hereby allege as follows.

15                            **PROLOGUE**

16         1.    Since researchers first synthesized it for commercial use within the

17    processed food industry in the late 1960s, the use and consumption of high-fructose

18    corn syrup—or "HFCS"—has become nearly ubiquitous in American beverages

19    and food.  In recent years, scientists and other observers noted that this dramatic

20    growth in the use of HFCS, which increased by over 1000% between 1970 and

21    1990, bears a strong temporal relationship to the growth in American obesity.  After

22    some researchers began to publish hypotheses based on testing of a potential causal

23    relationship between the dramatic, concurrent rises in HFCS consumption and

24    obesity, HFCS sales began a steady and sustained decline.

25         2.    Consumers increasingly seek to avoid food and drink containing HFCS

26    given the emerging science linking it to possible nutritional and health problems,

27    including obesity but also extending to a wide range of metabolic conditions.  Other

28    consumers avoid HFCS out of a desire to confine their diets to natural foods and

                                    SECOND AMENDED COMPLAINT

1   fulfill their desire for sweeteners through sugar from cane and beet plants.

2   Responding to consumer preferences, more and more food manufacturers have

3   replaced HFCS with sugar—and at the same time promoted their products' use of

4   "real sugar" or the absence of HFCS.

5          3.     The HFCS industry has not taken the decrease in sales lightly.  Instead,

6   the Corn Refiners Association ("CRA"), at the direction of and in concert with

7   several of its member companies (collectively "Defendants"), crafted a publicity

8   campaign to revitalize and rebrand HFCS.  This ongoing, evolving effort has

9   already manifested in a variety of different strategies, including the promotion of

10  HFCS as "natural" and the assertions of equivalence between HFCS and sugar—

11  such as "sugar is sugar," "your body can't tell the difference" and claims that HFCS

12  is "nutritionally the same as table sugar."  Defendants have even pursued the more

13  drastic approach of attempting to eliminate HFCS from the lexicon.  Several have

14  even recently referred to it in their own advertising and pricing sheets as "corn

15  sugar" and are seeking to obtain United States Food and Drug Administration

16  ("FDA") approval to substitute "corn sugar" for "high fructose corn syrup" on

17  ingredient labels.

18         4.     Seeking to sidestep growing consumer sentiment by co-opting the

19  goodwill of "sugar"—and even changing HFCS's name by calling it a kind of sugar

20  —constitutes paradigmatically false and misleading advertising for several reasons.

21         5.     First, "corn sugar" is already the FDA-approved name of a distinct

22  sweetener made from corn starch, and has been for decades.  Seeking to appropriate

23  the name of an existing, vastly different sweetener sends to the consuming public a

24  literally false message about the nature of the product being advertised and sold,

25  and misleads them in a manner that will cause confusion.

26         6.     Second, Defendants' re-branding efforts promoting HFCS as

27  "natural"—despite the absence of any naturally occurring fructose in corn or corn

28  starch and the fact that HFCS is a man-made product that did not even exist in

1   commerce until the late 1960s—is also literally false and misleads consumers in a
2   manner that will cause confusion.

3       7.    Third, Defendants' assertions that HFCS or "corn sugar" is
4   nutritionally the same as the real sugar from cane and beet plants and handled in the
5   same way by the body are also literally false and mislead consumers in a manner
6   that will cause confusion.  Scientific studies demonstrate clear molecular
7   differences between HFCS and sugar and clear differences in how the human body
8   processes them.  Additionally, scientific studies demonstrate an increasingly likely
9   link between consumption of HFCS and a variety of health problems, principally
10  obesity, diabetes, elevated cholesterol and triglycerides, and also extending to other
11  metabolic disorders.

12      8.    Defendants' representations equating HFCS with real sugar—such as
13  "sugar is sugar," "your body can't tell the difference" and "nutritionally the same as
14  table sugar"—mislead the consuming public in light of the indisputable molecular
15  differences between HFCS and real sugar, and emerging science showing the (at
16  best) uncertainty as to the truth of Defendants' statements that HFCS and real sugar
17  are no different from a health standpoint.

18      9.    Defendants' resort to such literally false and misleading statements
19  harms consumers, harms the makers of real sugar and harms any dialogue based on
20  the truth.  This lawsuit seeks to put an end to the deception.

21                      **JURISDICTION AND VENUE**

22      10.   The Court has jurisdiction over the subject matter presented by this
23  Complaint because it includes a claim of false advertising under the Lanham Act,
24  15 U.S.C. §§1051, *et seq.*, including 15 U.S.C. §1121, which expressly provides
25  that claims arising thereunder are subject to federal subject matter jurisdiction.  The
26  Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338.

27      11.   Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because
28  a substantial part of the events or omissions giving rise to Plaintiffs' claims

1    occurred in this district and because defendants are subject to personal jurisdiction

2    in this District.

3                                    **PARTIES**

4                                    *Plaintiffs*

5        12.    Plaintiff C & H Sugar Company, Inc. ("C&H"), a sugar producer,

6    refiner and distributor, is a corporation organized under the laws of the State of

7    Delaware, having a principal place of business at 830 Loring Avenue, Crockett, CA

8    94525.

9        13.    Plaintiff Michigan Sugar Company ("Michigan Sugar"), also a sugar

10   processor, producer and distributor, is a non-profit agricultural cooperative

11   corporation organized under the laws of the State of Michigan, having a principal

12   place of business located at 2600 South Euclid Avenue, Bay City, MI 48706.

