Adam R. Fox (State Bar No. 220584)
Adam.Fox@squiresanders.com
SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071
Telephone:    +1.213.624.2500
Facsimile:    +1.213.623.4581

David S. Elkins (State Bar No. 148077)
David.Elkins@squiresanders.com
SQUIRE SANDERS (US) LLP
600 Hansen Way
Palo Alto, CA  94304
Telephone:  +1.650.856.6500
Facsimile:    +1.650.843.8777

[*Additional Counsel Identified On Signature Page*]

Attorneys for Plaintiffs WESTERN SUGAR COOPERATIVE, MICHIGAN SUGAR CO., C & H SUGAR CO., INC., UNITED STATES SUGAR CORPORATION, AMERICAN SUGAR REFINING, INC., THE AMALGAMATED SUGAR COMPANY LLC, IMPERIAL SUGAR COMPANY, MINN-DAK FARMERS COOPERATIVE, THE AMERICAN SUGAR CANE LEAGUE U.S.A., INC., AND THE SUGAR ASSOCIATION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN SUGAR COOPERATIVE, a Colorado cooperative, *et al.*<br><br>                Plaintiffs,<br><br>        vs.<br><br>ARCHER-DANIELS-MIDLAND COMPANY, a Delaware Corporation, *et al.*<br><br>                Defendants. | Case No. CV11-3473 CBM (MANx)<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND TO STRIKE ALLEGATIONS FROM THE COUNTERCLAIM, AND TO STRIKE AFFIRMATIVE DEFENSE OF "UNCLEAN HANDS"**<br><br>Date:      TBD<br>Time:      TBD<br>Place:    Courtroom 2<br>The Honorable Consuelo B. Marshall<br><br>[Filed concurrently with Appendix of Electronic Authorities and [Proposed] Order] |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 28, 2013 at 11:00 a.m., or on any date thereafter at the Court's convenience, before the Honorable Consuelo B. Marshall in Courtroom 2 of the above-referenced Court located at 312 North Spring Street, Los Angeles, California, 90012, plaintiff and counterclaim defendant The Sugar Association, Inc. ("The Sugar Association") and plaintiffs Western Sugar Cooperative, Michigan Sugar Co., C & H Sugar Co., Inc., United States Sugar Corporation, American Sugar Refining, Inc., The Amalgamated Sugar Company LLC, Imperial Sugar Company, Minn-Dak Farmers Cooperative, and The American Sugar Cane League U.S.A., Inc. (together with The Sugar Association, "Plaintiffs") will, and hereby do, move the Court for the following relief:

    i.    To dismiss the identical counterclaims of Archer-Daniels-Midland Co., Cargill, Inc., Ingredion Inc., and Tate & Lyle Ingredient Americas, Inc. (collectively "Defendants/Counterclaimants") alleging false or misleading advertising against The Sugar Association under Lanham Act §43(a), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted;

    ii.    To strike Defendants/Counterclaimants' (a) insufficient "unclean hands" defense and (b) immaterial and other improper allegations from the First Amended Counterclaim and Answer of each, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure; and

    iii.    To strike defendant The Corn Refiners Association, Inc.'s insufficient defense of "unclean hands" from its Answer, pursuant to Rules 12(h)(2), 12(c) and 12(f) of the Federal Rules of Civil Procedure.

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Appendix of Electronic Authorities, other supporting evidence, the Court's file, and upon such further materials and argument as may be presented at the hearing of this matter.

1    This Motion is made following the conference of counsel pursuant to Local

2    Rule 7-3 which took place on October 15, 2012, during which counsel for Plaintiffs

3    advised counsel for Counterclaimants and Defendants of Plaintiffs' intent to file

4    this motion.

5    Date:  October 29, 2012                    Respectfully submitted,

6                                               SQUIRE SANDERS (US) LLP

7                                               By:*/s/ Adam R. Fox*
                                                   Adam R. Fox
                                                   David S. Elkins
8
9                                              Attorneys for Plaintiffs WESTERN
                                               SUGAR COOPERATIVE, MICHIGAN
10                                             SUGAR CO., C & H SUGAR CO., INC.,
                                               UNITED STATES SUGAR CORPORATION,
                                               AMERICAN SUGAR REFINING, INC., THE
11                                             AMALGAMATED SUGAR COMPANY
                                               LLC, IMPERIAL SUGAR COMPANY,
12                                             MINN-DAK FARMERS COOPERATIVE,
                                               THE AMERICAN SUGAR CANE LEAGUE
13                                             U.S.A., INC. AND THE SUGAR
                                               ASSOCIATION, INC. and Counter-
14                                             defendant THE SUGAR ASSOCIATION,
                                               INC.

15   *Additional Counsel for Plaintiffs:*

16   James P. Murphy (admitted *Pro Hac Vice*)
     James.Murphy@squiresanders.com
17   John A. Burlingame (admitted *Pro Hac Vice*)
     John.Burlingame@squiresanders.com
18   SQUIRE SANDERS (US) LLP
     1200 19th St., NW, Ste. 300
19   Washington, DC  20036
     Telephone:  +1.202.626.6793
20   Facsimile:  +1.202.626.6780

21   W. Mark Lanier (admitted *Pro Hac Vice*)
     wml@lanierlawfirm.com
22   THE LANIER LAW FIRM P.C.
     6810 FM 1960 West
23   Houston, Texas 77069
     Telephone:  +1.713.659.5200
24   Facsimile:  +1.713.659.2204

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................... - 1 -

II.  STATEMENT OF THE CASE ................................................ - 4 -

III. GOVERNING LEGAL STANDARDS ...................................... - 5 -

IV.  LEGAL ARGUMENT ............................................................ - 6 -

    A.   Unlike CRA's Advertising, The Sugar Association's Alleged Statements Do Not Constitute Commercial Speech .................... - 6 -

        1.   The Law Governing Commercial Speech ............................ - 7 -

        2.   Defendants' Advertisements Are Not A Proxy For The Sugar Association's Speech, And Provide No Guidance For Its Treatment .................................................................. - 9 -

        3.   The Sugar Association's Re-Posting Of An Editorial Authored By Dr. John McElligott Does Not Constitute Commercial Speech ............................................................. - 10 -

        4.   The Sugar Association's Re-Posting Of An Article Exposing The Efforts Of CRA To Silence Negative Press—And Having Virtually Nothing To Do With Criticizing HFCS—Does Not Constitute Commercial Speech .................................................................................... - 12 -

        5.   The Sugar Association's "Enough Is Enough" Press Release And Other Statements Do Not Constitute Commercial Speech ............................................................. - 14 -

    B.   No Statement Identified In The Counterclaim Was Disseminated Sufficiently To The Relevant Purchasing Public ........................... - 16 -

    C.   The Communications Decency Act Immunizes The Sugar Association's Re-Posting Of Dr. McElligott's Editorial And Ms. Bonvie's Investigative Report ......................................................... - 17 -

        1.   The Sugar Association Re-Posted Dr. McElligott's Editorial And Ms. Bonvie's Investigative Report Using An Interactive Computer Service ......................................... - 19 -

        2.   Dr. McElligott's Editorial And Ms. Bonvie's Investigative Report Were Each From Other "Information Content Providers." ................................................................. - 20 -

    D.   The Counterclaim's Internal Contradictions Demonstrate That It Fails To State A Claim Upon Which Relief May Be Granted ...... - 21 -

**SQUIRE SANDERS (US) LLP**
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- i -

**TABLE OF CONTENTS**
**(continued)**

Page

E.    The Corn Refiners' Counterclaim Contains Immaterial And Impertinent Allegations That The Court Should Strike .................. - 23 -

F.    Defendants' Affirmative Defense Of "Unclean Hands" Is Legally Insufficient And Should Be Stricken ................................- 24 –

V.    CONCLUSION ......................................................................... - 25 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st
Floor
Los Angeles, California 90071

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) ...................................................................... passim

