SUBMITTING COUNSEL LISTED

ON SIGNATURE PAGES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN SUGAR
COOPERATIVE, *et al.*

                  Plaintiffs,

    vs.

ARCHER-DANIELS-MIDLAND

COMPANY, *et al.*

             Defendants.

_____

And Related Counterclaim.

Case No. CV11-3473 CBM (MANx)

**[Discovery Matter]**

**JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL DE-DESIGNATION OF DOCUMENTS THAT DEFENDANTS HAVE PRODUCED AS "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"**

**(REDACTED PUBLICALLY FILED VERSION)**

Hearing :        January 21, 2014
Time:          10:00 a.m.
Place:         Courtroom 580
Magistrate Judge Margaret A. Nagle

Discovery Cutoff:    June 30, 2014
Pretrial Conference: November 14, 2014
Trial Date:       None Set

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTORY STATEMENT

#### A.   PLAINTIFFS' INTRODUCTION

Although this action arose from Defendants'[1] false advertising about high fructose corn syrup ("HFCS"), discovery reveals a much more sinister conspiracy. Defendants willfully deceived the public and press, concealed their relationships to advocates to whom they paid millions of dollars, and schemed to obscure science important to public health.  Defendants are wrong to advertise HFCS as "natural," as "corn sugar," or that "your body can't tell the difference" between HFCS and table sugar (*i.e.*, sucrose).  Even more troubling are the important documents they and their allies have produced under the cloak of confidentiality, and in which:

- An ADM executive warns that "we're . . . asking for trouble by using the 'natural' language." (Declaration of Adam R. Fox ["Fox Decl."] Ex. 1);
- Defendants seek "[a]n authoritative determination by FDA regarding the natural status of HFCS" – despite having already advertised HFCS as natural for two years. (*Id.* Ex. 2);[2]
- An ADM executive calls the plan to rename HFCS as corn sugar "dishonest and sneaky." (*Id.* Ex. 3);
- A Tate & Lyle executive later cautions that "two new TV ads" calling HFCS "corn sugar" may raise legal "concerns." (*Id.* Ex. 5);
- CRA's president agrees with advocate Berman & Co. that a peer-reviewed, published study[3] "undercuts . . . our abilities to argue that there

---

[1] "Defendants" are some of the largest companies in the world selling food commodities, defendants and counterclaimants Archer-Daniels-Midland Company ("ADM"), Cargill, Inc. ("Cargill"), Ingredion Incorporated ("Ingredion"), Tate & Lyle Ingredients Americas, Inc. ("Tate & Lyle") (collectively the "Corn Processors"), as well as their captive trade group, defendant Corn Refiners Association ("CRA").

[2] Other documents reveal that this request was rejected. (Fox Decl., Ex. 4).

[3] Bocarsly M., *et al.*, "High-Fructose Corn Syrup Causes Characteristics of Obesity in Rats: Increased Body Weight, Body Fat and Triglyceride Levels," *Pharmacol. Biochem. Behav.* (2010) 97:101-106.

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

is no conclusive evidence suggesting a metabolic difference" between HFCS and sugar – and the need to "tamp this study down." (*Id.* Ex. 8);

- CRA's president seriously considers a Berman & Co. recommendation to "sponsor[] some sort of counter-research" to another peer-reviewed, published study[4] and – if the results disfavor Defendants' marketing position – "bury the data." (*Id.* Ex. 9); and

- CRA's president advises Cargill executives that "[t]he Center for Consumer Freedom (Berman & Co.) will run [some of] our HFCS TV and print advertisements." She adds, "[O]ur sponsorship of this campaign remains confidential. We are funding Berman & Co. directly, not the Center for Consumer Freedom which is running the ads," to publicly disavow "funding the Center for Consumer Freedom." (*Id.* Ex. 6). This secret funding approaches ████████ in 2010 alone. (*Id.* Ex. 7).

These documents are important because they reflect Defendants' deliberate attempt to mislead the public and to conceal from public scrutiny matters important to public health and safety. Yet none of these documents can be filed in the Court's public record. Many cannot even be shared with Plaintiffs because Defendants and their agents have designated them "Highly Confidential - Attorneys Eyes Only" ("AEO") under the Court's Stipulated Protective Order ("Protective Order"). And these documents are just the tip of the iceberg.

Indeed, this motion challenges the confidentiality designations of nearly 200,000 documents by Defendants and two non-parties – James M. Rippe, M.D. ("Rippe") and John S. White, Ph.D. ("White," or collectively with Defendants and Rippe "Respondents") – whom Defendants have paid over $10 million to advocate on their behalf. Of the nearly 733,000 pages of documents Respondents have so far produced, they designated more than two-thirds as confidential or AEO. CRA, a

---

[4] Ventura EE, et al., "Sugar Content of Popular Sweetened Beverages Based on Objective Laboratory Analysis: Focus on Fructose Content," *Obesity* (2010) 19[4]:868-874.

1  trade group that makes and sells nothing, produced the majority – about 587,000

2  pages – and designated about 92% of them as confidential or AEO.

3      Although review of Respondents' documents continues, [5] Plaintiffs'

4  examination to date reveals that Respondents' confidentiality designations

5  persistently violate the Protective Order's prohibition against "mass, indiscriminate,

6  or routinized designations."   Dkt. 100 (Protective Order) § 1.   Respondents'

7  designations also violate the Protective Order for the independent reasons that they

8  conceal from public scrutiny matters "important to public health and safety," and

9  reveal "a deliberate effort by . . . [Defendants' and] their agents to conceal or

10  mislead the public or the scientific community." Id.

11      In short, Respondents' confidentiality designations defy both the letter and

12  spirit of the Protective Order.  They unfairly hamper Plaintiffs' ability to participate

13  directly in the action.   They also needlessly drive up Plaintiffs' costs and

14  unnecessarily burden the Court because of the special care that must be accorded to

15  such excessively designated materials.   And they will no doubt frustrate public

16  access to Court files and proceedings as discovery materials become incorporated

17  into briefs and used as hearing exhibits.

18      Although Plaintiffs have had some, limited, success in securing Respondents'

19  agreement to reconsider certain confidentiality designations on a piecemeal basis,

20  Respondents refuse to address the underlying problem.   Court intervention is

21  therefore required to rectify Respondents' rampant abuse of confidentiality

22  designations.  Plaintiffs respectfully request that the Court order a complete de-

23  designation of all documents that Respondents have produced, an order mandating

24  that Respondents re-evaluate and justify all designations by a date certain, or other

25  relief consistent with substantial justice.

---

[5] CRA produced the vast majority of its documents in August 2013.  The Corn Processors began producing their documents on October 2, 2013, substantially completing their productions on October 29, 2013.  (Fox Decl. ¶¶ 3-4.)

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

**B.   DEFENDANTS' INTRODUCTION**

The sugar Plaintiffs' motion regarding Defendants' confidentiality designations has little to do with a legitimate discovery dispute, and everything to do with publicly disparaging HFCS and its makers. Thus, Plaintiffs' introductory statement claims wildly that Defendants are engaged in a "sinister conspiracy" to hide information important to public health and safety—while never articulating exactly what health information is supposedly being hidden from the public. There is none. Plaintiffs employed a similar tactic in their Answer to Defendants' Counterclaim, which was so full of non-responsive argument that its intent to disparage HFCS and its makers was obvious. Not surprisingly, that filing was followed by a coordinated press release. If anything, it is Plaintiffs who have engaged in a spin-and-smear conspiracy to scare the public into consuming sugar over HFCS.

Indeed, the discovery record here shows it is the sugar industry Plaintiffs that are trying to hide and distort information about health and scientific studies as part of a malicious campaign to drive people away from HFCS and to processed sugar. For example, The Sugar Association internally found that a "study" challenging HFCS concentrations in popular soft drinks was **"so totally flawed that the [Sugar] Association should neither include it in the body of evidence nor should issue any public statement on it."** (Declaration of Bryna Dahlin ("Dahlin Decl.") Ex. 1.) Yet, despite this unfavorable internal assessment, Plaintiffs rely upon it publicly to attack HFCS in a variety of forums. (*Id.* Ex. 2.)

