1   CALDWELL LESLIE & PROCTOR, PC
    MICHAEL J. PROCTOR, State Bar No. 148235
2     *proctor@caldwell-leslie.com*
    JOAN MACK, State Bar No. 180451
3     *mack@caldwell-leslie.com*
    LENNETTE W. LEE, State Bar No. 263023
4     *lee@caldwell-leslie.com*
    JULIA J. BREDRUP, State Bar No. 275526
5     *bredrup@caldwell-leslie.com*
  725 South Figueroa Street, 31st Floor
6   Los Angeles, California 90017-5524
  Telephone: (213) 629-9040
7   Facsimile: (213) 629-9022

8   Attorneys for Defendants and Counterclaimants
  TATE & LYLE INGREDIENTS AMERICAS,
9   LLC, and INGREDION INCORPORATED

10             **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

| | |
|---|---|
| 13  WESTERN SUGAR COOPERATIVE, a Colorado cooperative, et al., | Case No. CV11-3473 CBM (MANx) |
| 14 | **DEFENDANT AND** |
| 15         Plaintiffs, | **COUNTERCLAIMANT INGREDION INCORPORATED'S** |
| 16       v. | **NOTICE OF MOTION AND MOTION TO DISQUALIFY** |
| 17  ARCHER-DANIELS-MIDLAND COMPANY, a Delaware corporation, et al., | **SQUIRE PATTON BOGGS (US) LLP; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 18         Defendants. | **THEREOF** |
| 19 | [Declarations of Michael N. Levy and Michael J. Proctor and Exhibits Thereto; [Proposed] Order Filed Concurrently Herewith] |
| 20 | |
| 21 | Hon. Consuelo B. Marshall |
| 22 | |
| 23 | Date:    September 23, 2014<br>Time:   10:00 a.m.<br>Place:   Courtroom 2 |
| 24 | |

25

26

27

28

CALDWELL
LESLIE &
PROCTOR

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE** that on September 23, 2014, at 10:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Consuelo B. Marshall, located in the United States Courthouse, 312 N. Spring Street, Los Angeles, CA 90012, Defendant and Counterclaimant Ingredion Incorporated ("Ingredion") will and hereby does move this Court to Disqualify Squire Patton Boggs (US) LLP ("Squire Patton Boggs"), counsel of record for Plaintiffs Western Sugar Cooperative, Michigan Sugar Co., C&H Sugar Co., Inc., United States Sugar Corporation, American Sugar Refining, Inc., The Amalgamated Sugar Company LLC, Imperial Sugar Corporation, Minn-Dak Farmers' Cooperative, The American Sugar Cane League U.S.A., Inc., and The Sugar Association, Inc. (collectively, the "Sugar Company Plaintiffs"), based on the following:

   By virtue of a June 1, 2014 merger of legacy firms Patton Boggs, LLP ("Patton Boggs") and Squire, Sanders & Dempsey (US) LLP ("Squire Sanders"), the newly formed law firm Squire Patton Boggs has a conflict of interest that precludes it from representing the Sugar Company Plaintiffs in this action because it is adverse to a long-standing client of Patton Boggs, Ingredion. *See Flatt v. Superior Court*, 9 Cal.4th 275 (1994). Ingredion was a client of Patton Boggs at the time of the merger and therefore became a client of Squire Patton Boggs as of the date of the merger. The attorney-client relationship between Ingredion and Squire Patton Boggs has not been terminated and continues to this day. Under California law, the default rule in the event of concurrent representation of clients with adverse interests is mandatory, automatic disqualification of the conflicted law firm, and this rule applies here. California law further does not permit attorneys, or their law firms, to escape disqualification by unilaterally converting a current client to a former client by withdrawing from its representation of the less-favored client.

CALDWELL
LESLIE &
PROCTOR

-1-                                    Case No. CV11-3473 CBM (MANx)
                                       INGREDION INCORPORATED'S
                         MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1    Even if Ingredion is deemed a former client of Squire Patton Boggs,

2 disqualification is mandatory because law firms may not represent clients with

3 adverse interests in successive representations if there is a "substantial relationship"

4 between the two representations.  Here, among other related regulatory matters,

5 Patton Boggs rendered legal advice to Ingredion related to the central and

6 potentially dispositive issue in this litigation of whether high fructose corn syrup

7 ("HFCS") qualifies as "natural" under Food and Drug Administration policy, and

8 counseled Ingredion regarding proper names to use in the labeling of HFCS on

9 consumer goods.  Having rendered this advice and gained client confidences from

10 Ingredion on these critical issues, Squire Patton Boggs may not continue to

11 represent the Sugar Company Plaintiffs in this litigation against it.

12    This Motion is based on this Notice of Motion, the accompanying

13 Memorandum of Points and Authorities, the Declarations of Michael N. Levy and

14 Michael J. Proctor filed concurrently herewith, all of the pleadings and other

15 documents on file in this case, the evidence and arguments raised in Co-defendant

16 Tate & Lyle Ingredients Americas, LLC's Motion to Disqualify Squire Patton

17 Boggs (US) LLP (which are specifically incorporated into this Motion), all other

18 matters of which the Court may take judicial notice, and any further argument or

19 evidence that may be received by the Court at the hearing.

20    This Motion is made following counsel's conference pursuant to Local Rule

21 7-3, which took place on August 19, 2004 at the offices of the undersigned counsel.

22 DATED:  August 26, 2014          CALDWELL LESLIE & PROCTOR, PC

23                                  By _____/S/_____

24                                     MICHAEL J. PROCTOR
                                       Attorneys for Defendants and Counterclaimants
25                                     TATE & LYLE INGREDIENTS AMERICAS,
26                                     LLC, and INGREDION INCORPORATED

27

28

CALDWELL
LESLIE &
PROCTOR

-2-                      Case No. CV11-3473 CBM (MANx)
                         INGREDION INCORPORATED'S
              MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    BACKGROUND ....................................................................................... 3

    A.    Ingredion Commenced Its Long-Standing Attorney-Client Relationship with Patton Boggs in 2004 ....................................... 3

    B.    In 2011, Squire Sanders Sued Ingredion on Behalf of the Sugar Company Plaintiffs in This Litigation, Which Pits the Sugar Industry against the Corn Refining Industry ........................................ 6

    C.    Patton Boggs Represented Ingredion on Matters Substantially Related to This Case ................................................................................ 8

          1.    Patton Boggs Advised Ingredion Regarding Permissible Names for HFCS .................................................................. 8

          2.    Patton Boggs Advised Ingredion Regarding FDA Policy Concerning Representations That HFCS Is "Natural" ............... 9

    D.    Patton Boggs and Squire Sanders Merged as of June 1, 2014 ............. 10

    E.    Squire Patton Boggs Belatedly Notified Ingredion of the Merger and Impermissibly Attempted to Drop Ingredion as a Client .............. 10

III.   CALIFORNIA LAW PROVIDES THE LEGAL STANDARD FOR THIS MOTION .............................................................................. 12

IV.    SQUIRE PATTON BOGGS MUST BE DISQUALIFIED FROM PROSECUTING THIS LAWSUIT AGAINST INGREDION ..................... 13

    A.    Disqualification Is Mandated by California's Per Se Rule Forbidding Concurrent Representation of Clients with Adverse Interests ............................................................................................ 13

    B.    Squire Patton Boggs's Belated Attempt to Cure the Conflict by Claiming Ingredion Is a "Former" Client Is Insufficient to Prevent Disqualification ........................................................................ 17

    C.    Even If Ingredion Is Considered a Former Client, Disqualification Is Mandatory Because Patton Boggs's Work on Behalf of the Company Substantially Relates to the Central Issues in This Case ............................................................................ 19

    D.    The Generalized Advance Waiver Provision in Patton Boggs's "Standard Terms of Engagement," Which Ingredion Did Not Sign, Does Not Apply by Its Terms and Does Not Amount to Informed Consent to Waive the Current Conflict ................................ 22

    E.    The Balancing of Interests Confirms That Disqualification Is Appropriate in This Case ................................................................ 24

CALDWELL
LESLIE &
PROCTOR

-i-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1

V.     CONCLUSION ................................................................................ 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV11-3473 CBM (MANx)
                                                  INGREDION INCORPORATED'S
                              MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3 **Cases**

4 *Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*,
5     913 F.Supp.2d 900 (C.D. Cal. 2012)................................................................9

