1  CALDWELL LESLIE & PROCTOR, PC
   MICHAEL J. PROCTOR, State Bar No. 148235
2    *proctor@caldwell-leslie.com*
   JOAN MACK, State Bar No. 180451
3    *mack@caldwell-leslie.com*
   LENNETTE W. LEE, State Bar No. 263023
4    *lee@caldwell-leslie.com*
   JULIA J. BREDRUP, State Bar No. 275526
5    *bredrup@caldwell-leslie.com*
   725 South Figueroa Street, 31st Floor
6  Los Angeles, California 90017-5524
   Telephone: (213) 629-9040
7  Facsimile: (213) 629-9022

8  Attorneys for Defendants and Counterclaimants
   TATE & LYLE INGREDIENTS AMERICAS
9  LLC, and INGREDION INCORPORATED

10            **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

| | |
|---|---|
| 13  WESTERN SUGAR COOPERATIVE, a Colorado cooperative, et al., | Case No. CV11-3473 CBM (MANx) |
| 14 | **DEFENDANT AND COUNTERCLAIMANT TATE & LYLE INGREDIENTS AMERICAS LLC'S NOTICE OF MOTION AND MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 15            Plaintiffs, | |
| 16            v. | |
| 17  ARCHER-DANIELS-MIDLAND COMPANY, a Delaware corporation, et al., | |
| 18            Defendants. | |
| 19 | [Declarations of Peter M. Castelli, Heidi R. Balsley, and Michael J. Proctor and Exhibits Thereto; [Proposed] Order filed concurrently herewith] |
| 20 | |
| 21 | Hon. Consuelo B. Marshall |
| 22 | Date:     September 23, 2014 |
| 23 | Time:     10:00 a.m. Place:    Courtroom 2 |

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD;**

**PLEASE TAKE NOTICE** that on September 23, 2014, at 10:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Consuelo B. Marshall, located in the United States Courthouse, 312 N. Spring Street, Los Angeles, CA 90012, Defendant and Counterclaimant Tate & Lyle Ingredients Americas LLC ("Tate & Lyle"), will and hereby does move to disqualify Squire Patton Boggs (US) LLP ("Squire Patton Boggs") as counsel of record for Plaintiffs Western Sugar Cooperative, Michigan Sugar Company, C&H Sugar Company, Inc., United States Sugar Corporation, American Sugar Refining, Inc., The Amalgamated Sugar Company LLC, Imperial Sugar Corporation, Minn-Dak Farmers Cooperative, The American Sugar Cane League of the U.S.A., Inc., and The Sugar Association, Inc. (collectively, the "Sugar Company Plaintiffs"), based on the following:

By virtue of a June 1, 2014 merger of legacy firms Patton Boggs LLP ("Patton Boggs") and Squire, Sanders & Dempsey (US) LLP, the newly formed law firm of Squire Patton Boggs has a conflict of interest that precludes it from representing the Sugar Company Plaintiffs in this action in which it is adverse to a long-standing client of Patton Boggs, Tate & Lyle. *See Flatt v. Superior Court*, 9 Cal.4th 275 (1994). Furthermore, as a matter of law, Squire Patton Boggs cannot cure the conflict, which Tate & Lyle has not agreed to waive, by relying on a 1998 boilerplate advance waiver, belatedly imposing an ethical wall, or unilaterally terminating its relationship with Tate & Lyle. *See Concat LP v. Unilever*, *PLC*, 350 F.Supp.2d 796 (N.D. Cal. 2004); *Flatt*, 9 Cal.4th at 288; *Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal.App.4th 1050, 1060 (1992). Disqualification of Squire Patton Boggs from this action is therefore warranted.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Peter M. Castelli, Heidi R. Balsley, and Michael J. Proctor and exhibits thereto, the evidence and arguments submitted

1  in Co-defendant Ingredion Incorporated's Motion to Disqualify Squire Patton Boggs

2  (US) LLC (which are specifically incorporated into this Motion), and such other

3  documents and argument as may be submitted at or before the hearing.

4        This Motion is made following the conference of counsel pursuant to L.R.

5  7-3, which took place on August 19, 2014 at the offices of the undersigned counsel.

6

7  DATED:  August 26, 2014        Respectfully submitted,

8                                CALDWELL LESLIE & PROCTOR, PC

9

10

11

12                                By               /S/

13                                   MICHAEL J. PROCTOR
                              Attorneys for Defendants and Counterclaimants

14                                TATE & LYLE INGREDIENTS AMERICAS
                              LLC, and INGREDION INCORPORATED

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

1
2

# **TABLE OF CONTENTS**

Page

3   I.      INTRODUCTION .................................................................................. 1

4   II.     BACKGROUND .................................................................................... 4

5           A.     Patton Boggs Has Represented Tate & Lyle Since 1998 ...................... 4

6           B.     Squire Sanders Has Prosecuted Tate & Lyle in the Instant
                   Action, Pitting the Refined Sugar Industry Against the Corn
7                  Refiners Industry, Since 2011 ............................................................ 5

8           C.     Squire Sanders and Patton Boggs Merge, Without Notice to Tate
                   & Lyle, in Breach of Their Fiduciary Duties ...................................... 6
9
                   1.     Squire Sanders and Patton Boggs Fail to Notify Tate &
10                         Lyle of the Conflict and Fail to Seek a Conflict Waiver .............. 6

11                 2.     Squire Patton Boggs Belatedly Acknowledged the Conflict
                          and Asked Tate & Lyle to Waive It ............................................. 7
12
                   3.     Squire Patton Boggs Claims Tate & Lyle Already Waived
13                         Any Conflict Through a Generalized Advance Waiver
                          From 1998 ................................................................................... 9
14
                   4.     Squire Patton Boggs Withholds Services and Then
15                         Unilaterally Terminates Its Relationship with Tate & Lyle ....... 11

16  III.    SQUIRE PATTON BOGGS MUST BE DISQUALIFIED FROM
            CONTINUED REPRESENTATION OF THE SUGAR COMPANY
17          PLAINTIFFS IN THIS ACTION ...................................................... 12

18          A.     California Law Unequivocally Mandates Squire Patton Boggs's
                   Disqualification From This Action .................................................... 13
19
                   1.     Squire Patton Boggs's Concurrent Representation of
20                         Adverse Clients Is Strictly Prohibited ...................................... 13

21                 2.     Disqualification Is Required Even Where the Conflict
                          Arises Due to a Law Firm Merger ............................................. 15
22
            B.     Squire Patton Boggs Cannot Avoid Disqualification with Its
23                 Belated Attempts to Cure the Conflict .............................................. 16

24                 1.     Patton Boggs's Generalized Advance Waiver Does Not
                          Constitute Informed Consent to Waive the Current
25                         Conflict .................................................................................... 16

26                 2.     Squire Patton Boggs's Untimely Ethical Wall Is Not
                          Legally Sufficient to Cure Its Conflict ..................................... 19

27
28

-i-

3. Squire Patton Boggs's Belated Attempt to Cure the Conflict by Terminating Its Relationship with Tate & Lyle Is Insufficient to Prevent Disqualification .................................. 21

C. The Balance of Interests Confirms the Need for Disqualification ....... 23

IV. CONCLUSION ............................................................... 25

CALDWELL
LESLIE &
PROCTOR

-ii-

1

## <u>TABLE OF AUTHORITIES</u>

2

3
<u>Page(s)</u>

4
<u>Cases</u>

5
*Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*,
6
   913 F.Supp.2d 900 (C.D. Cal. 2012) .................................................. 12, 14, 20, 21

7
*All Am. Semiconductor, Inc. v. Hynix Semiconductor, Inc.*,
   Case No. C 07-1200, 2008 WL 5484552 (N.D. Cal. Dec. 18, 2008) ................. 17
8

9
*Baytree Capital Assocs., LLC v. Quan*,
   No. CV 08-2822 CAS, 2008 WL 3891226
10
   (C.D. Cal. Aug. 18, 2008) ................................................................................. 12

11
*Beltran v. Avon Prods., Inc.*,
12
   867 F.Supp.2d 1068 (C.D. Cal. 2012) ......................................................... 12, 20

