A. Howard Matz – State Bar No. 55892
  ahm@birdmarella.com
Mark T. Drooks - State Bar No. 123561
  mtd@birdmarella.com
Marc E. Masters - State Bar No. 208375
  mem@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff THE SUGAR
ASSOCIATION, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| WESTERN SUGAR COOPERATIVE, a Colorado cooperative, et al.,<br><br>   Plaintiffs,<br><br>  vs.<br><br>ARCHER-DANIELS-MIDLAND COMPANY, a Delaware corporation, et al.,<br><br>   Defendants. | CASE NO. CV11-3473 CBM (MANx)<br><br>**PLAINTIFF THE SUGAR ASSOCIATION, INC.'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S AND INGREDION INCORPORATED'S MOTIONS TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP**<br><br>Date: September 23, 2014<br>Time: 10:00 a.m.<br>Crtrm.: 2<br><br>Assigned to Hon. Consuelo B. Marshall |

# TABLE OF CONTENTS

**Page**

I       INTRODUCTION ............................................................................ 1

II      BACKGROUND ............................................................................ 1

    A.      Losing Their Counsel Would Greatly Prejudice The Plaintiffs ............. 1

III     ARGUMENT ................................................................................ 3

    A.      There Is No Compelling Basis For Disqualifying SPB. ........................ 3

    B.      This Court Has Broad Discretion In Considering Motions For Disqualification. ............................................................................... 3

    C.      Disqualification Motions Are Strongly Disfavored And Subject To Strict Scrutiny. ......................................................................... 5

    D.      California Courts Have Considered The Changing Nature Of Legal Practice In Deciding To Apply Increasingly Flexible Standards For Disqualification ............................................... 6

    E.      This Court Should Exercise Its Discretion To Deny Disqualification. ................................................................... 8

IV      CONCLUSION ............................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Andrews Farms v. Calcot, LTD.*,
   No. CV–F–07–0464 LJO SKO, 2010 WL 4010146 (E.D. Cal. Oct.
   13, 2010) ................................................................................................. 7

*In re County of Los Angeles*,
   223 F.3d 990 (9th Cir. 2000) ................................................................. 7

*Kelly v. Roker*,
   No. C 11–05822 JSW, 2012 WL 851558 (N.D. Cal. March 13,
   2012) .................................................................................................. 5, 6

*Optyl Eyewear Fashion Intern. Corp. v. Style Cos., Ltd.*,
   760 F.2d 1045 (9th Cir. 1985) ............................................................ 5, 6

*Parkinson v. Phonex Corp.*,
   857 F. Supp. 1474 (D. Utah 1994) ...................................................... 11

*Research Corp. Techs., Inc. v. Hewlett-Packard Co.*,
   936 F. Supp. 697 (D. Ariz. 1996) ....................................................... 11

*Richardson-Merrell, Inc. v. Koller*,
   472 U.S. 424 (1985) (Brennan, J., concurring) ..................................... 6

*SWS Financial Fund A v. Salomon Bros. Inc.*,
   790 F. Supp. 1392 (N.D. Ill. 1992) ................................................. 10, 11

*UMG Recordings, Inc. v. MySpace, Inc.*,
   526 F. Supp. 2d 1046 (C.D. Cal. 2007) ................................... 4, 5, 7, 8

*Visa U.S.A., Inc. v. First Data Corp.*,
   241 F. Supp. 1100 (N.D. Cal. 2003) ..................................................... 5

**State Cases**

*Adams v. Aerojet–General Corp.*,
   86 Cal. App. 4th 1324 (2001) ............................................................... 7

*Baugh v. Garl*,
   137 Cal. App. 4th 737 (2006) ............................................................. 11

*Gregori v. Bank of America*,
   207 Cal. App. 3d 291 (1989) .................................................................. 6

*Kirk v. First Am. Title Ins. Co.*,
   183 Cal. App. 4th 776 (2010) ............................................. 4, 6, 7, 8, 10

*Koo v. Rubio's Restaurants, Inc.*,
   109 Cal. App. 4th 719 (2003) ........................................................... 9, 11

*Oaks Mgmt. Corp. v. Super. Ct.*,
   145 Cal. App. 4th 453 (2006) ............................................................. 4, 8

*Roush v. Seagate Tech., LLC*,
   150 Cal. App. 4th 210 (2007) ................................................................ 5

*Sharp v. Next Entm't, Inc.*,
   163 Cal. App. 4th 410 (2008) ............................................................. 7, 8

**State Statutes**

Code of Civil Procedure section 128 ...................................................... 11

Lanham Act ............................................................................................... 3

# I

# INTRODUCTION

The manifest purpose of Tate & Lyle Ingredients Americas, LLC's ("Tate") and Ingredion Incorporated's ("Ingredion") respective motions to disqualify Squire Patton Boggs (US) LLC ("SPB") from further participation in this action is to deprive the plaintiffs of their long-time, trusted counsel after three and a half years of hard-fought litigation, just as the case approaches trial. Yet despite abstract references to the duty of loyalty and presumptions of injury, neither Tate nor Ingredion has identified any actual injury that it suffered – or expects to suffer – from SPB's continued representation of the plaintiffs. Depriving a litigant of its chosen counsel is an extreme, potentially devastating step. It is not a matter of merely connecting the dots to show a technical conflict. Despite Tate's and Ingredion's references to "*per se*" rules and automatic outcomes, disqualification of counsel is a disfavored remedy confided to this Court's discretion. Exercising that discretion on the side of fairness counsels denial of these motions.

