the City of New York Formal Opinion 2006-1 (defining "sophisticated clients" as "clients that regularly engage outside counsel for legal services, or that have access to independent or inside counsel for advice on conflicts" and opining that "for a sophisticated client, blanked advance waivers . . . are ethically permitted.")

When informed, even an open-ended blanket waiver of a client's right to disqualify is enforceable. *Zador,* 31 Cal.App.4th at 1301. Relying on a Formal Opinion of the State Bar of California, the *Zador* court explained the State Bar committee determined a blanket waiver of a client's right to disqualify counsel, if informed, would not be "*per se* improper." *Id.,* citation omitted. The committee reasoned that while an attorney would likely not be permitted to represent both sides in the same dispute, "'*if the original waiver was informed, . . . counsel could withdraw from its representation of [one client] and continue to represent [the other] client even if otherwise confidential information would be used against [the now adverse] client.*'" *Id.,* citation omitted, emphasis original. [See also Pansky Decl., ¶¶ 16-18.]

2. *Tate Agreed to Waive Concurrent Conflicts In Unrelated Future Matters*

Tate cannot dispute that its then-Executive Vice President and General Counsel J. Patrick Mohan signed Patton Boggs's engagement letter with standard terms and thus communicated Tate's intention to be bound by those terms, including the advance waiver.

Despite that undeniable fact, and despite the law permitting advance waivers, Tate argues that the advance waiver should not be enforced because it is "generalized." Motion at 16-19. It argues that the *Visa* factors compel the court to conclude that the advance waiver is invalid. Tate is simply wrong, both on the law and the facts.

First and foremost, the advance waiver is enforceable because as it admits, Tate was highly sophisticated. For years, it has regularly used legal services provided by large law firms. It has its own legal department, with multiple lawyers. Its parent

company Tate PLC is a constituent of the FTSE 250 Index, which consists of the 101st to 350th largest companies listed on the London Stock Exchange. Its U.S. subsidiary A.E. Staley Manufacturing Co. was one of the largest American corn processors.

Moreover, Tate was represented by independent counsel. Mr. Mohan is admitted to the state bars of California, Illinois, and Ohio. When he signed the waiver, he had been practicing law for nearly 25 years, and he had been at Tate almost 20 years, the last ten as general counsel. The same year he signed the advance waiver, he assumed responsibility for all administrative services, including Human Resources, Finance, Information Systems, Risk Management, Purchasing, Law, and Public and Government Relations. His peers in the industry recognized him as one of their leaders, as he served as a member of the board of directors of the Corn Refiners Association starting in 1988, including as its chairman in 1992-93. Under ABA Model Rule 1.7 and ABA Formal Opinion 05-436, Mr. Mohan's status as a sophisticated attorney is enough to make the advance waiver enforceable.

Tate relies heavily on *Concat v. Unilever, PLC*, 350 F. Supp. 2d 796 (N.D. Cal. 2004), but that case is distinguishable. In *Concat*, there was no evidence that the waiving client, an individual, was a lawyer, or that he sought advice from independent counsel about the waiver. Here, Tate's independent, experienced, sophisticated general counsel agreed on its behalf to the waiver.

*Concat* pointed to a need to identify the specific nature of the conflict and the potential party involved. *Id.* at 820. That is out of step with more recent cases that do not require such disclosure and enforce more open-ended waivers. *See Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 404 (N.D. Tex. 2013) (denying disqualification and finding the difference between *Concat* and *Visa* on specificity "no longer persuasive for whether a particular waiver is insufficient to form the basis of informed consent"). After the *Concat* opinion was issued, ABA Formal Opinion 05-436 based on the more modern version of the ABA Model Rules

12

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY     CV11-3473 CBM (MANx)

(referenced in this Court's Local Rule) "withdrew" the earlier opinion that, like *Concat*, required specific foreseeability and disclosure of the specific kind of conflict and adverse party.

In addition, *Concat* seemingly treated all of the *Visa* factors as equivalent. That is contrary to the more recent ABA Formal Opinion 05-436 and New York Formal Opinion 2006-1, which suggest that the most critical factor as the client's level of sophistication.

The closer case to Tate's is *Visa*, where the court treated the client's "level of experience with legal services" as crucial to its determination that the client gave informed consent. *Id.* at 1109. In *Visa*, the court enforced an advance waiver, relying in part on the client's status as a Fortune 500 company. *Id.* 1110. The court considered the client a "sophisticated user of legal services." *Id.* at 1110. It not only had its own legal department, it routinely hired national law firms to handle its more complex legal matters. *Id.* It was, therefore, "expected to understand the full extent of what it waived . . ." *Id.*

Contrary to Tate's arguments, other *Visa* factors favor validity.