13       14.    Plaintiff Western Sugar Cooperative ("Western Sugar"), also a sugar

14   processor, producer and a distributor, is a cooperative organized under the laws of

15   the State of Colorado, having a principal place of business at 7555 East Hampden

16   Avenue, Suite 600, Denver, CO 80231.

17       15.    Plaintiff United States Sugar Corporation ("U.S. Sugar"), also a sugar

18   processor, producer and distributor, is a corporation organized under the laws of the

19   State of Florida, having a principal place of business at 111 Ponce de Leon Avenue,

20   Clewiston, FL 33440.

21       16.    Plaintiff American Sugar Refining, Inc. ("American Sugar"), also a

22   sugar processor, producer and distributor, is a corporation organized under the laws

23   of the State of Delaware, having a principal place of business at 1 Federal Street,

24   Yonkers, NY 10705.

25       17.    Plaintiff The Amalgamated Sugar Company LLC ("Amalgamated"),

26   also a sugar processor, producer and distributor, is a limited liability company

27   organized under the laws of the State of Delaware, having a principal place of

28   business at 1951 S. Saturn Way, Suite 100, Boise, ID 83709.

SQUIRE, SANDERS &
DEMPSEY (US) LLP
155 South Flower Street, 31st Floor
Los Angeles, CA  90071

                                  -4-        SECOND AMENDED COMPLAINT

18.     Plaintiff Imperial Sugar Corporation ("Imperial"), also a sugar processor, producer, refiner and distributor, is a corporation organized under the laws of the State of Texas, having a principal place of business at 8016 Highway 90A, Sugar Land, TX 77478.

19.     Plaintiff Minn-Dak Farmers Cooperative ("Minn-Dak"), also a sugar processor, producer and a distributor, is a cooperative association organized under the laws of the State of North Dakota, with a principal place of business at 7525 Red River Road, Wahpeton, ND 58075.

20.     Plaintiff The American Sugar Cane League of the U.S.A., Inc. (the "American Sugar Cane League") is a non-profit corporation Louisiana organized under the laws of the State of Louisiana, with a principal place of business located at 206 East Bayou Road, Thibodaux, LA, 70301.  The American Sugar Cane League is a trade association comprised of 450 sugar cane growers and eleven (11) raw sugar refiners, all located in Louisiana.  Its principal missions on behalf of its members include research, legislative activity, product promotion, consumer education and public relations.  Each member of the American Sugar Cane League competes against the members of the CRA in the sweetener industry.  Preventing the public from being misinformed about sugar is germane to the American Sugar Cane League's purpose.

21.     Plaintiff The Sugar Association, Inc. ("The Sugar Association") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 1300 L Street, NW, Suite 1001, Washington, DC 20005.  The Sugar Association is a trade group comprised of eleven (11) member companies, each of whom is a grower and/producer of sugar in the United States.  Part of The Sugar Association's mission is to promote the consumption of sugar as part of a healthy diet and lifestyle through the use of science and research.  Preventing the public from being misinformed about sugar is germane to The Sugar Association's

//

purpose.  Each member of The Sugar Association competes in the sweetener industry against the members of the CRA.

### Defendants

22.     Defendant The Corn Refiners Association, Inc. ("CRA") is a Delaware corporation with a principal place of business located at 1701 Pennsylvania Ave. NW, Suite 950, Washington, DC 20006.  The CRA is a national trade association that represents the interests of the corporate members of the corn refining industry. On information and belief, the CRA was formed by and for its members, maintains its existence subject to their support, and is funded by them to act subject to their direction and control in promoting their shared economic interests.  The CRA members' business interests include the manufacture, promotion, and sale of HFCS.

23.     Defendant Archer-Daniels-Midland Company ("ADM") is a Delaware corporation with a principal place of business located at 4666 Faries Parkway, Box 1470, Decatur, IL 62525.  ADM is a CRA member.  Upon information and belief, the following two ADM officers are members of the CRA Board of Directors: (i) Dennis C. Riddle, ADM's corporate Vice President and President of ADM's Corn Processing Division; and (ii) Mark A. Bemis, ADM's corporate Senior Vice President and President of ADM's Corn Business Unit.  In 2010, Mr. Riddle was the Chairman of the CRA Board of Directors.

24.     Defendant Cargill, Inc. ("Cargill") is a Delaware corporation with a principal place of business located at PO Box 9300, Minneapolis, MN 55440-9300. Cargill is a CRA member.  Upon information and belief, the following two Cargill officers are members of the CRA Board of Directors: (i) Alan D. Willits, Cargill's President; and (ii) Jeff A. Cotter, Cargill's Assistant Vice President of Business Development.  Mr. Willits is the current Chairman of the CRA Board of Directors.

25.     Defendant Corn Products International, Inc. ("Corn Products") is a Delaware corporation with a principal place of business located at 5 Westbrook Corporate Center, Westchester, IL 60154.  Corn Products is a CRA member.  Upon

information and belief, the following two officers of National Starch LLC ("National Starch")—a Corn Products subsidiary—are members of the CRA Board of Directors: (i) Richard N. Kyle, National Starch's Vice President of Business Planning and Services; and (ii) Terry W. Thomas, National Starch's corporate Vice President. Mr. Kyle is the current Vice Chairman of the CRA Board of Directors.

26.     Defendant Roquette America, Inc. ("Roquette") is a Delaware corporation with a principal place of business located at 1417 Exchange St., Keokuk, IA 52632. Roquette is a CRA member. Upon information and belief, the following Roquette officer and senior executive are members of the CRA Board of Directors: (i) Dominique D.P. Taret, Roquette's President and CEO; and (ii) Richard A. O'Hara, Roquette's Senior Director of Specialties Operations and Plant Manager.