*Aircapital Cablevision, Inc. v. Starlink Comms. Group, Inc.*,
   634 F. Supp. 316 (D. Kan. 1986) ............................................................ 15

*American Acad. of Pain Mgmt. v. Joseph*,
   353 F.3d 1099 (9th Cir. 2004) .................................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................... 6, 17, 21

*Balistreri v. Pacifica Police Dep't*,
   901 F.2d 696 (9th Cir. 1988) ................................................................... 5

*Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*,
   718 F. Supp. 2d 1167 (N.D. Cal. 2010) ............................................... 6, 25

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ......................................................... 2, 18, 19

*Beeman v. Anthem Prescription Mgmt., LLC*,
   652 F.3d 1085 (9th Cir. 2011) .................................................................. 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ passim

*Bernard v. Donat*,
   2012 U.S. Dist. LEXIS 19791 (N.D. Cal. Feb. 16, 2012) ...................... 14

*Biller v. Toyota Motor Corp.*,
   668 F.3d 655 (9th Cir. 2012) ............................................................ 4, 25

*Boston Scientific Corp . v. Schneider AG*,
   983 F. Supp. 245 (D. Mass. 1997) ........................................................ 16

*Boule v. Hutton*,
   328 F.3d 84 (2d Cir. 2003) .................................................................... 12

*California Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ........................................................................... 15

*Carafano v. Metrosplash.com, Inc.*,
    207 F. Supp. 2d 1055 (C.D. Cal. 2002) ............................................. 19

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ................................................... passim

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 (1980) ............................................................................. 7

*Charles v. City of Los Angeles*,
    2012 U.S. App. LEXIS 21281 (9th Cir. Oct. 15, 2012) ..................... 11

*Cincinnati v. Discovery Network*,
    507 U.S. 410 (1993) ...................................................................... 7, 10

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co*,
    173 F.3d 725 (9th Cir. 1999) ....................................................... 7, 16

*Dex Media West, Inc. v. City of Seattle*,
    2012 U.S. App. LEXIS 21278 (9th Cir. Oct. 15, 2012) ..................... 11

*Dworkin v. Hustler Mag., Inc.*,
    867 F.2d 1188 (9th Cir. 1989) ............................................................. 6

*eMove Inc. v. SMD Software Inc.*,
    2012 U.S. Dist. LEXIS 55625 (D. Ariz. Apr. 20, 2012) ................... 16

*Fantasy, Inc. v. Fogerty*,
    984 F.2d 1524 (9th Cir. 1993) ............................................... 3, 23, 24

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*,
    314 F.3d 48 (2d Cir. 2002) ............................................................... 16

*First Health Group Corp. v. BCE Emergis Corp.*,
    269 F.3d 800 (7th Cir. 2001) ........................................................... 17

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ......................................................... 16

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002) ............................................................ 19

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Flr
Los Angeles, California 90071

*Gordon & Breach Science Publrs. S.A. v. American Inst. of Physics*,
   859 F. Supp. 1521 (S.D.N.Y. 1994) ....................................................8, 9, 10, 15

*Johnson v. Con-Vey/Keystone, Inc.*,
   856 F. Supp. 1443 (D. Or. 1994) ........................................................ 15

*Keyishian v. Board of Regents*,
   385 U.S. 589 (1967) ............................................................. 13

*Manistee Town Ctr. v. City of Glendale*,
   227 F.3d 1090 (9th Cir. 2000) ..................................................... 2, 15

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ...................................................... 5

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................. 7

*Nissan Motor Co. v. Nissan Computer Corp.*,
   378 F.3d 1002 (9th Cir. 2004) ..................................................... 8, 14

*Oregon Nat. Res. Council v. Mohla*,
   944 F.2d 531 (9th Cir. 1991) ...................................................... 2, 15

*Oxycal Lab. v. Jeffers*,
   909 F. Supp. 719 (S.D. Cal. 1995) ................................................. 12

*Papasan v. Allain*,
   478 U.S. 265 (1986) ............................................................. 5

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) ...................................................... 11

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
   413 U.S. 376 (1973) ............................................................. 13

*Pods Enters. v. ABF Freight Sys.*,
   100 U.S.P.Q.2D (BNA) 1708 (M.D. Fla. 2011) ..................................... 24

*Pom Wonderful LLC v. Welch Foods, Inc.*,
   737 F. Supp. 2d 1105 (C.D. Cal. 2010) ............................................ 25

*Railroad Presidents Conference v. Noerr Motor Freight*,
   365 U.S. 127 (1961) ............................................................. 15

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Flr
Los Angeles, California 90071

*Republic Molding Corp. v. B. W. Photo Utilities*,
   319 F.2d 347 (9th Cir. 1963) ........................................................................ 25

*Riley v. Nat'l Fed. of the Blind*,
   487 U.S. 781 (1988) ............................................................................. 2, 7, 8

*SST Sterling Swiss Trust 1987 AG v. New Line Cinema, Corp.*,
   2005 U.S. Dist. LEXIS 47532 (C.D. Cal. Oct. 31, 2005) ................................ 24

*Starr v. Baca*,
   633 F.3d 1191 (9th Cir. 2011) ...................................................................... 6

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965) ................................................................................. 15

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
   425 U.S. 748 (1976) .................................................................................. 8

## STATUTES

47 U.S.C. § 230 ......................................................................................... 18

47 U.S.C. § 230(b)(1)-(2) ........................................................................... 18

47 U.S.C. § 230(c)(1) ........................................................................... 18, 19

47 U.S.C. § 230(f)(2) ................................................................................ 19

47 U.S.C. § 230(f)(3) ................................................................................ 20

California Unfair Business Practices Act (Cal. Bus. & Prof. Code §§ 17200
   *et seq.*) ................................................................................................. 4

Lanham Act (15 U.S.C. § 1125(a)) ................................................................ 4

## OTHER AUTHORITIES

Fed. R. Civ. P. 8 ...................................................................................... 21

Fed. R. Civ. P. 9(b) ................................................................................. 22

Fed. R. Civ. P. 12(b)(6) .......................................................................... 5, 6

Fed. R. Civ. P. 12(c) .................................................................................. 6

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Flr
Los Angeles, California 90071

1

Fed. R. Civ. P. 12(f)......................................................................................6, 23, 24

2

Fed. R. Civ. P. 12(h)(2)(B) .........................................................................  6

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SQUIRE SANDERS (US) LLP**
555 South Flower Street, 31st Flr
Los Angeles, California  90071

## I.     **INTRODUCTION**

The Court has rejected successive efforts by Defendants to dismiss this false advertising case.  [*See* Docs. 46 & 76.]  The Court has also ruled that Plaintiffs have "a reasonable probability of success on their argument that the [Defendants' advertising] statements are false."  [Doc. 47 at 11:11-12.]  Now, apparently embracing the strategy that the best defense is a good offense, four of the Defendants—Archer-Daniels-Midland Co. ("ADM"), Cargill, Inc. ("Cargill"), Ingredion Inc. ("Ingredion"), and Tate & Lyle Ingredient Americas, Inc. ("Tate & Lyle") (collectively the "Corn Refiners")—advance identical counterclaims (the "counterclaim") that fail to state a viable claim for relief.  [Docs. 85-88.]

The Corn Refiners once characterized Plaintiffs' lawsuit to stop their false, national, multimillion dollar advertising campaign about high fructose corn syrup ("HFCS") as an effort to "stifle an ongoing and vigorous public discussion."  [Doc. 24 at 1:2-3.]  The Court rejected that argument because the Corn Refiners, through their captive trade group, The Corn Refiners Association, Inc. ("CRA"), had used paid advertisements on television, in print and other media to purposefully "promote HFCS to purchasers"—in other words, it had engaged in classic "commercial speech."  [Doc. 46 at 8:13-22 & n.5.]  Now exaggerating the Court's ruling in an attempt to prohibit any discussion about the subjects of its false advertising by any other stakeholder, the Corn Refiners' counterclaim targets speech that is decidedly noncommercial.