In fact, the documents that Plaintiffs themselves designated as confidential—which clearly are not confidential—show The Sugar Association has been behind HFCS disparagement for a decade. In 2003, The Sugar Association identified driving buyers away from HFCS and to sugar as its "number one management objective." (*Id.* Exs. 3, 4.) It thereafter sought to "fe[e]d the media with the science to help fuel the public concern and debate on HFCS," while internally admitting it

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

-4-

**lacked** scientific evidence to show any meaningful differences in biological impact between sugar and HFCS. (*Id.* Exs. 4, 5.) The Sugar Association secretly funneled money to scientists through a group called the "Academic Network." (*Id.* Ex. 4.) But the scientists it funded were unable to support Plaintiffs' assertion that sugar is nutritionally superior to HFCS. As Charles Baker, Chief Science Officer for The Sugar Association, admitted behind closed doors: "Arguing dogmatically that a sucrose soft drink is different nutritionally than one sweetened with HFCS-55 is not only unsound but inaccurate." (*Id.* Ex. 6.) There is more: Acknowledging they lacked science to back their claims, Baker questioned "whether the industry has the resolve to pursue/fund the science that may (or may not) differentiate sugar" from HFCS. (*Id.* Ex. 7.)

The Sugar Association turned from trying to find scientific support for its attacks to its current scare tactic: claiming that beverages made with HFCS 55 are being sold with higher fructose levels, relying on a supposed "study" published by Goran and Ventura. They do so despite their own internal conclusion that the study is "so totally flawed that the [Sugar] Association should neither include it in the body of evidence nor should issue any public statement on it." (*Id.* Ex. 1.) The Sugar Association's analysis found the data supporting the study was **"illogical," "groundless"** and **"essentially meaningless."** (*Id.*) Yet The Sugar Association even today touts this discredited study in press releases, on its website, in this lawsuit (including the Complaint), and even in this very motion, to attack HFCS.

While falsely accusing HFCS makers of a "conspiracy" to hide science through confidentiality designations, the sugar industry secretly concluded that other "studies" they cite publicly do not support their attacks on HFCS. For example, The Sugar Association internally admitted that the 2004 Bray and Popkin hypothesis suggesting HFCS was responsible for obesity—cited in the opening paragraph of the Complaint in this case—has such "major shortcomings" that it *was recanted* by its own authors. (*Id.* Exs. 8, 8A.) What about the "Princeton" rat

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- 5 -

study, also featured prominently in Plaintiffs' Complaint?  Internally, The Sugar Association said it "lacks rigor" and should not be used as direct evidence.  (*Id.* Ex. 9.)  And, while The Sugar Association internally found that studies comparing HFCS and sucrose do not allow them "to definitively declare a difference in biological impacts at this time," that is exactly what they do.  (*Id.* Ex. 10.)

In public attacks on HFCS, the sugar industry Plaintiffs decry the supposed "health concerns" about HFCS and claim that HFCS is responsible for the nation's obesity crisis.  But when no one is looking, they admit in their internal documents that "sugar and total caloric sweeteners *(including HFCS) are not the cause of obesity*."  (*Id.* Ex. 11.)  So it is with great irony and hypocrisy, in this latest filing, that the sugar industry Plaintiffs accuse the corn refiners of a "conspiracy" to hide information important to public health.

Regarding the supposed subject of Plaintiffs' motion, Defendants are reviewing their production and will de-designate as appropriate.  Regarding the specific documents cited by Plaintiffs, Defendants are de-designating all but three.  Had Plaintiffs previously raised these designations, Defendants would have  revised as necessary.  That is the procedure required by the protective order and is common in large document cases like this one.  Thus, when Defendants recently challenged the confidentiality designations of over 500 documents produced by the sugar Plaintiffs, they removed the designations *from all but one*.  A cursory review of the many thousands of other documents marked confidential shows that the vast majority should likewise be undesignated.  The parties can and should work out the designations among themselves.  Plaintiffs did not need to burden the Court with their public disparagement ploy masquerading as a discovery dispute.

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California  90071

- 6 -

## II. DEFENDANTS' "CONFIDENTIAL" AND "AEO" DESIGNATIONS

### A. PLAINTIFFS' CONTENTIONS AND POINTS OF AUTHORITY

#### 1. DISCOVERY OF RESPONDENTS' INDISCRIMINATE, ROUTINIZED DESIGNATIONS AND MEET AND CONFER EFFORTS

Defendants' paid advocates Rippe and White produced their subpoenaed documents, through Defendants' counsel, in July 2013.[6] Their productions abused the Protective Order's license to make confidentiality designations:

- The productions contain mass and indiscriminate confidential and AEO designations – approximately 95% of the Rippe production and 85% of the White production are labeled AEO.[7] (Fox Decl. ¶ 2).

- The designated documents address such obviously non-confidential subjects as (1) spam emails from "no-reply" addresses (*id.* Ex. 10); (2) correspondence scheduling dinner meetings, accommodations and conference travel logistics (*id.* Ex. 11); and (3) public statements about HFCS (*id.* Ex. 12).

Discerning no "extremely sensitive" information that would "create a substantial risk of serious harm" for which the AEO designation is restricted, Plaintiffs challenged the Rippe and White designations.[8] (*Id.* Ex. 13). Plaintiffs identified 321 documents improperly designated AEO. Concerned about the scope of the improper designations in this early production and the prospect of continued

---

[6] The documents produced for Rippe on July 15, 2013 were in response to subpoenas served on Rippe and Rippe Lifestyle Institute in October 2012. The documents produced for White on July 15, 2013 were in response to a subpoena served in December 2012. (Fox Decl. ¶ 2.)

[7] Word searches revealed that of the 1,950 documents produced by Rippe, 330 simply contain the word "Confidential" and 1,519 contain the phrase "Highly Confidential – Attorneys' Eyes Only." Of the 4,662 documents produced by White, 867 simply contain the word "Confidential" and 3,079 contain the phrase "Highly Confidential – Attorneys' Eyes Only." (Fox Decl. ¶ 2.)

[8] The Protective Order establishes the procedure to challenge confidentiality designations. The process begins by "conferring directly with counsel for the Designating Party." [Dkt. 100 at § 6.2]. The party challenging the designations must explain the basis for its belief that the designations are improper and provide the Designating Party with an opportunity to review the designated material and explain its designation. *See id.*

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1   blanket designations, Plaintiffs specifically requested that future designations be

2   made judiciously as required by the Protective Order. (*Id.*)

3       Defendants' counsel conceded they had improperly designated as AEO *all*

4   *but one* of the 321 challenged documents. (*Id.* Ex. 14). In the meantime – on

5   August 23, 2013 – CRA produced 96,688 pages of documents, nearly doubling its

6   earlier productions. (*Id.* ¶ 3.) Plaintiffs' initial, cursory review of that latest

7   production revealed more improper designations. (*Id.*) As of that date, CRA had

8   produced in total 58,739 documents comprising 193,613 pages – about **98% of**

9   **which CRA had designated confidential or AEO.**[9] (*Id.*)

10      Given the mounting over-designations in an expanding data set, on

11   September 11, 2013, Plaintiffs' counsel again sought to meet and confer about

12   Respondents' growing track record of improper, routinized designations. (*Id.*, Ex.

13   15.) By that time, CRA had further expanded its production to nearly 587,000

14   pages of documents. (*Id.* ¶ 3.) Plaintiffs' counsel expressed the concern that the

15   apparent pattern of overzealous designations rendered neither feasible nor justified

16   the document-by-document analysis contemplated by section 6 of the Protective

17   Order. (*Id.*, Ex. 15.) Requiring that Plaintiffs conduct such an undertaking would

18   impose a huge and unwarranted burden on Plaintiffs given Defendants' evident

19   failure to exercise required good faith and restraint. (*Id.*)

20      Plaintiffs requested that Defendants reevaluate their designations in CRA's

21   production with a view toward de-designating documents undeserving of

22   confidentiality. (*Id.*) Plaintiffs additionally sought assurances that Defendants'