6 *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*,
7     96 Cal.App.4th 1017 (2002)................................................................17, 18

8 *Anderson v. Eaton*,
9     211 Cal. 113 (Cal. 1930) ................................................................13

10 *Baytree Capital Associates, LLC v. Quan*,
11     No. CV 08-2822 CAS, 2008 WL 3891226
12     (C.D. Cal. Dec. 18, 2008)................................................................15, 24

13 *Beltran v. Avon Prods., Inc.*,
14     867 F.Supp.2d 1068 (C.D. Cal. 2012)................................................................24

15 *Blue Water Sunset, LLC v. Markowitz*,
16     192 Cal.App.4th 477 (2011)................................................................14

17 *Burnett v. Rowzee*,
18     No. SACV07-641 DOC (ANX), 2007 WL 2767936
    (C.D. Cal. Aug. 13, 2007) ................................................................24
19

20 *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
    264 F.Supp.2d 914 (N.D. Cal. 2003) ................................................................13
21

22 *Concat LP v. Unilever, PLC*,
    350 F.Supp.2d 796 (N.D. Cal. 2004) ................................................................15, 23, 24
23

24 *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems*,
    809 F.Supp. 1383 (N.D. Cal. 1992) ................................................................16, 20
25

26 *Flatt v. Superior Court*,
27     9 Cal.4th 275 (1994)................................................................13, 14, 17, 20

28

CALDWELL
LESLIE &
PROCTOR

-iii-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
    No. 10-CV-03972-LHK, 2010 WL 5387920
    (N.D. Cal. Dec. 22, 2010)................................................................................17

*Gilbert v. Nat'l Corp. for Housing P'ships*,
    71 Cal.App.4th 1240 (1999)........................................................................13

*Gonzalez v. Kalu*,
    140 Cal.App.4th 21 (2006).........................................................................18

*Henriksen v. Great Am. Sav. & Loan*,
    11 Cal.App.4th 109 (1992)....................................................................11, 20

*H.F. Ahmanson & Co. v. Salomon Bros., Inc.*,
    229 Cal.App.3d 1445 (1999)......................................................................20

*In re Cnty. of L.A.*,
    223 F.3d 990 (9th Cir. 2000).....................................................................12

*Jack Baker, Inc. v. Office Space Dev. Corp.*,
    664 A.2d 1236 (D.C. 1995)........................................................................22

*Jessen v. Hartford Cas. Ins. Co.*,
    111 Cal.App.4th 698 (2003).......................................................................20

*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*,
    36 Cal.App.4th 1832 (1995).......................................................................25

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Sys., Inc.*,
    20 Cal.4th 1135 (1999)..................................................................13, 14, 15

*Picker Int'l, Inc. v. Varian Assocs., Inc.*,
    869 F.2d 578 (Fed. Cir. 1989)...............................................................16, 17

*Stanley v. Richmond*,
    35 Cal.App.4th 1070 (1995).......................................................................16

*Steinberg v. Chicago Medical School*,
    69 Ill.2d 320, 330 (1997)...........................................................................22

CALDWELL
LESLIE &
PROCTOR

-iv-

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

*Teradyne, Inc. v. Hewlett-Packard Co.*,
    NO. C-91-0344 MHP ENE, 1991 WL 239940
    (N.D. Cal. June 6, 1991)................................................................14, 15

*Truck Ins. Exchange v. Fireman's Fund Ins. Co.*,
    6 Cal.App.4th 1050 (1992).....................................................14, 17, 25

*White v. Experian Info. Solutions*,
    993 F.Supp.2d 1154 (C.D. Cal. 2014)..........................................14, 24

## **Statutes**

Lanham Act, 15 U.S.C. § 1125(a) ..............................................6, 7, 8, 21

## **Other Authorities**

ABA Model Rules of Prof. Conduct, Rule 1.3 (2013) cmt 4 .................18

Cal. R. Prof. Conduct 1-100(A) .........................................................16

Cal. R. Prof. Conduct 3-310 ...............................................................16

Cal. R. Prof. Conduct 3-310(C) ..........................................................14

Cal. R. Prof. Conduct 3-310(E) .......................................................3, 20

C.D. Cal. R. 83-3.1.2 .........................................................................12

Fed. R. Evid. 502(d) .............................................................................9

1 Legal Malpractice § 2:11 (2014) .....................................................22

Model Code of Professional Responsibility .........................................16

Restatement (Third) of Law Governing Law § 132, cmt c (2000)..........18

Restatement (Third) of the Law Governing Lawyers § 33A (2000)........18

Paul W. Vapnek, et. al., *Cal. Prac. Guide Prof. Resp.*,
    Ch. 4-B Conflicts Of Interest (The Rutter Group 2013) ...............16

CALDWELL
LESLIE &
PROCTOR

-v-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

As a result of the June 1, 2014 merger of Patton Boggs LLP ("Patton Boggs") and Squire, Sanders & Dempsey (US) LLP ("Squire Sanders"), Defendant and Counterclaimant Ingredion Incorporated ("Ingredion") has been placed in a vulnerable and unacceptable position:  Its own law firm, which has advised it for the past ten years on a variety of projects, including on important issues that are substantially related to the issues in this lawsuit, has now merged with the firm that is suing it in the instant lawsuit; indeed, that firm, now known as Squire Patton Boggs (US) LLP ("Squire Patton Boggs"), has proclaimed in court filings that it intends to force Ingredion to "put an end to the deception" allegedly at the center of its business model.  Ingredion's rightful expectation, shared by clients everywhere, that its counsel uphold its twin duties of loyalty and confidentiality, is directly challenged by the merger and by the way Squire Patton Boggs has mishandled its obligations in the wake of that merger.

For more than ten years, Ingredion has been an institutional client of Patton Boggs.  Over the course of their long-standing attorney-client relationship, Patton Boggs has advised Ingredion on a variety of regulatory issues, including subjects centrally related to the instant litigation:  (1) the proper names to use in labeling high fructose corn syrup ("HFCS") on consumer goods and (2) whether HFCS qualifies as "natural" under Food and Drug Administration ("FDA") policy.  Squire Sanders, meanwhile, has prosecuted this lawsuit against Ingredion and the rest of the corn-refining industry, a lawsuit that can only be described as a culmination of a years-long effort to replace HFCS with refined sugar in foods and that now accuses the corn-refining industry of falsely advertising HFCS.  On behalf of the plaintiffs in this lawsuit (the "Sugar Company Plaintiffs"), Squire Patton Boggs seeks to enjoin Ingredion and the other defendants from educating the public about the science demonstrating that HFCS is natural and is nutritionally equivalent to sugar.

Accordingly, Ingredion currently is being sued by its own law firm to halt business practices developed and maintained in part upon legal advice from this same firm.

On these facts, California law mandates that Squire Patton Boggs be disqualified.  Ingredion's attorney-client relationship with Squire Patton Boggs requires the firm to abide by strict ethical duties prohibiting it from taking a position adverse to Ingredion without the company's informed, written consent.  It is a cardinal rule in California that a law firm cannot sue a current client even in unrelated matters without the client's informed consent.  Despite this, Squire Patton Boggs has continued to prosecute this litigation campaign against the corn-refining industry—a case that hardly could be more adverse to Ingredion.  Squire Patton Boggs never sought—let alone received—a conflict waiver from Ingredion before the merger.  In fact, Squire Patton Boggs did not even alert Ingredion to the proposed merger before it occurred.  It was not until July 31, 2014, after Squire Patton Boggs impermissibly had been representing both the Sugar Company Plaintiffs and Ingredion for nearly two months, that Ingredion received a letter from its lawyers mentioning the merger and the resulting conflict.  Even this belated communication was not sent until after Co-defendant Tate & Lyle Ingredients Americas, LLC ("Tate & Lyle"), another Patton Boggs client, brought the conflict to Squire Patton Boggs's attention.  And Squire Patton Boggs's July 31, 2014 letter took no steps to address or rectify the egregious conflict of interest, instead attempting to unilaterally drop Ingredion as a client—a further breach of the duty of loyalty that is expressly prohibited by law.

Where, as here, a law firm engages in the simultaneous representation of clients with adverse interests, California law imposes a *per se* rule mandating that the firm be disqualified unless both clients give their informed, written consent.  This automatic disqualification rule applies equally in the context of law firm mergers where legacy firms with adverse clients combine to create a new firm.  The

CALDWELL LESLIE & PROCTOR

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1  law expressly does *not* allow law firms to evade this duty by unilaterally

2  withdrawing from the representation of the less-favored client.