13
*Blue Water Sunset, LLC v. Markowitz*,
14
   192 Cal.App.4th 477 (2011) .............................................................................. 14

15
*Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*,
   264 F.Supp.2d 914 (N.D. Cal. 2003) ................................................................ 13
16

17
*Cobb Publ'g, Inc. v. Hearst Corp.*,
   907 F.Supp. 1038 (E.D. Mich. 1995) ............................................................... 21
18

19
*Concat v. Unilever, PLC*,
   350 F.Supp.2d 796 (N.D. Cal. 2004) ..........................................................*passim*

20

21
*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
   809 F.Supp.1383 (N.D. Cal. 1992) .................................................................... 16

22
*Flatt v. Superior Court*,
23
   9 Cal.4th 275 (1994) ..................................................................................*passim*

24
*Henriksen v. Great Am. Sav. & Loan*,
25
   11 Cal.App.4th 109 (1992) ................................................................................ 20

26
*Hitachi, Ltd. v. Tantung Co.*
   419 F.Supp.2d 1158 (2006) ............................................................................... 20
27

28

-iii-

*Kirk v. First Am. Title Ins. Co.,*
   183 Cal.App.4th 776 (2010) ........................................................... 20, 21

*LaSalle Nat'l Bank v. County of Lake,*
   703 F.2d 252 (7th Cir. 1983) ................................................................ 21

*Moreno v. AutoZone, Inc.,*
   2007 WL 4287517 (N.D. Cal. Dec. 6, 2007) ........................................ 22

*Picker Int'l, Inc. v. Varian Assocs., Inc.,*
   869 F.2d 578 (Fed. Cir. 1989) ....................................................... 15, 16

*Rodriguez v. West Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ........................................................... 2, 12

*Stanley v. Richmond,*
   35 Cal.App.4th 1070 (1995) ........................................................... 2, 15

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,*
   72 Cal.App.4th 1422 (1999) ................................................................ 23

*Truck Ins. Exch. v. Fireman's Fund Ins. Co.,*
   6 Cal.App.4th 1050 (1992) ...................................................... 14, 22, 23

*Unified Sewerage Agency of Wash. County v. Jelco Inc.,*
   646 F.2d 1339 (9th Cir. 1981) ............................................................. 22

*Visa U.S.A., Inc. v. First Data Corp.,*
   241 F.Supp.2d 1100 (N.D. Cal. 2003) ........................................... 17, 18

*White v. Experian Info. Solutions,*
   993 F.Supp.2d 1154 (C.D. Cal. 2014) ............................................ 14, 22


**<u>Statutes</u>**

15 U.S.C. § 1125(a) ........................................................................................ 5


**<u>Other Authorities</u>**

ABA Model Rules of Prof'l Conduct R. 1.7 cmt 22 .................................... 16

C.D. Cal. R. 83-3.1.2 .................................................................................... 12

Cal. R. Prof. Conduct 3-310(C) ........................................................... 13, 17

Cal. R. Prof. Conduct 3-310(E) .......................................................... 3, 17, 19

Geoffrey C. Hazard, Jr., *Triangular Lawyer Relationships: An Exploratory Analysis*, 1 Geo. J. Legal Ethics 15, 21 (1987) ............................... 25

Paul W. Vapnek, *et al.*, *Cal. Prac. Guide: Prof. Resp.* ¶ 4:49 (Rutter Group 2013) ........................................................................... 15

Restatement (Third) of Law Governing Lawyers, § 132 cmt. c ................................. 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

For more than sixteen years, Defendant and Counterclaimant Tate & Lyle Ingredients Americas LLC ("Tate & Lyle") has relied on its trusted legal advisor, the law firm of Patton Boggs LLP ("Patton Boggs"), for advice on a wide variety of legal matters.  For the last three years, Tate & Lyle has defended itself in this highly contentious lawsuit prosecuted by the law firm Squire, Sanders & Dempsey (US) LLP ("Squire Sanders") on behalf of Plaintiffs, members of the sugar industry who have pitted themselves against companies like Tate & Lyle who manufacture high fructose corn syrup ("HFCS").  Trusted advisor and adversary collided on June 1, 2014, when, without notice to Tate & Lyle and without obtaining a specific conflict waiver from Tate & Lyle, Patton Boggs and Squire Sanders merged; the result was Squire Patton Boggs (US) LLP ("Squire Patton Boggs"), "a new integrated law firm with unparalleled local connections and global influence."  Understandably troubled by the fact that the law firm that had provided counsel in hundreds of food regulatory matters was now the same law firm suing it in this highly contentious action—an action in which the sugar industry seeks to "put an end" to marketing by the HFCS industry—Tate & Lyle approached the Squire Patton Boggs attorneys for an explanation.  The response it received was anything but sweet.

In a series of communications taking place in July and August, Squire Patton Boggs conceded that Tate & Lyle was a current client of the legacy firm Patton Boggs and that a conflict of interest existed.  It further claimed that it simply made a mistake in not notifying Tate & Lyle or discussing the impact of the merger. Having now recognized the conflict, Squire Patton Boggs told Tate & Lyle that it would seek the consent of all the plaintiffs in this action ("Sugar Company Plaintiffs") to continue representing them in this action and Tate & Lyle in other matters.  It asked Tate & Lyle to waive the conflict as well.  When Tate & Lyle declined to waive the conflict, Squire Patton Boggs changed its tune:  It claimed that

Tate & Lyle had already waived the conflict by virtue of a generalized advance waiver contained within an eight-page "Standard Terms of Engagement" document transmitted with a fee agreement signed more than fifteen years ago. It also asserted that, even though it had not immediately imposed a true ethical wall on June 1, a supposed "practical wall" accidentally created by its still-separate computer systems, as well as its promise to impose a true ethical wall in the future, was sufficient to address the conflict. Then, in another shift, on August 18, 2014, Squire Patton Boggs unilaterally terminated its relationship with Tate & Lyle—despite the clear prejudice such termination imposed (at least one current project the firm was in the midst of performing involved a ninety-day governmental deadline for response)—while continuing to represent the Sugar Company Plaintiffs in this action. Squire Patton Boggs's refusal to abide by clear rules of professional conduct that require it to withdraw as counsel for plaintiffs leaves Tate & Lyle no choice but to file the instant Motion.

Given the merger of the two firms, Squire Patton Boggs must be disqualified from continuing to represent the plaintiffs in this litigation. First, Squire Patton Boggs's concurrent representation of adverse clients without the specific, informed consent from the clients is a clear violation of California law, which governs the lawyers appearing in this case. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009). In light of this breach of its duty of loyalty, California law mandates Squire Patton Boggs's automatic disqualification. *Flatt v. Superior Court*, 9 Cal.4th 275, 284 (1994). This rule applies no less in the context of a law firm merger. *See Stanley v. Richmond*, 35 Cal.App.4th 1070, 1089-90 (1995).

Second, Squire Patton Boggs has no valid defense to this Motion. The generalized advance waiver on which Squire Patton Boggs relies is buried in an eight-page rider that contains only broad language without any specifics. It therefore does not amount to informed consent by Tate & Lyle to waive the current conflict. *See Concat v. Unilever, PLC*, 350 F.Supp.2d 796, 821 (N.D. Cal. 2004).

1   The only ethical way for Squire Patton Boggs to have continued to prosecute this

2   case against Tate & Lyle after the merger would have been for it to have obtained a

3   second, specific waiver once the actual conflict arose—which it failed to do.  *Id.*

4   Moreover, by its own terms, the generalized advance waiver does not apply here,

5   where Squire Patton Boggs possesses Tate & Lyle's material confidential

6   information that could be used against it in this litigation.  Cal. R. Prof. Conduct 3-

7   310(E) (a lawyer "shall not, without the informed written consent of the client or

8   former client, accept employment adverse to the client or former client where, by

9   reason of the representation of the client or former client, the member has obtained

10  confidential information material to the employment").