Plaintiff The Sugar Association joins in the opposition to the disqualification motions filed by SPB. The association files this separate opposition to the disqualification motions, through special counsel appearing solely for that purpose, in order to address two critical points: (a) the enormous, crippling prejudice that plaintiffs, who have done nothing whatsoever to warrant it, would suffer from disqualification of their trusted litigation counsel at this late stage of the case; and (b) the discretion entrusted to the Court to weigh that prejudice in reaching a decision on the motions.

# II

# BACKGROUND

## A.   Losing Their Counsel Would Greatly Prejudice The Plaintiffs.

The circumstances concerning the Patton Boggs law firm's respective relationships with Tate and Ingredion, the recent merger of Squire Sanders and

---

3113596.1

1

THE SUGAR ASSOCIATION, INC.'S OPPOSITION TO MOTIONS TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

Patton Boggs, and the handling of the purported conflict over the past six weeks are set forth in SPB's opposition papers.  They are not repeated here.

Squire Sanders (US) LLP (f/k/a Squire Sanders & Dempsey LLP)'s relationship with the sugar industry began in 2004, when the firm was retained to prosecute the first major false advertising case brought by The Sugar Association.  Declaration of Andrew C. Briscoe, III ("Briscoe Decl."), ¶ 5.  That case, which related to claims of false advertising against the makers of Splenda, was aggressively litigated in this District before Judge Dale Fischer and eventually settled shortly before trial in 2008.  *Id.*, ¶ 5.  After the conclusion of the Splenda Litigation, The Sugar Association and its members found themselves forced to return to the courts to again protect the integrity of sugar.  Several attorneys who had worked on the Splenda Litigation were available in 2010 to handle this Action on behalf of the plaintiffs.  *Id.*, ¶ 6.  Squire Sanders's exceptional handling of the Splenda Litigation was an important factor in The Sugar Association's decision to commence this Action.  *Id.*, ¶ 7.

Since this Action was filed three and a half years ago, the Squire Sanders (now SPB) lawyers on the case have devoted enormous time and resources to representing the plaintiffs.  More than 2,000,000 pages of documents have been produced by various parties and witnesses, all of which have been reviewed and analyzed.  Briscoe Decl., ¶¶ 8-9.  SPB lawyers have taken and defended the majority of the depositions in the case, identified and prepared expert witnesses, and briefed and argued all but one motion.  *Id.*, ¶¶ 10-12.  SPB lawyers are responsible for arguing the summary judgment motions set for hearing on the same day as these disqualification motions.  *Id.*, ¶ 12.  Over the next eighty days, SPB lawyers also are responsible for taking and defending all expert depositions, preparing all pre-trial documents, and otherwise preparing this case for trial.  *Id.*, ¶ 13.

The critical and substantial effort that SPB lawyers and paralegals have put into this litigation is illustrated by the legal fees paid to Squire Sanders in

connection with this action, which totaled over $12 million as of August 25, 2014. Briscoe Decl., ¶ 14.  This figure reflects more than 20,000 hours of time spent by lawyers and paralegals at the firm on the representation of plaintiffs in this Action. *Id.*

All of this time and energy has been spent to make the SPB lawyers on this case experts on extraordinarily complex issues.  These complex issues include: (1) the phramacokinetics and pharmacodynamics of glucose, fructose, sucrose, and the oligosaccharides and reactive α-dicarbonyls that are in the different formulations of high fructose corn syrup; (2) the complex analysis necessary to assess the effect that the defendants' advertising has had on the price of sugar; (3) the application of multivariate regression analysis to prices in two government supported industries that also compete in the world market; (4) corrective advertising damages; and (5) marketing surveys as used in Lanham Act litigation.  *Id.*

### III

### <u>ARGUMENT</u>

**A.      <u>There Is No Compelling Basis For Disqualifying SPB.</u>**

SPB's papers filed in opposition to these motions demonstrate that the facts of this case do not support any inference that Patton Boggs's work for either Tate or Ingredion was substantially related to Squire Sanders's work for the plaintiffs on this case.  SPB also demonstrates that there is no basis for application of a *per se* rule of disqualification based on any concurrent representation of either Tate or Ingredion.  SPB had no pending matters for Ingredion at the time of the merger and SPB had a valid, advance waiver from Tate.  The Sugar Association joins in those arguments.