- The waiver's breadth: The advance waiver's scope is limited: it covers only later matters that are unrelated to Patton Boggs's work for Tate. Thus, contrary to Tate's argument, it does not operate as a "blank check" for Patton Boggs. Rather, its effect is to make the substantial relationship test that applies to former representations applicable to future ones.

- Quality of conflict discussion: On this factor, Tate argues that Patton Boggs improperly "plac[ed] the burden on Tate to 'review the document carefully.'" Motion at 18. But given Mr. Mohan's experience and sophistication, it was entirely appropriate for Patton Boggs to expect that he would do exactly that and raise any questions he had about it. It follows from his signature that he was satisfied with the terms.

13

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY    CV11-3473 CBM (MANx)

- Specificity of the waiver: Tate complains that Patton Boggs provided "no hint of what any future conflict may be about." Motion at 18. But that is the very definition of a "blanket waiver," which an increasing number of courts and ethics authorities have found to be valid.
- Nature of the conflict: Tate points to the nature of the litigation—"a battle between two rival industries." Motion at 18. But even *Concat*, which Tate relies on most heavily, held that a waiver limited to unrelated matters would satisfy this factor. *Concat*, 350 F. Supp. 2d at 820.
- Interests of justice: Put simply, there is no reason to relieve Tate of its obligations under the advance waiver. The agreed-upon terms of engagement contemplated this exact situation. They provided that if a conflict arose and either Tate or Patton Boggs decided that the representation should not continue, then either party could terminate the representation. That is exactly what occurred here—Tate decided that it no longer wanted to waive conflicts, and Patton Boggs decided that the relationship could not continue.

Advance waivers enable more clients to engage counsel of their choice. They make it possible for sophisticated corporations like Tate to retain large law firms that practice in specialized areas. Unless the client makes a compelling showing that the client was uninformed about the advance waiver, they should be enforced. Tate has made no such showing.

3. *The Interests of Justice should be given great weight under these circumstances.*

The Rules governing the conduct of lawyers, which are intended to provide protections to clients, should not be applied in a way that inflicts injury upon a client unless there is a truly compelling reason to do so. The cases recognize the unfortunate use of motions to disqualify counsel in order to gain a tactical advantage in litigation; that is exactly what Tate attempts to do.

Tate asserts that this court has no discretion; they claim that this court is

14

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY        CV11-3473 CBM (MANx)

1  compelled to grant their motion. But this court does have discretion and under *Visa*
2  should consider the interests of justice. It would be manifestly unjust to disqualify
3  the counsel who have a longstanding relationship with the Sugar Association clients,
4  a relationship built through the litigation of several highly contested matters. *See In*
5  *re County of Los Angeles*, 223 F.3d at 996 (Disqualification denied. "A rule that
6  automatically disqualifies a firm in all cases substantially related to the tainted
7  lawyer's former representation could work a serious hardship for the lawyer, the
8  firm and the firm's clients . . . Such a rule also raises the specter of abuse.") The
9  SquirePB lawyers have developed enormous expertise in the complex issues
10 involved in this litigation. To ignore the advance consent and disqualify those
11 lawyers would delay this case (as the defendants have often sought to do) and would
12 require the plaintiffs to incur the enormous expense and nearly impossible task of
13 educating new counsel on the nuances of this hard fought litigation. [See Opposition
14 filed by Sugar Association Plaintiffs.] This court should exercise its discretion and
15 deny the motion to disqualify in the interest of justice.

16 Defendants have made no showing that SquirePB gained an advantage in the
17 litigation as a result of the representation of Tate by Patton Boggs LLP. This court
18 should exercise its discretion and deny the motion to disqualify in the interest of
19 justice.

20 **4. The "Hot Potato" Doctrine Does Not Apply Because SquirePB's Withdrawal**
21    ***from Representing Tate Was Permitted***

22 The "hot potato" doctrine does not apply to this set of facts for three reasons:

23 First, by the advance waiver, Tate agreed in advance to Patton Boggs's
24 withdrawal as a means for resolving a concurrent conflict were one to arise.