27.     Defendant Tate & Lyle Ingredients Americas, Inc. ("Tate & Lyle") is a Delaware corporation with a principal place of business located at 2200 East Eldorado St., Decatur, IL 62525. Tate & Lyle is a CRA member. Upon information and belief, the following two Tate & Lyle officers are members of the CRA Board of Directors: (i) J. Patrick Mohan, Tate & Lyle's President of Corporate Services and (ii) Matthew D. Wineinger, Tate & Lyle's President of Bulk Ingredients.

28.     The governing body of the CRA is its Board of Directors, which includes and is dominated by two decision-making individuals from each of the other Defendants—ADM, Cargill, Corn Products, Roquette, and Tate & Lyle (collectively, the "Member Companies"). Each of the persons on its Board of Directors spends, on average, between two and five hours each week (*i.e.*, upwards of 260 hours annually) working on CRA business, including the challenged advertising campaign. Certain decisions of the CRA Board of Directors— including, on information and belief, the decisions to launch and fund the multimillion dollar advertising campaign targeted by this action as well as the day-

1   to-day details about such matters as the advertising's content—are subject to the

2   approval of the Member Companies themselves.

3       29.     The right to and actual exercise of control over the CRA by the

4   Member Companies is unsurprising in light of, among other things, the fact that

5   they provide the CRA with the overwhelming majority of regular membership dues

6   and other money, including special assessments earmarked to fund the advertising

7   challenged in this amended complaint.  The Member Companies' representatives

8   also constitute the overwhelming majority of the voting members of the CRA's

9   Board of Directors.  The Member Companies thus enjoy both the actual power and

10  right to control and authorize all significant decisions made and actions taken by the

11  CRA, including those resulting in the advertising challenged in this amended

12  complaint.  Upon information and belief, both the CRA and the Member

13  Companies assent to the right of the CRA members to control the CRA in this way,

14  in particular with respect to the advertising challenged in this action.

15                    **FACTUAL BACKGROUND**

16               *What Is High-Fructose Corn Syrup?*

17      30.     High-fructose corn syrup, or HFCS, is a nearly ubiquitous commercial

18  sweetener used in a variety of products, with soft drinks among the best known.

19  Despite the presence of "corn" in the product's full name, HFCS is not a natural

20  product—one cannot simply extract it from an ear or stalk of corn.  Rather, corn

21  yields corn starch, which is commonly used in kitchens as a thickening agent.  Corn

22  starch can be turned into corn syrup, which, as its name implies, is a class of

23  viscous liquids containing various amounts of dextrose, also known as glucose.

24  Corn starch can also be turned into "corn sugar," which the FDA identifies as a

25  foodstuff "produced by the complete hydrolysis of corn starch with safe and

26  //

27  //

28  //

1  suitable acids or enzymes, followed by refinement and crystallization."[1]  Corn sugar
2  is almost 100% dextrose.

3      31.    The only sweetener that may be labeled simply as "sugar" is the natural
4  sucrose found in sugar cane and sugar beet plants.[2]  Sucrose is an organic
5  disaccharide consisting of equal parts glucose and fructose chemically joined by a
6  type of covalent bond known as a glycosidic bond.  Humans have used sugar for
7  millennia to sweeten food and drink.

8      32.    HFCS is a man-made product.  It has been commercially available only
9  since the late 1960s, when Japanese researchers discovered a method of
10 enzymatically transforming some of the glucose in corn syrup into fructose that
11 does not naturally occur in the plant.  The glucose and fructose that primarily
12 comprise HFCS are monosaccharides, lacking the glycosidic molecular bond found
13 in the organic sucrose molecule.  Free fructose is highly soluble in water and makes
14 bread crusts browner, cookies softer and everything sweeter.[3]  As a result, over the
15 past 40 years HFCS has rapidly become a staple in food and beverage production,
16 particularly in the United States.

17              ***The Rise of HFCS Mirrors the Rise of the Obesity Epidemic***

18      33.    At least as early as 2003, the United States Surgeon General, testifying
19 before a House subcommittee, warned of "a health crisis affecting every state,
20 every city, every community, and every school across our great nation.  [¶]  The
21 crisis is obesity.  It's the fastest-growing cause of disease and death in America."[4]

22      34.    The obesity epidemic in the United States has received considerable
23 attention over the past few years—with good reason.  In 1970, about 15 percent of
24 the United States population met the definition for obesity.  Since 1970, obesity
25 rates have skyrocketed, as shown in the chart on the top of the following page:

26  [1] 21 C.F.R. 184.1857.
    [2] 21 C.F.R. 184.1854.
27  [3] E. Neilson, *The Fructose Nation*, 18 J. Am. Soc. Nephrology 2619 (2007) ("Neilson").
    [4] http://www.surgeongeneral.gov/news/testimony/obesity07162003.htm.
28





*Overweight and Obesity Statistics*, U.S. Dept. Health & Human Servs., Nat'l Insts. Health (Feb. 2010) (http://win.niddk.nih.gov/publications/PDFs/stat904z.pdf). From 1980 to 2002 alone, obesity rates doubled; about one-third of the adult population was deemed obese as of 2006.[5]

35.    Although many factors have been identified as potential causes of the obesity epidemic, one major nutritional aspect that has come under scrutiny is the commercial use of HFCS, which experienced its rapid ascent during the same time period.  Indeed, from 1970 to 1990, consumption of HFCS increased over 1000%, "far exceeding the changes in intake of any other food or food group.  HFCS now represents > 40% of caloric sweeteners added to foods and beverages and [as of 2004 was] the sole caloric sweetener in soft drinks in the United States."[6]

36.    The existence of an association between the obesity epidemic and the meteoric rise in HFCS consumption has increasingly been the focus of attention by medical, health and food science researchers and by consumers.  In 2004, a landmark scientific report articulated the association in, among other things, the stark terms the appear on the top of the following page:

//

---

[5] C. Ogden, et al., Prevalence Of Overweight And Obesity In The United States, 1999–2004, 295:13 J. Am. Med. Ass'n 1549–55 (2006).
[6] G. Bray, et al., Consumption Of High-Fructose Corn Syrup In Beverages May Play A Role In The Epidemic Of Obesity, 79 Am. J. Clinical Nutrition 537 (2004) ("Bray").