The counterclaim is premised on core First Amendment communications: two articles originally posted by a medical doctor and a consumer group, and a few press releases, website posts and an op-ed piece.  [Docs. 85-88, Countercls. ¶¶ 68-93; *see also* Group Exh. A attached to each.]  Unlike the Corn Refiners' and CRA's lavish advertising campaign, The Sugar Association did not commission any paid advertising.  It hired no actors, directors or cameramen.  It purchased no television commercials or spreads in newspapers or magazines.  It made no presentations at

trade shows, in webinars or in the boardrooms of any of its members' customers.  It did not even write or call them.  In short, The Sugar Association's expression cannot form the basis for a viable claim.

First, The Sugar Association's Internet republication of content developed by third parties enjoys "full immunity" under the Communications Decency Act.  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003); *see also, e.g., Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (republishers' role in "editing . . . and selecting material for publication" not actionable).

Second, whatever indirect "financial motivation" the Corn Refiners may attribute to The Sugar Association in publishing these articles or any of the other challenged expression, their "commercial character . . . is inextricably intertwined with otherwise fully protected speech."  *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 795-96 (1988).  In this regard, the speech targeted by the Corn Refiners' counterclaim addresses the following subjects distinct from any promotion of sugar: (1) medical opinions from a seasoned practitioner, (2) an investigative report about CRA pressuring a university to change its announcement of a peer-reviewed study, (3) the response to a *60 Minutes* story critical of sugar based in part on studies involving HFCS rather than sugar, and (4) an editorial arguing that sugar does not belong in a "debate over sodas" in which it is not even an ingredient.  [Docs. 85-88, Countercls. ¶¶ 68-93; Group Exh. A attached to each.]

Some of the articles in The Sugar Association's alleged "publicity campaign" also tether their discussion to this lawsuit or a petition to the United States Food and Drug Administration ("FDA"), [Docs. 85-88, Countercls. ¶ 20; Group Exh. A attached to each at 7, 11 & 12], further amplifying the entire campaign's entitlement to full First Amendment protection.  *See, e.g., Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (affirming Rule 12(b)(6) dismissal based on immunity for "[a] publicity campaign directed at the general public" attendant to the petitioning of public authorities); *see also Oregon Nat. Res.*

1    *Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) ("A heightened level of

2    protection . . . is necessary to avoid a chilling effect on the exercise of this

3    fundamental First Amendment right.").

4          Third, apart from the constitutional concerns about the Corn Refiners' effort

5    to impose Lanham Act liability and therefore chill any expression addressing

6    HFCS, the counterclaim's significant, internal inconsistencies demonstrate its

7    futility.  For example, the Corn Refiners admit that "[t]he body cannot metabolize

8    sucrose" unless "an enzyme called sucrase breaks the covalent chemical bond"

9    found in sucrose, but not in HFCS.  [Docs. 85-8, Countercls. ¶¶ 32, ¶ 39.]  They

10   nevertheless charge that the following statements are false or misleading:

11   "[S]ucrose is molecularly different than HFCS due to a meaningful, naturally

12   occurring bond between its fructose and glucose molecules.  This bond must be

13   broken as part of the metabolism of sucrose.  HFCS does not have this bond."

14   [Docs. 85-88, Countercls. ¶ 89.]  These contradictions in the counterclaim deprive

15   the Corn Refiners of having "state[d] a claim to relief that is plausible on its face."

16   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

17         The Corn Refiners' counterclaim also contains protracted, immaterial and

18   impertinent allegations that should be stricken.  For example, the Corn Refiners

19   makes numerous allegations—many on information and belief—about the role of

20   Plaintiffs other than The Sugar Association, but name none of them as counterclaim

21   defendants.  [Docs. 85-88, Countercls. ¶¶ 10-25 & n.7.]  They also launch a vague

22   and spurious attack on non-party Citizens for Health, a consumer rights group, and

23   intimate something nefarious about its past relationship with The Sugar

24   Association, but make no specific charges against the group.  [*See id.*, ¶ 67.]

25   Permitting these allegations to remain would give the appearance that they are

26   legally relevant to the dispute, when all they do is give rise to "unwarranted and

27   prejudicial inferences."  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir.

28   1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

In short, multiple reasons call for dismissing or otherwise stripping the counterclaim down. These reasons likewise support striking the "unclean hands" defense that each of the Defendants (including CRA) premises on the same alleged speech of The Sugar Association. [Docs. 56 & 85-88, Answers.] Because none of its expression can be imputed to the other Plaintiffs, the defense should be stricken as to them. More fundamentally, because none of the allegedly "unclean" speech is directly related or temporally limited to the events giving rise to Defendants' false advertising at the core of the operative complaint, the defense is insufficient as a matter of law. *See Biller v. Toyota Motor Corp.*, 668 F.3d 655, 667-68 (9th Cir. 2012).

## II.   **STATEMENT OF THE CASE**

On April 22, 2011, Western Sugar Cooperative, Michigan Sugar Co., and C&H Sugar Co. filed a complaint commencing this action. [Doc. 1.] One month later, all Plaintiffs joined to file a First Amended Complaint ("FAC") alleging Defendants' false advertising under both the Lanham Act (15 U.S.C. § 1125(a)) and the California Unfair Business Practices Act (Cal. Bus. & Prof. Code §§ 17200 *et seq.*). [Doc. 15.] On July 1, 2011, Defendants moved to dismiss the FAC, arguing among other things that Plaintiffs had failed to allege an agency relationship between CRA and its members (the other defendants) and that their advertising did not constitute "commercial speech." [Doc. 24.] CRA alone also separately moved to strike the state law claim. [Doc. 32.]

The Court denied the motion to dismiss as to CRA, but granted the motion as to the other defendants because "Plaintiffs' allegations as to the relationship between CRA and [the other Defendants] are conclusory and do not establish the authority to control that is required to show an agency relationship. Hence, the Court cannot impute CRA's actions to the remaining defendants." [Doc. 46 at 12:19-22.] The Court also found that CRA's statements constitute commercial speech. [*Id.* at 8:13-22 & n.5.] In a separate order entered the same day, the Court

struck the state law claim because Plaintiffs had not presented evidence "that CRA's statements have influenced any purchasing decisions and that Plaintiffs have suffered an injury," even while noting that "Plaintiffs have met their burden in showing a reasonable probability of success on their argument that the statements are false." [Doc. 47 at 11:11-15.]

On November 18, 2011, Plaintiffs filed a Second Amended Complaint repleading Defendants' false advertising under the Lanham Act. [Doc. 55.] CRA answered on December 16, 2011. [Doc. 56.] That same day the other defendants filed a second motion to dismiss, arguing that "the SAC still does not adequately allege that [CRA's members] may be vicariously liable for the allegedly false advertising made by CRA (under an agency theory or otherwise)." [Doc. 57 at 4:2-4.] The Court denied the motion as to the Corn Refiners on July 31, 2012. [Doc. 76.] The Corn Refiners answered two weeks later, on August 14, 2012 [Docs. 80-83], but then on September 7, 2012 they each filed and served a First Amended Answer and Counterclaim. [Docs. 85-88.] Unsuccessful efforts by the parties to informally resolve disagreements regarding the propriety of the counterclaim and the "unclean hands" defense followed.

## III.   GOVERNING LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A legal theory is not cognizable simply because it is alleged; mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The Court may likewise disregard any "legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Even if the legal theory is cognizable and the factual allegations are detailed, so long as such "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," they fail to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim is "plausible" and therefore cognizable only when it is not "'merely consistent with' a defendant's liability" and offers more than a "possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Only a plausible claim may survive a motion to dismiss and "require the opposing party to be subjected to the expense of discovery." *Starr v. Baca*, 633 F.3d 1191, 1204 (9th Cir. 2011).