23

24   ───────────────

     [9] To determine the number of designated documents, Plaintiffs applied a two-step query to
25   Defendants' documents (which were made searchable using Optical Character Recognition
     software), first searching for all documents containing the phrase "Highly Confidential –
26   Attorneys' Eyes Only" and then searching for all documents containing the term "Confidential"
     and excluding those previously confirmed as bearing the AEO designation. (Fox Decl. ¶ 3).
27   Plaintiffs' late August 2013 review revealed that CRA had designated approximately 34% of its
     documents AEO and 64% as confidential – meaning CRA designated 98% of the total documents
28   it produced. (*Id.*)

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

future productions would adhere to both the letter and spirit of the Protective Order. (*Id.*)

Counsel met and conferred about the issue on September 12, 2013. (Fox Decl. ¶ 20). The parties agreed that each side would examine a subset of randomly selected documents from CRA's production, assess the propriety of the designations and then inform the other about their positions with respect to each document. Plaintiffs conducted their analysis and shared with Defendants a chart summarizing the results.[10] (*Id.* ¶ 20 & Ex. 16). Of the one hundred CRA documents that Plaintiffs randomly selected, CRA had invoked confidentiality for 93 of them: 27 as AEO and 66 as confidential. (*See generally id.*, Ex. 18)

Of these 93 designated documents, Plaintiffs concluded that three had properly been designated as confidential and four designated as AEO should have been designated confidential. The remaining 86 should not have been designated at all. (*Id.* [*see especially* first attachment to the exhibit]). From this random sample of just one hundred CRA documents, those designated under the Protective Order included:

- Correspondence to third parties regarding published statements about HFCS (*id.* Ex. 19);
- Copies of published, publicly available articles about HFCS (*id.* Ex. 20);
- Public comments, posted on the FDA's website, about Defendants' petition seeking permission to use "corn sugar" as an alternative name for HFCS (*id.* Ex. 21);

---

[10] This letter also identified 426 additional documents improperly designated in the White and Rippe productions. On October 18, their counsel agreed to downgrade the AEO designation to confidential for 66 documents identified in the October 7 list and agreed to completely withdraw confidentiality designations for the remaining 360 documents. (Fox Decl. Ex. 17). For the Court's convenience and reference, all 100 documents randomly selected and reviewed by Plaintiffs are attached, with separating tabs, to the accompanying Fox Declaration. (*See* Fox Decl. Ex. 18).

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- Blurry and illegible documents (*id.* Ex. 22);
- Blank pages with no information at all (*id.* Ex. 23); and
- A photograph of Rippe (*id.* Ex. 24).

On October 18, 2013, Defendants identified documents earlier produced and designated under the Protective Order for which they were prepared to withdraw all designations. (*Id.* Ex. 17).  These included 22 documents from Plaintiffs' random sample.  But although they had invoked confidentiality for the vast majority of their total production by that juncture,[11] Defendants declined to report the results of their own review.  (*Id.*)  Nor did they try to explain how their mass designations could plausibly be consistent with the Protective Order's requirements to exercise restraint and care in making designations.  "We believe our confidentiality designations in the first instance were appropriate," Defendants simply maintained without elaboration. (*Id.*)  Finally, in an attempt to dismiss their obligations under the Protective Order, Defendants closed the discussion by demanding that Plaintiffs continue to shoulder the burden of following the Protective Order's de-designation procedures by expressly identifying and challenging each improperly designated document. (*Id.*)

### 2.   THE PROTECTIVE ORDER'S STANDARDS GOVERNING CONFIDENTIALITY

The Protective Order provides for two levels of confidentiality: (1) "Confidential" information that "qualifies for protection under standards developed under F.R.Civ.P. 26(c)," and (2) "Highly Confidential – Attorneys' Eyes Only" ("AEO").  Protective Order [Doc. 100] §§ 2.3-2.4.  The Protective Order expressly requires "[r]estraint," and cautions producing parties to "take care to limit" making confidentiality designations.  *Id.* § 5.1.  "Mass, indiscriminate, or

---

[11] By October 18, 2013, Plaintiffs had received document productions from CRA, Cargill, Tate and Lyle and ADM.  Of those four productions, 92% of CRA's, 85% of Cargill's and 70% of Tate and Lyle's documents were designated confidential or AEO.  Defendants uncharacteristically applied some restraint in designating ADM's production, designating about 27% of those documents under the Protective Order. (Fox Decl. ¶ 4).

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1    routinized designations are prohibited." *Id.*   Moreover, the circumstances under

2    which an AEO designation may be applied are narrowly restricted; the designation

3    is reserved for "extremely sensitive" information that would "create a substantial

4    risk of serious harm" if disclosed and cannot be protected "by less restrictive

5    means." *Id.* § 2.4.

6           Consistent with Ninth Circuit law, the "Designating Party" bears the burden

7    of persuading the Court about the propriety of each confidentiality designation

8    challenged. *Id.* § 6.3; *see Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122,

9    1131 (9th Cir. 2003) (holding that the designating party must make a particularized

10   showing of "specific harm or prejudice that [it] expects will arise from disclosure of

11   any particular documents produced in discovery").

12          The Protective Order also makes a special point of recognizing the public

13   health issues presented by this case.  It expressly prohibits designations that conceal

14   information of public interest, including documents that show a deliberate effort to

15   conceal information from, or to mislead, the public or scientific community:

16                 [T]his litigation potentially involves the health of persons

17                 who have an interest in knowing whether sugar (sucrose)

18                 and   high   fructose   corn   syrup   present   metabolic

19                 differences relevant to weight gain, obesity, diabetes,

20                 hypertension   and   other   metabolic   disorders.   *No*

21                 *protections shall be permitted and no designations of*

22                 *confidentiality honored* if the Court determines that, on

23                 balance, the public interest in disclosure of information

24                 *important to public health and safety* outweighs the

25                 private   interests   in   the   protection   of   information

26                 designated in good faith as confidential pursuant to the

27                 provisions of this order.  Likewise, no confidentiality

28                 protection  shall  be  permitted  for  information  that  is

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- 11 -

1   determined by the Court to demonstrate a ***deliberate***
2   ***effort by any of the parties or their agents to conceal or***
3   ***mislead the public or the scientific community about***
4   ***these subjects.***
5   Dkt. 100 § 1 (emphasis added).  Particularly for documents of this nature, therefore,
6   the Designating Party must "'articulate compelling reasons supported by specific
7   factual findings' that outweigh the general history of access and the public policies
8   favoring disclosure." *Kamakana v. City & Co. of Honolulu,* 447 F.3d 1172, 1178-
9   1179 (9th Cir. 2006) (citing *Foltz,* 331 F.3d at 1135).
10       "The mere fact that the production of records may lead to a litigant's
11  embarrassment, incrimination, or exposure to further litigation will not, without
12  more, compel the court to seal its records."  *Id.* (internal citations and quotations
13  omitted).  After considering the competing public and private interests, "if the court
14  decides to seal certain judicial records, it must 'base its decision on the compelling
15  reason and articulate the factual basis for its ruling, without relying on hypothesis
16  or conjecture." *Id.* at 1179 (citing *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th
17  Cir. 1995)).
18       Defendants must make a particularized showing of "specific harm or
19  prejudice that [they] expect[] will arise from disclosure of any particular documents
20  produced in discovery" for each document Defendants seek to protect. *Foltz,* 331
21  F.3d at 1131; *see also Kamakana,* 447 F.3d at 1186 (trial court's decision affirmed
22  when unsealing due to finding that only generalized assertions of harm were made).
23  Broad, conclusory allegations of potential harm are not enough.  A party seeking to
24  establish good cause for protection must provide "specific demonstrations of fact,
25  supported where possible by affidavits and concrete examples, rather than broad,
26  conclusory allegations of potential harm." *Foltz,* 331 F.3d at 1130-1131.  "Broad
27  allegations of harm, unsubstantiated by specific examples or articulated reasoning,

28

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1   do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d

2   470, 476 (9th Cir. 1992).