3       Disqualification is also mandated by California Rules of Professional

4  Conduct, Rule 3-310(E), which flatly prohibits a lawyer from accepting employment

5  adverse to a client or former client, without the consent of the client, where the

6  lawyer has obtained confidential information material to the employment.  Here,

7  even if Ingredion were deemed a former, instead of current, client, Squire Patton

8  Boggs attorneys' past representation of Ingredion would mandate the firm's

9  disqualification.  Law firms may not engage in successive representation of adverse

10 clients if a "substantial relationship" exists between the two representations.  Here,

11 in addition to other related regulatory matters, Patton Boggs provided legal advice to

12 Ingredion relating to the central issues in this case of how to properly label HFCS

13 and whether HFCS is "natural" under FDA policy.  Disqualification is required.

14 **II.**     **BACKGROUND**

15     *A.*    *Ingredion Commenced Its Long-Standing Attorney-Client*

16          *Relationship with Patton Boggs in 2004*

17      Ingredion is a leading provider of ingredients to food and beverage

18 companies, and has been in business for more than a century.  (Declaration of

19 Michael Levy ("Levy Decl."), ¶ 2.)  Among other products, Ingredion refines corn

20 to produce HFCS.  (*Id.*)

21      Ingredion's attorney-client relationship with Patton Boggs dates back to at

22 least May 2004.  (*Id.*, ¶ 3.)  Ingredion has remained a regular institutional client of

23 Patton Boggs since that date, routinely reaching out to the firm for legal advice and

24 services.  (*Id.*)  Over the course of its relationship, Patton Boggs has provided legal

25 services to Ingredion on at least fifty-six different occasions.  (*Id.*)  Since 2007

26 alone, Patton Boggs has advised Ingredion on at least twenty-four separate

27 occasions.  (*Id.*)  Multiple Patton Boggs attorneys have provided legal services to

28 Ingredion, including Stuart M. Pape, Anna D. Spiggle, Daniel Waltz, Carey B.

-3-

Nuttall, Smitha Stansbury, and Paul D. Rubin.  (*Id.*)  Over the course of its relationship, Ingredion has paid Patton Boggs nearly a quarter million dollars in fees.  As would be expected from a ten-year attorney-client relationship, Patton Boggs obtained significant confidential information from Ingredion over the course of its representation.  (*Id.*)  Ingredion entrusted Patton Boggs with sensitive information regarding its products, its research and development activities, and its business decisions and processes and sought the firm's advice on a wide range of subjects. (*Id.*) *See infra* pp. 8-10.

During the course of the firm's decade-long representation, Ingredion reached out to Patton Boggs for legal advice and services on an as-needed basis; accordingly, like many institutional clients of law firms, the billing records reflect alternating periods of activity and inactivity.  (*Id.*, ¶ 5.)  For instance, there were gaps in activity between July 2008 and February 2009, as well as between June 2012 and May 2013.  (*Id.*)  During other periods, such as February 2007, attorneys from Patton Boggs were engaged in multiple projects for Ingredion at one time. (*Id.*)  The time gaps that arose in the natural course of Patton Boggs's decade-long representation were never treated by either Ingredion or the firm as a termination of the attorney-client relationship.  (*Id.*)  Rather, Ingredion was treated as an existing client and was not asked to enter into a new fee agreement when it approached Patton Boggs for counsel in February 2009, May 2013, or on other occasions following gaps.  (*Id.*)  All work was billed to Ingredion's existing account with the firm.  (*Id.*)  Ingredion was last invoiced by Patton Boggs in December 2013.  (*Id.*)

Ingredion did not locate any fee agreements with Patton Boggs in its files. (*Id.*, ¶ 4.)  Counsel for Squire Patton Boggs, however, provided Ingredion with a copy of a letter dated December 14, 2005, from Patton Boggs attorney Stuart M. Pape to Ingredion that reflected the ongoing nature of Patton Boggs's relationship with Ingredion.  (Declaration of Michael J Proctor ("Proctor Ingredion Decl."), ¶ 6, Ex. 10.)  In his letter, Mr. Pape described the scope of the firm's engagement

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1   broadly as "represent[ation] . . . in connection with FDA regulation of the
2   Company's products," and provided information regarding the nature of the firm's
3   expected billing-rate increases over the coming years.  (*Id.*, Ex. 10.)  Mr. Pape also
4   attached a copy of Patton Boggs's "Standard Terms of Engagement for Legal
5   Services" to his letter.  (*Id.*)  The "Standard Terms of Engagement" states, "[b]efore
6   we begin representing a particular client, we try to determine whether there are any
7   conflicts of interest that would interfere with our representation of that client's
8   interests," and promises, "[s]hould we determine in the course of our representation
9   that a conflict has arisen, we will promptly notify you."  (*Id.* at 3.)

10          The "Standard Terms of Engagement" also contains a paragraph setting forth
11   a generalized advance conflict waiver requesting clients to consent to the firm's
12   future representation of adverse clients, but only in "in any matter that is not
13   substantially related to our work for you . . . ."  (*Id.* at 4-5.)  More than once it
14   emphasizes that the requested "prospective consent to conflicting representation
15   shall not apply in any matter that is substantially related to the subject matter of our
16   representation of you, or as to which we have obtained from you sensitive,
17   proprietary or other confidential information of a non-public nature that, if known to
18   any other such client of ours, could be used by such client to the material
19   disadvantage of your interests."  (*Id.* at 5; *see also id.* ("We emphasize that the
20   consent requested covers only matters that are unrelated to the work for which you
21   are currently engaging us, and we would not undertake any representation that is
22   related in any material way to the current matter.").)  The generalized advance
23   waiver provision in the "Standard Terms of Engagement" focuses on Patton Boggs's
24   request for consent to work on "legislative or administrative policy matters that are
25   unrelated to the specific representation we have been asked to undertake on [your]
26   behalf."  (*Id.* at 4-5.)  The provision then cursorily states that "[i]t is also possible"
27   that some of the firm's clients may have "disputes" with each other.  (*Id.*)  Nowhere,
28   however, does the document seek consent to allow Patton Boggs to prosecute

CALDWELL
LESLIE &
PROCTOR

-5-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1  litigation against Ingredion.  In fact, the advance waiver provision does not

2  reference litigation at all.  (*Id.*)

3        Patton Boggs did not request that Ingredion sign a copy of the letter or the

4  "Standard Terms of Engagement," and Ingredion did not do so.  (Proctor Ingredion

5  Decl., ¶ 6.)  The conflict of interest waiver contained in the "Standard Terms of

6  Engagement" expressly states, "[y]our signature on the attached engagement letter

7  will constitute your agreement to the waivers . . . ."  (*Id.*, Ex. 10 at 5; *see also id.* at

8  4 (agreement is manifested "by signing the enclosed engagement letter").)

9  Accordingly, Ingredion never agreed to the advance conflict waiver.

10       **B.**    ***In 2011, Squire Sanders Sued Ingredion on Behalf of the Sugar***

11               ***Company Plaintiffs in This Litigation, Which Pits the Sugar Industry***

12               ***against the Corn Refining Industry***

13       In 2011, Squire Sanders, on behalf of its clients the Sugar Company Plaintiffs,

14 sued Ingredion and the other defendants in this case for purported violations of the

15 Lanham Act and California law (which claims were dismissed).  The lawsuit arose

16 in response to an educational campaign initiated by Defendant Corn Refiners

17 Association (CRA) in 2008 that sought to educate the public about HFCS and to

18 address the vilification and myths about the product with facts and scientific studies.

19 (Second Amended Complaint, Dkt. No. 55 ("SAC"), ¶ 46; Ingredion's Am. Answer

20 and Counterclaims to the SAC, Dkt. No. 91, Counterclaim, ¶ 46.)  As alleged by the

21 Sugar Company Plaintiffs, one of the central goals of CRA's education campaign

22 was the "promotion of HFCS as 'natural'" and nutritionally equivalent to sugar.

23 (SAC ¶¶ 3, 6, 30, 32, 46, 52, 53, 54, 56, 63, 64, 69.)  In 2010, CRA also filed a

24 Citizen Petition with the FDA seeking approval of "corn sugar" as an alternate

25 "common or usual name" for HFCS.  (SAC, ¶ 56.)