11      Squire Patton Boggs's belated imposition of an ethical wall (erected two

12  months after the merger) has no relevance to the disqualification analysis:  As a

13  matter of law, an ethical wall "*cannot*, in the absence of an informed waiver, cure a

14  law firm's breach of its duty of loyalty to its client."  *Concat*, 350 F.Supp.2d at 822

15  (emphasis added).  Further, an ethical wall cannot be effective if it is not timely

16  implemented.  Squire Patton Boggs's recent termination of Tate & Lyle attempts to

17  flout the well-established "hot potato" rule in California, which prohibits a law

18  firm's attempt to cure an actual conflict between existing clients by

19  opportunistically severing the relationship with one preexisting client.  *Flatt*, 9

20  Cal.4th at 288 ("So inviolate is the duty of loyalty to an existing client that not even

21  by withdrawing from the relationship can an attorney evade it.").  Where, as here,

22  the law firm learns of a conflict, and conveniently proceeds to convert a present

23  client into a former client, the automatic disqualification rule still applies.  *Id.*

24      Finally*,* disqualification of Squire Patton Boggs is the only fair result.  Squire

25  Patton Boggs refuses to own up to its multiple breaches of duties to one client while

26  unapologetically continuing to represent the Sugar Company Plaintiffs.  Meanwhile,

27  Tate & Lyle faces the dual challenge of teaching new counsel sixteen years' worth

28  of knowledge that Squire Patton Boggs possesses, while defending itself against

Squire Patton Boggs in this action where the continued business of the HFCS industry is at stake.  Tate & Lyle therefore respectfully requests that the Court grant its Motion, and disqualify Squire Patton Boggs in this action.

## II.   BACKGROUND

### A.   *Patton Boggs Has Represented Tate & Lyle Since 1998*

Tate & Lyle is a leading global provider of specialty food products. (Declaration of Peter M. Castelli ("Castelli Decl."), ¶ 2.)  It specializes in processing corn-based products, including HFCS, that are widely used by the food and beverage industry.  (*Id.*)

For the last sixteen years, Tate & Lyle has relied on the law firm of Patton Boggs to provide legal services and advice regarding Tate & Lyle's products, ensuring, among other things, that they comply with international export and customs laws and regulations.  (*Id.*, ¶¶ 3-4)  Since its initial engagement in 1998, multiple Patton Boggs attorneys, under the leadership of Stuart M. Pape ("Attorney Pape") and Daniel E. Waltz ("Attorney Waltz"), have advised Tate & Lyle on hundreds of occasions.  (*Id.*)  Patton Boggs has also represented Tate & Lyle before a variety of federal agencies, including the FDA, the USDA, and the Customs Service.  (*Id.*, ¶ 4.)  Patton Boggs has worked on numerous matters for Tate & Lyle and, indeed, was working on projects for Tate & Lyle until August 18, 2014, when Squire Patton Boggs unilaterally terminated services.  (*Id.*, ¶ 23; (Declaration of Michael J. Proctor ("Proctor-T&L Decl."), ¶¶ 5-6.)

At the heart of the Patton Boggs/Tate & Lyle relationship was the fact that Patton Boggs lawyers possessed, through many confidential communications, a thorough understanding of Tate & Lyle's business operations, including operations and processing of HFCS, the product at issue in this case.  (Castelli Decl., ¶ 5.) Indeed, Patton Boggs has provided legal advice specifically pertaining to HFCS.  On one particular occasion among others, in July 2012, Attorney Waltz prepared a response to an audit letter from the Mexican government as to the origins of

1   manufacture of certain products (including HFCS) that were exported to Mexico.

2   (*Id.*)  This engagement necessarily included discussions between Patton Boggs and

3   Tate & Lyle regarding the production processes for HFCS.  (*Id.*)

4         **B.**      ***Squire Sanders Has Prosecuted Tate & Lyle in the Instant Action,***

5                  ***Pitting the Refined Sugar Industry Against the Corn Refiners***

6                  ***Industry, Since 2011***

7         In or about 2008, the Corn Refiners Association, Inc. ("CRA") began a

8   campaign to educate the public with facts and scientific studies regarding HFCS.

9   (Docket ("Dkt.") No. 55 (2d Am. Compl.), ¶ 46; Dkt. No. 88 (Tate & Lyle's Am.

10  Answer to 2d Am. Compl.), ¶ 46.)  This campaign was in response to widespread

11  vilification of HFCS, including conduct by the Sugar Company Plaintiffs in this

12  case.  (Dkt No. 88 (Tate & Lyle's Ctrclm.), ¶ 63.)  On April 22, 2011, the law firm

13  of Squire Sanders, on behalf of the Sugar Company Plaintiffs, sued Tate & Lyle, the

14  CRA, and CRA's other members in what has become a hotly contested, high-stakes

15  matter.  (*See* Dkt. No. 1 (Compl.).)  The CRA's campaign to educate the public on

16  facts about HFCS is a centerpiece of the claims asserted by Squire Sanders, on

17  behalf of its clients; Squire Sanders alleges that the campaign "tout[s] the notions

18  that HFCS is natural and metabolically and nutritionally the same as real sugar [and]

19  advise[s] customers about purported trends in the sweetener industry that support

20  choosing HFCS over the real sugar extracted from sugar canes and sugar beets."

21  (Dkt. No. 55, ¶ 54.)  Squire Sanders further alleges that statements such as the claim

22  that HFCS is "natural" are "false and/or misleading representations of fact" in

23  violation of the Lanham Act, 15 U.S.C. § 1125(a).  (*Id.*, ¶¶ 63, 66-72.)  Although the

24  Sugar Company Plaintiffs fail to specify their damages, they unabashedly assert that

25  their goal is to "put an end to the deception."  (Dkt. No. 55, ¶¶ 9, 73.)

26        On September 4, 2012, Tate & Lyle filed a counterclaim against The Sugar

27  Association, Inc. for false advertising and commercial disparagement in violation of

28  the Lanham Act, 15 U.S.C. § 1125(a).  (*See* Dkt. No. 88, ¶ 1.)  Tate & Lyle alleges

1  that the "Sugar Association preys on consumers' fears by falsely representing that

2  HFCS will cause obesity, cancer, and cirrhosis of the liver, among other things,

3  while at the same time creating a health halo for processed sugar." (*Id.*)  Tate &

4  Lyle further alleges that "processed sugar and HFCS are nutritionally equivalent"

5  and quote independent experts who explain, among other things:  "'There's not a

6  shred of evidence that these products are differently biologically.  The decision to

7  switch from HFCS to cane sugar is 100% marketing and 0% science.'" (*Id.*, ¶ 2.)

8         **C.**    ***Squire Sanders and Patton Boggs Merge, Without Notice to Tate &***

9                ***Lyle, in Breach of Their Fiduciary Duties***

10        After months of confidential negotiations, on May 23, 2013, Squire Sanders

11  and Patton Boggs jointly announced their merger.  (Proctor-T&L Decl., ¶¶ 2-3, Exs.

12  9-10.)  The merger was touted as being advantageous to both firms because, in the

13  words of the new firm's chairman, it "will position us to become even more

14  competitive in an increasingly global marketplace." (*Id.*, Ex. 9)  On June 1, 2014,

15  the firms announced that the merger was completed.  (*Id.*, ¶ 4, Ex. 11.)