**B.      <u>This Court Has Broad Discretion In Considering Motions For Disqualification.</u>**

In California, as elsewhere, courts must evaluate "the propriety of disqualification [based] on the circumstances of the particular case in light of

THE SUGAR ASSOCIATION, INC.'S OPPOSITION TO MOTIONS TO DISQUALIFY SQUIRE PATTON BOGGS (US) LLP

1   competing interests." *Oaks Mgmt. Corp. v. Super. Ct.*, 145 Cal. App. 4th 453, 464

2   (2006).  "A judge's authority to disqualify an attorney has its origins in the inherent

3   power of every court in the furtherance of justice to control the conduct of

4   ministerial officers and other persons in pending judicial proceedings." *Oaks Mgmt.*

5   *Corp.*, 145 Cal. App. 4th at 462.  The court's discretion in considering

6   disqualification motions "derives from the court's equitable powers, and hence, a

7   motion for disqualification is governed by such equitable principles as waiver,

8   estoppel, laches, undue hardship, and a balancing of the equities." *UMG*

9   *Recordings, Inc. v. MySpace, Inc.*, 526 F. Supp. 2d 1046, 1062 (C.D. Cal. 2007).

10       Thus, in spite of Tate's and Ingredion's assertion that disqualification is

11  automatic and the court lacks discretion to do otherwise, California law makes

12  disqualification discretionary:

13       Given this history, we conclude that it is improper to rely on *Flatt* as

14       creating an absolute rule of vicarious disqualification in California.

15       Instead, we believe that neither *Flatt* nor *SpeeDee Oil* addressed the

16       issue of whether vicarious disqualification is absolute, and the state of

17       the law is that as initially expressed by the appellate courts: (1) a case-

18       by-case analysis based on the circumstances present in, and policy

19       interests implicated by, the case; (2) tempered by the *Henriksen* rule

20       that vicarious disqualification should be automatic in cases of a tainted

21       attorney possessing actual confidential information from a

22       representation, who switches sides *in the same case*.

23  *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 800 (2010) (emphasis

24  added).  Because no Patton Boggs lawyer ever represented Tate or Ingredion *in this*

25  *case*, the court has discretion to refuse to disqualify SPB.  Exercising that discretion

26  against disqualification is particularly appropriate where, as here, the prior

27  representation by Patton Boggs was exceedingly brief, quite long ago, and only

28  remotely related to this case.  SPB's opposition demonstrates that no confidences

1   were in fact compromised, nor are any such confidences at risk now.

2        Where client confidences are not at risk, this court is by no means required to

3   automatically disqualify counsel simply because this case involves an alleged

4   conflict.  Indeed, the court possesses "broad" discretion to issue orders less drastic

5   than disqualification, and "even when the court has misgivings about the conduct of

6   the challenged attorney, it is not obligated to disqualify that lawyer merely because

7   he has run afoul of the applicable ethical rules."  *UMG Recordings, Inc.*, 526 F.

8   Supp. 2d at 1063.  "In other words, even when counsel has been shown to have

9   committed an ethical rule infraction the court retains discretion to decline to order

10  disqualification, and, in many cases, courts have done just that."  *Id.*

11  **C.    Disqualification Motions Are Strongly Disfavored And Subject To Strict**

12          **Scrutiny.**

13        Not only do courts possess broad discretion to evaluate the equities

14  underlying a disqualification motion, but California courts also have uniformly

15  found that "[m]otions to disqualify counsel are strongly disfavored."  *Visa U.S.A.,*

16  *Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003); *UMG*

17  *Recordings, Inc.*, 526 F. Supp. 2d at 1062 (disqualification "should only be imposed

18  when absolutely necessary.").  Disqualification "is a drastic measure which courts

19  should hesitate to impose except in circumstances of absolute necessity."  *Kelly v.*

20  *Roker*, No. C 11–05822 JSW, 2012 WL 851558, *2 (N.D. Cal. March 13, 2012);

21  *Roush v. Seagate Tech., LLC*, 150 Cal. App. 4th 210, 219 (2007) (disqualification

22  should not be granted "simply out of hypersensitivity to ethical nuances or the

23  appearance of impropriety").  Moreover, such motions are "subjected to particularly

24  strict judicial scrutiny."  *Optyl Eyewear Fashion Intern. Corp. v. Style Cos., Ltd.*,

25  760 F.2d 1045, 1050 (9th Cir. 1985).  "The moving party, therefore, carries a heavy

26  burden and must satisfy a high standard of proof."  *Kelly*, 2012 WL 851558, at *2.