25 Second, under the rules of professional responsibility, SquirePB was permitted to
26 withdraw from its Tate representation, since the withdrawal could "be accomplished
27 without material adverse effect" on Tate's interests. *See* D.C. Rules of Professional

28

---

15

1 | Conduct Rule 1.16(b).[3]

2 | Third, this is not a situation in which a firm dropped a client "like a hot potato" in order to take on a new client. The longstanding representation of the Sugar Association plaintiffs, and the fact that withdrawal from that representation would cause substantial prejudice required withdrawal from the representation of Tate.

*a. The Terms of the Engagement Permitted Withdrawal: the Parties Agreed That If a Conflict Arose, Either Party Could Terminate the Attorney-Client Relationship*

In addition to agreeing in advance to waive future conflicts in unrelated matters, Tate agreed that if a conflict arose either party could terminate the attorney-client relationship. "If either you or we conclude that our representation should or must be terminated, we will do our best to protect your interests in providing a smooth transition to new counsel." That contractual provision removes this situation from the harsh rule in the "hot potato" cases.

When Tate raised the conflict with SquirePB, SquirePB obtained a waiver of any conflict from the Sugar Association clients, which would have allowed the continued representation of Tate. When Tate chose not to continue their consent, it forced SquirePB to choose between longstanding clients. The agreed-upon terms of engagement allowed SquirePB to withdraw from representing Tate. Tate had every right to end the consent, but having previously agreed, it could not demand that SquirePB end its representation in this case.

Tate relies on *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578 (Fed. Cir.

---

[3] SquirePB lawyers in Washington, D.C., performed the combined firm's legal services for Tate. None of those lawyers are admitted in the Central District of California. Their activities are governed by D.C. Rules of Professional Conduct. D.C. Rules of Professional Conduct Rule 8.5(b)(2); *see also* CRPC 1-100(D)(2) (limiting, for lawyers admitted in other jurisdictions, application of California Rules of Professional Conduct to "activities … while engaged in the performance of lawyer functions in this state"). The California Rules of Professional Conduct also permitted (if not required) the withdrawal because continuing representation would create a conflict for the lawyers litigating the Sugar Association case in California. [Cal. Rule of Prof'l Conduct 3-700; Dec. of Bruce Green, ¶ 18.]

16

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY    CV11-3473 CBM (MANx)

1989), but that case is distinguishable because the client in *Picker* had not agreed to an advance waiver. The trial court in *Picker* also did not consider the prejudice to the innocent client whose counsel was disqualified, a factor that courts in California do consider on disqualification motions. *See Zador,* 31 Cal. App. 4th 1302-03 ("[I]t must be kept in mind that disqualification usually imposes a substantial hardship on the disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement."); *see also SpeeDee Oil,* 20 Cal. 4th at 1144-45 (considerations include "client's right to chosen counsel" and "the financial burden on a client to replace disqualified counsel").

b. *The Rules of Professional Conduct Also Permitted Withdrawal*

In addition to being allowed under the terms of the engagement, SquirePB's decision to withdraw from representing Tate was also permitted under D.C.'s rules of professional conduct. Withdrawal is permitted if it "can be accomplished without material adverse effect on the interests of the client." D.C. Rules of Professional Conduct Rule 1.16(b).

Here, Tate makes little showing that it will suffer harm from the withdrawal, harm that is dwarfed by the severe prejudice that the Sugar Association plaintiffs would suffer were they to lose SquirePB as their counsel. *See* Plaintiff The Sugar Association, Inc.'s Opposition Brief and Declaration of Andrew C. Briscoe, III.

Further, when a client who granted an advance waiver changes his mind, D.C.'s Rules of Professional Conduct permit withdrawal from the representation of that client. DC Bar Ethics Opinion 317. The client cannot demand that the firm withdraw from representing its other clients, who along with the lawyer may have acted in reliance on that waiver when undertaking the representation. *Id.* ("[W]hile nothing can prevent a waiving client from later changing its mind, such an action might not compel the lawyer to withdraw from representing the other affected client. ... If there has been detrimental reliance by the other client or the lawyer, the lawyer ordinarily should continue representing the other client.").