The increased use of HFCS in the United States mirrors the rapid increase in obesity. The digestion, absorption, and metabolism of fructose differ from those of glucose. . . . Hepatic metabolism of fructose favors de novo lipogenesis. In addition, unlike glucose, fructose does not stimulate insulin secretion or enhance leptin production. Because insulin and leptin act as key afferent signals in the regulation of food intake and body weight, this suggests that dietary fructose may contribute to increased energy intake and weight gain. Furthermore, calorically sweetened beverages may enhance caloric overconsumption. Thus, the increase in consumption of HFCS has a temporal relation to the epidemic of obesity, and the overconsumption of HFCS in calorically sweetened beverages may play a role in the epidemic of obesity.[7]

37.   The precise role of HFCS in the obesity epidemic, as well as its contribution to a variety of health problems, is still the subject of scientific debate. Nevertheless, numerous researchers have identified as part of the likely problem the added fructose in the human diet, estimated to have "increased nearly 30% between 1970 and 2000."[8] It is noted that "[f]ructose is metabolized differently than glucose," and as a result can lead to insulin resistance (a precursor to diabetes), increased hypertension, and accelerated endothelial dysfunction, which can aggravate heart disease. "What we end up with is a familiar caloric additive provoking a new spate of metabolic dysfunction."[9]

---

[7] Bray, *supra* note 6, at 537.
[8] *Id.*
[9] Neilson, *supra* note 3, at 2619.

SQUIRE, SANDERS & DEMPSEY (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071

-11-        SECOND AMENDED COMPLAINT

38.     Although some have sought to spread the blame to reach sugar as well as HFCS, the results of a Princeton University study published in 2010 provide evidence that sucrose and HFCS have different effects on the body.[10]   Researchers observed that rats fed HFCS-55 (the kind commonly used in sweetened beverages) gained "significantly more body weight" than those fed sucrose—despite each control group consuming the same calories.  "This increase in body weight with HFCS was accompanied by an increase in adipose fat, notably in the abdominal region, and elevated circulating triglyceride levels.  Translated to humans, these results suggest that excessive consumption of HFCS may contribute to the incidence of obesity."

39.     Observing that "HFCS is different than sucrose in many ways," the Princeton study identified several important differences between the two sweeteners that may account for the study's results and conclusion recited above.  Among other noted differences:

- The fructose content of HFCS-55 is slightly higher than in sucrose;[11]
- Fructose is absorbed further down the intestine than glucose, with much of its metabolism in the liver, where it is converted to a precursor to the backbone of the triglyceride molecule;
- The free fructose in HFCS is metabolically broken down before it reaches the rate-limiting enzyme that prevents the unregulated increase in glycerol and fatty acids that are absorbed by adipose tissue; and

//

//

---

[10] M. Bocarsly, et al., High-Fructose Corn Syrup Causes Characteristics Of Obesity In Rats: Increased Body Weight, Body Fat And Triglyceride Levels, Pharmacol. Biochem. Behav. (2010) (the "Princeton study").
[11] An even more recent publication by researchers from the University of Southern California demonstrated that tested beverages sweetened with HFCS had a mean fructose content higher than 55%, with several major brands apparently produced with HFCS that is 65% fructose. *See* Ventura, et al., Sugar Content of Popular Sweetened Beverages Based on Objective Laboratory Analysis: Focus on Fructose Content, Obesity J. (Oct. 2010).

- HFCS bypasses the insulin-driven satiety system, suppressing "the degree of satiety that would normally ensue with a meal of glucose or sucrose, and this could contribute to increased body weight."[12]

40.    The Princeton study is not alone in observing these distinctions between HFCS and sucrose; other researchers have observed and published scholarly articles about such differences.  Even those researchers who have published testing suggesting alternative conclusions have readily admitted that the comparative analysis of HFCS and sucrose (at a minimum) remains the subject of debate and further analysis.  Whatever the final analysis may show regarding the metabolic effects of these different foodstuffs, your body can tell the difference between HFCS and real sugar because of differences in their taste profiles.

### The HFCS Backlash Causes Sales To Drop

41.    As the sampling of scientific literature shown above demonstrates, HFCS has become the focus of a maelstrom of events and serious research requiring a reassessment of its use:  the obesity epidemic's rise and concurrent rise in HFCS consumption; scientific research pointing to HFCS's likely role in obesity and other health problems; and an overall consumer preference for natural, as opposed to man-made, foodstuffs.

42.    Consumer concern regarding the presence of HFCS in food and drinks is palpable.  For example, market research firm The NPD Group, Inc., in a 2008 survey of consumer food safety concerns, reported that 58% of those surveyed listed HFCS as a food safety concern—just under the level of concern about mad cow disease (65%) and ahead of consumer concern over the use of bovine growth hormone in milk-producing cows (54%).[13]

//

//

---

[12] Princeton study, *supra* note 10, at 105.
[13] http://www.npd.com/press/releases/press_090330.html.

43.     Growing consumer concern about and reassessment of HFCS has already led a growing number of food and beverage producers to replace it with sugar.  For example, on May 17, 2010, www.msnbc.com issued the report below:

> ConAgra Foods Inc. has removed high fructose corn syrup from its Hunt's brand ketchup.  Shoppers have been shying away from high-fructose corn syrup due to health concerns, and it was consumer demand that drove the changes, said Hunt's brand manager Ryan Toreson. Hunt's is the latest brand to make the shift.  PepsiCo Inc. removed all high-fructose corn syrup from sports drink Gatorade and replaced it with cane sugar.[14]

44.     Food and beverage producers switching from HFCS to sugar have been doing so with consumer preferences and concerns in mind, as shown by the promotion of "real sugar" and/or the absence of HFCS in products, as the examples below show.