Short of dismissal, the Court may also "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 12(c) provides an additional device to eliminate any "insufficient defense." Fed. R. Civ. P. 12(c), advisory note (1966); *see also* Fed. R. Civ. P. 12(h)(2)(B). The applicable standard is "functionally identical" to Rule 12(b)(6). *Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Although the Ninth Circuit has not yet addressed whether to apply the *Twombly* heightened pleading standard to affirmative defenses, "the vast majority of courts" have done so. *Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1171 (N.D. Cal. 2010) (collecting cases).

## IV.   LEGAL ARGUMENT

### A.   UNLIKE CRA'S ADVERTISING, THE SUGAR ASSOCIATION'S ALLEGED STATEMENTS DO NOT CONSTITUTE COMMERCIAL SPEECH.

This Court has held that "CRA was engaging in commercial speech because it was advertising a specific product (HCFS [*sic*]) for an economic purpose." [Doc. 46 at 8:27-28.] That holding does not apply to The Sugar Association's challenged expression. The speech about which the Corn Refiners complain is decidedly

different from Defendants' own false advertising and is not appropriately deemed commercial.[1]

## 1.    THE LAW GOVERNING COMMERCIAL SPEECH

In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court articulated America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. An important exception to this obligation is speech that is essentially "commercial" in nature, even though it may "includ[e] references to public issues.*" Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983); *see also id.* at 64-65 ("The Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression."). This is precisely how the Court characterized Defendants' advertising campaign, despite its references to matters of public health. [Doc. 46 at 8:13-9:17.] On the other hand, speech does not automatically lose its full First Amendment protection just because it presents some commercial attributes. *See, e.g., Riley*, 487 U.S. at 796 ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.").

To avoid chilling speech that bears some commercial attributes but is primarily noncommercial, challenged expression must be "'examined . . . carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed.'" *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993) (quoting *Bolger,* 463 U.S. at 66); *see also Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (noting that the failure to conduct such an inquiry may generate "dilution, simply by a leveling process, of

---

[1] Any statement subject to the Lanham Act must first be determined to be "commercial speech." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co*, 173 F.3d 725, 735 (9th Cir. 1999); *see also* Doc. 46 [Order] at 7:14-21 (embracing the four-part test for commercial advertising or promotion under the Lanham Act).

1  the force of the [First] Amendment's guarantee with respect to [noncommercial]
2  speech") (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

3      Between the extremes of core commercial speech and purely noncommercial
4  speech is a spectrum of expression; the "boundary" beyond which otherwise
5  protected speech loses First Amendment panoply is not "clearly delineated." *See*
6  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004).
7  Courts routinely employ a three-factor test to determine if mixed speech is
8  essentially commercial: (1) whether the statement is in a typical advertising format
9  or is conceded to be advertising; (2) whether the statement refers to a commercial
10 product; and (3) whether the speech is commercially motivated. *See e.g., American*
11 *Acad. of Pain Mgmt. v. Joseph,* 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger,*
12 463 U.S. at 66-68). No single factor is dispositive, and "*all*" are often required.
13 *Bolger,* 436 U.S. at 66-67 (emphasis in original); *see Joseph*, 353 F.3d at 1106
14 (finding all three).

15     Despite the common use of these inquiries, in this flexible and nuanced
16 approach, the Court should be guided by the "commonsense differences" between
17 commercial and non-commercial speech. *Virginia State Bd. of Pharmacy v.*
18 *Virginia Citizens Consumer Council*, 425 U.S. 748, 772 (1976). If the nature of the
19 challenged expression, on balance, is consistent with that typically protected by the
20 First Amendment, it should not be deemed commercial even if it also presents
21 aspects consistent with commercial advertising.[2] *See, e.g., Riley,* 487 U.S. at 795-
22 96 (refusing to "parcel out the speech" where "the component parts of a single
23 speech are inextricably intertwined"); *see also, e.g., Gordon & Breach Science*
24 *Publrs. S.A. v. American Inst. of Physics*, 859 F. Supp. 1521, 1541 & 1543-44

25 _____

26     [2] Speech typically deemed commercial usually involves "a speaker engaged in the sale or hire of products or services conveying a message to a person or persons likely to want, and be willing to pay for, that product or service." *Beeman*
27 *v. Anthem Prescription Mgmt., LLC*, 652 F.3d 1085, 1106 (9th Cir. 2011), *reh'g en banc granted* (citing *Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (Cal. 2002), which
28 surveyed federal commercial speech jurisprudence)).

(S.D.N.Y. 1994) (examining the law thoroughly and dismissing a Lanham Act false advertising claim against a publisher based on certain articles, a press release and a letter to the editor of another publication—each of which had addressed a rating system deeming the publisher's product superior to its competitors—despite their obvious characteristics of "'commercial advertising or promotion'").

### 2. DEFENDANTS' ADVERTISEMENTS ARE NOT A PROXY FOR THE SUGAR ASSOCIATION'S SPEECH, AND PROVIDE NO GUIDANCE FOR ITS TREATMENT.

The Corn Refiners' counterclaim is ironic given Defendants' prior argument that their multimillion dollar campaign of television commercials and print advertisements broadcast to an excess of 2 billion impressions should escape Lanham Act scrutiny.  [Doc. 24 at 10:25-13:8; *see also* Doc. 15 ¶¶ 46, 53]. "Generally, a plaintiff can easily satisfy its burden of proving that the complained-of representation was made in 'commercial advertising or promotion' by pointing to paid advertisements by a commercial defendant on television or radio or in newspapers or magazines." *Gordon & Breach*, 859 F. Supp. at 1532 (collecting cases).  If Defendants once believed (erroneously) that the First Amendment protected their carefully scripted, acted and false advertising of HFCS as "natural," "nutritionally the same as table sugar," and really just a "corn sugar" that "your body can't tell the difference" from the real thing, [Doc. 15 ¶ 3], it is difficult to comprehend the Corn Refiners' dramatic turnabout in assailing just a few isolated editorials and other written reports that address a much broader and different range of subjects than the promotion of a commercial product.

The Court's ruling against Defendants with respect to their own advertising campaign hardly makes the case for them.[3]  As noted, no bright-line rules exist for

[3]  Indeed, the Court's ruling recognizes that a number of cases relied on by Defendants concerned noncommercial speech, explaining that the "purpose of the speech was not commercial" or "the statements were not made in advertisements." [Doc. 46 at 9:2-17 (noting the significance of statements made "in and during" a television show as opposed to during a commercial break, statements in an article directed at "'editorial comment'", statements that functioned like a "'consumer protection group,'" and statements "'comment[ing on]. . . cultural values.'").]

when speech contains elements that are both commercial and noncommercial. Courts thus routinely employ a careful and deliberate analysis of a number of factors and common sense so that "speech deserving of greater constitutional protection is not inadvertently suppressed."  *Bolger,* 463 U.S. at 66; *see also Cincinnati,* 507 U.S. at 423.  Consistent with this case law, and in stark contrast to the stylized and simplistic slogans characteristic of Defendants' own advertising, the speech targeted in the Corn Refiners' counterclaim is "fully protected expression first" and—at most—"only secondly . . . 'commercial advertising or promotion.'"  *Gordon & Breach*, 859 F. Supp. at 1541 (avoiding Lanham Act scrutiny of similarly characterized speech).  Unlike the Corn Refiners' campaign, The Sugar Association's speech is not a mere sales message masquerading as something more. *See id.* at 1540.

### 3.    THE SUGAR ASSOCIATION'S RE-POSTING OF AN EDITORIAL AUTHORED BY DR. JOHN MCELLIGOTT DOES NOT CONSTITUTE COMMERCIAL SPEECH.