3           **3.**    **DEFENDANTS' MASS DESIGNATIONS UNFAIRLY FRUSTRATE**

              **COUNSEL'S ABILITY TO CONFER WITH CLIENTS AND**

4                 **UNNECESSARILY INCREASE COSTS**

5         Defendants' gross overuse of AEO designations deprives Plaintiffs' counsel

6   of the ability to fully and frankly discuss the merits of the claims and defenses, and

7   hinders their ability to communicate with respect to strategy.   Counsel cannot

8   timely confer with their clients on case developments and important strategic

9   decisions.

10         For example, Plaintiffs recently answered the Corn Processors'

11   Counterclaims.   Portions of the Answer implicated and sometimes cited to or

12   quoted from documents that Defendants had designated confidential or AEO under

13   the Protective Order.  Plaintiffs' counsel were thus compelled to redact the Answer

14   for filing in the public record and to seek Court permission to file the unredacted

15   Answer under seal.   *See* Dkt. 136.  More important, however, is that Defendants'

16   improper AEO designations, in particular, precluded Plaintiffs' counsel from

17   discussing with their clients – much less let their clients review – information

18   material to the clients' responsive pleading.  For example, until the Court denied the

19   accompanying application to seal, Plaintiffs' counsel could not share with their

20   clients a startling document produced by Cargill that contradicts the fundamental

21   basis for the Counterclaims.  That document admits that Defendants' "assum[ption]

22   that sugar interests are behind the HFCS-trashing scientific studies" and their

23   "feel[ing that] we are constantly getting it in the shorts from the sugar industry" are

24   supported by "no proof." (Fox Decl. Ex. 25).

25         While the Court ensured that the unredacted Answer would be placed in the

26   public record, Plaintiffs' counsel remain unable to share with their clients the

27   underlying Cargill document in which the above quotes appear, and are more

28   broadly deprived of the ability fully to advise their clients.  Moreover, counsel for

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1  Plaintiffs remain unable to obtain important buy-in from their clients concerning
2  counsels' strategic recommendations concerning the best use of the limited
3  depositions authorized in this case and presentation of evidence to this Court.
4  Counsel for Plaintiffs are also unable to fully and timely advise their clients
5  concerning counsel's current assessment of core issues in this case, such as
6  Defendants' willfulness, and the specific evidence affecting counsel's assessment.

7      Respondents' massive, rote designations are also unnecessarily increasing
8  costs.    For example, in addition to preparing the Answer to Defendants'
9  Counterclaim, counsel for Plaintiffs had to prepare a redacted Answer and an
10 accompanying application to file it under seal (to which Defendants never even
11 bothered to respond – belying any notion that they were ever truly concerned about
12 disclosure of the information they designated under the Protective Order). *See* Dkt.
13 136-137.    The Court promptly determined that the redacted information in the
14 Answer should not be withheld from public view. Dkt. 138. Defendants' abusive
15 designations forced Plaintiffs to incur unnecessary expense, just as Plaintiffs now
16 incur unnecessary expense in preparing a redacted version of this Joint Stipulation
17 and its accompanying application to file under seal.    Of course, although the
18 Answer itself is now unredacted, Plaintiffs' counsel remain unable to discuss many
19 of the documents forming the Answer's bases because of Defendants' AEO
20 designations.

21     Moreover, Respondents' abuse of the AEO designation prevents Plaintiffs'
22 counsel from advising their clients about documents addressing the following
23 important subjects:

24 • CRA's internal discussions regarding consumer concerns about the
25   apparent lack of a single "independent scientific study that says HFCS is
26   just like sugar in the body" supporting CRA's statements of equivalence.
27   (Fox Decl. Ex. 26]);

28

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- Defendants' HFCS budgets for 2008 and 2009, which reveal the massive scope of Defendants' advertising campaign, including:
  - Their engaging three different public relations firms to work on it;
  - Payment of $████ in "retainer" payments and the funding of two HFCS studies in 2008;
  - Their sponsorship of conferences and webinars;
  - Their engaging of Berman & Co. for a "media defense" campaign and "opposition research;" and
  - Efforts to target specific consumer segments through the activation of a "Moms campaign" and "Registered Dietician Network" (*id.* Ex. 27);

- The Corn Processors' hiring Richard Berman's Center for Consumer Freedom ("CCF") and indirectly funding it through the related Berman & Co. with nearly $18 million in funds in 2010 alone, with the specific "hop[e that] Berman's oppo [*sic*] research expertise can uncover some facts," while conceding that Defendants themselves may be "just a bunch of conspiracy theorists"[12] (*id.* Ex. 25).

- The Corn Processors' orchestrated efforts to conceal their involvement by keeping its tens-of-millions-of-dollars "sponsorship of [the CCF] campaign . . . confidential" so they could publicly (and falsely) proclaim that they were "not funding the Center for Consumer Freedom"[13] (*id.*

---

[12] According to one commentator, Richard Berman is a "hired gun who uses front groups to defend his corporate clients against the public interest." Facts on Berman, http://www.bermanexposed.org/facts. Berman "has fought unions, Mothers Against Drunk Driving, PETA and other watchdog groups in their efforts to raise awareness about obesity, the dangers of smoking, mad cow disease, drunk driving, the minimum wage and other causes." *Id.* One of Berman's organizations is the Center for Consumer Freedom. Formerly known as Guest Choice Network, the organization was founded in 1995 with seed funding from tobacco giant Philip Morris USA Inc. *See* Caroline Mayer and Amy Joyce, *The Esclating Obesity Wars Nonprofit's Tactics, Funding Sources Spark Controversy*, Wash. Post, Apr. 27, 2005, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/04/26/AR2005042601259_pf.html.

[13] Defendants are no strangers to charges (some even conceded) of unlawful conduct, including "using the CRA" in "furtherance of the conspiracy" to fix prices for HFCS. *In re High Fructose*

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

Ex. 6).

The directive to conceal Defendants' intimate relationship with Berman & Co. is clear from in at least one undesignated document – "we do not want it to become public that CRA has engaged [Berman]." (*Id.* Ex. 28). Yet Defendants elsewhere use confidential or AEO designations to conceal the scope, depth and price of Berman & Co.'s involvement and to insulate Defendants from the negative optics that their relationship with Berman & Co. would bring if known. Consider the following revelations from confidential and AEO documents:

- Berman & Co.'s engagement was premised on Defendants' "approv[al of] final versions of each [Berman] ad" (*id.* Ex. 29);

- In 2009, before Defendants launched their more aggressive ad campaign in 2010, Berman & Co. advised CRA that media needed "a new hook" to cover the HFCS advertising campaign, suggesting that such attention could be garnered if the "sugar message" was adjusted in the advertising so that HFCS was "picking a fight [with sugar] that brings with it earned media" (*id.* Ex. 30);

- CRA agreed with Berman & Co.'s recommendations to "tamp . . . down" a peer-reviewed study that "undercuts" Defendants' "abilit[y] to argue that there is no conclusive evidence suggesting a metabolic difference" between HFCS and sugar (*id.* Ex. 8);

- Berman & Co. recognized that a study by University of California, Los Angeles, researchers linking fructose consumption to cancer would be compelling in the public sphere. "Because [Defendants] can't disprove the research," he recommended a "full-court press" public relations

*Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1023 (C.D. Ill. 2001), *rev'd*, 295 F.3d 651, 661 (7th Cir. 2002) (reversing summary judgment because evidence supported charges that ADM, Cargill, Tate & Lyle predecessor A.E. Staley Manufacturing Co. and Ingredion predecessor CPC International, Inc. had engaged in a "conspiracy orchestrated by a firm, ADM, conceded to have fixed prices on related products (lysine and citric acid) during a period overlapping the period of the alleged conspiracy to fix the prices of HFCS.").

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

response along the lines that "this is another 'everything causes cancer' food scare" in order to "freeze" continued "product switching by manufacture[r]s" (*id.* Ex. 31).

Disclosure of these facts would not result in the type of harm that the Protective Order is intended to prevent.

Narrow restrictions on counsel's ability to advise and confer with clients about information learned through discovery, and added expenses associated with complying with protective orders, routinely are a necessary inconvenience in cases involving competitors. But these burdens are intolerable here given Defendants' rampant abuse of confidentiality designations. The mass, indiscriminate designations are, on their own, improper. They also unacceptably limit Plaintiffs' counsels' ability to communicate material information with their clients regarding case strategy and the Corn Processors' intimate involvement in the challenged advertising.