26       The Sugar Company Plaintiffs allege that CRA's efforts to educate the public

27 about the fact that HFCS is natural and the industry's use of alternate "common or

28 usual" names for HFCS, including corn sugar, constitute false advertising under the

Lanham Act.  (*Id*. at ¶¶ 68, 69 (describing the corn-refining industry's use of the term "corn sugar" as the "first category of Defendants'" allegedly "false and/or misleading representations," and the industry's statements that "HFCS is a 'natural' product" as the "second category" of the alleged misrepresentations).)  The Sugar Company Plaintiffs seek to enjoin Ingredion and the other defendants from continuing their public education campaign and seek damages for alleged harms. (*Id*., Prayer for Relief.)

By contrast, Ingredion and the other defendants contend that the term "corn sugar" accurately depicts HFCS and that "FDA staff have confirmed that HFCS produced through the method commonly used in the industry qualifies as 'natural' under FDA's longstanding policy because nothing artificial or synthetic is included or added to the food that would not normally be expected."  (Ingredion's Motion to Dismiss the Sugar Company Plaintiffs' First Amended Complaint ("Ingredion's MTD"), Dkt. No. 24, at 5:12-15.)  Important support for this position is found, in part, in a letter issued by the FDA on July 3, 2008, which was signed by Geraldine June, Supervisor, Office of Nutrition, Labeling and Dietary Supplements, Center for Food Safety and Applied Nutrition (the "Geraldine June Letter").  (*Id*.; *see also* Levy Decl., ¶ 11, Ex. 4 (attaching copy of the Geraldine June Letter).)[1]  The Geraldine June Letter was issued as a retraction of June's prior comments to a news organization that HFCS was not natural.  (Levy Decl., Ex. 4.)  In the Geraldine June Letter, the FDA concluded that on the basis of additional information received from CRA, HFCS did indeed qualify as natural.  (*Id*.)

The Geraldine June Letter has been the subject of much interpretation and argument in this lawsuit, and figures to be an important piece of evidence as this case moves forward.  It was the subject of early motions to dismiss the case; it has

---

[1] The Geraldine June Letter also was attached as Appendix A to Exhibit F in support of Ingredion and the other defendants' Request for Judicial Notice ISO Defendants' Motion to Dismiss the FAC, Dkt. No. 25-6 (July 1, 2011).

-7-

1   been explored in multiple depositions.  (Proctor Ingredion Decl., ¶ 8, Exs. 11-16.)

2   The Geraldine June letter is expected to be the subject of upcoming expert discovery

3   and motions for summary judgment.  (Levy Decl., ¶ 11.)  And there is little doubt

4   that the Geraldine June letter will be addressed during any trial of this matter.  (*Id.*)

5       In its Am. Answer and Counterclaims to the SAC, Ingredion expressly denied

6   that "there is any credible science showing a unique link between consumption of

7   HFCS and obesity or other health problems that does not exist with respect to other

8   sugars, including refined sugar produced from cane or beet plants."  (Am. Answer

9   and Counterclaims, Answer, ¶ 2.)  Ingredion asserted a counterclaim against the

10  Sugar Company Plaintiffs for violation of the Lanham Act, based on the Sugar

11  Company Plaintiffs' "literally false and misleading representations that processed

12  sugar is different from [HFCS] in ways that are beneficial to consumers' health."

13  (*Id.* at Counterclaim, ¶ 1.)

14      **C.    *Patton Boggs Represented Ingredion on Matters Substantially***

15      ***Related to This Case***

16      During its ten-year attorney-client relationship, attorneys from Patton Boggs

17  counseled Ingredion on subjects that are substantially related to the issues in this

18  litigation.  (Levy Decl., ¶¶ 3, 9-11.)  Patton Boggs is presumed to have and did

19  obtain confidential information in the course of providing this advice, as well as in

20  conjunction with its work on a variety of related regulatory issues.  (*Id.*, ¶ 3.)  Of the

21  many subjects on which Patton Boggs received confidential information and

22  provided confidential advice, however, two stand out in light of the merger.

23      **1.    Patton Boggs Advised Ingredion Regarding Permissible**

24      **Names for HFCS**

25      First, in 2006, Patton Boggs attorneys Stuart Pape, Paul Rubin, and Smitha

26  Stansbury, among others, counseled Ingredion regarding permissible "common or

27  usual names" for HFCS.  (Levy Decl., ¶ 10.)  During the course of this

28  representation, the Patton Boggs lawyers billed for time to discuss the project,

CALDWELL
LESLIE &
PROCTOR

-8-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

research into regulations on labeling products with HFCS, review of FDA rules and regulations for HFCS, and the issue of "common or usual names" for the product.[2] (*Id.,* ¶ 10, Ex. 3.)  The case team billed for time to caucus regarding their findings prior to advising Ingredion.  (*Id.*, ¶ 10, Ex. 3.)  In the instant case, the Sugar Company Plaintiffs have attacked Ingredion specifically for using allegedly misleading "common or usual names" to refer to HFCS.  (*E.g.*, SAC, ¶ 68.)

### 2. Patton Boggs Advised Ingredion Regarding FDA Policy Concerning Representations That HFCS Is "Natural"

Similarly, in August 2009, Patton Boggs lawyers Smitha Stansbury and Paul Rubin advised Ingredion regarding FDA policy concerning what can be called "natural" in the wake of the Geraldine June Letter.  (Levy Decl., ¶ 11.)  Ingredion sought and received advice from Patton Boggs regarding the interpretation of the Geraldine June Letter, including specific advice concerning a key aspect of the HFCS manufacturing process and how that might affect whether the resulting HFCS product could be described as "natural."  (*Id.*)  Ingredion and the other defendants are relying on the Geraldine June Letter, among other things, to support their position that it is not a misrepresentation to state that HFCS is "natural."  (*Id.*)  The

---

[2] Ingredion has submitted redacted versions of the Patton Boggs invoices relevant to this project.  The Patton Boggs invoices contain information that is both protected by the attorney-client privilege and proprietary.  Accordingly, only redacted versions are being filed with the Court.  As set forth below, the Levy Declaration and redacted documents are more than sufficient to establish mandatory disqualification here—either under the *per se* automatic disqualification rule applicable to current clients or under the "substantially related" rule applicable to former clients.  Nevertheless, Ingredion is willing to provide the Court, pursuant to Federal Rule of Evidence 502(d), with unredacted versions of the relevant Patton Boggs invoices for the Court to review *in camera* if the Court determines that the records would assist it in deciding the instant motion.  *See Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F.Supp.2d 900, 903-04 (C.D. Cal. 2012) (acknowledging the *in camera* use of billing records to decide a disqualification motion).

1  legal advice provided by Patton Boggs in August 2009 in connection with the

2  Geraldine June Letter is of importance to Ingredion.  (*Id.*)

3      **D.**    ***Patton Boggs and Squire Sanders Merged as of June 1, 2014***

4        With no prior notice to Ingredion, and with none of its lawyers ever raising

5  the issue of possible conflicts, Squire Sanders and Patton Boggs announced plans to

6  merge on May 23, 2014.  (Proctor Ingredion Decl., ¶ 2, Ex. 6.)  This announcement

7  came nearly three years into Squire Sanders' prosecution of this lawsuit on behalf of

8  the Sugar Company Plaintiffs and a decade into Patton Boggs's ongoing attorney-

9  client relationship with Ingredion.  The merger was completed, and Squire Patton

10 Boggs officially formed on June 1, 2014, with its new chairman touting that the

11 merger would "position [the new firm] to become even more competitive in an

12 increasingly global marketplace."  (*Id.*, ¶ 2, Ex. 6.)  Ingredion was a client of Patton

13 Boggs at the time of the merger, and therefore became a client of Squire Patton

14 Boggs as of June 1, 2014.  (Levy Decl., ¶ 3.)  Simultaneous to its representation of

15 Ingredion, Squire Patton Boggs also continued to represent the Sugar Company

16 Plaintiffs in the instant litigation.

17     **E.**    ***Squire Patton Boggs Belatedly Notified Ingredion of the Merger and***

18              ***Impermissibly Attempted to Drop Ingredion as a Client***

19       Despite a ten-year history of relying on its counsel, and in clear violation of

20 Rule 3-500, Patton Boggs never contacted Ingredion to alert it to the proposed

21 merger prior to its completion on June 1, 2014.  (Levy Decl., ¶¶ 3, 6.)  Ingredion

22 was never asked to consent to the merger or to waive the conflict of interest created

23 by Squire Sanders's representation of the Sugar Company Plaintiffs in this case.