16         **1.**    **Squire Sanders and Patton Boggs Fail to Notify Tate & Lyle**

17             **of the Conflict and Fail to Seek a Conflict Waiver**

18        There can be no doubt that, in the weeks before June 1, 2014, the lawyers for

19  Squire Sanders and Patton Boggs contacted many of their clients to discuss the

20  impending merger, any conflicts it might have engendered, and how it affected the

21  duty of loyalty that lawyers owe their clients.  Inexplicably, however, no one from

22  Patton Boggs or Squire Sanders reached out to Tate & Lyle.  (Castelli Decl., ¶ 7.)[1]

23

24  [1] No one from either firm reached out to Patton Boggs's client Ingredion

25  Incorporated ("Ingredion"), either.  Ingredion, like Tate & Lyle, is a manufacturer of

26  HFCS and a defendant and counterclaimant in this action.  Simultaneous to the filing of the instant motion, Ingredion is filing its own motion to disqualify Squire

27  Patton Boggs.  Tate & Lyle incorporates the arguments and factual record in

28  Ingredion's motion.

1    Instead, on July 23, 2014, Tate & Lyle's corporate counsel, Heidi R. Balsley,

2 contacted Attorney Waltz, and asked him whether he knew about the lawsuit

3 pending between the members of the Sugar Association and the members of the

4 CRA (*i.e.*, this case), wherein Squire Sanders represented the parties adverse to Tate

5 & Lyle.  (Declaration of Heidi R. Balsley ("Balsley Decl."), ¶ 6.)  Attorney Waltz

6 was surprised by the question; he said that he was not aware of the representation of

7 the sugar companies in that lawsuit by Squire Sanders.  He said that he would get

8 back to Tate & Lyle.  (*Id.*)

9          **2.      Squire Patton Boggs Belatedly Acknowledged the Conflict**

10                  **and Asked Tate & Lyle to Waive It**

11    On July 28, 2014, Squire Patton Boggs partners Stacy D. Ballin (formerly a

12 litigation partner and general counsel at Squire Sanders) and Charles "Rick"

13 Talisman (formerly assistant general counsel at Patton Boggs) spoke with Tate &

14 Lyle's group vice president and general counsel, Peter Castelli, and Ms. Balsley.

15 (*Id.*, ¶ 7; Castelli Decl., ¶ 10.)  In that conversation, Squire Patton Boggs asserted

16 that it and the legacy firms had made a mistake in failing to identify the conflict,

17 even though Tate & Lyle was identified as a *current client* in Patton Boggs's

18 database.  (Balsley Decl., ¶ 8; Castelli Decl., ¶ 11.)  Ms. Ballin and Mr. Talisman

19 blamed the mistake on a senior paralegal at Patton Boggs, who they asserted was

20 tasked with preparing the list of clients with conflicts for purposes of the merger but

21 had inadvertently omitted Tate & Lyle from the list.[2]  (Balsley Decl., ¶ 8; Castelli

22

23 [2] As mentioned *supra* note 1, at least one other Patton Boggs client was not notified

24 that the merger created a conflict:  Ingredion, also a party to this case.  Soon after
Tate & Lyle alerted Attorney Waltz to its conflict with this litigation, on July 31,

25 2014, Squire Patton Boggs finally sent a letter to Ingredion, advising that effective

26 June 1, 2014, Ingredion's "food and drug attorneys who previously practiced at
Patton Boggs LLP have joined Squire Patton Boggs" and acknowledging the

27 resulting "conflict of interest."  (*See* Declaration of Michael N. Levy filed in support

28 of Ingredion's Motion to Disqualify, ¶ 7, Ex. 1.)  The letter claimed, however, that

1   Decl., ¶ 11.)  Squire Patton Boggs asked Tate & Lyle to waive the conflict, and also

2   stated it would seek a waiver from the Sugar Company Plaintiffs.  This would, the

3   firm said, allow Squire Patton Boggs to continue its representation of Tate & Lyle in

4   regulatory matters while proceeding to prosecute Tate & Lyle in this case.  (Balsley

5   Decl., ¶ 9; Castelli Decl., ¶ 12.)  Squire Patton Boggs further claimed that a

6   "practical" ethical wall had been in place for the two months following the merger,

7   as Squire Sanders and Patton Boggs's physical files and computer systems had not

8   yet integrated and still remained physically separate.  (Balsley Decl., ¶ 9; Castelli

9   Decl., ¶ 12.)

10          On August 5, 2014, the same four individuals spoke again.  During that call,

11  Tate & Lyle informed Squire Patton Boggs that it could not waive the conflict due

12  to the fact that this is no ordinary commercial litigation, but a fundamental dispute

13  between two competing industries.  (Balsley Decl., ¶ 10; Castelli Decl., ¶ 13.)  In

14  subsequent correspondence, Tate & Lyle further confirmed that it had important

15  reasons for why it could not waive the conflict:  "Given the nature of the allegations

16  and positions being taken by the sugar industry plaintiffs in the Western Sugar Case,

17  and Tate & Lyle's long-standing relationship with the legacy Patton Boggs firm, the

18  adversity that now exists goes to the very core of the firm's duty of loyalty to Tate

19  & Lyle."  (Castelli Decl., ¶ 15, Ex. 3.)  Tate & Lyle reiterated its request that, due to

20  the extreme adversity in this action, Squire Patton Boggs withdraw from the instant

21  case.  (*Id.*, ¶ 16, Ex. 1.)

22

23  _____

24  Ingredion was not a current client of the firm (although Ingredion believed that it
    was), and therefore, if Ingredion "should wish to engage Squire Patton Boggs . . . in
25  the future, it will be necessary for [the firm] to seek the consent of the sugar industry
    clients and obtain a waiver from Ingredion" for the conflict presented by this
26  litigation.  (*Id.*)  Notably absent from this letter is any mention of an ethical wall or
27  what the Sugar Company Plaintiffs were told about the prior representation of
    Ingredion.
28

### 3. Squire Patton Boggs Claims Tate & Lyle Already Waived Any Conflict Through a Generalized Advance Waiver From 1998

On August 10, 2014, Squire Patton Boggs sent a letter to Tate & Lyle, enclosing a copy of a February 11, 1998 engagement letter from Patton Boggs to Tate & Lyle's predecessor, A.E. Staley Manufacturing Company ("1998 Engagement Letter"). (Castelli Decl., ¶ 16, Ex 1.) Attorney Pape signed the engagement letter on behalf of Patton Boggs, confirming that he, Attorney Waltz, and Daniel A. Krakov would be the primary attorneys working for Tate & Lyle. (*Id.*) Enclosed with the 1998 Engagement Letter was an eight-page form rider entitled "Standard Terms of Engagement for Legal Services." (*Id.*) The 1998 Engagement Letter briefly previewed that the rider covered additional matters such as Patton Boggs's "procedure for handling potential conflicts of interest, fees . . . billing arrangements and terms of payment." (*Id.*)

Contrary to its earlier position, Squire Patton Boggs took the position that it did not need a waiver of the conflict because one of the paragraphs in the "Standard Terms of Engagement" was a generalized advance waiver that provided "advance consent that [the firm] could represent other clients on matters adverse to Tate & Lyle so long as those matters were unrelated to our work for Tate & Lyle." (*Id.*) On this basis, Squire Patton Boggs reiterated its proposal to carry forward the simultaneous representations of the Sugar Company Plaintiffs and Tate & Lyle on other matters with two distinct teams of lawyers and an ethical wall. (*Id.*)

The language in the "Standard Terms of Engagement" upon which Squire Sanders relied was as follows:

> It is also possible that some of our current or future clients will have disputes with you during the time we are representing you. We therefore also ask each of our clients to agree that we may continue to represent or may undertake in the future to represent

1    existing or new clients in any matter that is not substantially

2    related to our work for you, even if the interests of such clients

3    in those unrelated matters are directly adverse to yours.  We

4    agree, however, that your prospective consent to conflicting

5    representation shall not apply in any matter that is substantially

6    related to the subject matter of our representation of you, or as

7    to which we have obtained from you sensitive, proprietary or

8    other confidential information from a non-public nature that, if

9    known to any other such client of ours, could be used by such

10   client to the material disadvantage of your interests.  We

11   emphasize that the consent requested covers only matters that

12   are unrelated to the work for which you are currently engaging

13   us, and we would not undertake any representation that is

14   related in any material way to the current matter.  In all cases,

15   we will preserve the confidentiality of all non-public

16   information that you provide us. Your signature on the attached

17   engagement letter will constitute your agreement to the waivers

18   requested in this paragraph.

19   (*Id.*)

20        No disclosure of the nature or specifics of a genuine conflict was included in

21   the generalized advance waiver.  Nor does it contain the identity of any potentially

22   adverse parties.  There is simply no specificity whatsoever.  Moreover, the language

23   is as broad as possible, and contains no time limit.  It is, in a word, boilerplate:  It is

24   not the type of waiver that would be required to satisfy the "informed consent" of a

25   client by actually providing an understanding of the material risks involved.