27        The strict standards for ordering disqualification are based on courts' concern

28  that disqualification motions "are often tactically motivated and . . . tend to derail

the efficient progress of litigation." *Id.*; *Optyl*, 760 F.2d at 1050 ("The cost and inconvenience to clients and the judicial system from misuse of the [disqualification motion] for tactical purposes is significant."). "[A]s courts are increasingly aware, motions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent." *Gregori v. Bank of America*, 207 Cal. App. 3d 291, 300-01 (1989). As Justice Brennan stated, "the tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation. When a trial court mistakenly disqualifies a party's counsel[,] the court in essence permits the party's opponent to dictate his choice of counsel." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) (Brennan, J., concurring); *Gregori*, 207 Cal. App. 3d at 301 ("attorneys now commonly use disqualification motions for purely strategic purposes."). Disqualification motions "can be misused to harass opposing counsel, or to intimidate an adversary into accepting settlement on terms that would not otherwise be acceptable." *Gregori*, 207 Cal App. 3d at 301. Tate and Ingredion's respective disqualification motions are precisely the type of tactical motions that California courts reject.

**D.** **California Courts Have Considered The Changing Nature Of Legal Practice In Deciding To Apply Increasingly Flexible Standards For Disqualification**

In determining the propriety of disqualification, this Court, in its broad discretion and given that disqualification is strongly disfavored, should also consider the changing realities of the legal practice and their implications on the propriety of disqualification in this case.

The federal courts and the California Courts of Appeal have acknowledged on numerous occasions that the practice of law has been substantially transformed, and as a result these courts have questioned the assumptions underlying the wooden application of disqualification standards. For example, the court in *Kirk*, in ruling that vicarious disqualification must be applied on a case-by-case basis, stated that,

due to "the changing landscape of legal practice," the conflicted attorney could be "working in a different geographical office and in a different practice group from the attorneys with responsibility for the litigation."  *Kirk*, 183 Cal. App. 4th at 802. The court also noted that other jurisdictions have adopted rules of professional conduct that adapt to these changing realities.  *Id.* at 802-03 (noting that almost half of the states have rejected automatic vicarious disqualification).

Similarly, the California Court of Appeal has observed: "Large law firms . . . are becoming ever larger, opening branch offices nationwide or internationally . . .. Individual attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe." *Adams v. Aerojet–General Corp.*, 86 Cal. App. 4th 1324, 1336 (2001) (rejecting automatic application of vicarious disqualification); *see also In re County of Los Angeles*, 223 F.3d 990, 995-97 (9th Cir. 2000) ("The changing realities of law practice call for a more functional approach to disqualification than in the past."); *UMG Recordings, Inc.*, 526 F. Supp. 2d at 1047-48 (observing "the pitfalls that large firms representing powerful clients in high stakes disputes often encounter in complying with ethical and professional requirements that were promulgated in a different era").[1]

---

[1] For example, in the context of class actions, courts in California have cautioned against "rigid application of disqualification rules" to account for "the nature of class representation and the importance of retaining counsel with the most experience on the case." *Andrews Farms v. Calcot, LTD.*, No. CV–F–07–0464 LJO SKO, 2010 WL 4010146, *4 (E.D. Cal. Oct. 13, 2010); *see also Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 430 (2008). In *Andrews*, the court specifically noted that the lawsuit had been "pending for three years, through hard-fought pleadings, discovery and law and motion practice. . . . The knowledge and experience gained by counsel during the pendency of this action is irreplaceable." *Andrews*, 2010 WL 4010146 at *4.

**E.** **This Court Should Exercise Its Discretion To Deny Disqualification.**

Given the equities in this case, the strict scrutiny applied to disqualification motions, and California courts' application of increasingly flexible standards for disqualification in light of the changing nature of legal practice, neither Tate nor Ingredion has made the requisite showing that disqualification is proper here.

In evaluating the propriety of disqualification, courts "must weigh the combined effects of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest."  *Oaks Mgmt. Corp.*, 145 Cal. App. 4th at 464-65.  Preservation of public trust "is *just one* of the many policy interests which must be balanced by a trial court considering a disqualification motion," and the public interest does not always outweigh other interests, such as the right to choose counsel, the burdens of replacing counsel, and the possibility of tactical abuse.  *Kirk*, 183 Cal. App. 4th at 802 (emphasis in original); *see also Sharp*, 163 Cal. App. 4th at 428 (in some cases involving concurrent representation, "the dangers of . . . harm to the interests of protecting the public confidences in the system are outweighed by permitting clients and lawyers to contract with one another and automatic disqualification is not required").