*c. The "Hot Potato" Doctrine Should Not Be Applied to Conflicts Like This One*

A firm's inadvertent concurrent representation created by a law firm merger, followed by an attempt to resolve and a withdrawal from representation, is not the sort of thing the hot potato doctrine should address. *See* John Leubsdorf, *Conflicts of Interest: Slicing the Hot Potato Doctrine*, 48 San Diego L. Rev. 251, 270-71 (2011) (observing that "[s]ome courts apply the hot potato doctrine when a conflict results from the firm's acts in merging" and concluding that "[T]hat application seems questionable. Mergers and hires are not professional misconduct, even if they do sometimes result in conflict of interest, always provided that the firm acts promptly to resolve the conflict."). For example, in *Research Corp. Techs. v. Hewlett-Packard Co.*, 936 F. Supp. 697, 703 (D. Ariz. 1996), an inadvertent adverse concurrent representation arose as a result of law firm merger. After the conflict was identified, the firm took actions to protect disclosure, asked for consent, and resolved the conflict by withdrawing from the client's representation. *Id.* The court denied disqualification, finding that the former client could not show that the adversary had gained an advantage in the case, nor that the former client had suffered more than minimal prejudice. *Id.* The court concluded: "[t]he situation here cannot reasonably be viewed as [the firm] dropping Hewlett-Packard 'like a hot potato' in favor of a more lucrative client." *Id.*

The strict rules that apply to concurrent representation should give way to today's realities of law practice. Indeed, as the Ninth Circuit has explained, "[t]he changing realities of law practice call for a more functional approach to disqualification than in the past." *In re County of Los Angeles*, 223 F.3d at 997. Especially when withdrawal is permitted and can be achieved without real harm to a client, the court should not adopt a rule in effect giving veto power to any one client over a law firm merger involving many other lawyers besides those directly involved and many other clients, in this case hundreds of other lawyers and thousands of other clients.

18

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY    CV11-3473 CBM (MANx)

Tate relies on *Flatt* and *Truck Ins. Exchange* for the proposition that concurrent representation conflicts may not be cured "by the expedient of severing the relationship with the preexisting client." [Motion at 22-23.] But even in *Flatt*, the law firm continued to represent one of the two clients, and the court recognized the firm's continuing duty of loyalty to that client. *Flatt*, 9 Cal. 4th at 288. As the court in *Forrest v. Baeza*, 58 Cal. App. 4th 65, 80 (1997), observed, *Truck Ins. Exchange* and *Flatt* "hold that an attorney may not violate his or her duty of loyalty to an existing client by undertaking representation adverse to that client's interests; they do not, however, hold that the attorney is required to cease representation of either client." The *Forrest* court further observed that counsel in *Truck Ins. Exchange* had voluntarily withdrawn from representing the first client before being disqualified from representing the second, but "this effect is a function of the particular facts of the case. The opinion does not suggest that if [counsel] had not so withdrawn it would have been precluded from continuing to represent Fireman's Fund in the wrongful termination cases." *Id.*

SquirePB did not withdraw from the representation of Tate to opportunistically take on a new matter for the Sugar Association plaintiffs. Rather, SquirePB first attempted to find a solution that was consistent with the terms of its engagements and that would have resulted in the least prejudice to all of its clients: a continued consent to conflicts in unrelated matters. When Tate declined that solution, SquirePB took the relative prejudice to all of its clients into account.

SquirePB's decision to terminate its representation of Tate was reasonable, made in good faith, and allowed under the D.C. (and California) Rules of Professional Conduct because Tate would not suffer a material adverse effect. SquirePB also offered to make its lawyers available at no charge to help with the transition and to pay transition expenses. Its reasonable conduct does not merit disqualification.

*THE WORK PATTON BOGGS PERFORMED FOR TATE& LYLE IS NOT SUBSTANTIALLY RELATED TO THE SUBJECT MATTER OF THIS LAWSUIT.*

*1. The Substantial Relationship Test Requires a Showing that the Subject Matters of the Representations Are Substantially Related*

A motion to disqualify counsel in a successive representation case will be granted only if "the client demonstrates a 'substantial relationship' between the subject of the antecedent and current representations." *Fiduciary Trust Int'l of Calif. v. Superior Court,* 218 Cal.App.4th 465, 479 (2013) quoting *Flatt v. Superior Court*, 9 Cal.4th 275, 283 (1994). "A substantial relationship exists where 'the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation." *Khani,* 215 Cal.App.4th at 916 (citing *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal.App.4th 698-710-11 (2003)). When deciding whether a substantial relationship exists, courts consider three factors: "(1) factual similarities between the two representations, (2) similarities in legal issues, and (3) the nature and extent of the attorney's involvement" in the earlier matter "and whether he was in a position to learn of the client's policy or strategy." *Adams v. Aerojet-General Corp.*, 86 Cal. App. 4th 1324, 1332 (2001).