   

45.     The growing concern over HFCS has thus led to its decreased sales. Since the United States Surgeon General's testimony to Congress in 2003 warning //

---

[14] http://www.msnbc.msn.com/id/37189171/ns/business-consumer_news/.

of the rising obesity epidemic through the filing of the original complaint in this case in April 2011, sales of HFCS had declined 11%.[15]

### The Defendants' $50 Million Campaign To Remake HFCS Into "Corn Sugar"

46.     Evidently alarmed by the growing vilification of HFCS and resulting drop in sales, on information and belief, the CRA's Member Companies conspired to exercise their collective right and actual power to control the CRA as their agent in an attempt to turn consumer sentiment around beginning in or about June 2008. Upon information and belief, the Member Companies either used regular meetings of the CRA Board of Directors or separate meetings conducted contemporaneous with such regular meetings (or both) to collaborate in the formation of a common scheme to authorize, develop, and fund an advertising campaign to promote HFCS as "natural," make assertions of equivalence between HFCS and sugar—such as "sugar is sugar," "your body can't tell the difference" and claims that HFCS is "nutritionally the same as table sugar"—and additionally to rebrand HFCS as "corn sugar."

47.     The Member Companies orchestrated these acts largely through their control and domination of the CRA, and authorized the CRA to receive from them the necessary funding for such an advertising campaign. This funding exceeded the CRA's regular total revenue many times over. Upon information and belief, each of the Member Companies had to authorize the CRA to proceed with this course of conduct and also had to authorize special assessments necessary to design, develop, and sustain the advertising campaign, all subject to the Member Companies' approval. On information and belief, each of the Member Companies independently evaluated whether the advertising campaign would advance its own economic interests and approved the funding, creation, and development of the campaign and its particular messaging. Upon information and belief, each of the

---

[15] UDSA Economic Research Service, Corn Sweetener Supply, Use, and Trade, Table 30: U.S. High Fructose Corn Syrup (HFCS) Supply and Use, by Calendar Year.

SQUIRE, SANDERS &
DEMPSEY (US) LLP
155 South Flower Street, 31st Floor
Los Angeles, CA 90071

Member Companies provided the necessary authorization because, among other things, it determined that the promotion of HFCS would advance its economic interests.

48.      The Member Companies' placement of their own senior executives onto the CRA's Board of Directors—and specifically in positions of authority and governance of that board—facilitates the Member Companies' exercise of their right to control and approve of the CRA's decisions and actions.  The CRA recognizes that the members of its Board of Directors act as the representatives and agents of the Member Companies.  The Board of Directors gives the Member Companies a means to provide their individual input and to control through their orchestrated actions the decisions of that board.  Recognizing this right to exercise such power, control and domination, specifically as it relates to the advertising campaign challenged in this amended complaint, the CRA has publicly acknowledged working with the Member Companies on the campaign.

49.      The Member Companies exercise their right of control over the CRA's marketing efforts and other activities in multiple ways.  One way is through their placement of high-ranking Member Company executives on the CRA Board of Directors.  Another way is by subjecting certain decisions (including, on information and belief, the decisions to fund, design, and launch the challenged false advertising campaign) of the CRA's Board of Directors to the approval of the CRA members themselves.  The Member Companies provide the funding that has been required to orchestrate and maintain this significant, broad-based, national media, multimillion dollar advertising campaign.

50.      Upon information and belief, in each year of the challenged advertising, the Member Companies have reaffirmed their approval of the challenged advertising by authorizing continued funding for it.  Upon information and belief, in 2008, the Member Companies collectively provided approximately $13 million for the false advertising campaign.  Upon information and belief, the

1   Member Companies' funding of the false advertising campaign has exceeded that

2   $13 million initial investment in each of the years 2009, 2010 and 2011.  The

3   annual funding of the false advertising campaign is many multiples of the CRA's

4   ordinary annual operating revenue.

5        51.     According to the New York Times, the CRA, at the direction of its

6   Member Companies, and working with its ad agency DDB and a team at Ogilvy

7   Public Relations, had by May 2010, already "plowed more than $30 million over

8   the last two years into an ad campaign called 'Sweet Surprise' that highlights what

9   it says are vague and unsubstantiated opinions."[16]

10       52.     The "Sweet Surprise"

11  campaign features a website dedicated

12  to the re-branding effort

13  (www.sweetsurprise.com), Internet

14  banner advertising, exhibitions at

15  professional organizations, TV

16  commercials and print ads, such as the

17  one at right.  The campaign attempts to

18  recast HFCS as a natural product,

19  nutritionally identical and directly

20  comparable to sugar.  As the ad to the

21  right claims, HFCS is "natural,

22  nutritionally the same as table sugar

23  and has the same number of calories."



24       53.     The Member Companies have also taken separate actions to promote,

25  endorse and ratify these messages of the campaign they otherwise controlled and

26  ran through the CRA.  Among other things, the campaign and its messages are

27  _____

28  [16] http://www.nytimes.com/2010/05/02/business/02syrup.html?ref=corn&pagewanted=all

1    touted on several of the Member Companies' official websites. The Cargill and

2    Corn Products websites, for example, provide direct links to the "Sweet Surprise"

3    campaign website to expand exposure to and the audience for the false advertising

4    campaign. Cargill, and others, including Tate & Lyle, have also used

5    spokespersons to disseminate the advertising theme that HFCS is no different than

6    sugar. ADM, Corn Products, and, upon information and belief, the other Member

7    Companies, have similarly repeated, endorsed, and ratified the messaging of the

8    advertising campaign in direct communications to customers, ranging from detailed

9    presentations to simple correspondence. These communications tout the notions

10   that HFCS is natural and metabolically and nutritionally the same as real sugar,

11   advise customers about purported trends in the sweetener industry that support

12   choosing HFCS over the real sugar extracted from sugar canes and sugar beets, and

13   otherwise advance the false advertising campaign.