The Corn Refiners first complain about The Sugar Association's republication online of an editorial authored by non-party John McElligott, a medical doctor and Fellow of the American College of Physicians. [*See, e.g.,* Docs. 85-88 ¶¶ 69-76; Group Exh. A attached to each at 1-2.]  The piece is entitled, "Dr. John McElligott weighs in on the high fructose corn syrup debate in Land Line Magazine," and shares his perspective on the consumption of HFCS.  [Group Exh. A at 1.]  Recognizing some "controversy," Dr. McElligott explicitly characterizes his views with statements of "belief" and "opinion," as the following examples make plain:

- "[M]any of us in the medical community ***think*** [HFCS] is right there at the top of the list" of factors contributing to American obesity;

- "***In my opinion***, high-fructose corn syrup is one of the worst things you can put in your body";

- "Some have called it the 'crack cocaine' of all sweeteners.  ***I agree***";

- "*[I]n my opinion* extensive use of HFCS as a food sweetener is more harmful than using regular sugar";

- "*I believe* it to be one of the worst food additives you can ingest";

- "*I believe* it has a range of dangers, from affecting your appetite to leading to weight gain";

[*Id.* at 1-2 (emphases supplied).]   These are broad, "pure" opinions that do not clearly imply facts capable of being proved true or false, and therefore are not actionable.  *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995).

Dr. McElligott's editorial nevertheless also identifies potential bases for his opinions and beliefs, including "a recent Princeton study" in which "rats fed the same caloric intake of HFCS got really fat" compared to rats consuming natural sugar.   [*Id.* at 2.]   This is no doubt the same Princeton study referred to in the operative complaint and already provided to this Court as part of earlier motion practice.   [*See* Doc. 54 ¶¶ 38-40; *see also* Doc. 37-9.]   Dr. McElligott also references his consultation with a "Duke University Medical School researcher named Anna Mae Diehl, MD" and studies examining the role of HFCS in non-alcoholic fatty liver disease.  [Group Exh. A at 2.]  Perhaps most significantly, Dr. McElligott encourages his readers to "[t]ry to stick with food that is not processed."   [*Id.*]  However one characterizes his statements about HFCS, his editorial cannot be said to constitute an advertisement or unambiguously promote consumption of refined sugar.

Common sense dictates that Dr. McElligott's speech enjoys First Amendment protection.  *See Dex Media West, Inc. v. City of Seattle*, 2012 U.S. App. LEXIS 21278, *21-*26 (9th Cir. Oct. 15, 2012) (finding speech noncommercial and embracing the basic notions that "editorial content" is not commercial speech and "economic motive in itself is insufficient to characterize a publication as commercial"); *Charles v. City of Los Angeles*, 2012 U.S. App. LEXIS 21281, *18-*21 (9th Cir. Oct. 15, 2012) (supporting the proposition that reprinting protected speech "to inform the public of the nature and contents of the

1    underlying speech" may be immune from a false advertising claim, otherwise "the

2    contents of the underlying speech could be chilled") (citations omitted).

3        Applying the *Bolger* factors only underscores this conclusion.  None of Dr.

4    McElligott's statements are conceded to be advertisements, and none are in an

5    advertisement format.  Although Dr. McElligott mentions HFCS, he does so as a

6    potential health risk, not as a commercial product.  Finally, Dr. McElligott had no

7    economic motive to promote a specific commercial product.  Given these facts and

8    the "public expression of opinion" that characterizes Dr. McElligott's editorial, the

9    Court should be "careful not to permit overextension of the Lanham Act to intrude

10   on First Amendment values."  *Boule v. Hutton*, 328 F.3d 84, 91 (2d Cir. 2003)

11   (quotation marks omitted).

12       Allowing the counterclaim to proceed on the basis of Dr. McElligott's

13   editorial would have a chilling effect on similar speech involving professional

14   medical opinions.  Such a result would be wholly inconsistent with the notion of

15   free participation in the marketplace of ideas without fear of sanctions.  *See, e.g.,*

16   *Oxycal Lab. v. Jeffers*, 909 F. Supp. 719 (S.D. Cal. 1995) (finding a book

17   commenting on the elimination of cancer from peoples' lives to be non-commercial

18   speech, noting "academic freedom is 'a special concern of the First Amendment'"

19   and concern for deterring contributors to the academic debate).  Noncommercial

20   speech like Dr. McElligott's editorial should not be stifled by the Corn Refiners'

21   campaign to silence all negative commentary about HFCS from the public debate.

**4.    THE SUGAR ASSOCIATION'S RE-POSTING OF AN ARTICLE EXPOSING THE EFFORTS OF CRA TO SILENCE NEGATIVE PRESS—AND HAVING VIRTUALLY NOTHING TO DO WITH CRITICIZING HFCS—DOES NOT CONSTITUTE COMMERCIAL SPEECH.**

25       The next target in the Corn Refiners' counterclaim is The Sugar

26   Association's republication online of an article written by another non-party, Linda

27   Bonvie, a blogger for *FoodIdentityTheft.com*.  The focus of her article, entitled

28   "The Corn Refiners 'get their way' with UCLA, or do they?" is CRA's public

relations efforts, which involved "badgering" the UCLA press office to make changes in its press release about a recently published peer-reviewed study. [Group Exh. A. at 4-6.]  The story makes no direct effort to disparage HFCS.  Instead, it accurately observes that a new study conducted by Dr. Fernando Gomez-Pinilla, a UCLA professor of neurosurgery at the David Geffen School of Medicine, "found that a diet high in fructose can slow down mental processes 'hampering memory and learning.'"  [*Id.* at 4.]  UCLA's first press release and certain quotes from Dr. Gomez-Pinilla specifically referenced HFCS, implicated because it is a key source of fructose in the American diet.  Ever protective of its constituents' image, CRA representative David Knowles "made such a pest of himself"—to use the words of a source at the UCLA press office—that the UCLA campus editor "did what he had to do to get him off his back" and created a new version of the release.  [*Id.* at 3-4.]  The article reveals the extremes to which CRA will go to combat negative press, including "pummeling [a] campus editor"—again, using words from a UCLA source—but it does not directly critique or promote any specific product.  [*Id.*]

Ms. Bonvie's description of CRA's public relations squad, and the lengths to which it will go, is not advertising or promotion of HFCS or sugar no matter how positively or negatively CRA was portrayed.  Thus, as with Dr. McElligott's editorial, common sense leads to the inescapable conclusion that this is not commercial speech.  Once again, the *Bolger* factors echo that conclusion.  The article is not advertising.  Its principal aim is to expose certain practices of CRA to stifle academic freedom and shape a public dialogue, not to promote or disparage HFCS or sugar.  *Cf. Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (noting the risk of "impos[ing] any straight jacket" on the study that takes place at universities).  Moreover, whatever Ms. Bonvie's economic motivation, her critical report of CRA's practices is core First Amendment expression that is not subject to the Lanham Act.  *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385 (1973) (noting that if a reporter's profit motive were

1  determinative, "the selection of news stories to the choice of editorial position . . .

2  would be subject to regulation"); *Bernard v. Donat*, 2012 U.S. Dist. LEXIS 19791,

3  at *7-*8 (N.D. Cal. Feb. 16, 2012) (dismissing a Lanham Act claim, in part,

4  because negative commentary on websites was not "commercial speech").

5      The Corn Refiners' counterclaim attempts to chip away at intellectual

6  freedom by threatening liability against those who reveal efforts by the Corn

7  Refiners' captive trade association (CRA) to bully academics who question the

8  health of HFCS.   The counterclaim seeks to hold The Sugar Association liable

9  because it republished a consumer advocate's exposure of these tactics.  The Court

10 should reject this endeavor on policy grounds alone.  But it need not resort to that

11 justification because the Ninth Circuit has already specifically held that "[n]egative

12 commentary . . . [that] does more than propose a commercial transaction . . . is,

13 therefore, non-commercial." *Nissan Motor Co.*, 378 F.3d at 1017.