Defendants have not explained – because they cannot – why the overwhelming majority of their productions merit confidential or AEO treatment. They just stubbornly insist that their designations are "appropriate." Because so many of these documents are material to the parties' claims and defenses, Defendants should be held to the "compelling reason" standard in justifying any designations they seek to maintain. *See Kamakana,* 447 F.3d at 1178-1179.

### 4. DEFENDANTS' INDISCRIMINATE DESIGNATIONS CONCERNING PUBLIC HEALTH SHOULD NOT BE HONORED

The Protective Order explicitly acknowledges the public interest in health issues involved in this case and carves out an explicit exception for documents concerning public health: "No protections shall be permitted and no designations of confidentiality honored if the Court determines that, on balance, the public interest in disclosure of information important to public health and safety outweighs the private interests in the protection of information designated in good faith as

- 17 -

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

confidential." Dkt. 100 § 1.  The Protective Order also explicitly bars the invoking of confidentiality to perpetuate public deception: "[N]o confidentiality protection shall be permitted for information that is determined by the Court to demonstrate a deliberate effort by any of the parties or their agents to conceal or mislead the public or the scientific community about these [metabolic differences]." *Id.*

Many documents produced by Defendants concern public health.  For example, documents reveal that consumers with corn allergies or intolerances reported the literal falsity in the statements that "Corn sugar is sugar" and that "your body can't tell the difference" between HFCS and sugar, because their bodies could, in fact, "tell the difference."  (Fox Dec. Ex. 32).  These individuals were correct to point out the dangers in equating HFCS with sugar, as some members of the public may need to avoid corn and its by-products.  CRA recognized "that a number of cereal grains are known to cause allergic reaction, but that is separate from the metabolic concern" addressed by the false advertising campaign. (*Id.*)

Equally undeserving of confidentiality because it affects the public health and interest is a CRA-produced email acknowledging that relabeling HFCS as "corn sugar" could pose a health problem for individuals with hereditary fructose intolerance – but determining not to be proactive in discussing this problem. (*Id.* Ex. 33).  Lest any doubt exist, the FDA itself, in denying Defendants' petition to authorize the use of "corn sugar" as an alternative name for HFCS explicitly determined that the proposed name change posed a public health risk for those with hereditary fructose intolerance.  (*Id.* Ex. 34).  These documents, which unquestionably relate to public health, do not present any risk to the "competitive harm" for which confidentiality is justified.

Likewise, many documents improperly designated as confidential or AEO belie Defendants' theory that HFCS and sucrose are metabolized the same and identify key differences between HFCS and sucrose, including "the name, the exact composition, functionality, chemical formulas, absorption [by the body], etc." (*Id.*

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1   Ex. 35.) Defendants even acknowledge a difference in the rates of the absorption.

2   (*Id.* Ex. 36.) These documents reveal that Defendants knew their advertisements

3   were misleading, and do not merit confidentiality protection.

4          Ostensibly protected documents also show that Rippe and White – vocal

5   champions of HFCS – receive *substantial* annual funding from Defendants. Since

6   2008, Rippe has received at least $ ▮▮▮▮▮ annually in "consulting fees" from

7   the Corn Processors though CRA. (*Id.* Ex. 37.) Rippe and his company, Rippe

8   Lifestyle Institute, have received close to $ ▮▮▮▮▮ in "consulting fees" and

9   research funds from the Corn Processors (through CRA) since 2008. (*Id.*) Since

10  2011, White has received through his company, White Technical Research, at least

11  $ ▮▮▮▮▮ annually from the Corn Processors through the CRA. (*Id.*)

12         Rippe has referred to himself as a "canary" for CRA. (*Id.* Ex. 38.) The Corn

13  Processors have described White as "CRA's hired gun." (*Id.* Ex. 39.) Rippe and

14  White are perhaps the two most "tireless" advocates of the argument that the

15  various formulations of HFCS and sucrose are "nutritionally equivalent" and that

16  "your body can't tell the difference" between the sweeteners. The public has an

17  interest in knowing the biases motivating these supposedly independent scientists.

18  (*Id.* Ex. 40.)

19         A similarly compelling public interest exists in knowing that at least one of

20  Defendants' consultants boasted of the ability to "bury" scientific data that might

21  undercut Defendants' marketing position. In 2010 researchers from the University

22  of Southern California revealed that tested beverages sweetened with HFCS had a

23  mean fructose content higher than 55%, with several major brands apparently

24  containing nearly 65% fructose.[14] In response to this study, Berman & Co.

25  recommended that "CRA should be sponsoring some sort of counter-research to

26  refute USC," with the understanding that – if the results were unfavorable – they

27  _____

[14] Ventura EE, et al., "Sugar Content of Popular Sweetened Beverages Based on Objective
28  Laboratory Analysis: Focus on Fructose Content," *Obesity* (2010) 19[4]:868-874.

- 19 -

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1  "***bury the data***." (*Id.* Ex. 41 (emphasis added).)  This alarming statement revealing

2  serious  consideration  about  concealing  scientific  research  does  not  merit

3  confidentiality.  Burying scientific data, or even active discussion of doing so, is not

4  remotely in the public interest.

5        Protected documents also reveal that Defendants apparently adopted Berman

6  &  Co.'s  suggestion  by  engaging  Larry  Hobbs,  Executive  Director  of  the

7  International Society of Beverage Technologists, to use Krueger Food Laboratories,

8  a private contract company, to analyze a series of commercial HFCS 42 and 55

9  samples.  The data were reported in a letter to the editor in the journal *Obesity,* in

10  which  the  original  study  was  published.  (Fox Decl. Ex. 42.)  Although this

11  information was not buried, CRA's hand in crafting the letter to the editor was –

12  indeed, CRA deliberately manipulated the situation to prevent third parties from

13  "detect[ing] CRA edits."  (*Id.* Ex. 43).  Despite a disclosure obligation, Hobbs

14  failed to reveal CRA's involvement in the responsive study. (*Id.* Exs. 42 & 44).

15        The public has a compelling interest in learning precisely how Defendants

16  have schemed to skew the public debate and state of science surrounding HFCS.

17  The public interest in disclosure of information about the bias of HFCS's scientific

18  champions, the efforts to conceal this bias and to obscure the science easily

19  outweighs any private interest in maintaining this information as confidential.

20       **5.**    **THE COURT SHOULD SANCTION DEFENDANTS' ABUSE OF THE**

21            **PROTECTIVE ORDER**

22        "Designations that are shown to be clearly unjustified, or that have been

23  made  for  an  improper  purpose  (e.g.,  to  unnecessarily  encumber  the  case

24  development process, or to impose unnecessary expenses and burdens on other

25  parties), expose the Designating Party to sanctions." Dkt. 100 § 5.1; *see also Fink*

26  *v. Gomez,* 239 F.3d 989, 991-93 (9th Cir. 2001) (noting that a district court may

27  levy sanctions pursuant to its inherent power for "willful disobedience of a court

28  order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1  for oppressive reasons"); *see* Fed. R. Civ. P. 37(b) (authorizing the district court's

2  imposition of appropriate sanctions to remedy violation of a protective order).

3      Defendants demonstrably violated the Protective Order by applying

4  confidential and AEO designations as defaults rather than exceptions, and to masses

5  of documents that manifestly do not merit confidentiality. Defendants' agreement,

6  on two occasions now, to withdraw or downgrade the designations for most every

7  challenged document in the White and Rippe productions underscores the massive

8  and indiscriminate nature of the designations in the first instance. (Fox Decl. Exs.

9  14 & 17). Further underscoring Defendants' cavalier approach towards

10  designations is their failure to explain how these indiscriminate designations

11  occurred in the first instance.

12          **a.**    THE COURT SHOULD ORDER DEFENDANTS, RIPPE, AND WHITE TO WITHDRAW ALL DESIGNATIONS FROM THE DOCUMENT PRODUCTIONS

13

14      The evidence overwhelmingly demonstrates that Defendants, Rippe, and

15  White violated the Protective Order by failing to exercise care, restraint, and good

16  faith. These failures unfairly burden and frustrate Plaintiffs' litigation efforts and

17  unnecessarily increase the costs of this case. Plaintiffs therefore respectfully

18  request this Court order the removing of the confidentiality designations on all

19  documents produced by Defendants, Rippe, and White to date.