24 (*Id.*, ¶ 6.)  Indeed, Squire Patton Boggs first informed Ingredion of the merger and

25 its resulting conflicts in a letter from the firm's assistant general counsel Charles E.

26 Talisman dated July 31, 2014 (the "July 31 Letter"), two months after the merger

27 was completed.  (*Id.*, ¶ 7, Ex. 1.)  The July 31 Letter was sent three days after Co-

28 defendant Tate & Lyle contacted one of its attorneys at Squire Patton Boggs to ask

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1    about the implications of the merger on conflicts, given Squire Sanders's

2    representation of the Sugar Company Plaintiffs in this lawsuit against Tate & Lyle.

3    (Declaration of Peter Castelli in Support of Tate & Lyle's Motion to Disqualify

4    Squire Patton Boggs (US) LLP, ¶ 10 (filed concurrently).)

5         Likely because the decision-makers at Squire Patton Boggs fully understood

6    that Ingredion never would agree to waive the conflict at issue here—where its own

7    law firm was now merged with the law firm that was suing in an attempt to put an

8    end to Ingredion's business model—the July 31 Letter did not even ask for a waiver.

9    (Levy Decl., Ex. 1.)  Instead, the letter acknowledged the merger but characterized

10   Ingredion, in very careful language, as a *former* client.  (*Id.* (claiming that the firm

11   "has not been engaged to do any work for Ingredion").)  The letter further advised

12   that Squire Patton Boggs was continuing the prosecution of this lawsuit against the

13   corn-refining industry "and therefore is adverse to Ingredion."  (*Id.*)  Because of this

14   adversity and resulting conflict, the letter went on, if Ingredion wanted its lawyers to

15   continue to do work for them in the future, Squire Patton Boggs would need to "seek

16   the consent of the sugar industry clients and obtain a waiver from Ingredion of any

17   conflict present by our role in the Sugar Association Case."  (*Id.*)

18        The July 31 Letter did not include any mention of an ethical wall or other

19   protections established to safeguard Ingredion's confidential information or any

20   generalized advance waiver.  Nor did the letter provide any analysis of the subject

21   matter of Patton Boggs's advice and counsel to Ingredion over the years and

22   whether those subjects were substantially related to the issues involved in this

23   litigation, or any discussion of what the Sugar Company Plaintiffs were told about

24   Patton Boggs's representation of Ingredion.[3]

25

26   _____

     [3]  As of the date of this Motion, Squire Patton Boggs has not represented to
27   Ingredion that an ethical wall is in place, but even if it had, in California, a lawyer
     cannot cure a current client conflict or a conflict with a former client where the
     lawyer possess material confidential information by erecting an ethical wall.
28   *Henriksen v. Great Am. Sav. & Loan*, 11 Cal.App.4th 109, 117 (1992).

CALDWELL
LESLIE &
PROCTOR

-11-                                    Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

Ingredion responded to Squire Patton Boggs's July 31 Letter in a letter dated August 13, 2014.  (Levy Decl., ¶ 8, Ex. 2.)  Ingredion stated that it could not "agree with the underlying premise of [the July 31 Letter] that Ingredion is not a current client of [Squire Patton Boggs]," pointing out that the company "has regularly relied on legal counsel from Patton Boggs for the past ten years concerning all manner of legal issues," has never terminated the attorney-client relationship, and prior to receiving the July 31 Letter, would have had no reason to believe that it could not "continue to rely on [its] lawyers" for advice in the future.  (*Id.*, Ex. 2.)  Ingredion strongly objected to Squire Patton Boggs's prosecution of the instant litigation and noted that the case is substantially related to issues on which Patton Boggs has advised Ingredion in the past.  (*Id.*)  Finally, Ingredion requested that Squire Patton Boggs explain "the timing of [the July 31 Letter]," including why the "advisement of facts so material to our company was delayed over two months" from the date that Squire Sanders and Patton Boggs merged.  (*Id.*)  To date, Squire Patton Boggs has neither provided such explanation nor otherwise responded to Ingredion's concerns in its letter.  (*Id.*, ¶ 8.)

## III.   CALIFORNIA LAW PROVIDES THE LEGAL STANDARD FOR THIS MOTION

Federal courts in California apply California state law in determining matters of disqualification.  *In re Cnty. of L.A.*, 223 F.3d 990, 995 (9th Cir. 2000) ("[W]e apply state law in determining matters of disqualification."); *Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F.Supp.2d 900, 906 (C.D. Cal. 2012) ("The Ninth Circuit . . . has made clear that a federal court in California must apply California law in a disqualification motion.").  Indeed, the Central District explicitly applies the State Bar Act, the Rules of Professional Conduct of the State Bar, and the applicable judicial decisions thereto as to the standards of professional conduct in the Central District.  C.D. Cal. L.R. 83-3.1.2.

## IV.   SQUIRE PATTON BOGGS MUST BE DISQUALIFIED FROM PROSECUTING THIS LAWSUIT AGAINST INGREDION

### A.   *Disqualification Is Mandated by California's* **Per Se** *Rule Forbidding Concurrent Representation of Clients with Adverse Interests*

Because Squire Patton Boggs currently represents both the Sugar Company Plaintiffs and Ingredion, Squire Patton Boggs is subject to mandatory, automatic disqualification under California law.[4]  Simply put, "an attorney (and his or her firm) cannot simultaneously represent a client in one matter while representing another party suing that same client in another matter." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F.Supp.2d 914, 919 (N.D. Cal. 2003); *see also Flatt v. Superior Court*, 9 Cal.4th 275, 285 (1994) ("Something seems radically out of place if a lawyer sues one of the lawyer's own present clients on behalf of another client.") (internal quotation marks omitted).  To prevent this, California law imposes a *per se* bar forbidding attorneys from simultaneously representing clients with adverse interests without the client's informed, written consent.  *Id.*  This prohibition exists to ensure the attorney's undivided duty of loyalty, which requires it "to protect each of [its] clients in every possible way."  *Gilbert v. Nat'l Corp. for Housing P'ships*, 71 Cal.App.4th 1240, 1253 (1999); *Anderson v. Eaton*, 211 Cal. 113, 116 (Cal. 1930); *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Sys., Inc.*, 20 Cal.4th 1135, 1146 (1999) (preserving the duty of loyalty by avoiding

---

[4] This Memorandum employs the "concurrent representation" language of the cases, despite Squire Patton Boggs's position that Ingredion is no longer a client, for two reasons:  First, until the July 31 Letter, Squire Patton Boggs had never terminated its relationship with Ingredion, and by that time concurrent representation had already occurred for two months.  Second, California's "hot potato" rule, discussed *infra* at p.17, holds that where a firm attempts to drop one of its clients, the *per se* disqualification rule still holds.  Firms are not permitted to benefit from their "expedient of severing the relationship with the preexisting client," and if they try to, the cases hold, the court performs the same analysis as if no termination of the relationship had occurred.  *Flatt*, 9 Cal.4th at 288.

1  dual representation is crucial to "avoid undermining public confidence in the legal

2  profession."); *see also* Cal. R. Prof. Conduct 3-310(C).

3      Since the client of one attorney in a law firm is considered the client of the

4  entire firm, the prohibition on concurrent representation equally forbids attorneys

5  within the same law firm from representing adverse clients.  *See, e.g.*, *Flatt,* 9 Cal.

6  4th at 286 (approvingly citing case finding that where one attorney was a partner in

7  two law firms, the two law firms could not represent adverse clients).  This is true

8  regardless of the size of the firm.  *Truck Ins. Exchange v. Fireman's Fund Ins. Co.*,

9  6 Cal.App.4th 1050, 1059-60 (1992) ("summarily reject[ing]" the argument that the

10  automatic disqualification rule is unduly "harsh when applied to large law firms

11  organized into specialty practice groups representing institutional clients").