26        On August 13, 2014, Squire Patton Boggs stated it believed that the 1998

27   Engagement Letter and "Standard Terms of Engagement" "established the terms of

28   our engagement, and enclosed copies of another engagement agreement dated June

CALDWELL
LESLIE &
PROCTOR

-10-

13, 2002, but unsigned by Tate & Lyle, in support of its position that Tate & Lyle had previously agreed to an advance waiver on this particular conflict.  Yet Squire Patton Boggs admitted that under these old agreements, "we were obligated to notify you upon learning of a conflict."[3]  (*Id.*, ¶ 18, Ex. 5.)

### 4.   Squire Patton Boggs Withholds Services and Then Unilaterally Terminates Its Relationship with Tate & Lyle

On August 14, 2014, Attorney Waltz responded to an earlier email from Tate & Lyle seeking legal advice, stating that there is "a potential conflict issue that's arisen as a result of the combination of Patton Boggs and Squire Sanders.  I've been instructed to hold off on providing additional legal advice to Tate & Lyle until that issue is resolved."  (Castelli Decl., ¶ 20, Ex. 6.)  Tate & Lyle immediately responded to Squire Patton Boggs, objecting to Attorney Waltz's withholding of legal services in light of the ongoing conflict, and advising Squire Patton Boggs that losing Attorney Waltz would be detrimental to the company.  (*Id.*, ¶ 21, Ex. 7.)

On August 18, 2014, Squire Patton Boggs emailed a letter to Tate & Lyle, unilaterally terminating its sixteen-year relationship with Tate & Lyle.  (*Id.*, ¶ 22, Ex. 8.)  According to Squire Patton Boggs, the termination was necessary because "Tate & Lyle will not honor the agreement it made in 1998 inducing Patton Boggs's

---

[3] Tate & Lyle has no record that it signed the June 2002 engagement letter.  (Castelli Decl., ¶ 19.)  Based on the unexecuted June 2002 engagement letter enclosed with Squire Patton Boggs's August 10 letter, it appears that Tate & Lyle engaged Patton Boggs jointly with The American Sugar Refining Company ("TASR"), one of the plaintiffs in this case (operating under the new name "American Sugar Refining, Inc.") in connection with an investigation by the United States Customs Service, and following a transaction involving the sale of a business by Tate & Lyle to TASR. (Castelli Decl., ¶ 19, Ex. 5.)  Due to the conflicting interest of the two clients, Patton Boggs requested a conflict waiver from both Tate & Lyle and TASR—an indication that even Patton Boggs did not consider the 1998 generalized advance waiver to be adequate to cover an actual, specific conflict that arose in 2002.  (*Id.*)

1   representation" and because the Sugar Company Plaintiffs "would face severe

2   prejudice" if Squire Patton Boggs could not continue its representation. (*Id.*)

3         Squire Patton Boggs's abrupt termination of services leaves Tate & Lyle in a

4   real bind.  Indeed, on August 19, 2014, outside counsel for Squire Patton Boggs

5   informed Tate & Lyle that Attorney Waltz received a final report from the Canada

6   Border Services Agency, which imposes a ninety-day deadline for Tate & Lyle to

7   take corrective action and report such action to the Canadian agency.  (Proctor-T&L

8   Decl., ¶ 6.)  Because Attorney Waltz has ceased his services to Tate & Lyle, the

9   company must now scramble to retain new counsel, and expend significant

10  resources to educate the new attorneys on its products and business practices—

11  information that Squire Patton Boggs attorneys learned over the course of sixteen

12  years.  (Castelli Decl., ¶ 23; Balsley Decl., ¶ 11.)

13  **III.  SQUIRE PATTON BOGGS MUST BE DISQUALIFIED FROM**

14        **CONTINUED REPRESENTATION OF THE SUGAR COMPANY**

15        **PLAINTIFFS IN THIS ACTION**

16        The right to disqualify counsel lies squarely within the discretion of the Court

17  as an exercise of its inherent powers.  *Beltran v. Avon Prods., Inc.*, 867 F.Supp.2d

18  1068, 1076 (C.D. Cal. 2012).  When determining matters of disqualification, federal

19  courts apply the law of the state in which the district is located.  *Rodriguez*, 563 F.3d

20  at 967 ("By virtue of the district court's local rules, California law controls whether

21  an ethical violation occurred."); *Advanced Messaging Techs., Inc. v. EasyLink Servs.*

22  *Int'l Corp.*, 913 F.Supp.2d 900, 906 (C.D. Cal. 2012) ("The Ninth Circuit . . . has

23  made clear that a federal court in California must apply California law in a

24  disqualification motion."); *Baytree Capital Assocs., LLC v. Quan*, No. CV 08-2822

25  CAS (AJWx), 2008 WL 3891226, at *6 (C.D. Cal. Aug. 18, 2008) ("Motions to

26  disqualify counsel are decided under state law.").  Accordingly, California standards

27  of professional conduct and California state law applying these standards govern

28  here.  *See* C.D. Cal. R. 83-3.1.2 (adopting the Rules of Professional Conduct of the

CALDWELL
LESLIE &
PROCTOR

-12-

1  State Bar of California and the applicable judicial decisions thereto as the standards

2  of professional conduct in the Central District).

3      **A.**    ***California Law Unequivocally Mandates Squire Patton Boggs's***

4          ***Disqualification From This Action***

5          **1.**    **Squire Patton Boggs's Concurrent Representation of**

6              **Adverse Clients Is Strictly Prohibited**

7      California law establishes a bright-line rule prohibiting the simultaneous

8  representation of clients with adverse interests, unless both clients provide informed

9  written consent.  *Flatt*, 9 Cal.4th at 284; *see also Certain Underwriters at Lloyd's,*

10  *London v. Argonaut Ins. Co.*, 264 F.Supp.2d 914, 919 (N.D. Cal. 2003) ("Simply

11  put, an attorney (and his or her firm) cannot simultaneously represent a client in one

12  matter while representing another party suing that same client in another matter.");

13  Cal. R. Prof. Conduct 3-310(C) (prohibiting an attorney from "[representing] a

14  client in a matter and at the same time in a separate matter accept as a client a person

15  or entity whose interest in the first matter is adverse to the client in the first

16  matter").[4]  The prohibition applies even if the simultaneous representations are

17  completely unrelated to one another.  *Concat*, 350 F.Supp.2d at 815 (citing *Flatt*, 9

18  Cal.4th at 284).  Furthermore, because the client of one attorney in a law firm is

19  considered the client of the entire firm, the prohibition on concurrent representation

20  equally forbids attorneys within the same firm from representing adverse clients.

---

22  [4] This Memorandum employs the "concurrent representation" language of the cases,
23  despite Squire Patton Boggs's unceremonious firing of Tate & Lyle as a client on
   August 18, 2014, for two reasons:  First, there is no doubt that the firm
   simultaneously represented both Tate & Lyle and the Sugar Company Plaintiffs for
24  over two and a half months.  Second, California's "hot potato" rule, discussed *infra*
25  at 21-23, holds that where a firm attempts to drop one of its clients, the *per se*
   disqualification rule still holds:  Firms are not permitted to benefit from the
26  "expedient of severing the relationship with the preexisting client," and if they try
27  to, the cases hold, the court performs the same analysis as if no termination of the
   relationship had occurred.  *Flatt*, 9 Cal.4th at 288.

1  *Advanced Messaging*, 913 F.Supp.2d at 910 (applying California rule that "an
2  attorney's conflict is imputed to the law firm as a whole") (citation omitted); *Truck*
3  *Ins. Exch. v. Fireman's Fund Ins. Co*., 6 Cal.App.4th 1050, 1059-60 (1992)
4  (rejecting argument that the automatic disqualification rule is unduly "harsh when
5  applied to large law firms organized into specialty practice groups representing
6  institutional clients"). Cases refer to this as the *per se* automatic disqualification
7  rule. *See, e.g.*, *Flatt*, 9 Cal.4th at 284.