Courts have emphasized that there is "an interest in preserving the continuity of the lawyer-client relationship," particularly in complicated or longstanding cases."  *UMG Recordings, Inc.*, 526 F. Supp. 2d at 1065.  "[O]therwise, if such relationships were easily disrupted, complicated cases . . . would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers."  *Id.* (holding that disqualification

8

would be overly harsh given the complicated nature of the case and the "minor nature of the conflict").  Moreover, the disqualified attorney's client bears the burden and cost of finding a replacement, and "suffers a particularly heavy penalty where … his attorney is highly skilled in the relevant area of the law." *Koo v. Rubio's Restaurants, Inc.*, 109 Cal. App. 4th 719, 734 (2003).

Here, the balance of interests weighs heavily against disqualification.  SPB has represented plaintiffs in this action since its inception, and has vigorously litigated the action at every step of the litigation process, including extensive discovery and motion practice (involving over 2,000,000 pages of documents and over 237 docket entries for filings with the Court).  The plaintiffs have incurred over $12 million in fees from SPB on these matters, reflecting over 20,000 hours of professional time and demonstrating the depth of the firm's involvement.  All of this time and resources have been spent to make the SPB lawyers on this case experts on the extraordinarily complex issues at issue here.  *See* Section II.A, *supra*.  No replacement firm could master these issues without a near-identical effort.

To force plaintiffs to find replacement counsel now, after SPB has developed substantial expertise and familiarity with the complex issues, facts, parties, and procedural history involved in this matter over more than three years of litigation in this case and a ten-year relationship, would impose overwhelming prejudice and undue hardship upon the plaintiffs and cause substantial delay and disruption to these proceedings.[2]  Briscoe Decl., ¶¶ 5-16.  On the other hand, neither Tate nor

_____

[2] Tate and Ingredion may argue that the presence of SPB's co-counsel, the Lanier Firm, eliminates or reduces this prejudice. That is demonstrably false. The Lanier Firm has had a limited role to date in the Action; advancing the interests of the ten plaintiffs without SPB's continued involvement and leadership would be an impossible challenge.  For example, the Lanier Firm has had no role in document review.  Although lawyers from the Lanier Firm took three depositions, they were substantially assisted by SPB attorneys in preparing for the depositions, including the assembling of all pertinent documents.  SPB lawyers attended and assisted

Ingredion has established a substantial relationship between the matters at issue, nor have they articulated any tangible prejudice in their respective motions.[3] Indeed, in making this motion, Tate attempts to strip plaintiffs of their counsel by disclaiming an advance waiver signed by its own general counsel.

Even in the absence of an advance waiver, courts have denied disqualification in cases involving concurrent representation based on facts similar to this one. For example, in *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1400 (N.D. Ill. 1992), the court denied defendant's motion to disqualify plaintiff's counsel where counsel was simultaneously representing the defendant in an unrelated compliance matter, reasoning that plaintiff would suffer "substantial costs" if disqualification were granted. The *SWS* court specifically cautioned that disqualification would become a tactical tool to "manufacture" potential conflicts:

> [If disqualification were granted,] the implications would be overwhelming. Clients of enormous size and wealth, and with a large demand for legal services, should not be encouraged to parcel their business among dozens of the best law firms as a means of

---

during these depositions. Lawyers from the Lanier Firm have argued only one motion, and they have had a very limited role in the preparation of briefs and expert reports. They are not familiar with the complex issues relating to the metabolism and nutrition of sweeteners or the calculation of damages. Although Mr. Lanier will have a substantial role at trial, the plan always has been that he would share responsibility with the SPB lawyers, who would remain in charge of the many technical factual and legal issues in the case. Briscoe Decl., ¶ 15.

[3] Tate and Ingredion essentially seek to vicariously disqualify SPB as a firm, since the disqualification would extend beyond former Patton Boggs lawyers to all of the former Squire Sanders lawyers working on this case. These former Squire Sanders lawyers never worked for Tate or Ingredion, which was represented by Patton Boggs. Only one former Patton Boggs lawyer had even a passing involvement with this case. California courts adopt a case-by-case analysis for vicarious disqualification, and have rejected an automatic rule for vicarious disqualification, noting that such a rule "can be harsh and unfair to both a law firm and its client." *Kirk*, 183 Cal. App. 4th at 794.

1    purposefully creating the potential for conflicts. . . . [T]he law should

2    not give large companies the incentive to manufacture the potential for

3    conflicts by awarding disqualification automatically.

4  *Id.* at 1402-03; *see also Research Corp. Techs., Inc. v. Hewlett-Packard Co*., 936 F.

5  Supp. 697, 702-03 (D. Ariz. 1996) (denying disqualification motion where

6  plaintiff's counsel simultaneously represented defendant in a minor matter, but had

7  spent 19 months preparing plaintiff's case); *Parkinson v. Phonex Corp*., 857 F.

8  Supp. 1474, 1477 (D. Utah 1994) (holding that disqualification was not justified

9  where two attorneys in the same law firm simultaneously represented the plaintiff

10  and defendant in two separate matters for a one-month period; one matter was a

11  three-year litigation while the other was a one-month estate planning

12  representation).[4]

13        SPB is a large law firm, employing approximately 1,500 attorneys, in 44

14  offices located in 21 countries around the world, representing thousands of clients.