This litigation is about the propriety of advertising under the Lanham Act an issue wholly different from the issues in trade and customs work.

This is a materiality standard: a similarity of legal issues alone will not establish a substantial relationship sufficient to warrant disqualification. *Khani,* 215 Cal.App.4th at 916. Rather, the substantial relationship test "requires that 'the evidence before the trial court support[] a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.'" *Id.*

For example, in *Khani*, plaintiff's counsel had worked on California lemon law cases for Ford at his previous firm. *Id.* He later sued Ford and its dealers for defects in a 2008 Lincoln Navigator, asserting similar California lemon law claims. *Id.* Ford sought to disqualify plaintiff's counsel, claiming he worked on approximately 150 similar lemon law cases on behalf of Ford during his three-year tenure with his prior firm and was "privy to confidential client communications and information relating to the defense of" such cases, as well as to "pre-litigation strategies, tactics, and case handling procedures." *Id.* at *534. In addition, Ford claimed plaintiff's counsel provided "unspecified 'input' to Ford's Office of General Counsel and Consumer Affairs and communicated regularly with Ford about lemon law cases. *Id.* The trial court granted Ford's motion and disqualified plaintiffs' counsel. *Id.*

Explaining that the substantial relationship test was never intended to "create a lifetime prohibition against representation adverse to a former client," the court of appeal reversed. *Id.* It held there was no evidence any information or strategy to which plaintiff's counsel was privy during his representation of Ford "would be material to his representation of [the plaintiff] in this case." *Id.* *536. Ford "did not establish that any confidential information about the defense in those [prior] cases would be at issue in [the current] case." *Id.* "Neither the allegedly defective 2008 Lincoln Navigator nor its repair history . . . was the subject of any lawsuit in which [counsel] represented Ford." *Id.* Moreover, Ford failed to demonstrate it had "any policies, practices, or procedures generally applicable to the evaluation, settlement or litigation of California lemon law cases at the time [counsel] represented Ford, or that any such policies, practices, or procedures continued in existence unchanged between [the time he left his prior firm and the date of the current lawsuit against Ford]." *Id.* The *Khani* court declined to find a substantial relationship merely because the cases "involved clams under the same statute," and "Ford's bare-bones evidence" was insufficient to establish differently. *Id.*

Similarly, in *Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*,

No. CV F 04-5810, 2005 U.S. Dist. LEXIS 39648 (E.D. Cal.), two lawyers had previously represented ConAgra in antitrust matters relating to Conagra's sale of its fresh chicken business. The lawyers' firm represented ConAgra's adversary in a later case involving a dispute over precooked turkey meat, a different product with a different market. The trial court denied ConAgra's disqualification motion. The court found that the two matters "do not share sufficient factual and legal similarities to warrant disqualification" and that ConAgra had not shown how information from the earlier matter would help Foster in the latter case.

A substantial relationship also does not exist merely because an attorney is aware of a former client's "general business practices or litigation philosophy . . ." *Banning Ranch Conservancy v. Superior Court,* 193 Cal.App.4th 903, 918 (2011). To the contrary, courts have consistently rejected a "playbook approach" to the substantial relationship test. *Khani,* 215 Cal.App.4th at ____ ("The attorney's acquisition of general information about the former client's 'overall structure and practices' would not of itself require disqualification unless it were found to be 'material'—i.e., directly in issue or of critical importance—in the second representation.") (citing *Jessen,* 111 Cal.App.4th at 709-10); *see also* ABA Model Rules of Prof'l Conduct R. 1.9 cmt. 3 (2013) ("In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation ....").

*Banning* demonstrates that the "playbook approach" does not suffice. In that case, the court of appeal reversed an order granting disqualification of a law firm that represented Banning Ranch Conservancy against the City of Newport Beach and its efforts to build a highway, even though the firm had previously represented the City on numerous legal matters, including the creation of the City's approach to CEQA, CEQA Guidelines and the California Coastal Act, all of which the City claimed were potentially implicated in the current lawsuit. *Banning,* 193 Cal.App.4th at 909, 917-18. The court reasoned that "none of [the law firm's prior

cases on behalf of the City] bore any substantial relation to the current litigation . . ." *Id.* 917. It rejected the City's claim that the firm's "'special insight' . . . into the City's approach to land use matters" over the decades and the "firm's 'national recognition as a leading environmental and land use law firm" were sufficient to establish a substantial relationship between the firm's prior work and its current representation of the Conservancy against the City related to similar land use matters. *Id.* at 918-19. Because there was no evidence of a substantial relationship between the former and present representations, the City failed to meet its burden. *Id.*