14       54.     Despite Defendants' "Sweet Surprise" campaign, HFCS sales

15   continued to slump into the second half of 2010. The CRA and the Member

16   Companies thus re-doubled their re-branding effort. While continuing to label

17   HFCS as "natural" and "the same as sugar"—despite not being found in nature and

18   despite the clear molecular differences between the two—the CRA and its members

19   sought to change consumers' attitudes by obtaining FDA approval to change the

20   product's name so that consumers will no longer see "high fructose corn syrup"

21   listed as an ingredient on food and drink labels. Rather, consumers would see the

22   name of a different sweetener: "corn sugar."

23       55.     Corn sugar and HFCS are not the same. The FDA and food industry

24   have long recognized corn sugar as dextrose in crystalline form, derived from corn

25   starch. HFCS, on the other hand, is a processed syrup mixture created by

26   enzymatically converting dextrose into varying amounts of fructose, the percentage

27   of which can be controlled according to the preferred industrial use (e.g., HFCS-42,

28   HFCS-55 and HFCS-90, containing 42%, 55% and 90% fructose, respectively).

HFCS likewise has long been known by its name in the food industry.  Indeed, the corn-refining industry itself proposed the name "high fructose corn syrup" to the FDA in a 1977 petition.  The FDA approved that label in 1983, and reaffirmed it in 1996 as part of the FDA's comprehensive review of sugar and syrup sweeteners.[17]

56.     Despite having proposed the FDA-approved label for HFCS over thirty years ago, Defendants, acting through the CRA, submitted a "citizen's petition" to the FDA on September 14, 2010 to change the name of HFCS.  Acknowledging that FDA regulations provide that "corn sugar" is the approved label for a real and distinct corn starch product, Defendants' petition asks that the FDA radically change that agency's long-standing labeling system for sugars and syrups.  In particular, Defendants want the FDA to allow them to appropriate the name of the authentic corn sugar product so that they can re-label HFCS as "corn sugar." Defendants did not make their request to more closely associate their product with corn.  Rather, Defendants' request seeks to appropriate the goodwill of natural sugar.

57.     Defendants' pending FDA petition received considerable media scrutiny when submitted,[18] and the FDA has received a large volume of public comments regarding the petition—more than 10-1 against the change.

58.     Defendants, however, were not content to proceed through FDA or other formal channels to obtain approval to use their desired "corn sugar" label. Rather, they simply appropriated the name at the same time they submitted their petition to the FDA and began using it in advertising and other documentation.  In

//

---

[17] 48 Fed. Reg. 5,716 (Feb. 8, 1983); 61 Fed. Reg. 43,447 (Aug. 23, 1996).
[18] *See, e.g., A New Name for Corn Syrup*, N.Y. Times (Sept. 14, 2010),
http://well.blogs.nytimes.com/2010/09/14/a-new-name-for-high-fructose-corn-syrup/#;
*Corn Refiners Left with Bitter Taste Over Sugar*, Financial Times (Sept. 17, 2010),
http://www.ft.com/cms/s/0/fcf19a16-c280-11df-956e-00144feab49a.html#axzz1JvvLCdly;
*"Corn Sugar" Makers Hope You'll Buy the New Name*, NPR (Sept. 19, 2010),
http://www.npr.org/templates/story/story.php?storyId=129971532.

other words, despite recognizing the need for FDA approval to re-brand HFCS, Defendants simply started using "corn sugar" without waiting for such approval.[19]

59.     In its "reply to comments" letter submitted to the FDA on April 4, 2011, the CRA, responding on behalf of itself and the Member Companies, states:

> When CRA filed its citizen petition, it conducted a nation-wide high profile campaign in connection with the petition.  This campaign has garnered more than 1.6 billion impressions in major broadcast and print media. *CRA is also continuously running national, educational television commercials that equate HFCS and corn sugar. These commercials have earned in excess of 2 billion impressions since September 2010.*  (Emphasis added.)

60.     Thus, the CRA and its Member Companies continued the rebranding efforts begun in 2008, by using the term "corn sugar" in their advertising, price lists and other documentation.  On information and belief, the CRA and Member Companies have thereby added to their investment to rebrand HFCS so that their total expenditure thus far is equal to or greater than $50 million.  The changed focus of all Defendants' re-branding effort is evident from the promotional statements on the CRA's www.corn.org and www.sweetsurprise.com websites (with emphases added):

- *"It is important that consumers recognize added sugars in the diet. Despite its confusing name, <u>high fructose corn syrup</u> is simply <u>corn sugar</u> - or an added sugar in the diet."*

//

---

[19] To ensure the absence of any misunderstanding, Plaintiffs' claim is not based on the CRA's citizen petition to the FDA.  Plaintiffs' claim is exclusively based on Defendants' advertising and related documents and statements, as alleged herein.