14         **5.    THE SUGAR ASSOCIATION'S "ENOUGH IS ENOUGH" PRESS
                RELEASE AND OTHER STATEMENTS DO NOT CONSTITUTE
15              COMMERCIAL SPEECH.**

16     The Corn Refiners' third example of The Sugar Association's alleged false

17 advertising concerns a press release it issued attendant to this lawsuit, and entitled,

18 "Enough Is Enough: There's Only One Sugar... And It's Not High-Fructose Corn

19 Syrup."  [Docs. 85-88 ¶¶ 86-91; Group Exh. A attached to each at 7-8.]  The Corn

20 Refiners also place at issue a handful of additional statements, including an editorial

21 posted on the Internet arguing that sugar does not belong in a "debate over sodas"

22 because "[t]he majority (about 92 percent) . . . are sweetened with high fructose

23 corn syrup (HFCS), not sugar," a separate letter to the AARP (also published

24 online) that basically repeats this argument, and another Internet essay questioning

25 the notion that "less sugar will result in less obesity" given that the substitution of

26 HFCS for sugar has resulted in consumption of "much less sugar now than . . .

27 before the obesity epidemic."  [Docs. 85-88 ¶¶ 92-93 & nn. 39-41; Group Exh. A at

28 10-16.]  Each of these statements importantly includes a discussion of Defendants'

advertising campaign and either this lawsuit or the FDA's rejection of CRA's petition to "authorize 'corn sugar' as another name for HFCS because 'use of the term "sugar" to describe HFCS . . . would not accurately identify or describe the basic nature of the food.'" [Group Exh. A at 7-8 & 10-16.]

Because the challenged speech is part of "[a] publicity campaign directed at the general public" and attendant to the petitioning of public authorities, it is immunized under the *Noerr-Pennington* doctrine.[4] *See Manistee Town Center*, 227 F.3d at 1092 (affirming dismissal based on the doctrine's application); *see also, e.g., Johnson v. Con-Vey/Keystone, Inc.*, 856 F. Supp. 1443, 1448-51 (D. Or. 1994) (recognizing the doctrine's application to conduct "incidental" to litigation); *Aircapital Cablevision, Inc. v. Starlink Comms. Group, Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986) (applying the doctrine to immunize a lawsuit's "attendant publicity"). Moreover, because the Corn Refiners' allegations trigger an invocation of the doctrine, "[a] heightened level of protection . . . is necessary to avoid a chilling effect on the exercise of this fundamental First Amendment right" of petitioning the government and discussing the petition. *Mohla*, 944 F.2d at 533.

An additional statement made by The Sugar Association is an April 1, 2012 press release responding to a *60 Minutes* story critical of sugar, based in part on studies involving HFCS instead of sugar. [Docs. 85-88 ¶ 92 & n. 38; Group Exh. A at 9.] It deserves no less protection even though it does not discuss this lawsuit or the FDA petition. The protection is warranted because the press release "fall[s] too close to core First Amendment values to be considered 'commercial advertising or promotion' under the Lanham Act." *Gordon & Breach*, 859 F. Supp. at 1541 & 1544 (holding a press release and a letter to the editor of another publication not

---

[4] The doctrine, which immunizes petitions directed to any branch of government as well as attendant publicity campaigns, derives its name and operation from a trilogy of United States Supreme Court cases. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961).

actionable).  This conclusion holds true regardless of *Noerr-Pennington* immunity.[5]  Once again, both common sense and the *Bolger* factors compel the conclusion that The Sugar Association's expression is entitled to protection.

### B. NO STATEMENT IDENTIFIED IN THE COUNTERCLAIM WAS DISSEMINATED SUFFICIENTLY TO THE RELEVANT PURCHASING PUBLIC.

To assert a facially viable claim for false advertising under the Lanham Act, the Corn Refiners must allege facts showing that The Sugar Association's challenged statements were sufficiently disseminated to the relevant purchasing public to constitute advertising.  *Coastal Abstract Serv.*, 173 F.3d at 735.  The counterclaim fails to do so.  Unlike the Corn Refiners own nationwide television and print campaign, The Sugar Association's limited distribution of the challenged statements on passive websites and listservs does not meet the standard for sufficient dissemination to maintain a Lanham Act claim.  *See, e.g., eMove Inc. v. SMD Software Inc.*, 2012 U.S. Dist. LEXIS 55625, *15 (D. Ariz. Apr. 20, 2012) ("[R]epresentations that are commercial advertising or promotion under the Lanham Act must be part of an organized campaign to penetrate the market, rather than isolated disparaging statements."); *see also, e.g., Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) (characterizing "widespread dissemination within the relevant industry [a]s a normal concomitant of meeting this requirement").

Advertising is commonly defined as "a form of promotion to anonymous recipients" and "[i]n normal usage an advertisement read by millions (or even

---

[5] Although the *60 Minutes* press release, Dr. McElligott's editorial, and Ms. Bonvie's investigative report are not explicitly tied to petitioning activity, they should nevertheless be treated in the context of the entire alleged campaign "as a whole." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005) (holding that an "isolated instance" cannot deprive a course of conduct "as a whole of its legitimacy" for purposes of *Noerr-Pennington* immunity); *see also, e.g., Boston Scientific Corp . v. Schneider AG*, 983 F. Supp. 245, 272  (D. Mass. 1997) (expressing "doubt that the sham exception to the *Noerr-Pennington* doctrine applies to independent claims as opposed to the entire suit").  Like *Freeman*, the "whole" thus includes this lawsuit, the FDA petition and the attendant publicity, and immunity for The Sugar Association should be examined in this full context.

thousands in a trade magazine) is advertising." *First Health Group Corp. v. BCE Emergis Corp*., 269 F.3d 800, 803 (7th Cir. 2001).  Unlike Defendants' television and print advertising campaign, The Sugar Association's expression targeted no anonymous audience, held no person captive, and did not foist any message onto the public.  It was also not specifically targeted to particular businesses that purchase sugar as an ingredient for their products.  Instead, as the Corn Refiners admit, information was distributed by The Sugar Association only to those "persons who signed up to receive The Sugar Association's newsletter." [Docs. 85-88 ¶ 69.] This self-selecting group of persons—the size of which is not even alleged by the counterclaim—was exposed to The Sugar Association's speech only because they deliberately sought it out.  The Sugar Association took no strategic steps to have its expression penetrate the public to the tune of more than 2 billion impressions, as Defendants' advertising did.  [Doc. 24 at 10:25-13:8; *see also* Doc. 15 ¶¶ 46, 53.]

Similarly, information posted on the website *sugar.org* or social media such as The Sugar Association's Facebook page and Twitter feed is accessible only to those who actively and deliberately seek it out, find it and then browse its contents. There was no effort made to penetrate any nationwide market in the same manner or degree as Defendants' multimillion dollar campaign of television and print advertising.  Indeed, except for their telling admission that The Sugar Association's distribution was limited in this way, the Corn Refiners make no more allegations about the size or depth of the audience for any of The Sugar Association's challenged expression.   The Corn Refiners accordingly fail to demonstrate a "plausible" claim.  *Iqbal*, 556 U.S. 662, at 678.

## C.  THE COMMUNICATIONS DECENCY ACT IMMUNIZES THE SUGAR ASSOCIATION'S RE-POSTING OF DR. MCELLIGOTT'S EDITORIAL AND MS. BONVIE'S INVESTIGATIVE REPORT.

The two articles that lead off the Corn Refiners' false advertising allegations—Dr. McElligott's editorial and Ms. Bonvie's investigative report—are each "reprinted" from different websites.  This speech falls squarely within the

Communications Decency Act's immunity, wholly independent of the First Amendment protections that render them improper subjects for a Lanham Act claim.

"Title V of the Telecommunications Act of 1996, Pub. L. No. 104-104, is known as the '*Communications Decency Act of 1996*' [the 'CDA' or 'the Act']" and is codified at 47 U.S.C. § 230.  *Batzel*, 333 F.3d at 1026 (citations omitted). Section 230(b) lists the CDA's several policy objectives.  Pertinent to this motion are the first two objectives:

> (1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

> (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.