20      Although the Protective Order sets forth a procedure to challenge dubious

21  designations, good cause exists for bypassing that procedure. Respondents'

22  wholesale abrogation of their obligations to exercise good faith and restraint

23  effectively transforms the Protective Order's designation-challenge procedure into

24  one that imposes undue burdens on Plaintiffs. Indeed, under a wooden reading of

25  the Protective Order, Plaintiffs' counsel would be constrained to track and identify

26  literally hundreds of thousands of documents – where Respondents abandoned their

27  duty to do so in the first instance – only to initiate the meet and confer process (and

28  potentially file motions) before many may even be shared with Plaintiffs

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1   themselves. Doing so would essentially punish Plaintiffs for Respondents' failures

2   of compliance with the Protective Order.

3   This result is all the more intolerable given the time that doing so would take.

4   Plaintiffs should be permitted to focus on the already substantial task of reviewing

5   Respondents' documents and proceeding with depositions so that they can timely

6   complete fact discovery and prepare for the ensuing expert discovery in 2014.

7   Having to spend countless hours identifying each of the hundreds of thousands of

8   documents that Respondents improperly designated, sending the required meet and

9   confer letter and then engaging in follow up discussions and motion practice would

10  needlessly distract Plaintiffs from their substantive work at hand and unfairly drive

11  up the costs of this litigation. Given their mass, routinized and baseless

12  designations, the burden should be borne by Respondents to cure their violations.

13  **b.    THE COURT SHOULD ORDER DEFENDANTS, RIPPE, AND WHITE TO JUSTIFY THE DESIGNATION FOR EACH DOCUMENT THEY SEEK TO KEEP PROTECTED**

14

15  As an alternative, Plaintiffs request the Court to order Defendants, Rippe, and

16  White to explain, for each document they seek to shield from disclosure to

17  Plaintiffs or the public, with "specific demonstrations of fact" and "concrete

18  examples" why continued confidentiality is justified. *Foltz*, 331 F.3d at 1130-1131.

19  As illustrated above, many of the documents impacted by the overzealous

20  designations are directly relevant to the merits of the case, demonstrating the

21  willfulness with which Defendants acted by basing advertising on statements they

22  knew to be untrue, and will thus be subjected to the "compelling reason" test.

23  *Kamakana*, 447 F.3d at 1178-1179.

24  **B.    DEFENDANTS' CONTENTIONS AND POINTS OF AUTHORITY**

25

26  Plaintiffs' motion comes as a surprise to Defendants, who had been

27  corresponding with Plaintiffs regarding both sides' use of confidentiality

28  designations. Defendants had already agreed to de-designate hundreds of

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- 22 -

1   documents (as had Plaintiffs).  (Fox. Decl. Exs. 14, 17.)   The discussions were

2   never turned off.  Further discussions could have brought about a resolution of this

3   matter, but that would thwart Plaintiffs' goal to publicly denigrate HFCS, this time

4   by claiming baselessly that Defendants are part of a "sinister conspiracy" to conceal

5   information relating to public health and safety.   The parties have in place a

6   mechanism for addressing confidentiality designations, and it has been working.

7         **1.   DEFENDANTS WILL DE-DESIGNATE DOCUMENTS AS
               APPROPRIATE.**

8

9         Confidentiality designations are particularly important in this case, where

10  Defendants are producing, among other things, highly sensitive pricing, spending,

11  shipment, and profit data that they cannot share with each other, let alone disclose

12  in a public setting or to a competitor in the sweeteners category.  As has been the

13  parties' practice, Defendants have reviewed the documents cited in Plaintiffs'

14  portion of the joint stipulation and will agree to de-designate all but three of those

15  documents. [15]   Defendants will downgrade the designations on those three

16  documents from "highly confidential" to "confidential."[16]

17        The documents for which Defendants maintain confidentiality designations

18  contain internal financial information for the Corn Refiners Association's ("CRA")

19  educational campaign, special assessment levies, and other spending information.

20  This sensitive and proprietary budget information is properly designated under the

21  protective order.  The protective order and numerous courts in this circuit explicitly

22  recognize that such information is routinely protected.  *See* Protective Order (D.E.

23  100 at § 2.4) ("the Parties anticipate that both they and non-parties will need to

24  protect sensitive proprietary and financial information as 'Highly Confidential –

25  Attorneys' Eyes Only" when the disclosure of such documents would pose a

26  _____

27  [15] Defendants are de-designating Exhibits 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 19, 20, 21, 22, 23, 24, 25, 26, 29, 30, 31, 32, 33, 35, 36, 38, 39, 40, 41, 43, and 44 to the Fox Declaration.

[16] These three documents are Exhibits 7, 27, and 37 to the Fox Declaration.

28

- 23 -

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1    serious risk of competitive harm."); *Oakes v. Halvorsen Marine, Ltd.*, 179 F.R.D.

2    281, 284 (C.D. Cal. 1998) (noting that parties have an interest in the nondisclosure

3    and confidentiality of its financial records which can be protected by a protective

4    order); *Valdez v. Travelers Indemnity Co. of Connecticut*, 2013 WL 3989583, at *6

5    (N.D. Cal Aug. 2, 2013) (ordering parties to enter into a protective order to protect

6    against disclosure of Plaintiff's financial documents).   Indeed, Plaintiffs have

7    designated many of their own similar internal financial documents as "Highly

8    Confidential – Attorneys Eyes' Only." (Dahlin Decl. Ex. 12.)

9          Plaintiffs ask this Court to summarily de-designate *all* of Defendants'

10   documents (as well as documents from subpoena recipients Drs. White and Rippe),

11   including any and all documents that contain highly sensitive proprietary and

12   financial information.  There is no basis for this request.  Plaintiffs alternatively ask

13   the Court to order Defendants to "explain for each document" why continued

14   confidentiality is justified.   Section Six of the Protective Order sets forth the

15   procedures for challenging confidentiality designations.    According to that

16   section—which all parties agreed to—the challenging party bears the burden of

17   initiating confidentiality challenges.  *See* D.E. 100 § 6.2 ("A Party that elects to

18   initiate a challenge to a Designating Party's confidentiality designation ... must

19   begin the process by conferring directly with counsel for the Designating Party.  In

20   conferring, the challenging Party must explain the basis for its belief that the

21   confidentiality designation was not proper and must give the Designating Party an

22   opportunity to review the designated material, to reconsider the circumstances . . . .

23   "); *Id.* at § 6.3 ("A Party that elects to press a challenge to a confidentiality

24   designation after considering the justification offered by the Designating Party may

25   file and serve a motion . . . that identifies the challenged material and sets forth in

26   detail the basis for the challenge . . . .  Until the court rules on the challenge, all

27   parties shall continue to afford the material in question the level of protection to

28   which it is entitled under the Producing Party's designation.").

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

- 24 -

1    Defendants will make a good-faith effort to go back and review their
2    designations, as parties in large complex document cases typically do when there
3    exist so many competitively sensitive documents and time is of the essence to
4    produce large quantities of documents.    This is particularly true here, where
5    Defendants have made a production vastly larger than Plaintiffs' production, which
6    is still deficient and massively incomplete.  The sugar industry Plaintiffs, who have
7    designated such things as a picture of a soda can, emails with no text, and publicly
8    available newsletters as confidential, all in a production that is both small in
9    number and plainly deficient in so many ways, should do the same.[17]

10    Plaintiffs seek to abrogate the Protective Order and force Defendants and
11    third parties to justify the designations of documents which Plaintiffs have not
12    challenged.  There is no cause for drastically modifying the Protective Order in this
13    way.  Defendants have demonstrated good faith and have agreed to withdraw
14    confidentiality designations for most of the documents identified by Plaintiffs in
15    their motion.  Defendants will also review the remainder of their production, now
16    that their production is substantially complete, to revisit and where necessary
17    eliminate or downgrade confidentiality designations.  Pursuant to the Protective
18    Order in place, the parties have been working out confidentiality designations on
19    both sides among themselves.  That process should be utilized for future challenges
20    without unnecessarily burdening the Court or creating a public affairs event, as
21    Plaintiffs are attempting to do here.