12      When a law firm engages in concurrent representation of clients with adverse

13  interests, it is *presumed* that the firm's duty of loyalty has been breached, and absent

14  each clients' informed written consent, the firm is *per se* disqualified.  *Flatt*, 9

15  Cal.4th at 282–85 ("Indeed, in all but a few instances, the rule of disqualification in

16  simultaneous representation cases is a *per se* or 'automatic' one."); *White v.*

17  *Experian Info. Solutions*, 993 F.Supp.2d 1154, 1161 (C.D. Cal. 2014) ("The default

18  rule for a concurrent conflict in California is automatic disqualification"); *see also*

19  *Blue Water Sunset, LLC v. Markowitz*, 192 Cal.App.4th 477, 486–87 (2011) ("If an

20  attorney simultaneously represents two clients with adverse interests, automatic

21  disqualification is the rule in all but a few instances.").  Disqualification is required

22  regardless of whether the dual representations are related.  *SpeeDee Oil*, 20 Cal.4th

23  at 1147.  The party seeking disqualification further need not show any "adverse

24  effect" from the dual representation or that any client confidences are at risk of

25  breach.  *Teradyne, Inc. v. Hewlett-Packard Co.*, NO. C-91-0344 MHP ENE, 1991

26  WL 239940 at *2 (N.D. Cal. June 6, 1991).  This is because the "paramount

27  concern" in ensuring that firms do not engage in concurrent representation is "the

28  preservation of public trust in the scrupulous administration of justice and the

1  integrity of the bar." *Baytree Capital Associates, LLC v. Quan*, No. CV 08-2822
2  CAS, 2008 WL 3891226 at *6 (C.D. Cal. Dec. 18, 2008).  Nor do screening
3  measures like ethical walls prevent disqualification, because the prohibition on dual
4  representation arises from "the attorney's duty of loyalty, not confidentiality."
5  *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 822 (N.D. Cal. 2004).

6          Here, Squire Patton Boggs represents both the Sugar Company Plaintiffs and
7  Ingredion.  Ingredion is a longtime institutional client of the legacy firm Patton
8  Boggs, with its relationship dating back to 2004.  (Levy Decl., ¶ 3.)  Ingredion never
9  terminated its relationship with Squire Patton Boggs and considers itself a current
10  client of the firm.  (*Id.*)  Despite this, Squire Patton Boggs also represents the Sugar
11  Company Plaintiffs in this litigation.  There can be no dispute that the Sugar
12  Company Plaintiffs and Ingredion are adverse to each other.  The Sugar Company
13  Plaintiffs have sued Ingredion, seeking a sweeping injunction and damages that
14  would harm Ingredion's HFCS business and ability to compete with the Sugar
15  Company Plaintiffs.  Ingredion and the other defendants similarly have filed
16  counterclaims seeking relief against the Sugar Company Plaintiffs.

17          The existence of the instant lawsuit is sufficient to require disqualification
18  even if Squire Patton Boggs's representation of Ingredion had nothing to do with
19  this litigation and there was no risk of actual prejudice to Ingredion's interests.
20  *SpeeDee Oil*, 20 Cal. 4th at 1147; *Teradyne*, 1991 WL 239940 at *2.  In fact,
21  however, Squire Patton Boggs's representation of Ingredion is directly related to the
22  issues in this lawsuit, particularly Squire Patton Boggs attorneys' advice regarding
23  FDA policy on whether a product can be called "natural" in the wake of the
24  Geraldine June Letter and what constitutes acceptable "common or usual names" for
25  HFCS.  (*See* Levy Decl., ¶¶ 9-11.)  These issues lie at the heart of this lawsuit.  (*See*
26  SAC, ¶¶ 68-69.)  Thus, although the *per se* automatic disqualification rule does not
27  require a showing of prejudice, Ingredion nevertheless faces serious and concrete
28  prejudice by Squire Patton Boggs's continued prosecution of this action against it.

1    The fact that Squire Patton Boggs was formed by merger does not alter the

2  analysis.  The automatic disqualification rule applies equally to conflicts created

3  where, as here, two legacy firms with adverse clients merge to create a new firm.

4  *See, e.g.*, *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems*, 809 F.Supp. 1383,

5  1391-93 (N.D. Cal. 1992) (finding even short-lived and ultimately unsuccessful

6  merger sufficient to warrant disqualification and holding that "time-honored rules

7  designed to protect clients and the honor of the legal profession are not less

8  meaningful in a time of mergers and 'de-mergers'"); *Stanley v. Richmond*, 35

9  Cal.App.4th 1070, 1089-90 (1995) (firm created by merger of attorneys representing

10  adverse clients subject to "immediate and 'automatic' disqualification under the rule

11  applicable to cases of dual representation"); Paul W. Vapnek, et. al., *Cal. Prac.*

12  *Guide Prof. Resp.*, Ch. 4-B Conflicts Of Interest (The Rutter Group 2013).

13    *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 582-583 (Fed. Cir.

14  1989) is on point.  In *Picker*, the merger between two large law firms, Jones Day

15  and McDougall, Hersh & Scott (MH&S) resulted in a conflict of interest:  One of

16  the legacy firms, Jones Day, represented Picker in a case against Varian; the other

17  legacy firm, MH&S, represented Varian on other matters.  *Picker*, 869 F.2d at 579-

18  580.  Even though MH&S's representation of Varian was unrelated to the subject

19  matter of Jones Day's representation of Picker, the Federal Circuit held that MH&S

20  and Jones Day's actions violated the Model Code of Professional Responsibility's

21  general prohibition on simultaneously representing clients with adverse interests and

22  upheld the district court's decision to disqualify the firm.[5]  *Id.* at 582.  Notably, the

23  *Picker* court held that disqualification was deemed warranted even under the more

24  ─────────────────────
[5] California does not follow the Model Code of Professional Responsibility ("Model

25  Code"), but instead requires attorneys to follow California's Rules of Professional

26  Conduct.  The California Rules of Professional Conduct, including Rule 3-310, are

27  stricter than the Model Code on the issues raised by this Motion.  California courts may look to the Model Rules for guidance, *see* Cal. R. Prof. Conduct 1-100(A), but

28  the Model Rules do not override California's specific rules and case law.

-16-

Case No. CV11-3473 CBM (MANx)

INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

liberal discretionary standard in Ohio's rules of professional responsibility.  *Id.* at 581.  Under California's *per se* disqualification rule it is an even easier conclusion.

### B.    Squire Patton Boggs's Belated Attempt to Cure the Conflict by Claiming Ingredion Is a "Former" Client Is Insufficient to Prevent Disqualification

Nor is Squire Patton Boggs excused from disqualification as a result of its unilateral attempt to terminate its relationship with Ingredion by claiming in its July 31 Letter that its representation had concluded.  Concurrent representation conflicts cannot be cured by playing client "hot potato" and unilaterally converting a present client into a former one.  *Flatt*, 9 Cal.4th at 288 ("So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it."); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-CV-03972-LHK, 2010 WL 5387920 at *7 (N.D. Cal. Dec. 22, 2010) (same); *Truck Ins. Exchange*, 6 Cal.App.4th at 1057 (1992) (discussing the "hot potato" rule); *see also Picker*, 869 F.2d at 582-583 (MH&S's "unilateral attempt to terminate" client prior to merging with Jones Day "could not resolve the conflict problem posed by the impending merger").  The reason for this ban is obvious.  If unilateral withdrawal were enough, "the challenged attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client."  *Truck Ins. Exchange*, 6 Cal.App.4th at 1057 (quoting *Unified Sewerage Agency of Washington County, Or. v. Jelco*, 646 F.2d 1339, 1345 n.4 (9th Cir. 1981) (internal quotation marks omitted).  This would allow "such unethical behavior [as concurrent representation] to continue unrestricted."  *Id.* at 1058 (internal quotation marks omitted).

In fact, attempting to unilaterally convert a current client into a former client "may itself be a breach of the duty of loyalty."  *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal.App.4th 1017, 1037 (2002).  Where an attorney who prematurely withdraws is "motivated by a desire to represent the new [adverse] client," the attorney has violated its "obligation of loyalty to the existing client."

-17-

1 Restatement (Third) of Law Governing Law § 132, cmt c (2000).  It is indeed hard

2 to imagine an act more contrary to an attorney's duty of loyalty than dropping a

3 client without consent in order to clear the way to represent the client's adversary.