8       Where such concurrent representation of adverse clients exists, California law
9  requires disqualification in nearly every instance. *White v. Experian Info. Solutions*,
10  993 F.Supp.2d 1154, 1162 (C.D. Cal. 2014) ("When that conflict is a concurrent
11  conflict, automatic disqualification is the governing rule."); *see also Blue Water*
12  *Sunset, LLC v. Markowitz*, 192 Cal.App.4th 477, 486-87 (2011) ("If an attorney
13  simultaneously represents two clients with adverse interests, automatic
14  disqualification is the rule in all but a few instances.").

15       The reason for this stringent standard is well grounded:  Simultaneous
16  representation compromises and, in fact, breaches the "attorney's duty—and the
17  client's legitimate expectation—of *loyalty*." *Flatt*, 9 Cal.4th at 284 (emphasis in
18  original); *see also Concat*, 350 F.Supp.2d at 815 (collecting California cases
19  discussing the prohibition against representation of adverse clients given an
20  attorney's duty of loyalty). Indeed, a "client who learns that his or her lawyer is also
21  representing a litigation adversary . . . cannot long be expected to sustain the level of
22  confidence and trust in counsel that is one of the foundations of the professional
23  relationship." *Flatt*, 9 Cal.4th at 285.  Furthermore, if the duty of undivided loyalty
24  is compromised, "public confidence in the legal profession and the judicial process
25  is undermined." *Truck Ins. Exch.*, 6 Cal.App.4th at 1057 (quotations omitted).  It is
26  because of this paramount duty of loyalty, rather than an attorney's duty of
27  confidentiality, "that courts and ethical codes alike prohibit an attorney from

28

CALDWELL
LESLIE &
PROCTOR

TATE & LYLE INGREDIENTS AMERICAS LLC'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1  simultaneously representing two client adversaries, even where the substance of the

2  representations are unrelated." *Flatt*, 9 Cal.4th at 285.

3          These well-established principles apply squarely here.  Squire Patton Boggs

4  concedes that Tate & Lyle was a current client of legacy firm Patton Boggs at the

5  time of the merger.  (Castelli Decl., ¶ 11; Balsley Decl., ¶ 8.)  Indeed, Squire Patton

6  Boggs attorneys were working on regulatory matters for Tate & Lyle just days

7  before Squire Patton Boggs unilaterally terminated its representation of Tate & Lyle.

8  (Balsley Decl., ¶ 11.)  At the same time, Squire Patton Boggs is suing Tate & Lyle

9  in this case.  Absent informed written consent from the Sugar Company Plaintiffs

10  and Tate & Lyle—which Squire Patton Boggs does not have—Squire Patton Boggs

11  should be disqualified from this action.  *Concat*, 350 F.Supp.2d at 820.

12          **2.      Disqualification Is Required Even Where the Conflict Arises**

13                   **Due to a Law Firm Merger**

14          The fact that Squire Patton Boggs's conflict arose because of a merger

15  between law firms does not alter the analysis.  *See Stanley*, 35 Cal.App.4th at 1089-

16  90; Paul W. Vapnek, *et al*., *Cal. Prac. Guide:  Prof. Resp*. ¶ 4:49 (Rutter Group

17  2013) ("At some point in [merger] discussions, the parties *must* confront and resolve

18  client conflicts of interest.") (emphasis in original).  In *Picker Int'l, Inc., v. Varian

19  Assocs., Inc.*, 869 F.2d 578 (Fed. Cir. 1989), for example, conflict of interest issues

20  arose as the result of a merger between the law firms of Jones Day and McDougall,

21  Hersh & Scott ("MH&S").  One of the legacy firms, Jones Day, represented Picker

22  in a case against Varian.  The other legacy firm, MH&S, represented Varian on

23  other matters.  *Picker Int'l, Inc.*, 869 F.2d at 579-580.  Even though MH&S did

24  what Patton Boggs failed to do here and informed Varian of the merger and

25  potential conflict *before* it occurred, the Federal Circuit nevertheless held that

26  MH&S and Jones Day's actions violated the Model Code of Professional

27  Responsibility's general prohibition on simultaneously representing clients with

28  adverse interests and upheld the district court's decision to disqualify the firm.

CALDWELL
LESLIE &
PROCTOR

-15-

Notably, in *Picker*, disqualification was deemed warranted under the more forgiving Model Code of Professional Responsibility, which does not have a *per se* automatic disqualification rule and which California does not follow.  *See Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F.Supp.1383, 1391 (N.D. Cal. 1992).  Thus, there is no question that California's *per se* automatic disqualification rule would have compelled the same result in *Picker*, or that it requires the disqualification of Squire Patton Boggs under the facts of this case.

## B.   Squire Patton Boggs Cannot Avoid Disqualification with Its Belated Attempts to Cure the Conflict

Squire Patton Boggs's various attempts to "remedy" the conflict that it neglected to identify—relying on a generalized advance waiver, implementing a supposed ethical wall, and recently terminating its representation after Tate & Lyle refused to waive the conflict—fail to resolve the problem, which can only be remedied by the firm's automatic disqualification.

## 1.   Patton Boggs's Generalized Advance Waiver Does Not Constitute Informed Consent to Waive the Current Conflict

Disqualification is automatic unless both clients, with full understanding of the conflict of interest, knowingly agree to waive the conflict in writing.  *Concat*, 350 F.Supp.2d at 820.  Squire Patton Boggs's generalized advance waiver from 1998 does not even approach meeting that standard.  It is, in the words of the *Concat* court, a "generalized boilerplate waiver" lacking specific disclosures that does not constitute informed consent.  *Id.* at 821; *see also* ABA Model Rules of Prof'l Conduct R. 1.7 cmt 22 ("If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved").  To be effective, an advance waiver of potential future conflicts must adequately disclose the nature of the conflict at hand; otherwise, a second, more specific waiver is required.  *Concat*, 350 F. Supp.2d at 820.  Here, the generalized advance waiver simply fails to establish that

1   Tate & Lyle gave its informed consent to waive Squire Patton Boggs's present

2   conflict.  *Id.*   Squire Patton Boggs was therefore required to obtain a more specific

3   waiver that sufficiently disclosed the nature of the conflict, which it did not do.  *See*

4   *Visa U.S.A., Inc. v. First Data Corp.*, 241 F.Supp.2d 1100, 1106 (N.D. Cal. 2003);

5   Cal. R. Prof. Conduct 3-310(C), (E).

6      *Concat* is directly on point.  In that case, a client's engagement letter with

7   Morgan Lewis & Bockius, LLP ("Morgan Lewis") contained a generalized advance

8   waiver quite similar to—though slightly more informative than—the one at issue

9   here:  It stated that "[Morgan Lewis] may continue to represent, or may undertake in

10  the future to represent, existing or new clients in any matter, including litigation,

11  that is not substantially related to our work for you, even if the interests of such

12  clients in those other matters are directly adverse to you." *Id.* at 801.  Morgan Lewis

13  argued that this generalized advance waiver was sufficient allow it to avoid its

14  automatic disqualification resulting from its concurrent representation of adverse

15  clients. *Id.* at 820.  Noting the generalized advance waiver was "extremely broad

16  and [] evidently intended to cover almost any eventuality"—yet lacking the

17  necessary specificity as to the conflicts it covers—the Court held that allowing such

18  a waiver would be akin to awarding Morgan Lewis "an almost blank check." *Id.*

19  Such a "generalized boilerplate waiver" failed to obtain informed consent of a

20  present conflict, and since Morgan Lewis failed to obtain a second, more specific

21  waiver that disclosed the eventual conflict it was therefore disqualified from the

22  case. *Id.* at 821.  *See also All Am. Semiconductor, Inc. v. Hynix Semiconductor,*

23  *Inc.*, Case No. C 07-1200, 2008 WL 5484552, at *10 (N.D. Cal. Dec. 18, 2008)

24  (holding that generalized waiver language in prospective waiver did not sufficiently

25  disclose the nature of the conflict that subsequently arose between the parties).