15  It is the result of a merger so recent that the two merging firms have not even fully

16  integrated their computer systems or offices.  Given its large size, it is typical for

17  attorneys to have no knowledge of the matters and clients represented by other

18  attorneys within the same firm.  And given the increasing complexity of both law

19  firm structure and commercial litigation, with the best of intentions and conflicts

20  system, a conflict may occasionally and inadvertently escape notice.  An innocent

21  error in a conflict check, however, does not require the Court to permit an

22  _____

23  [4] Since disqualification does not have a punitive purpose, it "is only justified where

24  the misconduct will have a 'continuing effect' on judicial proceedings."  *Baugh v. Garl*, 137 Cal. App. 4th 737, 744 (2006).  "If . . . the court's purpose is to punish a

25  transgression which has no substantial continuing effect on the judicial proceedings

26  to occur in the future, neither the court's inherent power to control its proceedings nor [the] Code of Civil Procedure section 128 . . . can be stretched to support the

27  disqualification."  *Koo*, 109 Cal. App. at 734.

28

1  opportunistic defendant to compel the drastic result of disqualification, particularly

2  given the severe prejudice that the ten plaintiffs in this action would suffer and the

3  lack of prejudice suffered by either Tate or Ingredion.

4  **IV**

5  **CONCLUSION**

6    For the foregoing reasons, The Sugar Association respectfully urges the Court

7  to protect the plaintiffs' attorney-client relationship with SPB and its right to counsel

8  of its choice and to deny Tate's and Ingredion's Motions to Disqualify Counsel For

9  Plaintiffs.

10

11  DATED:  September 2, 2014   Respectfully submitted,

12

13             A. Howard Matz

           Mark T. Drooks

14             Marc E. Masters

           Bird, Marella, Boxer, Wolpert, Nessim,

15             Drooks, Lincenberg & Rhow, P.C.

16

17           By:   /s/ A. Howard Matz

18               A. Howard Matz

           Attorneys for Plaintiff THE SUGAR

19             ASSOCIATION, INC.

20

21

22

23

24

25

26

27

28

# BRISCOE DECLARATION

## DECLARATION OF ANDREW C. BRISCOE, III

I, Andrew C. Briscoe, III declare as follows:

1.      I am a resident of the Commonwealth of Virginia and the President of The Sugar Association, a plaintiff in this action. I have been employed by the Sugar Association since September 2002 and have been the President of The Sugar Association since April 2003. I make this declaration in connection with motions recently filed by defendants and counterclaimants Tate & Lyle Ingredients Americas LLC and Ingredion Incorporated, seeking to disqualify Squire Patton Boggs (US) LLP ("SPB") from acting as counsel to plaintiffs and counter-defendants in this action. Except where otherwise indicated, I make this declaration based on my personal knowledge and I could and would so testify under oath if called upon to do so.

2.      The Sugar Association is one of the plaintiffs in this action, styled *Western Sugar Cooperative, et. al. v. Archer-Daniels Company, et al.*, Case No. 11-3473 CBM (the "Action"). The Sugar Association is the trade association for the sugar industry. All but one of the corporate plaintiffs in this Action are members of The Sugar Association. In my position as President of The Sugar Association, I have been personally involved in the selection of counsel for the Action and for coordination with and supervision of counsel in the Action.

3.      Promoting the truth about sugar, and protecting sugar from efforts by manufacturers of other sweeteners to portray themselves as being just like sugar is a key objective for The Sugar Association and its members. For the past ten years, the law firm of Squire Sanders, now SPB, has been The Sugar Association's trusted litigation counsel in the handling of major litigation implicating the most significant legal issues affecting the sugar industry, including dealing with companies who through advertising campaigns try to align their sweeteners with sugar and thereby diminish the distinctive qualities of sugar in the minds of consumers. Through its longstanding representation, SPB has become inextricably linked with the association and its members. The lawyers handling this Action for the ten plaintiffs have developed an intimate knowledge and understanding

3113777.1

1

of not merely the facts and law underlying the issues in this case but the way in which those issues affect our industry and the thousands of sugar farmers we represent. They are the counselors who, over the past decade, have earned the special trust, confidence, and reliance of the association and its members. Disqualification of these lawyers and their firm at this late juncture of the case would cripple the ten plaintiffs' efforts to protect their rights and to promote their interests in this Action. Even if the Action were stayed to allow other lawyers a reasonable opportunity to review the files in the Action, it is inconceivable to me that new lawyers could effectively replace our lawyers at SPB.