A moving party's need to provide specific, detailed evidence establishing the similarities of relevant facts and legal issues between the former and current representations is particularly important given the current realities of practicing law. *Kirk v. First American Title Ins. Co.*, 183 Cal.App.4th 776, 801-02. "[A]ttorney mobility and firm mergers have increased exponentially." *Id.* 802. "Large law firms . . . are becoming ever larger, opening branch offices nationwide or internationally, and merging with other large firms. Individual attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe." *Id.* quoting *Adams v. Aerojet-General Corp.*, 86 Cal.App.4th 1324, 1336 (2001).

2. *The Engagements that Tate Describes Do Not Meet the Substantial Relationship Test*

Tate's unsupported assertion that by virtue of the customs and trade matters handled by Patton Boggs, the firm "had a thorough understanding of Tate's business operations" is not sufficient under the test articulated in *Khani*. Patton Boggs did not represent Tate in litigation and did not know its approach to litigation. Patton Boggs did not represent Tate in any matter relating to the advertising of HFCS.

Mr. Castelli asserts that confidential information was given to Mr. Waltz in

23

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY   CV11-3473 CBM (MANx)

connection with a response to an audit letter from the Mexican government as to the *origins of manufacture* of certain products (including HFCS) that were exported to Mexico." [Castelli Declaration, Para. 8, emphasis added] The Sugar Association litigation has absolutely nothing to do with whether or not the Tate HFCS is made in the United States. There is no similarity to the factual or legal issues involved. The vague assertion that there were "confidential discussions between Patton Boggs and Tate regarding the company's methods of producing HFCS and financial information relating to the production of HFCS" [id. at Para. 8] are also insufficient to warrant the draconian remedy of disqualification. The limited information to be provided to a Mexican authorities in a specific customs and trade action by the Mexican government is not the same factual information relevant to an industry wide dispute over the labeling of HFCS.

Although Mr. Waltz acknowledges that he received generalized information about the Tate manufacturing process and sales information limited solely to the specific customs inquiry involved, he had no information which could possibly provide an advantage to the Sugar Association Plaintiffs in this case.

Mr. Waltz provided with the basic steps in the process. Mr. Waltz was not provided with the "recipe" for the manufacturer of high fructose corn syrup; nor was he provided with the identification of the specific products used the processing of the product. Mr. Waltz was asked by the counsel filing this opposition to review the Geraldine June letter. He did so and has declared that the information provided to him for the Mexican customs issue was far less detailed then what is set forth in Ms. June's letter.

There is no dispute in this litigation over the method by which the defendants manufacture HFCS. In Defendants Statement of Uncontroverted Facts filed in Support of the Motions for Summary Adjudication on Plaintiffs Claims of Falsity [Docket ___], Uncontroverted Fact No. 24 states, "Each Defendant manufactures HFCS in the United States in the manner described in FDA's July 3, 2008 letter.

24

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE & LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY   CV11-3473 CBM (MANx)

1 | This fact is UNDISPUTED by the Plaintiffs.

2 | Neither Mr. Waltz nor any other lawyer working on Tate's matters has provided
3 | any information about Tate to any lawyer working on the Sugar Association cases.

### CONCLUSION

5 | In light of the authorities and reasons outlined above, the harm to the Sugar
6 | Association Plaintiffs (the innocent clients of SquirePB), the absence of real
7 | prejudice to Tate & Lyle, the interference with the court's own schedule, and the
8 | tactical use of this motion to disqualify, this court should apply the "particularly
9 | strict judicial scrutiny" as advised by *Emblaze Ltd. v. Microsoft Corp. (supra)* and
10 | deny Tate's motion to disqualify SquirePB.

11 | DATED: September 2, 2014

Respectfully submitted,
ROBIE & MATTHAI
A Professional Corporation

_____
EDITH R. MATTHAI
T. JOHN FITZGIBBONS
Attorneys for Non-Party
SQUIRE PATTON BOGGS (US) LLP

25

NON-PARTY SQUIRE PATTON BOGGS (US) LLP'S OPPOSITION TO TATE    CV11-3473 CBM (MANx)
& LYLE INGREDIENTS AMERICAS LLC'S MOTION TO DISQUALIFY