- *"High fructose corn syrup is simply a kind of corn sugar. It has the same number of calories as sugar and is handled similarly by the body."*
- *"High fructose corn syrup is simply a kind of corn sugar that is handled by your body like sugar or honey."*
- *"Whether it's corn sugar or cane sugar, your body can't tell the difference. Sugar is sugar."*

61.     The Member Companies have also ratified the rebranding of HFCS as "corn sugar," through their separate and repetitive use of the term "corn sugar" in place of HFCS.  Tate & Lyle, for example has used the phrase "corn sugar" to denote HFCS in presentations, annual reports, pricing sheets and other communications directed to customers and investors.  ADM, Cargill, and Corn Products have also used the phrase "corn sugar" to denote HFCS in pricing sheets and in other communications.  On information and belief, each of the Member Companies, approved of and has ratified this marketing ploy by using the phrase "corn sugar" to denote HFCS, as well as the other aspects of the challenged false advertising.

62.     Also, as with the other aspects of the challenged advertising campaign, in speeches and publications, individual Member Companies (sometimes through senior executives or other authorized spokespersons) have endorsed, supported and ratified the name change from "HFCS" to "corn sugar."  For example, Mr. Willits of Cargill has expressed his company's motivation for supporting the use of the "corn sugar" terminology to reinforce the notion that HFCS is the same as real sugar.  Upon information and belief, other Member Companies also have similarly engaged and continue to engage in efforts to advance this rebranding in furtherance of the Member Companies' and the CRA's common plan to deceive the public and thereby influence the Member Companies' customers to purchase and include HFCS in their food and beverage products rather than real sugar.

63.     The Sweet Surprise campaign and "corn sugar" rebranding efforts are false and misleading.  In short and contrary to the challenged advertising:

- HCFS is a man-made product not found in nature;
- Science shows that HFCS and real sugar are chemically different, and emerging science strongly suggests the body processes HFCS differently than it does real sugar;
- Despite the need for FDA approval (that they have not received) to re-label HFCS and despite the decades-old use of the FDA-approved name "corn sugar" for a completely different product, the Defendants have begun re-branding HFCS as "corn sugar";
- Consumer attitudes have been and are changing about the consumption of HFCS, resulting in food manufacturers increasingly using sugar in place of HFCS; and
- HFCS sales have consequently been in decline for several years.

Given these facts, Defendants' representations—that HFCS is a "natural" product, identical to real sugar (*e.g.*, "sugar is sugar," "your body can't tell the difference" and "nutritionally the same as table sugar") and that it is simply "corn sugar"—are literally false and/or misleading.  Moreover, given their knowledge of the foregoing facts, the false and/or misleading nature of Defendants' representations demonstrates their recklessness and/or deliberate and malicious intent to mislead the consuming public about HFCS and real sugar to (i) obscure from the consuming public the connection between the emerging health concerns associated with HFCS and that very product, (ii) stem the decline of HFCS sales from which the CRA's members have been suffering, and (iii) divert sales from Plaintiffs, the American Sugar Cane League's members and The Sugar Association's other members to CRA members—who directly compete with and are acting through the CRA to compete unfairly against Plaintiffs, the American Sugar Cane League's members and the Sugar Association's other members.

64.     On information and belief, with the progression of advertising, first from the claims of HFCS being "natural" and equivalent to sugar and later to calling HFCS "corn sugar," the Member Companies have known of the misleading and false nature of the advertising and anticipated the wrongdoing arising out of it. Instead of stopping the earlier false advertising, the Member Companies have nevertheless continued to authorize, ratify and fund the campaign with its ever escalating falsehoods.  Further disclosing the collusive nature of the Defendants' conduct and the overarching scheme to mislead the public—and thereby influence the Member Companies' customers—while at the same time attempting to shield themselves from liability, on information and belief, the use of the "corn sugar" terminology in last year's pricing sheets of the Member Companies has ceased in their most recently circulated pricing sheets because of concern about this lawsuit.

## CLAIM FOR RELIEF

### VIOLATIONS OF SECTION 43(A) OF THE LANHAM ACT – FALSE ADVERTISING

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

65.     Plaintiffs reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 64 above as if set forth in full here.

66.     Defendants have made and continue to make literally false and/or misleading representations of fact in their advertising and/or promotion in commerce regarding HFCS.  CRA has undertaken the advertising and "corn sugar" rebranding effort on its own behalf and as the agent of and in concert with the Member Companies, which enjoy the right to and exercise actual control over the CRA's actions through their respective representatives on the CRA Board of Directors and through their financial contributions that enable the CRA to conduct the unlawful advertising campaign.  The Member Companies also have separately engaged in conduct in furtherance of their common plan to mislead the public demonstrating that they have individually and collectively assisted in, authorized,

//

1    participated, ratified and adopted the advertising campaign and rebranding efforts,

2    with the anticipation and knowledge that such efforts are false and misleading.

3         67.    As detailed above, Defendants' false and/or misleading representations

4    of fact generally fall into one of the following categories.

5         68.    The first category of Defendants' false and/or misleading

6    representations of fact stems from their unilateral appropriation of the label "corn

7    sugar"—"in excess of 2 billion impressions since September 2010"—when that

8    label has long been used for a recognized form of sugar in crystalline form with no

9    fructose. Defendants have done so in defiance of the FDA's regulatory scheme for

10   labeling for sweeteners and syrups. In particular, Defendants' use of the label "corn

11   sugar" falsely suggests to consumers that HFCS is or is similar to the actual corn

12   sugar product, when in fact the two products are wholly different.

13        69.    The second category is comprised of Defendants' false and/or

14   misleading representations of fact that HFCS is a "natural" product. These

15   representations falsely assert that HFCS is found in nature, when in fact it is a man-

16   made product that did not exist for commercial consumption before the late 1960s.

17        70.    The third category is comprised of Defendants' false and/or misleading

18   representations of fact that HFCS is the same as sugar, *e.g.*, "sugar is sugar" and

19   "your body can't tell the difference." These representations are literally false or, at

20   best, reckless and misleading in light of the irrefutable molecular differences

21   between the free-floating monosaccharides fructose and glucose in HFCS and the

22   bonded disaccharide sucrose. The noted representations are likewise literally false

23   or, at best, reckless and misleading in light of scientific studies and analyses, such

24   as those published by Bray, Neilson and the Princeton study, to name just a few.