47 U.S.C. § 230(b)(1)-(2).  "Consistent with these provisions, courts construing § 230 have recognized as critical in applying the statute the concern that lawsuits could threaten the 'freedom of speech in the new and burgeoning Internet medium.'"  *Batzel*, 333 F.3d at 1027 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  "Through this provision, Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party.  As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio."  *Carafano*, 339 F.3d at 1122 (citing *Batzel*, 333 F.3d at 1026-27).

CDA immunity in this case rests on the answer to two questions: (i) whether The Sugar Association's website—which re-posted Dr. McElligott's and Ms.

Bonvie's expression—is "an interactive computer service" and (ii) whether the source of each piece was "another information content provider."   47 U.S.C. § 230(c)(1).  "Yes" is the answer to each inquiry.

### 1.   THE SUGAR ASSOCIATION RE-POSTED DR. MCELLIGOTT'S EDITORIAL AND MS. BONVIE'S INVESTIGATIVE REPORT USING AN INTERACTIVE COMPUTER SERVICE.

The Corn Refiners allege that Dr. McElligott's editorial and Ms. Bonvie's investigative report each appeared on The Sugar Association's website—which they characterize as a type of "social media tool"—and was distributed to a "listserv" of persons who had chosen to sign up to receive The Sugar Association's electronic newsletter.  [*See, e.g.,* Docs. 85-88 ¶¶ 5, 65, 69, 71, 77-78.]  The Corn Refiners also allege that The Sugar Association posted a link to each re-posted piece through its Twitter feed and on its Facebook site, and that readers could "social share" the challenged speech.  [*Id.* ¶¶ 71, 78.]

Under the CDA, "[t]he term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2).  The Ninth Circuit has taken note of the "relatively expansive definition of 'interactive computer service.'"  *Carafano*, 339 F.3d at 1123 (citing 47 U.S.C. § 230(f)(2)).  Accordingly, websites have been held to constitute interactive computer services.  *See, e.g., Carafano v. Metrosplash.com, Inc.,* 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002), *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003) (holding that website is an "interactive computer service"); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 831 & n.7 (2002) (same).  Because "the definition of 'interactive computer service' on its face covers '*any*' information services or other systems, as long as the service or system allows 'multiple users' to access 'a computer server'" (*Batzel*, 333 F.3d at 1030), the definition also applies broadly enough to encompass multiple-user systems such as Facebook, Twitter and, as the Ninth Circuit expressly held (*id.* at 1031), listservs.  The first prong of CDA immunity is thus satisfied.

**2.      DR. MCELLIGOTT'S EDITORIAL AND MS. BONVIE'S INVESTIGATIVE REPORT WERE EACH FROM OTHER "INFORMATION CONTENT PROVIDERS."**

With the first prong of CDA immunity met, Dr. McElligott's editorial and Ms. Bonvie's report are subject to CDA immunity if they also meet the second prong, demonstrating that each is from an "information content provider."  Under the governing statute, "[t]he term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  The Ninth Circuit has accordingly explained that "[u]nder § 230(c) . . . so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process."  *Carafano*, 339 F.3d at 1124.

On its face, Dr. McElligott's editorial reflects that it was provided by the online Land Line magazine (*www.LandLineMag.com*).  The article appears under the following title:



Dr. John McElligott weighs in on the high fructose corn syrup debate in Land Line Magazine

[Group Exh. A at 2.]  Moreover, at its end is a notice that "[t]his article was reprinted with permission from Land Line Magazine."  [*Id.* at 3 (hyperlink excluded)].

The face of Ms. Bonvie's report likewise discloses that it is from a third party, in this case *www.FoodIdentityTheft.com*, the address of which begins the article in the manner of a by-line.  [*Id.* at 4.]  Following the report is a statement that "[t]his article originally appeared on Food Identity Theft on Thursday, May 24, 2012." [*Id.* at 6 (hyperlink excluded).]

As stated above, "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carafano*, 339 F.3d at 1124. Group Exhibit A to the Corn Refiners' counterclaim plainly establishes the second prong of CDA immunity. The counterclaim should therefore be dismissed to the extent based on The Sugar Association's Internet re-posting of Dr. McElligott's and Ms. Bonvie's expression.

D. **THE COUNTERCLAIM'S INTERNAL CONTRADICTIONS DEMONSTRATE THAT IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.**

Aside from its other constitutional and statutory infirmities, the Corn Refiners' counterclaim presents a fundamental failure to plead a plausible false advertising claim. An "I'm-doing-it-because-you're-doing-it" accusation does not satisfy this standard. A viable complaint "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

As Defendants noted when advancing their own motion to dismiss, *Twombly* (and *Iqbal*) clarified the pleading standard imposed by Federal Rule of Civil Procedure 8. A claimant must not only provide enough detail to give fair notice of what the claim is and the grounds on which it is based, but also, through its allegations, to show "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Because the plaintiffs in *Twombly* had not "nudged their claims across the line from conceivable to plausible, their complaint [was] dismissed." *Id*. The Supreme Court has since reaffirmed the general applicability of *Twombly*, further underscoring the need to look beyond bare legal conclusions and baseless assertions to ensure that the complaint asserts sufficient facts to convince the Court that a plausible claim exists. *See Iqbal*, 556 U.S. at 678.

Even if one were to accept the conclusions of the counterclaim as true, its internal inconsistencies demonstrate its futility. The Corn Refiners' principal allegation of false advertising is a representation by The Sugar Association that

"sugar is **different** from high fructose corn syrup." [Docs. 85-88, Countercl. ¶ 1 (emphasis supplied); *see also id.* ¶ 89 (alleging that the following statement is also false or misleading: "[S]ucrose is molecularly **different** than HFCS due to a meaningful, naturally occurring bond between its fructose and glucose molecules. This bond must be broken as part of the metabolism of sucrose.  HFCS does not have this bond." [Docs. 85-88, Countercl. ¶ 89 (emphasis supplied).]  The Corn Refiners charge that sugar and HFCS are, in fact, no different from one another, and the core of The Sugar Association's expression is therefore false. [*Id.* ¶¶ 43, 83 (making repeated assertions that sugar and HFCS are "indistinguishable" and "approximately the same").]

The problem with the counterclaim at this stage of the proceedings lies in the Corn Refiners' admissions (inconsistent with their principal charge) that the two products are, in fact, different from one another.  In this regard, the Corn Refiners acknowledge that sugar and HFCS are different, as "[t]he body cannot metabolize sucrose" (*i.e.* sugar) unless "an enzyme called sucrase breaks the covalent chemical bond" found in sugar, but not in HFCS.  [*Id.* ¶¶ 32, 39.]  They also admit sugar and HFCS "have different properties and applications," and "different benefits." [*Id.* ¶ 40.]  They likewise concede that although sugar "is comprised of 50% glucose and 50% fructose" (*id.* ¶ 31), in HFCS the proportion of these monosaccharides varies, and "HFCS in its most common varieties consists of either 42% fructose and 58% glucose" or "55% fructose and 45% glucose." [*Id.* ¶ 39.]

Such admissions contradict key charges in the counterclaim, and therefore deprive it of the plausibility required by governing pleading standards. *Twombly*, 550 U.S. at 570.  Because the counterclaim fails to state a plausible claim, it should be dismissed in its entirety.[6]

---

[6] Because the Corn Refiners' counterclaim fails to meet even standard pleading requirements, it necessarily fails to meet the heightened pleading standard of Rule 9(b), which requires that averments be stated with "particularity."  The Corn Refiners do not dispute that Rule 9(b) applies to their allegations of false advertising.  [Doc. 24 at 23:14-24:28.]

### E.   THE CORN REFINERS' COUNTERCLAIM CONTAINS IMMATERIAL AND IMPERTINENT ALLEGATIONS THAT THE COURT SHOULD STRIKE.

Courts may "order stricken from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fogerty*, 984 F.2d at 1527 (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 70607 (1990)). "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 70607 (1990)). A motion to strike seeks to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial. *Id.* (quoting *Sidney-Vinstein v. A. H. Robins Co*., 697 F.2d 880, 885 (9th Cir. 1983)).