22

23  [17] While the five Defendants have thus far produced a total of 716,321 pages of documents, the
24  combined **nine** Plaintiffs have produced only 123,558 pages.  Among the many deficiencies in
     Plaintiffs' production to date, Plaintiffs failed to produce attachments to emails for a significant
25  percentage of their production; documents related to The Sugar Association's public marketing
     and promotion of sugar and denigration of HFCS; documents related to The Sugar Association's
26  funding of research—research that ultimately failed to demonstrate any nutritional difference
     between sugar and HFCS; documents related to claims made on the sugar.org website; and
27  documents related to The Sugar Association's funding of one or more third-party groups focused
28  on attacking HFCS and its makers.

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

2.   **PLAINTIFFS' CLAIMS OF HEALTH AND HUMAN SAFETY AND INABILITY TO CONFER WITH CLIENTS IS A PLOY TO VILIFY HFCS.**

Plaintiffs' assertion that they could not show their clients documents cited in their Answer to Defendants' Counterclaim lacks merit, as none of those documents had anything to do with actually answering the Counterclaim, and everything to do with making wild claims about Defendants and their product which Plaintiffs can then publicize.    Indeed, Plaintiffs issued an inflammatory press release in conjunction with filing their Answer wherein they impugned the character of Drs. White and Rippe, two highly regarded scientists who act as consultants to the CRA, and who *have never hidden their connection to the CRA*.    (*See* Dahlin Decl. Ex. 13:   "Corn Processors Pay Advocates, Claiming They Are Science Experts, According to New Legal Filing From The Sugar Association.").   As they have done in multiple press releases attacking HFCS since the court dismissed their state law claim under California's anti-SLAPP law, Plaintiffs went so far as to imply to the public (and potential jurors) that the Court had already ruled in their favor on the merits of this case.   In their press release, Plaintiffs described the court's ruling **granting** Defendants' anti-SLAPP motion as follows:  "U.S. District Court Judge Consuelo Marshall, who is presiding over the lawsuit, has also ruled on an earlier motion that the plaintiff sugar farmers have presented evidence demonstrating 'a reasonable probability of success on their argument that the statements (made by the corn processors) are false.'"   (*Id.*) [18]   There is no doubt here that Plaintiffs are

---

[18] As a further example, Plaintiffs issued a press release after losing their motion to dismiss the Counterclaim entitled "Sugar Association Concerned About Court Ruling's Impact on Free Speech," wherein they claimed that Defendants had only filed their counterclaim "[a]fter the court ruled that a preliminary review of evidence showed 'a reasonable probability of success' that these statements are false."   Consistent with their spin-and-smear campaign, Plaintiffs also used the press release to accuse Defendants of "bullying" third parties because Defendants sent subpoenas to scientists (some of whom had accepted money from the Sugar Association) seeking information plainly relevant to this lawsuit.   Plaintiffs described these lawful subpoenas as "part of a much larger, and ongoing effort to intimidate and silence anyone who dissents from the view that HFCS is healthy and no different from common table sugar."   (*Id.* Ex. 19.)

- 26 -

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California  90071

1  engaged in a public spin- and-smear campaign, and this motion is another part of
2  that campaign.[19]

3          In their current motion, Plaintiffs claim they cannot share with their clients a
4  "highly confidential" document that supposedly "contradicts the fundamental basis
5  for their counterclaims," citing a document from one of the Defendants who
6  "wonders" if sugar interests were behind the "HFCS trashing." (*Supra* at 10.)   Of
7  course, this document does not contradict Defendants' Counterclaim.   Rather, it
8  shows that Defendants questioned, inquired, and subsequently learned that the
9  sugar industry Plaintiffs actually *were* behind efforts to attack HFCS for their own
10 financial gain.   As Plaintiffs note, Defendants' suspicions caused them to hire
11 Berman & Co. to investigate whether such activities were occurring (Fox Decl. Ex.
12 25), and Berman's subsequent report demonstrated that the concerns were justified.
13 (Dahlin Decl. Ex. 14.)   The Berman report revealed not only that

17 . (*Id.*)

18         Plaintiffs also make much of the fact that CRA hired Berman & Co. to create
19 online videos that repeated the same truthful messages that were part of CRA's

---

[19] Indeed, Plaintiffs need to file the documents they plan to spin in the press, since the public does not have a presumptive right of access to discovery documents that are not filed.  *See, e.g., Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("[W]hile the public has a presumptive right to access discovery materials that are filed with the court, used in a judicial proceeding, or otherwise constitute 'judicial records,' the same is not true of materials produced during discovery but not filed with the court.  Generally speaking, the public has no constitutional, statutory (rule-based), or common-law right of access to *unfiled* discovery.").  "Pretrial discovery—depositions, interrogatories, and the production of documents—'are not public components of a civil trial,' 'were not open to the public at common law,' and 'in general, are conducted in private as a matter of modern practice.'"  *Id.* at 1074-1075, *quoting Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984).

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1  educational campaign.  There is nothing wrong with that.  On the other hand, The
2  Sugar Association has secretly funded "Citizens for Health," which poses as a
3  consumer interest group, to disseminate false and highly inflammatory message that
4  HFCS is dangerous to consume—despite FDA's finding that HFCS and sugar are
5  equally safe.[20]  (*Id.* Ex. 17.)   Consistent with this theme, Citizens for Health
6  recently issued a press release declaring that "HFCS is deemed [by Citizens for
7  Health] the new trans fat" (an ingredient recently banned by the FDA), and calling
8  HFCS "the most dangerous ingredient in the nation's food supply."  (*Id.* Ex. 18.)
9  As "proof" for its outrageous claim, Citizens for Health cited the same Goran and
10  Ventura study that The Sugar Association admitted was so utterly **"illogical,"**
11  **"groundless"** and **"essentially meaningless"** that it should never be relied upon.
12  (*Id.* Ex. 15.)
13       As part of their ongoing efforts to scare consumers away from HFCS,
14  Plaintiffs also use this motion to assert, without support, that Defendants are hiding
15  important health and safety information from the public.   Yet none of the
16  documents Plaintiffs cite in their portion of the joint stipulation contain information
17  important to public health and safety that is in any way being concealed or hidden
18  from the public.   Plaintiffs' assertion that Defendants are hiding information
19  important to consumers with corn allergies is nonsensical, given that the term "corn
20  sugar" **obviously** refers to an ingredient made from corn.  (*Supra* at 15.)  Plaintiffs'
21  invocation of the supposed "danger" in equating "corn sugar" with sugar is likewise
22  absurd, as the term "corn sugar" today is the FDA-approved label name for
23  dextrose, another ingredient **produced from corn**.  (*Id.*)
24       Finally, Plaintiffs claim CRA's supposed knowledge that HFCS and sugar
25  are not identical in composition somehow demonstrates that CRA knew its
26  educational campaign asserting nutritional equivalence was misleading.  (*Supra* at
27  
28  [20]http://www.fda.gov/food/ingredientspackaginglabeling/foodadditivesingredients/ucm324856.htm

- 28 -
JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

16.)   But this case is not about whether HFCS and sugar are identical—the issue is nutritional equivalence.  Plaintiffs' own internal documents acknowledge as much, recognizing that the Defendants' campaign does not claim that "HFCS is nutritionally identical to sugar."   (Dahlin Decl. Ex. 10.)  Plaintiffs know the issue in this case is whether CRA can educate the public that HFCS and sugar are *nutritionally* equivalent, as so many leading scientists, medical associations, and nutritionists recognize. (*See, e.g.,* Counterclaim ¶¶ 41-62.)[21]

[21] FDA recently explained: "FDA receives many inquiries asking about the safety of HFCS, often referring to studies about how humans metabolize fructose or fructose-containing sweeteners. These studies are based on the observation that there are some differences between how we metabolize fructose and other simple sugars.  We are not aware of any evidence, including the studies mentioned above, that there is a difference in safety between foods containing HFCS 42 or HFCS 55 and foods containing similar amounts of other nutritive sweeteners with approximately equal glucose and fructose content, such as sucrose, honey, or other traditional sweeteners. The 2010 Dietary Guidelines for Americans recommend that everyone limit consumption of all added sugars, including HFCS and sucrose." http://www.fda.gov/food/ingredientspackaginglabeling/foodadditivesingredients/ucm324856.htm