4      Rather, an attorney-client relationship does not end until "the client actually

5 has or reasonably should have no expectation that the attorney will provide further

6 legal services." *Gonzalez v. Kalu*, 140 Cal.App.4th 21, 30-31 (2006).  *See also*

7 *American Airlines*, 96 Cal.App.4th  at 1037 (upholding verdict finding that

8 Sheppard Mullin's representation did not end until the firm informed its client,

9 American Airlines, in writing, that it considered the representation to have

10 concluded); *see also* Restatement (Third) of the Law Governing Lawyers § 33A,

11 ("In terminating a representation, a lawyer must take steps to the extent reasonably

12 practicable to protect the client's interests, such as giving notice to the client of the

13 termination, allowing time for employment of other counsel, surrendering papers

14 and property to which the client is entitled, and refunding any advance payment of

15 fee the lawyer has not earned.").  Prior to Squire Patton Boggs's belated attempt in

16 the July 31 Letter to drop Ingredion in favor of the Sugar Company Plaintiffs,

17 Ingredion had no reason to expect that its longtime attorneys would not continue to

18 provide legal services. (Levy Decl., ¶ 3.)  To the contrary, Ingredion had been an

19 institutional client of Patton Boggs for ten years, regularly turning to the firm for

20 legal advice and services whenever needed.  (*Id.*)  Ingredion reasonably expected

21 that this relationship would continue.  *See* ABA Model Rules of Prof. Conduct, Rule

22 1.3 (2013) cmt 4 ("If a lawyer has served a client over a substantial period in a

23 variety of matters, the client sometimes may assume that the lawyer will continue to

24 serve on a continuing basis unless the lawyer gives notice of withdrawal.  Doubt

25 about whether a client-lawyer relationship still exists should be clarified by the

26 lawyer, preferably in writing  . . . .").

27      The fact that Ingredion was not in active communication with Patton Boggs

28 regarding a specific legal question at the time of the merger does not alter the

1   analysis.  Gaps in communication had occurred several times during Ingredion's
2   ten-year relationship with Patton Boggs, including an eleven-month gap between
3   June 2012 and May 2013.  (Levy Decl., ¶ 5.)  But neither the firm nor Ingredion
4   treated the gaps as terminating the representation.  (*Id.*)  On the contrary, when
5   Ingredion reached out for legal advice in May 2013, Patton Boggs treated the
6   company as an existing client.  (*Id.*)  It did not ask Ingredion to sign a new
7   engagement agreement, and all services were billed to Ingredion's existing account.
8   (*Id.*)  Nor is Ingredion rendered a former client by the statement in Patton Boggs's
9   "Standard Terms of Engagement" that "[i]t is also our policy that the attorney-client
10  relationship will terminate upon our completion of any services that you have
11  retained us to perform."  (Proctor Ingredion Decl., Ex. 10 at 5.)  Even if Ingredion
12  had agreed to the "Standard Terms of Engagement," which it did not, the 2005 letter
13  from Patton Boggs attorney Stuart Pape that accompanied the "Standard Terms of
14  Engagement" confirms that Ingredion retained Patton Boggs not for a discrete issue
15  or litigation, but to provide ongoing representation "in connection with FDA
16  regulation of the Company's products."  (*Id.* at 1.)  That representation had not
17  concluded.  Thus, there is no basis to conclude that Ingredion's attorney-client
18  relationship with Patton Boggs had terminated before the merger.  The automatic
19  disqualification rule applies, and Squire Patton Boggs must be disqualified.

20  **C.    *Even If Ingredion Is Considered a Former Client, Disqualification Is***
21  ***Mandatory Because Patton Boggs's Work on Behalf of the Company***
22  ***Substantially Relates to the Central Issues in This Case***

23  Even if Ingredion is considered to be a former client of Squire Patton Boggs,
24  instead of a current client, the firm remains subject to mandatory disqualification.
25  In addition to prohibiting the concurrent representation of adverse clients regardless
26  of the subject matter of the representation, California law also forbids attorneys
27  from representing a client adverse to a former client without a waiver where "by
28  reason of the representation of the . . . former client, the member has obtained

1   confidential information material to" its representation of the current client.  Cal. R.

2   Prof. Conduct 3-310(E).  This rule exists "to protect the confidential relationship . . .

3   between attorney and client, a relationship which continues after the formal

4   relationship ends."  *Henriksen*, 11 Cal.App.4th at 113.  As the "fiduciary nature of

5   that relationship requires the application of strict standards[,] . . .a former client may

6   seek to disqualify [an] attorney with its confidential information from representing

7   an adverse party."  *Id*.

8        To avoid subjective inquiries into privileged matters in order to determine

9   precisely what information was conveyed in cases like this, California has adopted a

10  bright-line rule that conclusively presumes an attorney received confidential

11  information where the present and former representations have a "substantial

12  relationship."  *Elan Transdermal*, 809 F.Supp. at 1385, 1389-91; *Henriksen*, 11

13  Cal.App.4th at 114; *H.F. Ahmanson & Co. v. Salomon Bros., Inc*., 229 Cal.App.3d

14  1445, 1452 (1999).  Successive representations are "substantially related" when the

15  evidence before the trial court supports a rational conclusion that the information

16  material to the evaluation, prosecution, settlement, or accomplishment of the former

17  representation, given its factual and legal issues, is also material to the evaluation,

18  prosecution, settlement, or accomplishment of the current representation, given its

19  factual and legal issues.  *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.App.4th 698, 713

20  (2003).   Where the "substantial relationship" test is met, the former attorney is

21  automatically disqualified, and "the disqualification extends vicariously to the entire

22  firm."  *Flatt*, 9 Cal.4th at 283.  Disqualification is required even if the specific

23  attorneys who provided the substantially related legal advice to the former client

24  have left the firm.  *Elan Transdermal*, 809 F.Supp. at 1385, 1389-91.

25       Here, Patton Boggs rendered legal advice to Ingredion relating to crucial and

26  potentially dispositive issues in this litigation:  (1) whether HFCS qualifies as

27  "natural" under FDA policy and (2) what name or names may be used in labeling

28  HFCS on consumer goods.  The Sugar Company Plaintiffs' contentions that HFCS

CALDWELL
LESLIE &
PROCTOR

-20-

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

is not "natural" and that the corn-refining industry's effort to approve and communicate "corn sugar" as a common or usual name for HFCS is misleading lie at the core of their claim that Ingredion is liable for false advertising under the Lanham Act.  (*See, e.g.*, SAC at ¶¶ 3, 6, 30, 32, 46, 52, 53, 54, 56, 63, 64, 68, 69.) Ingredion's counterclaims likewise rest, in part, on its position that HFCS is natural and that the industry's nomenclature for HFCS is permissible under the law.  So central are these issues to the case that the lead Squire Patton Boggs attorneys prosecuting this action boast in their firm biographies that they are "lead counsel for [the Sugar Company Plaintiffs] in a federal false advertising lawsuit against [the corn-refining industry] for falsely advertising that the various formulations of HFCS are '*natural*,' that "your body can't tell the difference" between HFCS and sugar, and that HFCS is '*corn sugar*.'"[6]  (Proctor Ingredion Decl., ¶ 5, Ex. 9 (emphasis added).)  Thus, the same law firm that advised Ingredion on whether HFCS can be described as natural is now suing Ingredion for doing so—seeking both an injunction and massive damages.  There can be no situation more antithetical to the legal profession, or to a modern law firm's duty of loyalty and protection of the confidentiality of its clients.

On these facts, there can be no dispute that Patton Boggs's work for Ingredion substantially relates to Squire Patton Boggs's representation of the Sugar Company Plaintiffs.  Under California law, no remedy short of disqualification is sufficient to redress the conflict.  It thus does not matter whether Ingredion is considered a current or former client.  In either case, Squire Patton Boggs is barred from prosecuting this lawsuit against Ingredion and mandatory disqualification applies.

---

[6] One can understand why, given the argumentative style of these biographies, Ingredion could not be expected to waive the conflict created by Squire Patton Boggs's prosecution of this action on behalf of the Sugar Company Plaintiffs.  How could Ingredion feel its law firm was loyal to it under these circumstances?