26     The *Concat* court's conclusion rested on the traditional factors of analysis of

27  advance waivers, such as:  (1) the waiver's breadth, (2) its temporal scope, (3) the

28  quality of conflict discussion between the attorney and client, (4) the specificity of

CALDWELL
LESLIE &
PROCTOR

-17-

1   the waiver, (5) the nature of the actual conflict, (6) the sophistication of the client,

2   and (7) the interests of justice. *Id.* (citing *Visa U.S.A.*, 241 F.Supp.2d at 1106 ).

3   These factors, as a whole, and others compel the conclusion that Patton Boggs's

4   generalized advance waiver is weaker than the one in *Concat*, and cannot overcome

5   the automatic disqualification rule.

6          First, the generalized advance waiver is as broad as can be imagined:  Patton

7   Boggs's clients are all apparently expected to agree to this "blank check."  Second,

8   it is wholly open-ended, by its own terms stretching from 1998 until forever.  Third,

9   it contains within it no real discussion of the pros, cons, or ramifications of the

10  waiver—and there is no indication that Patton Boggs discussed this conflict waiver

11  or its significance with Tate & Lyle back in 1998.  (Castelli Decl., ¶ 16, Ex. 1.

12  (placing the burden on Tate & Lyle to "review the document carefully to ensure that

13  it comports with your understanding").)  This fact alone establishes that there was

14  no "informed consent" to the current conflict.

15         Fourth, there is no specificity whatsoever, and particularly no hint of what

16  any future conflict may be about.  Fifth and Sixth, while Tate & Lyle's

17  sophistication is conceded, the nature of the conflict here—a battles between two

18  rival industries, with the Sugar Company Plaintiffs attempting to change the

19  business model of Tate & Lyle—cannot be overstated and certainly outweighs any

20  sophistication.  Finally, in terms of the interests of justice, it cannot be said that two

21  law firm's desire to become more lucrative by means of a merger should trump Tate

22  & Lyle's right to expect ethical loyalty from its attorneys.

23         Other facts support this conclusion.  Tellingly, the generalized advance

24  waiver does not even use the term "litigation" or "lawsuit"; it only notes that some

25  of the firm's future or present clients may be "adverse" or "in dispute" with Tate &

26  Lyle.  (*Id.*)  Moreover, even Patton Boggs recognized that its generalized advance

27  waiver had no teeth, as evidenced by the fact that it twice sought subsequent specific

28  waivers from Tate & Lyle—in 2002 and a few weeks ago, Tate & Lyle brought the

1  conflict to Squire Patton Boggs's attention.  (*Id.*, ¶¶ 12, 18.)

2  Moreover, putting aside *Concat* and the legal inadequacy of the generalized

3  advance waiver, the simple fact is that it does not apply by the operation of its own

4  terms.  The document expressly provides that it does not apply where the firm has

5  obtained from the client "sensitive, proprietary, or other confidential information . . .

6  that, if known to any other such client of ours, could be used by such [adverse]

7  client to the material disadvantage of your interests."  (*Id.*, ¶ 16, Ex. 1)  By virtue of

8  Patton Boggs's regulatory work, Squire Patton Boggs possesses Tate & Lyle's

9  proprietary and confidential information, including methods of producing HFCS and

10 financial information relating to the production of HFCS.  (*Id.*)  Such information

11 could be used by the Sugar Company Plaintiffs against Tate & Lyle in this action, as

12 the information pertains to the assertions (and Tate & Lyle's denials) that HFCS is

13 not "natural" or nutritionally equivalent  to refined sugar, and factors into the

14 calculation of the parties' alleged damages.  Thus, by its own terms, the generalized

15 advance waiver expressly prohibits Squire Patton Boggs's continued representation

16 in this action.  This is the same result mandated by California Rule of Professional

17 Conduct 3-310(E), which prohibits a lawyer from accepting employment adverse to

18 a client or former client, without the consent of the client, where the lawyer has

19 obtained confidential information material to the employment.

20 **2.    Squire Patton Boggs's Untimely Ethical Wall Is Not Legally**

21 **Sufficient to Cure Its Conflict**

22 Squire Patton Boggs urged Tate & Lyle to waive the conflict based on

23 assurances that an ethical wall would be put in place.  An ethical wall, however,

24 cannot cure a breach of the duty of loyalty, cannot be implemented without client

25 consent where the lawyers possess material confidential information and, even if it

26 could, the ethical wall here was not implemented until August 1, 2014, two months

27 after the conflict arose, thereby making it legally insufficient.

28

CALDWELL
LESLIE &
PROCTOR

TATE & LYLE INGREDIENTS AMERICAS LLC'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1    "Although an ethical wall may, in certain limited circumstances, prevent a
2    breach of confidentiality, it *cannot*, in the absence of an informed waiver, cure a law
3    firm's breach of its duty of loyalty to its client." *Concat*, 350 F.Supp.2d at 822
4    (emphasis added).  As discussed above, Squire Patton Boggs's concurrent
5    representation of adverse clients is prohibited because it constitutes a breach of the
6    duty of loyalty, not of the duty of confidentiality.  *Flatt*, 9 Cal.4th at 284.  "Since the
7    duty of loyalty is paramount, the prohibition applies even where there is no misuse
8    of confidential information or other evidence adverse effect." *Concat*, 350
9    F.Supp.2d at 822.  Thus, as a matter of law, the ethical wall implemented by Squire
10   Patton Boggs on August 1, 2014, cannot cure its breach of the duty of loyalty, and
11   automatic disqualification is warranted.  *Id.*

12           Further, in cases such as this where the lawyers clearly possess material
13   confidential information, an ethical wall cannot cure the conflict absent client
14   consent.  *Henriksen v. Great Am. Sav. & Loan*, 11 Cal.App.4th 109, 113 (1992).
15   Even in cases of subsequent representations where disqualification is based upon a
16   rebuttable presumption that the tainted attorneys have shared confidential
17   information about their client with the other attorneys in their firm, the established
18   law in California still rejects ethical walls.  *See Hitachi, Ltd. v. Tantung Co.*, 419
19   F.Supp.2d 1158 (2006); *Beltran*, 867 F.Supp.2d at 1083-84 (doubting that ethical
20   screening can prevent disqualification); *Advanced Messaging*, 913 F.Supp.2d 900.

21           Moreover, under the standard utilized by the one California appellate court
22   that permitted a firm's ethical screening to rebut the presumption, the ethical wall
23   implemented by Squire Patton Boggs fails because it was untimely.  *Kirk v. First
24   Am. Title Ins. Co.*, 183 Cal.App.4th 776, 810 (2010) ("First, the screen must be
25   timely imposed; a firm must impose screening measures when the conflict first
26   arises.").  Here the ethical wall was not established until August 1, 2104, two full
27   months after the merger was complete.  (Proctor-T&L Decl., Ex. 13.)  This delay in
28   the implementation of the ethical wall renders it ineffective as a matter of law.

1   *Concat*, 350 F.Supp.2d at 822 (ethical screen ineffective because it was

2   implemented three months after conflict arose); *Advanced Messaging*, 913

3   F.Supp.2d at 911 (screen untimely where it was implemented eight months after

4   conflict arose); *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 259 (7th Cir.

5   1983) (holding that, for an ethical screen to be effective, it must be set up at the time

6   when the potentially disqualifying event occurred); *Cobb Publ'g, Inc. v. Hearst*

7   *Corp.*, 907 F.Supp. 1038, 1047 (E.D. Mich. 1995) (finding that a delay of eleven or

8   eighteen days in establishing an ethical wall is too long).

9          Further, the purported "practical wall" referenced in Squire Patton Boggs's

10   initial communications after Tate & Lyle brought the conflict to the law firm's

11   attention was not a true ethical wall and, in fact, was quite accidental.  The assertion

12   that a screen existed was based on the representation that "the two legacy firms'

13   computer systems have not been integrated, documents have been isolated in

14   different physical office locations, and [Attorney Waltz] has had no discussions with

15   the [] team working on [this litigation]."  (Castelli Decl., ¶ 12, Ex. 2.)  This

16   accidental wall of sorts does not meet the stringent requirements for a legally

17   effective ethical screen.  *See Kirk*, 183 Cal.App.4th at 810 (an effective ethical wall

18   typically must, among other things: "be timely imposed"; have "prohibitions against

19   and sanctions for discussing confidential matters"; and have "procedures preventing

20   a disqualified attorney from sharing in the profits from the representation").

21          **3.     Squire Patton Boggs's Belated Attempt to Cure the Conflict**

22                  **by Terminating Its Relationship with Tate & Lyle Is**

23                  **Insufficient to Prevent Disqualification**

24          Squire Patton Boggs's most recent mistreatment of Tate & Lyle—abruptly

25   terminating the attorney-client relationship after Tate & Lyle refused to waive the

26   conflict—runs directly afoul of California's "hot potato" rule, which prohibits

27   counsel from curing its duty of loyalty problems by terminating its relationship with

28   one of its clients.  *Flatt*, 9 Cal.4th at 288.  Such a termination neither cures the

conflict nor avoids the automatic disqualification rule. *White*, 993 F.Supp.2d at 1163; *Moreno v. AutoZone, Inc.*, 2007 WL 4287517, at *6 (N.D. Cal. Dec. 6, 2007) ("[D]ual representation conflicts cannot be cured by the expedient [severing of] the relationship with one of the clients."). Indeed, by unilaterally terminating its relationship with Tate & Lyle in favor of continued representation of the Sugar Company Plaintiffs, Squire Patton Boggs further breached its duty of loyalty to Tate & Lyle. Restatement (Third) of Law Governing Lawyers, § 132 cmt. c ("A premature withdrawal violates the lawyer's obligation of loyalty to the existing client and can constitute a breach of the client-lawyer contract of employment.").

The reason for not permitting a firm to benefit by playing "hot potato" with its client is intuitive: Without such a rule, a law firm could always avoid disqualification despite a conflict, simply by withdrawing from its representation of the less favored or less profitable relationship. *Unified Sewerage Agency of Wash. County v. Jelco Inc.*, 646 F.2d 1339, 1344-45 n.4 (9th Cir. 1981); *see also Truck Ins. Exch.*, 6 Cal.App.4th at 1058-59 ("courts should not allow a law firm to profit from a conflict of interest which it created"). This would allow "such unethical behavior [as concurrent representation] to continue unrestricted" and eliminate the incentive to avoid concurrent representations of adverse interests in the first place. *Truck Ins. Exch.*, 6 Cal.App.4th at 1058.

Furthermore, while the rule is designed to apply equally regardless of the attorney's motivation, *Flatt*, 9 Cal.4th at 289, Squire Patton Boggs's unceremonious dismissal of Tate & Lyle was particularly offensive. The firm justified its termination by suggesting that the work it performed for Tate & Lyle was inconsequential, and Attorney Waltz and others could withdraw "'without material adverse effect on the interests'" of the company. (Castelli Decl., ¶ 22, Ex. 8.) The law firm proceeded to blame Tate & Lyle for the termination, claiming that it resulted because "Tate & Lyle will not honor the agreement it made in 1998 *inducing* Patton Boggs's representation." (*Id.* (emphasis added).) Then, Squire

1  Patton Boggs confirmed that the Sugar Company Plaintiffs were more valuable

2  clients, and the potential prejudice they might face if the law firm withdrew in this

3  action warrants the termination of services to Tate & Lyle.  (*Id.*)

4       Squire Patton Boggs may not play favorites (for financial reasons or

5  otherwise) in this scenario.  Its unilateral termination of its relationship with Tate &

6  Lyle does not negate its conflict and, consequently, Squire Patton Boggs cannot

7  escape the automatic disqualification that follows.

8       ***C.     The Balance of Interests Confirms the Need for Disqualification***

9       California's *per se* disqualification rule applies in this case and, therefore, the

10  balancing of interests is irrelevant.  Even if it is considered, however, the

11  "paramount concern must be the preservation of public trust both in the scrupulous

12  administration of justice and in the integrity of the bar."  *State Farm Mut. Auto. Ins.*

13  *Co. v. Federal Ins. Co.*, 72 Cal.App.4th 1422, 1428 (1999).  Thus, a party's right to

14  its counsel of choice "must yield to the ethical considerations that embody the moral

15  principles of our judicial process."  *Id.*  Here, there is no question that Squire Patton

16  Boggs jeopardized these principals, breaching its duty of loyalty to Tate & Lyle

17  through the continued representation of the Sugar Company Plaintiffs against Tate

18  & Lyle in this case.  On this basis alone, Squire Patton Boggs should be disqualified.

19       Disqualification is the equitable solution here.  Squire Patton Boggs must not

20  be rewarded for its carelessness.  It certainly should not be permitted to extract itself

21  from a morass of its own making by opting to represent clients in a lucrative

22  litigation to the detriment of a long-standing client of sixteen years.  *See Truck Ins.*

23  *Exch.*, 6 Cal.App.4th at 1059 (noting that disqualification is based on the premise

24  "that courts should not allow a law firm to profit from a conflict of interest which it

25  created").[5]

26

27  ──────────────

   [5] Furthermore, while the final pretrial conference is scheduled to take place on

28  November 17, 2014, no trial date has been set in this matter.  (Dkt. No. 141.)  Thus,

1    Moreover, Tate & Lyle should not be penalized for a conflict of interest that it

2    did not create, and stands to suffer greatly if Squire Patton Boggs is allowed to

3    continue its representation this matter.  In that scenario, Tate & Lyle will have no

4    choice but to seek new counsel for its regulatory matters, after it has relied on the

5    legacy firm Patton Boggs for more than sixteen years.  Attorney Waltz and other

6    attorneys from the legacy firm Patton Boggs are deeply entrenched in Tate & Lyle's

7    business, and have long-standing working relationships with many Tate & Lyle

8    employees.  (Castelli Decl., ¶ 22.)  The extensive knowledge of Tate & Lyle's

9    business that Squire Patton Boggs attorneys have learned in the course of sixteen

10   years cannot be transferred to a new law firm without Tate & Lyle dedicating

11   significant time and financial resources.  (*Id*, ¶ 23.)  Additionally, Tate & Lyle now

12   has the added challenge of finding new regulatory counsel immediately and bringing

13   them up to speed in order to address a looming ninety-day deadline imposed in one

14   of its matters.  (*See* Proctor-T&L Decl., ¶¶ 6, 8.)

15   Finally, as discussed above, Squire Patton Boggs possesses Tate & Lyle's

16   confidential information, yet it lacks meaningful measures to ensure that this

17   information does not reach the numerous Squire Patton Boggs attorneys working on

18   this case.  *See supra* at 19-21.  The only proper solution to prevent any misuse of

19   such information is to disqualify Squire Patton Boggs from this action.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26   there is sufficient time for the Sugar Company Plaintiffs to obtain new counsel and
     proceed with trial without compromising existing dates set in this action.  The

27   docket also reflects that the Plaintiffs are represented by The Lanier Law Firm PC in
     addition to Squire Patton Boggs.

28

CALDWELL
LESLIE &
PROCTOR

-24-

TATE & LYLE INGREDIENTS AMERICAS LLC'S
MOTION TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

**IV.    CONCLUSION**

"In the relationship with the client, the lawyer is required above all to demonstrate loyalty."  Geoffrey C. Hazard, Jr., *Triangular Lawyer Relationships: An Exploratory Analysis*, 1 Geo. J. Legal Ethics 15, 21 (1987).  It is this duty of loyalty that now prevents Squire Patton Boggs from suing its own client in this case.

For all of the foregoing reasons, Tate & Lyle respectfully requests that the Court grant its Motion and disqualify Squire Patton Boggs (US) LLP from representing Plaintiffs in this action.

DATED:  August 26, 2014                    Respectfully submitted,

                                                                      CALDWELL LESLIE & PROCTOR, PC


                                                                      By _____/S/_____
                                                                              MICHAEL J. PROCTOR
                                                                      Attorneys for Defendants and Counterclaimants
                                                                      TATE & LYLE INGREDIENTS AMERICAS
                                                                      LLC, and INGREDION INCORPORATED