### A.   Selection of Squire Sanders

4.      I was involved in the decision to retain Squire Sanders (US) LLP (f/k/a Squire Sanders & Dempsey LLP) as counsel in this action in 2010. One of the key factors in the decision was the long and extensive representation that Squire Sanders previously had provided to The Sugar Association and several of its members in the only other major litigation in which the association has been involved.

5.      Squire Sanders had represented The Sugar Association, The Amalgamated Sugar Company ("Amalgamated"), American Sugar Cane League ("ASCL"), American Sugar Refining, Inc. ("ASR"), C&H Sugar Company, Inc. ("C&H"), Michigan Sugar, Minn-Dak Farmers' Cooperative ("Minn-Dak"), Rio Grande Valley Sugar Growers, Inc. ("Rio Grande"), and Western Sugar Cooperative ("Western Sugar") in a false advertising lawsuit against McNeil PPC-Inc. and McNeil Nutritionals, LLC, Case No. CV-04-10077 DSF (RZx) (C.D. Cal.), relating to the advertising of the chemical sweetener Splenda® (the "Splenda Litigation"). Squire Sanders filed the Splenda Litigation in December 2004. The Splenda Litigation involved many of the same false advertising issues presented in this case and, like this case, it was an effort by the sugar industry to protect the integrity of its product and the reputation of that product in the marketplace. Sugar is known worldwide as the gold standard of sweeteners and there are 27 other sweeteners in the U.S., many of which are striving to be viewed as just like sugar. The Splenda Litigation

1  proceeded through the final pre-trial conference and ultimately settled before trial, in
2  November 2008.

3        6.     After the conclusion of the Splenda Litigation, The Sugar Association and its
4  members found themselves forced to return to the courts to again protect the integrity of
5  sugar.  Several attorneys who had worked on the Splenda Litigation were available in 2010
6  to handle this Action on behalf of the plaintiffs.  These lawyers included Daniel Callister,
7  Adam Fox, and John Burlingame, who remain actively involved today.  Callister, Fox, and
8  Burlingame had gained considerable expertise concerning the U.S. sugar industry through
9  their substantial work on the Splenda Litigation.  This expertise included knowledge about
10  the economics of the U.S. sugar industry, the sugar companies that are plaintiffs in this
11  case, and an understanding of the different challenges and concerns of the many members
12  of The Sugar Association, who, despite having shared interests producing or marketing
13  sugar, are also competitors.

14        7.     Squire Sanders's exceptional handling of the Splenda Litigation was a critical
15  factor in The Sugar Association's decision to commence this Action.  Before we filed the
16  Action, we expected that the high fructose corn syrup industry would devote its
17  considerable resources to waging a fierce legal battle.  The Sugar Association and each of
18  the other nine companies that are plaintiffs in this case placed our trust and confidence in
19  Squire Sanders based upon the firm's outstanding representation of The Sugar Association
20  and member companies in the Splenda Litigation.

21       **B.**    **The Action**

22        8.     This Action was filed on April 22, 2011.  During the past three and half
23  years, the scope of the case and the resources that the lawyers responsible for prosecuting
24  it have had to devote to the matter have been huge.  I am informed and believe that the
25  defendants have produced 944,589 pages of documents.  I also understand that non-parties
26  in the Action have produced 877,800 pages of documents.  SPB has been responsible for
27  reviewing all the documents associated with these productions.  SPB also was responsible

28

1   for all aspects of Plaintiffs' document production, which I am informed and believe totaled
2   443,258 pages of documents.

3        9.      As a result of its consistent devotion to the plaintiffs' collective interests,
4   SPB has mastered the issues and the evidence in this case.  SPB has devoted considerable
5   time and resources to understanding the documents and testimony in the Action, the extent
6   to which the evidence bears on the issues in the case, and how that evidence can be used to
7   advance the plaintiffs' interests in the Action.  The amount of time, effort, and expense that
8   would be necessary for new counsel to invest in reviewing and understanding the
9   documents would be enormous.

10       10.     SPB has been responsible for taking and defending most of the depositions in
11  the Action.  SPB also has prepared all of the motions and oppositions to motions that have
12  been filed, and will be filed, in this case.  For example, in just over the past two weeks
13  alone, SPB has prepared or is in the process of preparing the following filings:

14       •      Opposition to Defendants' Motion to Re-Open Discovery (filed on
15  August 15, 2014)

16       •      Opposition to Defendants' Motion to Certify Appeal (filed on August
17  26, 2014)

18       •      Motion for Summary Judgment regarding Defendants' counterclaim
19  (filed on August 26, 2014)

20       •      Opposition to Defendants' Motion for Summary Judgment regarding
21  liability (to be filed on September 2, 2014)

22       •      Opposition to Defendants' Motion for Summary Judgment regarding
23  damages (to be filed on September 2, 2014).

24       11.     SPB lawyers have been responsible for identifying and working with our
25  expert witnesses, both testifying experts and consulting experts.  SPB also has been
26  responsible for identifying and working with experts to evaluate and, when necessary,
27  rebut the opinions expressed by experts designated by the defendants.  On August 29,
28  2014, the defendants served ten expert reports.  Rebuttal reports to these ten expert reports

3113777.1                                    4

1 must be prepared and served by September 30, 2014.  SPB also will be responsible for

2 taking and defending all expert depositions.

3      12.    It is particularly distressing that this issue of potential disqualification is

4 being raised more than three years into this litigation, at a critical juncture in the Action.

5 The final pre-trial conference in the case is set for November 17, and the Court presumably

6 will set a trial date at that time.  In the weeks ahead, the plaintiffs are relying on SPB

7 lawyers to handle all of the critical tasks necessary to bring the case to trial on a timely

8 basis.  SPB lawyers are responsible for  arguing the summary judgment motions set for

9 hearing on September 23, 2014.

10     13.    In addition, plaintiffs are relying on SPB lawyers to effectively and

11 efficiently meet the following pre-trial deadlines:

12     •    Rebuttal expert reports are due on September 30, 2014;

13     •    Expert depositions must be completed by October 31, 2014;

14     •    Pre-trial designation of witnesses, exhibits, deposition excerpts, contentions

15     of fact and law, and stipulations of facts not in dispute are due on October 8, 2014;

16     and

17     •    A memorandum of contentions of fact and law, a joint exhibit list and a final

18     witness list are due on October 27, 2014.

19     14.    The critical and substantial effort that SPB has put into this litigation is

20 illustrated by the legal fees paid to Squire Sanders in connection with this Action, which

21 totaled over $12 million as of August 25, 2014.  I am informed and believe that this figure

22 reflects more than 20,000 hours of time spent by lawyers and paralegals at the firm on the

23 representation of plaintiffs in this Action.  All of this time and energy has been spent to

24 make the SPB lawyers on this case experts on extraordinarily complex issues.  These

25 complex issues include: (1) the phramacokinetics and pharmacodynamics of glucose,

26 fructose, sucrose, and the oligosaccharides and reactive $\alpha$-dicarbonyls that are in the

27 different formulations of high fructose corn syrup; (2) the complex analysis necessary to

28 assess the effect that the defendants' advertising has had on the price of sugar; (3) the

3113777.1                                    5

1  application of multivariate regression analysis to prices in two government supported

2  industries that also compete in the world market; (4) corrective advertising damages; and

3  (5) marketing surveys as used in Lanham Act litigation.

4      15.   SPB's co-counsel, the Lanier Firm, has had a limited role to date in the

5  Action; advancing the interests of the ten plaintiffs without SPB's continued involvement

6  would be an impossible challenge.  The Lanier Firm has had no role in document review.

7  Although lawyers from the Lanier Firm took three depositions, they were substantially

8  assisted by SPB attorneys in preparing for the depositions, including the assembling of all

9  pertinent documents.  SPB lawyers attended and assisted during these depositions.

10  Lawyers from the Lanier Firm have argued only one motion, and they have had a very

11  limited role in the preparation of briefs and expert reports.  They are not familiar with the

12  complex issues relating to the metabolism and nutrition of sweeteners or the calculation of

13  damages.  Although Mr. Lanier will have a substantial role at trial, the plan always has

14  been that he would share responsibility with the SPB lawyers, who remain in charge of the

15  many technical factual and legal issues in the case.

16      **C.**    **Disqualification of SPB Would Work a Profound Hardship on the**

17  **Plaintiffs**

18      16.   Disqualification of SPB would result in the loss of years of study,

19  preparation, and knowledge developed by the law firm that the U.S. Sugar industry relies

20  on for its major litigation. This Action is only the second civil litigation that the sugar

21  industry has been forced to file against competing entities that have attempted to mislead

22  consumers about their products.  Squire Sanders (now SPB) has handled both of those

23  cases.  The deep base of knowledge that Squire Sanders has developed over that decade of

24  work cannot be replaced by any new firm stepping into this representation.  Moreover,

25  beyond that expertise, the individual lawyers involved in the representation have earned

26  the respect and confidence of a disparate array of plaintiffs.  Even the extraordinary

27  investment of time and other resources that new lawyers would have to make to attempt to

28  master the vast record of this Action could not possibly confer on those lawyers an

3113777.1

6

1  appreciation for the critical details and unique nuances of the case that our lawyers at SPB

2  have developed.  I am absolutely convinced that plaintiffs would be grievously injured by

3  the loss of its chosen counsel at this late date in the Action in a manner that could not

4  effectively be mitigated by new counsel.

5    I declare under penalty of perjury under the laws of the United States of America

6  that the foregoing is true and correct and that I executed this declaration on September 2,

7  2014, in Washington, D.C.

8

9

10

        Andrew C. Briscoe, III

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28