25   These studies demonstrate a likely causal link between HFCS consumption and

26   obesity, hyperlipidemia, hypertension and other health problems that is not equally

27   presented by the consumption of sucrose.

28   //

71.     Moreover, past statements of the CRA and some of the Member Companies—when it suited them to distinguish HFCS from sugar—demonstrate the false and/or misleading nature of these representations.  For example, the CRA trumpeted (in connection with an antidumping investigation conducted by the government of the United Mexican States in the late 1990s) the fundamental physical, chemical and molecular differences between HFCS and sugar.

72.     Defendants' false and/or misleading representations of fact violate Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)).  Defendants have made and are making these false and/or misleading representations of fact in interstate commercial advertising and/or promotion—in this district and elsewhere—and the effects of Defendants' acts throughout the United States are intended to and do fall upon Defendants in this district and elsewhere.

73.     As a result of the foregoing, Plaintiffs have been damaged in an amount that will be ascertained according to proof.  Indeed, a recent study involving a survey of food shoppers disclosed an overall preference for an identical product containing "corn sugar" rather than HFCS and that the confusing nature of any name change thwarts food shoppers' desire to avoid an ingredient they do not wish to consume.  Plaintiffs' damages from such an influence on food shoppers' purchasing decisions, which in turn impacts the purchasing decisions of food processors, include actual damages in the form of price erosion and lost profits stemming from artificially reduced demand caused by Defendants' false and misleading advertising (whether or not consumer demand has been retained by or driven to HFCS or other competitive sweeteners); the disgorgement of any profits that Defendants unfairly realized, retained or gained through their unlawful conduct; the monetary expenditures that Defendants have made on their false and misleading rebranding campaigns and that Plaintiffs have made and will be required to make on corrective advertising and education to inform the consuming public of the truth; and the costs of this action.

74.    Because Defendants made and continue to make their false and/or misleading representations of fact about HFCS in intentional disregard of their falsity and/or misleading nature, Plaintiffs are entitled to an award of enhanced damages under Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)).  Moreover, this is an exceptional case for which the Court should award Plaintiffs' their reasonable attorneys' fees.

75.    Defendants' activities have caused and will cause irreparable harm to Plaintiffs for which they have no adequate remedy at law.  In particular, Defendants' past and continuing false and/or misleading representations of fact, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  Plaintiffs will continue to suffer irreparable injury to their goodwill, rights and businesses unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

a.    That the Court enjoin Defendants from continuing to make false and/or misleading representations of fact about HFCS;

b.    That Defendants pay Plaintiffs damages for the harms they have suffered and continue to suffer as a result of Defendants' false and/or misleading advertising, promotion and/or marketing, reflecting a disgorgement of illicit gains from such advertising, promotion and/or marketing, and providing a corrective advertising award as permitted by law;

c.    That this Court award Plaintiffs three times any damages award pursuant to 15 U.S.C. §1117;

d.    That this case be found to be exceptional within the meaning of 15 U.S.C. §1117;

SQUIRE, SANDERS &
DEMPSEY (US) LLP
155 South Flower Street, 31st Floor
Los Angeles, CA  90071

-26-        SECOND AMENDED COMPLAINT

1        e.     That the Court award Plaintiffs their costs and expenses of suit,

2 including all reasonable attorneys' fees they have incurred and will incur in this

3 matter;

4        f.     That the Court award Plaintiffs prejudgment and post-judgment

5 interest; and

6        g.     That the Court grant Plaintiffs such other and further relief as the

7 Court deems just and proper.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all issues so triable.

November 18, 2011                    Respectfully submitted,

SQUIRE, SANDERS & DEMPSEY (US) LLP

By: _Adam R. Fox_ sby
_____
Adam R. Fox
David S. Elkins

Attorneys for Plaintiffs
WESTERN SUGAR COOPERATIVE, MICHIGAN
SUGAR CO., C & H SUGAR CO., INC., UNITED
STATES SUGAR CORPORATION, AMERICAN SUGAR
REFINING, INC., THE AMALGAMATED SUGAR
COMPANY LLC, IMPERIAL SUGAR CORPORATION,
MINN-DAK FARMERS COOPERATIVE, THE
AMERICAN SUGAR CANE LEAGUE U.S.A., INC AND
THE SUGAR ASSOCIATION, INC.

*Additional Counsel for Plaintiffs:*

James P. Murphy (admitted *Pro Hac Vice*)
James.Murphy@ssd.com
John A. Burlingame (admitted *Pro Hac Vice*)
John.Burlingame@ssd.com
SQUIRE, SANDERS & DEMPSEY (US) LLP
1200 19th St., NW
Ste. 300
Washington, DC  20036
Telephone:  +1.202.626.6793
Facsimile:   +1.202.626.6780

# PROOF OF SERVICE

I, Consuelo Lopez, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 555 S. Flower Street, 31st Floor, Los Angeles, CA 90071.  On November 18, 2011, I served the within document(s):

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT (15 U.S.C. §1125(a))**

**JURY TRIAL DEMANDED**

☒   I caused to be personally served by USA Courier Messenger Service a true and correct copy of the above listed documents in a sealed envelope, addressed as follows:

Gail J. Standish
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA  90071-1543

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 18, 2011, at Los Angeles, California.

_____
Consuelo Lopez

LOSANGELES/325895.3

1

GRAHAM & JAMES LLP
801 South Figueroa Street
14th Floor
Los Angeles, CA 90017-5554