Here, the Court should strike paragraphs 10-25 and footnote 7 (the "Immaterial Allegations"). Each of the Immaterial Allegations parrots the agency-related allegations in Plaintiffs' Second Amended Complaint.[7] But unlike Plaintiffs' claim for false advertising, the Corn Refiners assert their counterclaim against only the trade association; they do not assert vicarious liability against any individual member of The Sugar Association. The Immaterial Allegations thus give an unwarranted appearance that The Sugar Association's individual members are responsible for the alleged false "advertising."

This unwarranted appearance promises to confuse the issues and unfairly prejudice The Sugar Association's members, which are also parties (Plaintiffs) to the underlying case. The Corn Refiners evidently hope to cast these Plaintiffs as being culpable of the very misconduct in which ADM, Cargill, Tate & Lyle, and Ingredion have engaged: an orchestrated, behind-the-scenes scheme to gain an unfair commercial advantage by directing their trade association to mislead

---

[7] *Compare generally* Second Amended Complaint [Doc. 55] paragraphs 23-29 *with* the Agency Allegations.

consumers.  Absent an actual claim against The Sugar Association's members, the Immaterial Allegations should be stricken.  *See SST Sterling Swiss Trust 1987 AG v. New Line Cinema, Corp*., 2005 U.S. Dist. LEXIS 47532, *16-*17 (C.D. Cal. Oct. 31, 2005) (striking allegations relating to claim not pled because a complaint "is not the appropriate place to reserve undeveloped rights or make statements to the Court, counsel, or the public").

In addition to the Immaterial Allegations, paragraph 67 contains charges impertinent, scandalous and immaterial to this dispute.  The Corn Refiners allege, "on information and belief," that non-party Citizens for Health has "disparaged HFCS" and that it "has previously received funds from The Sugar Association to attack the well-known sweetener Splenda."  Such allegations do not pertain to, and have no bearing on, the Corn Refiners' allegations of false advertising against The Sugar Association in this case, and should be stricken under Rule 12(f).  *See Fogerty*, 984 F.2d at 1527-28 (deeming it correct to strike from a complaint allegations irrelevant to the claims asserted and further identifying a serious risk of prejudice to the defendant of allegations not involving parties to the action).

### F.   DEFENDANTS' AFFIRMATIVE DEFENSE OF "UNCLEAN HANDS" IS LEGALLY INSUFFICIENT AND SHOULD BE STRICKEN.

Defendants' affirmative defense of "unclean hands" is premised upon essentially the same charges as the Corn Refiners' counterclaim.  [*See, e.g.,* Doc. 56 ¶ 4; Docs. 85-88 ¶¶ 1-4.]  Accordingly, the many bases for dismissing the counterclaim also justify striking the "unclean hands" defense.  *See, e.g., Pods Enters. v. ABF Freight Sys.*, 100 U.S.P.Q.2D (BNA) 1708 (M.D. Fla. 2011) (striking an "unclean hands" affirmative defense premised on the same allegations as the defendant's implausible and invalid counterclaims, which were likewise dismissed).  Indeed, because this defense is premised upon the same charges as the counterclaim but with even fewer details—particularly in the case of CRA [Doc. 56 at 16:24-27]—its lack of plausibility is even more pronounced.  *See Barnes*, 718 F.

Supp. 2d at 1171 (applying "*Twombly*'s heightened pleading standard" to affirmative defenses).[8]

The Court should also strike the defense for the independent reason that it is inapplicable as pled.  In evaluating the defense, "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them ***in acquiring the right he now asserts***."  *Republic Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963) (emphasis supplied).  Articles that in 2012 briefly appeared on the Sugar Association's website and unspecified "other communications" do not "relate directly to the cause at issue" arising from Defendants' national false advertising campaign beginning in 2008.  *Biller*, 668 F.3d at 668 (quoting *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999)).  These acts about which Defendants complain are far too remote and indirectly related to their own actionable conduct to suffice as a valid basis for the defense.  *See id.*; *see also, e.g., Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1109-10 (C.D. Cal. 2010) (noting that plaintiff Pom's "'position must be judged by the facts existing as they were when suit was begun,'" and therefore rejecting unclean hands defense that was "not sufficiently related to Pom's claims in the lawsuit") (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 2010) § 31:48).  The "unclean hands" defense should be stricken.

## V.    **CONCLUSION**

For these reasons, the motion to dismiss and to strike should be granted.

Date:  October 29, 2012                    Respectfully submitted,

                                           SQUIRE SANDERS (US) LLP
                                           By:*/s/ Adam R. Fox*
                                           Adam R. Fox

---

[8] Even if Defendants' allegations were sufficient to assert a plausible defense against The Sugar Association, this Court's application of the same standard previously imposed on Plaintiffs would otherwise warrant striking the defense. This is because Defendants' charges about the role of all other Plaintiffs are at best conclusory and "do not establish the authority to control that is required to show an agency relationship.  Hence, the Court cannot impute [The Sugar Association's] actions to the remaining [plaintiffs]."  [Doc. 46 at 12:19-22.]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David S. Elkins

Attorneys for Plaintiffs
WESTERN SUGAR COOPERATIVE,
MICHIGAN SUGAR CO., C & H SUGAR
CO., INC., UNITED STATES SUGAR
CORPORATION, AMERICAN SUGAR
REFINING, INC., THE AMALGAMATED
SUGAR COMPANY LLC, IMPERIAL
SUGARCOMPANY, MINN-DAK
FARMERS COOPERATIVE, THE
AMERICAN SUGAR CANE LEAGUE
U.S.A., INC. AND THE SUGAR
ASSOCIATION, INC.

*Additional Counsel for Plaintiffs:*

James P. Murphy (admitted *Pro Hac Vice*)
James.Murphy@squiresanders.com
John A. Burlingame (admitted *Pro Hac Vice*)
John.Burlingame@squiresanders.com
SQUIRE SANDERS (US) LLP
1200 19th St., NW, Ste. 300
Washington, DC  20036
Telephone:  +1.202.626.6793
Facsimile:    +1.202.626.6780

W. Mark Lanier (admitted *Pro Hac Vice*)
wml@lanierlawfirm.com
THE LANIER LAW FIRM P.C.
6810 FM 1960 West
Houston, Texas 77069
Telephone:  +1.713.659.5200
Facsimile:    +1.713.659.2204

## CERTIFICATE OF SERVICE

### (United States District Court)

I, Adam R. Fox, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 555 S. Flower Street, 31st Floor, Los Angeles, CA   90071.   On October   29, 2012, the following document(s):

**PLAINTIFFS' NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND TO STRIKE ALLEGATIONS FROM THE COUNTERCLAIM, AND TO STRIKE AFFIRMATIVE DEFENSE OF "UNCLEAN HANDS"**

was served on:

| | |
|---|---|
| Gail J. Standish<br>WINSTON & STRAWN LLP<br>gstandish@winston.com<br>Erin R. Ranahan<br>eranahan@winston.com<br>333 S. Grand Avenue<br>Los Angeles, CA  90071-1543 | Dan K. Webb<br>dwebb@winston.com<br>Stephen V. D'Amore<br>sdamore@winston.com<br>Cornelius M. Murphy<br>nmurphy@winston.com<br>Brynna J. Dahlin<br>bdahlin@winston.com<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, CA  60601-9703 |

Service was accomplished as follows.

☒    **By Electronic Means**.   On the above date, I filed the above-mentioned document(s) by electronic means with the U.S. District Court for the Central District of California, over the internet, through its Case Management/Electronic Case Filing (CM/ECF) system.   As such, the Court electronically mailed such document(s) to the parties noted above, whose electronic mail address is set forth above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 29, 2012, at Los Angeles, California.

*/s/  Adam R. Fox*
Adam R. Fox