And, from the April 2012 American Society for Nutrition-Experimental Biology Expert Panel: "the body cannot tell the difference between sucrose and high-fructose corn syrup (HFCS).  That was the consensus of a panel of scientists at the 2012 American Society of Nutrition (ASN) conference on experimental biology, held April 21-25 at San Diego, CA.  They examined fructose, sucrose and HFCS, describing relevant scientific findings and health implications." http://www.bakingbusiness.com/Features/Formulating%20and%20R%20and%20D/2012/6/Science%20panel%20debates%20sugar%20at%20experimental%20biology%20meeting.aspx

Likewise, the American Medical Association has observed:  "After studying current research, the American Medical Association concluded that high fructose syrup does not appear to contribute more to obesity than other caloric sweeteners."  Press Release, Am. Med. Ass'n, AMA Finds High Fructose Syrup Unlikely to Be More Harmful to Health Than Other Caloric Sweeteners (June 17, 2008).

Further, the American Medical Association published a study concluding that "[b]ecause the composition of HFCS and sucrose are so similar, particularly on absorption by the body, it appears unlikely that HFCS contributes more to obesity or other conditions than sucrose."  The study noted that "[e]ven if sucrose is not hydrolyzed before consumption, the covalent bond between the fructose and glucose molecules in sucrose is easily cleaved by the enzyme sucrase in the brush-border cells of the small intestine. Thus, the body is absorbing free fructose and glucose molecules, regardless of whether they originated as part of HFCS or sucrose."  Suzen M. Moeller et al., Am. Med. Ass'n, *The Effects of High Fructose Syrup*, 28 J. Am. C. Nutrition 619, 624 (2009).

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

## 3.    SANCTIONS ARE UNWARRANTED.

Plaintiffs' demand for unspecified sanctions is meritless.  Both parties have agreed to review and revise confidentiality designations where necessary in the course of litigation.  Defendants have done so here.  Plaintiffs should continue to do the same, rather than engaging in unnecessary motion practice.

Plaintiffs' demand for sanctions rings particularly hollow because they have themselves overly designated many thousands of documents as confidential or highly confidential.  To cite just a few examples:

- SAI00042533 – designating publicly available USDA data as "Highly Confidential – Attorneys' Eyes Only"
- SAI00042984 – designating a publicly disseminated Sugar Association newsletter as "Confidential"
- SAI00043041 – designating an email containing no text as "Confidential"
- SAI00044061 – designating an email containing publicly available "news clips" as "Highly Confidential – Attorneys' Eyes Only"
- SAI00044883 – designating a publicly available article as "Confidential"
- SAI00044885 – designating the Sugar Association's publicly disseminated e-newsletter as "Confidential"
- SAI00045017 – designating a photograph of a soft drink as "Confidential"
- SAI00045248 – designating a publicly-disseminated Sugar Association document entitled "How to Have a Safe Halloween" as "Confidential"
- SAI00042549 – designating an email discussing a publicly-available Wall Street Journal article as "Confidential."
- SAI00049365 – designating an email between two Sugar Association employees containing no text as "Confidential."

(Dahlin Decl. Ex. 16.)

Plaintiffs cannot demand that Defendant be sanctioned while at the same

- 30 -

1  time over-designating their own documents with abandon, especially given that the

2  parties are competitors and Defendants have agreed to de-designate or downgrade

3  designations as appropriate.  *See e.g., Ubiquiti Networks, Inc. v. Kozumi USA*

4  *Corp.*, 2013 WL 772664, at *3 (N.D. Cal. Feb. 28, 2013) (denying sanctions in case

5  challenging attorneys' eyes only confidentially designations where the parties were

6  competitors, defendants agreed to de-designate or downgrade numerous documents,

7  and plaintiffs "prematurely terminated the meet and confer and insisted on court

8  intervention.").   Plaintiffs have no legal basis—and cite no authority—for the

9  proposition that they are entitled to sanctions in a situation where Defendants have

10  *agreed* to de-designate documents where appropriate, and where Plaintiffs

11  themselves have designated many thousands of documents that are not confidential

12  or highly confidential, as the above examples and the redactions Defendants were

13  required to make in this motion so aptly demonstrate.  Their request for sanctions

14  should, therefore, be denied.

15

16  **III.   CONCLUSION**

17      **A.   PLAINTIFFS' CONCLUSION**

18      Defendants' abusive over-designations violate the Protective Order, unfairly

19  prejudice Plaintiffs' litigation efforts, and seek to conceal information from the

20  public for an improper purpose.  Plaintiffs respectfully request that the Court order

21  a complete de-designation of all documents produced to date by Defendants, Rippe,

22  and White, or alternatively, require them to justify the specific documents they seek

23  to maintain protected.

24      **B.   DEFENDANTS' CONCLUSION**

25      Plaintiffs' goal has been, and continues to be, to attack HFCS publicly in

26  order to drive users away from HFCS to processed sugar.  This motion continues

27  that effort by claiming irresponsibly that Defendants are part of a "sinister

28  conspiracy" to conceal or obscure information important to public health.  That

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

SQUIRE SANDERS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071

1  baseless assertion cannot be left unanswered.  Defendants sought to protect their

2  documents and reputations from the exact misuse Plaintiffs now employ.  Pursuant

3  to the Protective Order in place, the parties have been working out confidentiality

4  designations on both sides among themselves.  They should continue to do so.

5

6

7  Dated:  December 30, 2013          Respectfully submitted,

8                                     SQUIRE SANDERS (US) LLP

9

10                                    By:/s/ Adam R. Fox

11                                       Adam R. Fox
                                         David S. Elkins
12                                    Attorneys for Plaintiffs
                                      WESTERN SUGAR COOPERATIVE, MICHIGAN
13                                    SUGAR CO., and C&H SUGAR CO., INC., UNITED
                                      STATES SUGAR CORPORATION, AMERICAN
14                                    SUGAR REFINING, INC., THE AMALGAMATED
                                      SUGAR COMPANY LLC, IMPERIAL SUGAR
15                                    COMPANY, MINN-DAK FARMERS
                                      COOPERATIVE, THE AMERICAN SUGAR CANE
16                                    LEAGUE U.S.A., INC., AND THE SUGAR
                                      ASSOCIATION, INC.
17  *Additional Counsel for Plaintiffs:*

18  James P. Murphy (Admitted *Pro Hac Vice*)
    James.Murphy@squiresanders.com
19  John A. Burlingame (Admitted *Pro Hac Vice*)
    John.Burlingame@ squiresanders.com
20  SQUIRE  SANDERS (US) LLP
    1200 19th Street, N.W., Ste. 300
21  Washington, DC  20036
    Telephone:  +1.202.626.6600
22  Facsimile:   +1.202.626.6780

23  W. Mark Lanier (Admitted Pro Hac Vice)
    wml@lanierlawfirm.com
24  THE LANIER LAW FIRM, P.C.
    6810 FM 1960 West
25  Houston, Texas 77069
    Telephone:  + (713) 659-5200
26  Facsimile:   + (713) 659-2204

27

28

JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS

1

2   December 30, 2013                    Respectfully submitted,

3

4                                         WINSTON & STRAWN LLP

5

6                                         By:/s/ *Bryna J. Dahlin*

7                                              Bryna J. Dahlin
                                               Gail J. Standish
8                                         Attorneys for Defendants CORN REFINERS
                                          ASSOCIATION, INC., ARCHER-DANIELS-
9                                         MIDLAND COMPANY, CARGILL, INC., CORN
                                          PRODUCTS INTERNATIONAL, INC., ROQUETTE
                                          AMERICA, INC., AND TATE & LYLE
10                                        INGREDIENTS AMERICAS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 33 -
JOINT STIPULATION OF THE PARTIES RE MOTION TO DE-DESIGNATE DEFENDANTS' DOCUMENTS