-21-

1    **D.    The Generalized Advance Waiver Provision in Patton Boggs's**

2    **"Standard Terms of Engagement," Which Ingredion Did Not Sign,**

3    **Does Not Apply by Its Terms and Does Not Amount to Informed**

4    **Consent to Waive the Current Conflict**

5          The requirement of disqualification is not altered by the generalized advance

6    waiver provision in Patton Boggs's "Standard Terms of Engagement" attached to

7    the letter that Patton Boggs attorney Stuart Pape sent to Ingredion in 2005.  As an

8    initial matter, Patton Boggs did not ask Ingredion to review or sign the "Standard

9    Terms of Engagement" or accompanying letter, and Ingredion did not do so.  The

10   mere act of sending the "Standard Terms of Engagement" to Ingredion, without any

11   reciprocal action on Ingredion's part, does not constitute informed consent to a

12   boilerplate conflict waiver.[7]  Indeed, the conflict of interest waiver in two separate

13   places states that acceptance of its terms is triggered by signature.  (Proctor

14   Ingredion Decl., ¶ 6, Ex. 10 at 4-5.)  Ingredion did not sign the "Standard Terms of

15   Engagement" or accompanying letter or otherwise agree in writing to any advance

16   conflict waiver.  (*Id*., ¶ 6.)  But even if Ingredion could be deemed to be bound by

17   the "Standard Terms of Engagement," by its terms, the advance waiver provision

18   does not apply to this case:  "[The requested] prospective consent to conflicting

19   representation shall not apply in any matter that is *substantially related to the*

20   _____

21   [7] In fact, the unsigned "Standard Terms of Engagement" likely does not even

22   constitute an enforceable contract under the laws of either Washington, D.C., from
     where the letter was sent, or Illinois, where Ingredion received it.  *See, e.g.*, *Jack*

23   *Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1238 (D.C. 1995) ("Under
     D.C. law . . . there must be both (1) agreement as to all material terms; and (2)

24   intention of the parties to be bound.") (internal citations and quotations omitted);

25   *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 330 (1997) ("An offer, *an*
     *acceptance*, and consideration are basic ingredients of a contract.") (emphasis

26   added) (internal citations omitted).  *See also* 1 Legal Malpractice § 2:11 (2014)

27   ("[A]ll engagement letters should include . . . [a] request that the client sign an
     enclosed extra copy of the letter.") (emphasis in original).

28

-22-                    Case No. CV11-3473 CBM (MANx)
                        INGREDION INCORPORATED'S
                        MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1  *subject matter of our representation of you*, or as to which we have obtained from

2  you *sensitive, proprietary or other confidential information* of a non-public nature

3  that, if known to any other such client of ours, could be used by such client to the

4  material disadvantage of your interests." (*Id.*, Ex. 10 at 5 (emphasis added).)  As

5  discussed above, Patton Boggs's representation of Ingredion is substantially related

6  to two of the key issues in this litigation and, through the course of its decade-long

7  attorney-client relationship, Patton Boggs has gained extensive "sensitive,

8  proprietary, or other confidential information" that the Sugar Company Plaintiffs

9  could use to Ingredion's material disadvantage.  Accordingly, far from allowing

10  Squire Patton Boggs to continue to represent the Sugar Company Plaintiffs, the

11  terms of the advance conflict waiver expressly prohibit such representation.  In

12  addition, Squire Patton Boggs breached the obligation set forth in the "Standard

13  Terms of Engagement" to "promptly notify" Ingredion in the event of a conflict of

14  interest by waiting until two months after the merger was complete to raise the issue

15  and by failing, to this day, to provide any explanation for this delay.

16        Furthermore, an advance waiver of potential future conflicts may signify

17  informed consent only where it adequately discloses the nature of the conflict at

18  issue.  *Concat*, 350 F.Supp.2d at 820.  A "generalized boilerplate waiver" that does

19  not specify the nature of the conflict does not suffice.  *Id.* at 821.  Here, the

20  "Standard Terms of Engagement" that Patton Boggs sent to Ingredion discusses

21  only the firm's potential work on "legislative or administrative policy matters . . .

22  unrelated to the specific representation we have been asked to undertake" that

23  "might have a direct or indirect adverse impact upon your interests," and cursorily

24  notes that some of the firm's clients occasionally may be adverse to each other.

25  (Proctor Ingredion Decl., Ex. 10 at 4-5.)  Conspicuously absent from the provision is

26  any request to allow the firm to prosecute a litigation campaign aimed at

27  dismantling Ingredion's business practices.  The word "litigation" is never even

28  mentioned.  Indeed, if Squire Patton Boggs believed that the advance waiver were

CALDWELL
LESLIE &
PROCTOR

-23-                Case No. CV11-3473 CBM (MANx)
                    INGREDION INCORPORATED'S
            MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1    effective, it would not have dropped Ingredion as a client.  The generalized advance
2    conflict waiver in the unsigned "Standard Terms of Engagement" in no way
3    qualifies as informed consent under the circumstances.[8]  *See Concat*, 350 F.Supp.2d
4    at 820-21.  Disqualification remains mandatory.

5        **E.    The Balancing of Interests Confirms That Disqualification Is**
6        **Appropriate in This Case**

7        Where, as here, the *per se* disqualification rule applies, there can be no
8    balancing of interests.  Even if the competing interests are considered in this case,
9    however, it is clear that Squire Patton Boggs must be disqualified.  The issue of
10   disqualification implicates a conflict between the client's right to counsel of its
11   choice and the need to maintain ethical standards of professional responsibility.  *See,*
12   *e.g.*, *Beltran v. Avon Prods., Inc.*, 867 F.Supp.2d 1068, 1076-77 (C.D. Cal. 2012).
13   In resolving a motion to disqualify counsel, a district court must balance "a client's
14   right to chosen counsel, an attorney's interest in representing a client, the financial
15   burden on the client to replace disqualified counsel, and the possibility that tactical
16   abuse underlies the disqualification motion" against "the need to maintain ethical
17   standards of professional responsibility."  *Burnett v. Rowzee*, No. SACV07-641
18   DOC (ANX), 2007 WL 2767936, at *3 (C.D. Cal. Aug. 13, 2007).

19       "However, these broad disqualification principles give way to narrower, more
20   specific rules in the case of attorney-client conflicts."  *White v. Experian Info.*
21   *Solutions*, 993 F.Supp.2d at 1162.  Ultimately, the court's "paramount concern must
22   be to preserve the public trust in the scrupulous administration of justice and the
23   integrity of the bar."  *Id.* at 1166.  Thus, when balancing these competing interests,
24   the "right to counsel of one's choosing must yield to considerations of ethics that
25   run to the very integrity of our judicial process."  *Baytree Capital Assocs., LLC*,

26   _____

27   [8] Ingredion further incorporates the arguments raised in Tate & Lyle's Motion to
28   Disqualify Squire Patton Boggs regarding the generalized advance conflict waiver.

CALDWELL
LESLIE &
PROCTOR

-24-

Case No. CV11-3473 CBM (MANx)
INGREDION INCORPORATED'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1  2008 WL 3891226, at *6 (C.D. Cal. 2008) (internal quotation marks omitted);

2  *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal.App.4th 1832, 1838 (1995).

3          Here the unfortunate reality is that the ethical considerations outweigh any

4  cost or inconvenience to the Sugar Company Plaintiffs, who, apart from Squire

5  Patton Boggs, are represented by co-counsel from The Lanier Firm.  Squire Patton

6  Boggs has a conflict between concurrent clients that it failed to identify in a timely

7  manner.  The *per se* disqualification rule applies.  It also is imperative that Squire

8  Patton Boggs not be rewarded for its error.  It would be profoundly unfair to

9  Ingredion to allow Squire Patton Boggs to continue to represent the Sugar Company

10  Plaintiffs in a lucrative litigation against its other client Ingredion.  *See Truck Ins.*

11  *Exch.*, 6 Cal.App.4th at 1059 (disqualification is based on the premise that "courts

12  should not allow a law firm to profit from a conflict of interest which it created").

13  **V.     CONCLUSION**

14          Even today, law remains a profession, not simply a business.  Squire Patton

15  Boggs owes Ingredion the principal duties of our profession, loyalty and

16  confidentiality.  By mishandling the conflicts of interest created by its merger,

17  Squire Patton Boggs has subrogated those duties to other interests.

18          Ingredion respectfully requests that the Court grant its Motion and disqualify

19  Squire Patton Boggs from prosecuting this action against it.

20  DATED:  August 26, 2014              CALDWELL LESLIE & PROCTOR, PC

21

22                                       By _____/S/_____

23                                          MICHAEL J. PROCTOR
                                            Attorneys for Defendants and Counterclaimants
24                                          TATE & LYLE INGREDIENTS AMERICAS,
                                            LLC, and INGREDION INCORPORATED
25

26

27

28

CALDWELL
LESLIE &
PROCTOR

-25-                          Case No. CV11-3473 CBM (MANx)
                                   INGREDION INCORPORATED'S
                     MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP