1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18

WESTERN SUGAR COOP., ET AL.,

Plaintiffs,

v.

ARCHER-DANIELS-MIDLAND CO.,
ET AL.,

Defendants.

No. CV 11-3473 CBM (MANx)

**ORDER GRANTING INGREDION
INCORPORATED'S AND TATE &
LYLE INGREDIENTS AMERICAS,
INC.'S MOTION TO DISQUALIFY
SQUIRE PATTON BOGGS LLP**

19
20
21
22
23
24

Before the Court is Defendant/Counterclaimant Ingredion Incorporated's
and Tate & Lyle Ingredients Americas, Inc.'s Motions to Disqualify Plaintiffs'
counsel, Squire Patton Boggs LLP (collectively the "Motions"). (Dkt. Nos. 232,
233.) Squire Patton Boggs LLP and Plaintiff Sugar Association oppose the
Motions. (Dkt. Nos. 250, 249, 252.)

25

**I.   JURISDICTION**

26
27

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331,
1338.

28

## II.  PROCEDURAL AND FACTUAL BACKGROUND

The underlying case arises from false advertising claims relating to the marketing of high-fructose corn syrup ("HFCS"), pitting the sugar industry against the corn-refining industry.  Plaintiffs are sugar industry manufacturers, trade groups, and associations:  Western Sugar Cooperative; Michigan Sugar Co.; C & H Sugar Co., Inc.; United States Sugar Corporation; American Sugar Refining, Inc.; The Amalgamated Sugar Co., LLC; Imperial Sugar Corp.; Minn-Dak Farmers Cooperative; The American Sugar Cane League U.S.A., Inc.; and The Sugar Association, Inc. ("Sugar Association") (collectively the "Sugar Plaintiffs"). (Second Am. Compl. ("SAC") ¶¶ 12-21 (Dkt. No. 55).)  Defendants are manufacturers and trade groups and associations active in the corn and HFCS industry:  Archer-Daniels-Midland Company ("ADM"); Cargill, Incorporated ("Cargill"); Ingredion Inc., formerly called Corn Products International, Inc. ("Ingredion"); Tate & Lyle Ingredients Americas, Inc. ("Tate & Lyle"); and The Corn Refiners Association ("CRA") (collectively "Defendants").[1]  (*Id.*, ¶¶ 22-27.)

Plaintiffs, represented by the legacy law firm of Squire Sanders & Dempsey, LLP ("Squire Sanders"), filed the instant lawsuit on April 22, 2011, and the SAC on November 21, 2011.  (Dkt. No. 55.)  The SAC asserts one cause of action for false advertising under the Lanham Act, alleging that Defendants misled consumers by use of the term "corn sugar."  (SAC ¶¶ 65-75.)

On September 4, 2012, Defendants ADM, Cargill, Ingredion, and Tate & Lyle each filed a counterclaim against Plaintiff the Sugar Association.  (Dkt. Nos. 85-88.)  Defendants' counterclaim asserts one cause of action for false advertising in violation of the Lanham Act, alleging that the Sugar Association misrepresented HFCS as unhealthy.  (*Id.* ¶¶ 68-95.)

---

[1] Plaintiffs' SAC also named defendant, Roquette America, Inc.  However, Plaintiffs' claim against Roquette America, Inc. was dismissed on July 31, 2012.  (Dkt. No. 76.)

## A.    The Patton Boggs and Squire Sanders Merger

On June 1, 2014, the law firms of Patton Boggs LLP ("Patton Boggs") and Squire Sanders combined to form Squire Patton Boggs ("SPB").  SPB remains the Sugar Plaintiffs' counsel of record.  Ingredion and Tate & Lyle each filed motions to disqualify SPB from representing the Sugar Plaintiffs in this action because SPB is now adverse to both Ingredion and Tate & Lyle—long-standing clients of the legacy firm Patton Boggs.

## B.    Patton Boggs' and SPB's Representation of Tate & Lyle

Tate & Lyle is a global provider of food products that specializes in processing corn-based products, including HFCS.  (Castelli Decl. ¶ 2.)  Tate & Lyle entered into an attorney-client relationship with Patton Boggs in or about February 1998, as documented in a letter dated February 11, 1998, signed by Stuart Pape of Patton Boggs (the "1998 Engagement Letter").  (*Id*. ¶ 3, Ex. 1.)

Tate & Lyle has relied on multiple lawyers at Patton Boggs for legal advice on a wide range of matters since 1998 and through the merger in June 2014. (Castelli Decl. ¶ 4.)  Patton Boggs has represented Tate & Lyle before international regulatory bodies and federal agencies, such as the Food and Drug Administration ("FDA"), the United States Department of Agriculture, and the United States Customs Service.  (*Id*.)  Tate & Lyle's counsel declares that Patton Boggs' lawyers advised Tate & Lyle on matters that required a thorough understanding of its business operations, including its operations and processing of ingredients such as HFCS.  (*Id*.)

### 1.    Tate & Lyle Bring the Conflict to SPB's Attention

In late July 2014, Tate & Lyle's counsel, Heidi Balsley, contacted SPB attorney, who was formerly a Patton Boggs attorney, Dan Waltz, inquiring whether he knew of the pending lawsuit, which he did not.  (Balsley Decl. ¶ 6.) Thereafter, on July 28, 2014, SPB attorneys, Stacy Ballin (former partner and general counsel at Squire Sanders) and Charles Talisman (former assistant general

counsel at Patton Boggs) spoke with Tate & Lyle's vice president and general counsel, Peter Castelli, and Ms. Balsley.  (*Id.* ¶ 7; Castelli Decl. ¶ 10.)  During that call, Ms. Ballin and Mr. Talisman stated that SPB failed to identify the conflict, despite Tate & Lyle appearing as a current client in Patton Boggs' database.  (Castelli Decl. ¶ 11.)  They explained that a paralegal at Patton Boggs had prepared a list of clients with conflicts for considerations as part of the pre-merger conflicts diligence, and Tate & Lyle had been inexplicably omitted from the list.  (*Id.*)  During that call, they asked Tate & Lyle for a conflict waiver.  (*Id.* ¶ 12.)  They explained that, as a practical matter, a *de facto* ethical wall was in place because the two firms' computer systems had not been integrated and documents were in different offices.  (*Id.*)

### 2.     Tate & Lyle Does Not Agree to Waive the Conflict

During another call on August 4, 2014, Tate & Lyle's counsel, Mr. Castelli, informed Mr. Talisman and Ms. Ballin that because the instant litigation was not "ordinary commercial litigation, but rather a contentious battle between two competing industries," Tate & Lyle would not waive the conflict.  (*Id.* ¶ 13.)  Mr. Castelli requested that SPB withdraw from its representation of the Sugar Plaintiffs.  (*See id.*)

Thereafter on August 10, 2014, SPB's counsel sent a letter to Tate & Lyle's counsel, enclosing a copy of the 1998 Engagement Letter.  (Castelli Decl. ¶ 16, Ex. 1.)  The letter states, "the terms of Tate & Lyle's engagement of Patton Boggs. . . provided us with Tate & Lyle's advance consent that we would represent other clients on matters adverse to Tate & Lyle so long as those matters were unrelated to our work for Tate & Lyle."  (*Id.*)  In the letter, SPB proposed to carry forward the simultaneous representations of the Sugar Plaintiffs and Tate & Lyle on other matters with two distinct teams of lawyers and an ethical wall.  (*Id.*, Ex. 1.)

### 3.     SPB Withdraws from Its Representation of Tate & Lyle

On August 18, 2014, SPB sent a letter to Tate & Lyle's counsel terminating

4

its relationship with Tate & Lyle. (*Id.*, ¶ 22, Ex. 8.) Dan Waltz and other lawyers at SPB were actively providing services to Tate & Lyle up until SPB's termination on August 18, 2014. (Castelli Decl. ¶ 23.)

**C.    Patton Boggs' Representation of Ingredion**

Defendant Ingredion provides ingredients to food and beverage companies and refines corn to produce HFCS. (Levy Decl. ¶ 2.) Ingredion first retained Patton Boggs in May 2004, and Patton Boggs continued to perform work for Ingredion over the years and last performed work for Ingredion in September 2013. (Talisman Decl. ¶ 3.) Patton Boggs has provided legal services to Ingredion on at least fifty-six different occasions, and since 2004, Ingredion has paid Patton Boggs over $230,000 in legal fees. (Levy Decl. ¶ 3.)

Shortly after Tate & Lyle's counsel raised the conflict, SPB sent Ingredion's counsel a letter dated July 31, 2014, advising it of the merger and that Squire Sanders had been representing the Sugar Plaintiffs and SPB would continue to do so going forward. (*Id.* ¶ 7, Ex. 1.) The letter stated that if Ingredion wanted to have its lawyers from Patton Boggs do any new work, it would be necessary to obtain a waiver from Ingredion due to the conflict presented by SPB's role in the present case. (*Id.*)

Ingredion and Tate & Lyle each move to disqualify SPB from representing the Sugar Plaintiffs in this action, contending that the merger resulted in SPB simultaneously representing adverse clients.

## III.    LEGAL STANDARD

Motions to disqualify counsel are governed by state law. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("By virtue of the district court's local rules, California law controls whether an ethical violation occurred.") The Central District applies the California State Bar Act, the California Rules of Professional Conduct, and the related judicial decisions in assessing the standards of professional conduct. *See* C.D. Cal. L.R. 83-3.1.2.

1    The decision to disqualify counsel is within the trial court's discretion

2 limited by applicable legal principles.  *See Trone v. Smith*, 621 F.2d 994, 999 (9th

3 Cir. 1980); *People ex rel Dep't of Corp. v. SpeeDee Oil*, 20 Cal. 4th 1135, 1143

4 (1999).  Because of the potential for abuse, disqualification motions are subject to

5 strict judicial scrutiny.  *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760

6 F.2d 1045, 1050 (9th Cir. 1985).  A court should examine the implications of

7 disqualification, including "a client's right to chosen counsel, an attorney's

8 interest in representing a client, the financial burden on a client to replace

9 disqualified counsel, and the possibility that tactical abuse underlies the

10 disqualification motion."  *SpeeDee Oil*, 20 Cal. 4th at 1145.

11    Motions to disqualify generally arise in one of two contexts:  (1) in cases of

12 successive representation, where an attorney seeks to represent a client with

13 interests that are potentially adverse to a former client; and (2) in cases of

14 simultaneous representation, where an attorney seeks to represent in a single

15 action multiple parties with potentially adverse interests.  The primary fiduciary

16 duty at stake in each of these contexts differs, and the applicable disqualification

17 standards vary accordingly.

18 **A.**     **Successive Representation of Adverse Clients**

19    The rules regarding successive representation of clients with adverse

20 interests focus on an attorney's duty of confidentiality.[2]  If an attorney undertakes

21 to represent a client adverse to a former client without obtaining informed consent,

22 the former client may disqualify the attorney by showing a "substantial

23 relationship" between the subjects of the prior and current representations.  *Flatt v.*

24 *Super. Ct.,* 9 Cal. 4th 275, 283 (1994); *In re Charlisse C.*, 45 Cal. 4th 145, 166

25

26 ───────────────
[2] California Rule of Professional Responsibility 3–310(E) governs successive representation of clients
with adverse interests providing, "[a] member shall not, without the informed written consent of the
27 client or former client, accept employment adverse to the client or former client where, by reason of the
representation of the client or former client, the member has obtained confidential information material
28 to the employment."

6

n.11 (2008).  This protects the enduring duty to preserve client confidences that survives the termination of the attorney's representation.  *City & Cnty. of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 846 (2006).  When a substantial relationship between the representations is established, the attorney is automatically disqualified from representing the second client.  *Id.* at 847.

In determining whether there is a "substantial relationship," a court should first analyze whether there was a direct relationship with the former client and whether the relationship touched on issues related to the present litigation.  *Id.*; *Advanced Messaging Tech., Inc. v. EasyLink*, 913 F. Supp. 2d 900, 907 (C.D. Cal. 2012) (Pregerson, J.).  The substantial relationship test requires evidence supporting a rational conclusion that "information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." *Khani v. Ford Motor Co.,* 215 Cal. App. 4th 916, 921 (2013) (citations omitted); *see also Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 679 (2004) (evaluating whether the two representations are substantially related centers upon the factual and legal similarities of the two representations).

If the former representation involved a direct relationship with the client and the matters are substantially related, the former client need not prove that the attorney possesses actual confidential information; instead, the attorney is presumed to possess confidential information.[3]  *Cobra Solutions,* 38 Cal. 4th at 847.  The presumption that an attorney has access to confidential information relevant to the subsequent representation and resulting disqualification extends vicariously to the entire firm.  *In re Charlisse,* 45 Cal. 4th at 161; *Flatt*, 9 Cal. 4th

---

[3] When the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation.  *Cobra Solutions*, 38 Cal. 4th at 847 (citations omitted).

1  at 283.

2  **B.      Concurrent Representation of Adverse Clients**

3          Attorneys owe current clients a duty of undivided loyalty to avoid

4  undermining public confidence in the legal profession and the judicial process.[4]

5  *Flatt,* 9 Cal. 4th at 284; *SpeeDee Oil*, 20 Cal. 4th at 1146.  When a law firm

6  simultaneously represents clients who have conflicting interests, with few

7  exceptions, "disqualification follows automatically, regardless of whether the

8  simultaneous representations have anything in common or present any risk that

9  confidences obtained in one matter would be used in the other."  *SpeeDee Oil*, 20

10  Cal. 4th at 1147 (citation omitted); *White v. Experian Info. Solutions*, 993 F. Supp.

11  2d 1154, 1166 (C.D. Cal. 2014) (Carter, J.) ("The default rule for a concurrent

12  conflict in California is automatic disqualification in all but a small number of

13  cases.")  This is because the "primary value at stake in cases of simultaneous or

14  dual representation is the attorney's duty—and the client's legitimate

15  expectations—of *loyalty,* rather than confidentiality."  *Pour Le Bebe, Inc. v.*

16  *Guess? Inc.*, 112 Cal. App. 4th 810, 822 (2003) (citations and quotations omitted)

17  (emphasis in original).  This strict *per se* rule recognizes that a client cannot be

18  expected to sustain trust and confidence in his or her counsel who is also

19  representing the client's adversary in litigation.  *See In re Charlisse*, 45 Cal. 4th at

20  160.  An attorney's conflict is imputed to the law firm as a whole.  *Advanced*

21  *Mess.*, 913 F. Supp. 2d at 906.

22

23

24

25  ─────────────────

26  [4] California Rule of Professional Conduct 3-310(C) provides, "a member shall not, without informed written consent of each client, (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or (2) Accept or continue representation of more than one

27  client in a matter in which the interests of the clients actually conflict; or (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the

28  first matter is adverse to the client in the first matter."

# IV.   DISCUSSION

**A.   SPB Is Subject to Disqualification Due to Its Concurrent Representation of Tate & Lyle and the Sugar Plaintiffs**

The parties do not dispute that at the time of the merger, Tate & Lyle was a current client of SPB.  SPB contends that Tate & Lyle consented to SPB's concurrent representation of the Sugar Plaintiffs by agreeing to a general advanced waiver set forth in Patton Boggs' Standard Engagement Terms enclosed in the 1998 Engagement Letter.[5]  (*See* Castelli Decl., Ex. 1.)

**1.   Waiver Principles**

When evaluating whether a law firm may concurrently represent two clients, even on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified, unless full reasonable disclosure is made and both clients knowingly agree in writing to waive the conflict.  *See Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003) (Hamilton, J.) (citation omitted); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 819 (N.D. Cal. 2004) (Illston, J.) (citation omitted).

Because the waiver must be informed, a second waiver may be required if the original waiver insufficiently disclosed the nature of a subsequent conflict. *Concat*, 350 F. Supp. 2d at 820.  But an advanced waiver of potential conflicts need not specify the exact nature of the future conflict.  *Visa*, 241 F. Supp. 2d at 1105.  California law does not require that every possible consequence of a conflict be disclosed for consent to be valid; the inquiry is "whether the waiver was fully informed."  *Id*.  Whether full disclosure was made and the client made an informed waiver is a fact-specific inquiry that considers the following factors: (1) the breadth of the waiver; (2) the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the

---

[5] The 1998 Engagement Letter was countersigned by Executive Vice President and General Counsel of Tate & Lyle's corporate predecessor, Patrick Mohan, and the letter referenced the Standard Terms of Engagement that were in effect at that time.  (Mohan Decl., ¶ 1, 3.)

future); (3) the quality of the conflicts discussion between the attorney and the client; (4) the specificity of the waiver; (5) the nature of the actual conflict (whether the attorney sought to represent both sides in the same dispute or in unrelated disputes); (6) the sophistication of the client; and (7) the interests of justice. *Id.* at 1106 (citations omitted).

## 2.   Tate & Lyle Did Not Make an Informed Waiver of SPB's Concurrent Representation

The prospective waiver in the Standard Engagement Terms provides in relevant part:

> "It is possible that some of our current or future clients will have disputes with you during the time we are representing you.  We therefore also ask each of our clients to agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you, even if the interest of such clients in those unrelated matters are directly adverse to yours . . . ."

(Castelli Decl., Ex. 1.)

The breadth and temporal scope of Patton Boggs' advanced waiver is open-ended.  It purports to waive conflicts in any matter not substantially related indefinitely.  The waiver also lacks specificity.  It does not identify a potentially adverse client, the types of potential conflicts, or the nature of the representative matters.

SPB argues that like in *Visa*, the Court should enforce the advanced waiver, finding Ingredion's "level of experience with legal services" crucial in determining that Ingredion gave informed consent.  *See Visa*, 241 F. Supp. 2d at 1109-10 (finding the client gave informed consent, reasoning, in part, that the client was a Fortune 500 company; it had its own legal department; it routinely hired national law firms to handle its more complex legal matters, and accordingly, it was "expected to understand the full extent of what it waived. . . .").  SPB contends that Tate & Lyle's own highly experienced counsel signed the

1998 Engagement Letter on behalf of Tate & Lyle, and it is undisputed that Tate
& Lyle is a sophisticated client.  (Opp'n at 13:16-14:16.)  SPB further contends
that other jurisdictions and the ABA Model Rules and opinions recognize that the
most important factors in evaluating informed consent are the involvement of
independent counsel; the sophistication of the client; and the exclusion of conflicts
in substantially related matters.  (Opp'n at 10:1-19.)

Tate & Lyle's former Executive Vice President and General Counsel who
signed the 1998 Engagement Letter, Patrick Mohan, declares, "I am certain that no
one from Patton Boggs discussed the advanced waiver with me at the time that I
executed the 1998 Engagement Letter. . .[i]f they had and I had understood that it
was meant to waive actual future conflicts without further disclosure and consent
by Tate & Lyle, I never would have signed the agreement."  (Mohan Decl. ¶ 5.)
Mr. Mohan further declares, "I did not understand or intend Tate & Lyle to be
agreeing to waive future conflicts that would include having Patton Boggs adverse
to Tate & Lyle in litigation while it was still actively representing Tate & Lyle on
other matters without a further, specific disclosure and request for a waiver from
Tate & Lyle."  (*Id*. ¶ 4.)

Moreover, the Model Rules are merely persuasive authority, and in any
event, they embrace a consideration of all of the *Visa* factors—not just a select
few.  *See, e.g.*, ABA Model Rules of Prof'l Conduct R. 1.7 cmt. 22 (2011).
Furthermore, in *Visa*, the court upheld the prospective waiver that identified the
adverse client by name, it disclosed as fully as possible the nature of any potential
conflict that could arise between the parties, and it specifically contemplated the
firm's representation of Visa against First Data in litigation matters.  *See Visa*, 241
F. Supp. 2d at 1107; *see also Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285, 1302
(1995) (upholding an advanced waiver in which the prospective, adverse client
was specifically named).

The advanced waiver here did not identify potential adverse clients or the

11

nature of any potential conflicts covered by the waiver.  It is difficult to imagine that in 1998, Patton Boggs contemplated potential conflicts that could surface 16 years later and disclosed them to Tate & Lyle, and that Tate & Lyle—as sophisticated as it is—fully appreciated the risks and made an informed waiver.

The Court finds that the advanced waiver did not amount to a full and reasonable disclosure of the potential conflict; accordingly, Tate & Lyle did not knowingly waive the conflict. [6]  *Visa*, 241 F. Supp. 2d at 1106-07.  A second more specific waiver was required because the advanced waiver did not sufficiently disclose the nature of the conflict and the material risks of SPB's ongoing representation of Tate & Lyle and the adverse Sugar Plaintiffs.  *See Concat*, 350 F. Supp. 2d at 820-21.

### 3.   SPB's Withdrawal Did Not Cure the Conflict

On August 18, 2014, after SPB concurrently represented Tate & Lyle and the Sugar Plaintiffs for more than two and a half months, SPB terminated its relationship with Tate & Lyle after it would not agree to waive the conflict. (*See* Castelli Decl. ¶ 22, Ex. 8.)

The "hot potato rule" bars an attorney and law firm from curing the dual representation of clients by expediently severing the relationship with the pre-existing client.  *See Flatt*, 9 Cal. 4th at 288.  Accordingly, the automatic disqualification rule applicable to concurrent representations cannot be avoided by unilaterally converting a present client into a former client.  *Id*.

SPB argues that the "hot potato doctrine" does not apply and it was permitted to withdraw:  (1) pursuant to the terms of the 1998 Engagement Letter; (2) because the withdrawal could be accomplished without material adverse effect

---

[6] Because Patton Boggs' advanced waiver does not constitute "informed consent," the Court does not address the parties' alternative arguments regarding whether the terms of the waiver apply, *e.g*., whether the waiver is inapplicable because Patton Boggs/SPB has obtained sensitive, proprietary or other confidential information of Tate & Lyle or whether the former and current representations are substantially related.

and was permitted under the District of Columbia and California Rules of Professional Responsibility; and (3) because it is not a situation in which SPB dropped a client "like a hot potato" to take on a new client. (Opp'n at 15:20-19:26.)

The 1998 Engagement Letter provides, "[i]f either you or we conclude that our representation should or must be terminated, we will do our best to protect your interests in providing a smooth transition to new counsel." (Castelli Decl., Ex. 1.) That provision does not authorize SPB to cure a conflict of interest by its withdrawal. Moreover, at the time of SPB's withdrawal, it was representing Tate & Lyle in a project involving a 90-day response deadline. (Proctor Decl. ¶ 6.) Tate & Lyle's counsel declares that the company is now forced to find new counsel to replace its counsel of sixteen years and bring that new counsel up to speed. (Castelli Decl. ¶ 23; Balsley Decl. ¶ 11.)

Additionally, the "hot potato rule" applies regardless of the attorney's reasons for terminating the relationship.[7] *See Flatt*, 9 Cal. 4th at 289. The "hot potato rule" does not distinguish circumstances in which counsel drops a client to represent a new client, from the circumstances present here. Rather, the doctrine is grounded in an attorney's undivided duty of loyalty, which was unquestionably breached by SPB simultaneously representing adverse clients. *See id*. at 284.

In sum, SPB concurrently represented Tate & Lyle in regulatory matters and the adverse Sugar Plaintiffs in this action. Tate & Lyle did not consent to the concurrent representation, and SPB's withdrawal from its representation of Tate & Lyle did not cure the conflict or convert Tate & Lyle into a former client for purposes of disqualification. SPB is therefore subject to disqualification from the present action.

---

[7] SPB cites the District of Columbia and California Rules of Professional Conduct, but California law applies to the Motions to Disqualify in this case. *See In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue").

**B.     SPB is Subject to Disqualification Due to its Prior Representation of Ingredion in Matters Substantially Related to the Present Action**

**1.     Ingredion was a Former Client of SPB**

Ingredion first retained Patton Boggs in May 2004, and Patton Boggs has continued to perform work for Ingredion over the years and last performed work for Ingredion in September 2013.  (Talisman Decl. ¶ 3.)

Ingredion contends that it was an existing client at the time of the merger because during the firm's decade-long representation, Ingredion reached out to Patton Boggs on an as-needed basis, but time gaps never resulted in a termination of the attorney-client relationship.[8]  (Levy Decl. ¶ 5.)  Ingredion contends that it was treated as an existing client and was not asked to enter into a new fee agreement when it approached Patton Boggs in February 2009, May 2013, or on other occasions following time gaps.  (*Id.*)  All work was billed to Ingredion's existing account with Patton Boggs.  (*Id.*)

An engagement letter dated December 14, 2005 (the "2005 Engagement Letter") from Patton Boggs' attorney, Stuart Pape, enclosed Patton Boggs' Standard Terms of Engagement.  The Standard Terms of Engagement provides, "[i]t is our policy that the attorney-client relationship will terminate upon our completion of any service that you have retained us to perform."  (Talisman Decl., Ex. 2.)  Patton Boggs completed services for Ingredion in September 2013, eight months prior to the merger in June 2014, and under the terms of the 2005 Engagement Letter, its attorney-client relationship with Ingredion ended.

Ingredion contends that it was not rendered a former client by the statements in Patton Boggs' Standard Terms of Engagement because (1) it did not expressly agree to those terms; and (2) the 2005 Engagement Letter that accompanied the Standard Terms of Engagement shows that Ingredion retained

---

[8] For example, there were gaps of activity between July 2008 and February 2009, as well as between June 2012 and May 2013.  (*See* Levy Decl. ¶ 5.)

1  Patton Boggs not for a discrete issue or litigation, but to provide ongoing

2  representation in connection with FDA regulation of Ingredion's products.  (*See*

3  Proctor Decl. ¶ 6, Ex. 10.)

4       Ingredion was not required to take any action to show its assent to the

5  Standard Terms of Engagement.  The 2005 Engagement Letter from Mr. Pape

6  provides, "[t]his letter supplements and modifies the enclosed terms of

7  engagement. . . [i]f you agree with these terms and conditions, including those set

8  forth in the [Standard Terms of Engagement], no further action is required. . . ."

9  (*Id.*)

10      The 2005 Engagement Letter also provides that Patton Boggs was retained

11 to "represent [Ingredion] in connection with FDA regulation of the Company's

12 Products."  (*Id.*, Ex. 10.)  It does not specify that Patton Boggs' representation is

13 ongoing, continuing or open-ended.  The Standard Terms of Engagement provides

14 that the attorney-client relationship would end upon completion of Patton Boggs'

15 services and states that should Ingredion continue to retain Patton Boggs, the

16 attorney-client relationship would be re-established at that time.  (*Id.*)  Once

17 Patton Boggs completed its representation of Ingredion in September 2013, the

18 attorney-client relationship terminated.  *See, e.g.*, *Banning Ranch Conservancy v.*

19 *Super. Ct.*, 193 Cal. App. 4th 903, 913-14 (2011).

20      Accordingly, Ingredion was a former client of Patton Boggs at the time of

21 the June 2014 merger.[9]  Whether SPB can represent the Sugar Plaintiffs in this

22 action after previously representing Ingredion depends on whether SPB can do so

23 while maintaining its duty of confidentiality it owes to Ingredion.  That, in turn,

24

25 [9] In any event, whether Ingredion was a current or former client is a moot issue because as set forth *infra*, the Court finds that the former and current matters are "substantially related."  SPB is thus presumed to
26 have confidential information, thereby subjecting it to automatic disqualification.  *See Flatt*, 9 Cal. 4th at 283; *Cobra Solutions*, 38 Cal. 4th at 847.  In addition, the Court need not address whether Ingredion
27 consented to waive the conflict by the advanced waiver provision in Patton Boggs' Standard Terms of Engagement because the advanced waiver by its terms did not waive conflicts in matters that are
28 substantially related.  (Opp'n at 9:7.)

15

depends on whether the former and current matters are "substantially related."

## 2. The Prior and Current Representations are "Substantially Related"

### a. *Patton Boggs' Prior Work for Ingredion vs. Its Work in the Present Action*

Patton Boggs' attorneys advised Ingredion regarding permissible, common or unusual names for HFCS. (Levy Decl. ¶ 10.) Evidence filed *in camera* shows lawyers billed time in 2006 for researching regulations on advertising products with HFCS; reviewing FDA and Department of Agriculture rules and regulations on HFCS, and discussing research and common or unusual names for HFCS with each other and Ingredion. (Levy Decl. *¶* 10*; In Camera* Proctor Decl., Exs. 3, 5.)

Patton Boggs' attorneys also advised Ingredion regarding FDA statements and enforcement actions following a letter issued from the FDA dated July 3, 2008, signed by Geraldine June (the "Geraldine June Letter"). (Levy Decl. ¶ 11, Ex. 4.) The Geraldine June Letter describes aspects of manufacturing HFCS and whether a resulting product could be considered "natural." (*Id*. ¶ 10.) Ingredion received advice from Patton Boggs regarding interpretation of the Geraldine June Letter, including advice concerning a key aspect of the HFCS manufacturing process and how that might affect whether the resulting HFCS product could be described as "natural." (*Id*. ¶ 11.) Patton Boggs' lawyers billed time in 2009 for researching and discussing FDA statements and natural claims internally and with Ingredion. (*In Camera* Proctor Decl., Ex. 5.)

Ingredion contends that in the Geraldine June Letter, the FDA concluded that HFCS qualifies as "natural." (*Id*.; Mot. at 7:20-22.) Counsel for Ingredion declares that it and other Defendants are relying on the Geraldine June Letter in this action in support of their position that it is not a misrepresentation to claim that HFCS is "natural." (*Id*.)

SPB represents Plaintiffs in this lawsuit against Defendants, alleging that

1  they engaged in false advertising of HFCS.  Plaintiffs allege that this lawsuit is a

2  response to an educational campaign initiated by Defendant CRA in 2008 that

3  sought to educate the public about HFCS and to address the Sugar Plaintiffs'

4  purported vilification and myths about HFCS with facts and scientific studies.

5  (*See* SAC ¶ 46; Ingredion's Am. Ans., Counterclaims (Dkt. No. 91) at ¶ 46.)

6  Sugar Plaintiffs allege that Defendant CRA's campaign constitutes false

7  advertising under the Lanham Act, identifying two categories of false and/or

8  misleading representations:  the first category is Defendants' use of the term "corn

9  sugar," and the second category is Defendants' statements that HFCS is a

10  "natural" product.  (SAC ¶¶ 68, 69.)

11      Defendants, including Ingredion, defend that the term "corn sugar"

12  accurately depicts HFCS and that the FDA has confirmed methods of producing

13  HFCS that qualifies as "natural."  (*See* Mot. (Dkt. No. 24) at 7:8-22, 5:12-15.)

14  Ingredion's defense relies, in part, on the Geraldine June Letter.  (*See id.*; Levy

15  Decl., ¶ 11.)  The Geraldine June Letter has been explored in multiple depositions,

16  it is expected to be discussed in motions for summary judgment, and it will likely

17  be addressed at trial.  (*See* Levy Decl. ¶ 11; Proctor Decl. ¶ 8.)

18              ***b.      Legal and Factual Similarities***

19      The evaluation of whether the two representations are substantially related

20  centers upon the factual and legal similarities of the representations.  *See Farris*,

21  119 Cal. App. 4th at 679 (citations omitted).

22      SPB contends that none of the four billing entries from August 2006

23  relating to HFCS, concern the use of the word "sugar" or any other term at issue in

24  this litigation.  (Opp'n at 16:2-10.)  SPB further argues that there was no question

25  related to whether the word "sugar" could be used for HFCS in labeling, or any

26  question regarding the relative benefits of sugar versus HFCS, and the inquiry did

27  not relate to advertising.  (*Id.*)

28      SPB contends that the Geraldine June Letter is only at issue in this litigation

regarding whether Defendants can rely on it as an FDA endorsement of marketing HFCS as "natural." (*Id*. at 16:20-22.)  SPB further contends that work performed in August 2009, was performed by attorneys Paul Rubin, who left Patton Boggs in August 2012 (two years before the merger) and Smitha Stansbury, who left SPB in July 2014 (almost two months after the merger). (*Id*. at 16:16.)

A "substantial relationship" does not necessarily mean an exact match between the facts and issues involved in the two representations. *See Farris*, 119 Cal. App. 4th at 688; *see also Trone*, 621 F.2d at 1000 (explaining that the substantial relationship test does not require that the issues in the two representations be identical); *see also Flatt*, 9 Cal. 4th 275, 283; *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 712-13 (2003).  The work Patton Boggs performed for Ingredion in 2006 and 2009 relates to the propriety of characterizing HFCS as "natural" under FDA policy—advice that is germane to issues concerning marketing and advertising HFCS as natural and whether such claims could be false or misleading.  Accordingly, the similarities of the legal and factual issues of Patton Boggs' prior representation of Ingredion put Patton Boggs, now SPB, in a position where confidential information material to its current representation of the Sugar Plaintiffs was likely imparted to counsel. *See Cobra Solutions*, 38 Cal. 4th at 847.  Moreover, the fact that former Patton Boggs attorneys Smitha Stansbury and Paul Rubin are no longer at SPB does not change the outcome, particularly since Ms. Stansbury left SPB *after* the merger. *See, e.g.*, *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1390-91 (N.D. Cal. 1992) (Orrick, J.).

Ingredion has established that there is a "substantial relationship" between the prior and current representations, and the attorneys at Patton Boggs, now SPB, are presumed to possess confidential information.  SPB is thus subject to

automatic disqualification from this action.[10]  *See Farris*, 119 Cal. App. 4th at
679; *Cobra Solutions*, 38 Cal. 4th at 847.

### 3.    SPB's Evidence Does Not Overcome the Presumption

SPB provides declarations from attorneys that have worked on the instant
lawsuit on behalf of the Sugar Plaintiffs.  These attorneys declare that they have
never received any information from any lawyer who was with Patton Boggs
about either Ingredion or Tate & Lyle, and they have not performed work on any
matter for Tate & Lyle after the merger.  (*See gen*. SPB's Omnibus Compendium
of Declarations (Dkt. No. 262).)  SPB's counsel declares that the only lawyers
who remain at SPB who have worked on Ingredion matters after 2010 are Stuart
Pape, Carey Nuttall, and Ann Spiggle.  (Talisman Decl., Ex. 39 at ¶ 6.)  These
lawyers declare that they have never provided any information to any lawyer who
was at Squire Sanders about Ingredion, and after the firms merged, they did not
work on any matter for the Sugar Plaintiffs.[11]  (*See* Nuttall Decl., Ex. 28; Pape
Decl., Ex. 29; Spiggle Decl, Ex. 38.)

Shortly after the merger in July 2014, Stuart Pape—the Patton Boggs
attorney who signed the engagement letters for both Ingredion and Tate & Lyle—
consulted with the Sugar Plaintiffs' expert witness, David Kessler, and the former
Squire Sanders attorney, John Burlingame, who is co-lead attorney for the Sugar
Plaintiffs in this action.  (*See* Pape Decl. ¶¶ 12-16; Burlingame Decl. ¶ 9.)  This
consultation occurred prior to any formal ethical walls being in place.  There is a
real risk that confidential information was in fact compromised.

---

[10] The presumption that an attorney has access to confidential matters relevant to a subsequent
representation extends the attorney's disqualification vicariously to the attorney's entire firm.  *See In re
Charlisse*, 45 Cal. 4th at 161; *Flatt*, 9 Cal. 4th at 283.

[11] Similarly, attorneys who worked on matters for Tate & Lyle declare that they have had no contact with
any lawyer formerly with Squire Sanders about the Sugar case; shall have no such contact in the future;
have not had any discussion about Tate & Lyle with any lawyer formerly employed at Squire Sanders;
and have never provided any information to any lawyer formerly with Squire Sanders about Tate & Lyle.
(*See, e.g.,* Mudrick Decl., Ex. 27; Randle Decl., Ex. 31; Samolis Decl., Ex. 32; Schutzer Decl., Ex. 34.)

In any event, whether the attorneys actually possessed or conveyed confidential information is not the test.  Rather, because Ingredion has met its burden showing that a "substantial relationship" exists between the two representations, SPB is *conclusively presumed* to possess confidential information material to the present action.  *See Jessen,* 111 Cal. App. 4th at 709 (emphasis in original); *Flatt*, 9 Cal. 4th at 283.  The "substantial relationship" test ensures that clients are not forced to reveal the confidences the rule is intended to protect. *Trone*, 621 F.2d at 999 ("It is the possibility of the breach of confidence, not the fact of the breach, that triggers disqualification"); *Adams v. Aerojet-Gen. Corp.,* 86 Cal. App. 4th 1324, 1331-32 (2001); *see also Jessen,* 111 Cal. App. 4th at 710.

The Court finds that SPB is subject to automatic disqualification because it previously represented Ingredion in matters substantially related to the present action, and SPB is thus presumed to possess client confidences revealed in the prior representations.  *See Flatt*, 9 Cal. 4th at 283; *Trone,* 621 F.2d at 999. Evidence showing that the Patton Boggs attorney who signed the engagement letters for Ingredion and Tate & Lyle actually consulted with Sugar Plaintiffs' counsel and expert witness following the merger reinforces the Court's finding.

**C.    Proposed Alternatives to Disqualification**

SPB and Plaintiff Sugar Association propose the following remedial measures, which they contend sufficiently address the concerns raised in the Motions as follows:

(1)   SPB agrees to reimburse Tate & Lyle and Ingredion for fees incurred in connection with the instant Motions;

(2)   SPB implemented formal ethical walls by the time of the November 2014 hearing but after the Motions to Disqualify were filed;

(3)   SPB will deposit all physical and electronic Patton Boggs' records to a third party for safekeeping, and no legacy Squire

Sanders lawyer or legacy Patton Boggs lawyer would have access to the records without written permission from Tate & Lyle, Ingredion or court order;

(4)   SPB offered to provide its attorney Dan Waltz's services without charge to Tate & Lyle to ease its transition with new counsel and agrees to reimburse it for reasonable transition expenses incurred;

(5)   Plaintiffs will stipulate in this case that all Defendants (other than CRA) manufacture various formulations of HFCS, consistent with the description set forth in the Geraldine June Letter ("HFCS Manufacturing Stipulation"); and

(6)   SPB agrees that at trial, no SPB lawyer will examine any Tate & Lyle or Ingredion witnesses or make arguments or address documents that came from Tate & Lyle or Ingredion.

**1.      Whether the Proposed Alternatives Sufficiently Mitigate the Conflicts and Ethical Violations to Avoid Disqualification**

Mindful of the late stage of this case and potential prejudice that the Sugar Plaintiffs could suffer if their counsel is disqualified, the Court considers whether the it could adopt some or all of SPB's proposed alternatives to mitigate the impact of its ethical violations without prejudicing Ingredion or Tate & Lyle.

SPB's offer to reimburse Ingredion and Tate & Lyle for their fees incurred in the instant Motions and SPB's offer to reimburse Tate & Lyle reasonable transition expenses are offers that would help mitigate the admitted errors made by SPB during the merger.  Those offers, however, do not cure SPB's breach of its ethical duties.

### *a.      SPB's Breached Duty of Confidentiality*

The Court first considers whether the imposition of formal ethical walls and the removal of Patton Boggs' records to a third party could help mitigate SPB's breach of its duty of confidentiality to Ingredion.

### i.  *Ethical Walls and Removal of Records*

Because SPB formerly represented Ingredion on matters that are "substantially related" to the present lawsuit, SPB is presumed to possess confidential information material to the present action, and under California law, SPB is subject to automatic disqualification.  *Cobra Solutions*, 38 Cal. 4th at 847.

The California Supreme Court noted that it "need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification by establishing that the firm imposed effective screening measures."  *See SpeeDee Oil*, 20 Cal. 4th at 1151; *see also In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) (interpreting *SpeeDee Oil* as a signal that the California Supreme Court may adopt a more flexible approach to vicarious disqualification in the future).

The Ninth Circuit in *In re Cnty. of Los Angeles* assumed that the former and current matters were substantially related, but concluded that disqualification of the law firm was not warranted because a timely, effective ethical wall had been imposed, thereby rebutting the presumption that the lawyer and new law firm had confidential information relevant to the current action.  223 F.3d at 997. Similarly, at least one California appellate court found that a law firm could rebut the presumption of shared client confidences if it imposed ethical screening when the conflict arose.  *See Kirk v. First Am. Title Ins. Co*., 183 Cal. App. 4th 776, 801 (2010).

SPB contends that following the merger a *de facto* ethical wall was in place because Patton Boggs' lawyers did not have access to Squire Sanders' computer systems and vice versa, and at the November 2014 hearing, SPB's counsel stated that formal ethical walls are in place.  (*See* Talisman Decl. ¶ 7; Ballin Decl. ¶ 13). But following the merger—and before formal ethical walls were in place—the Patton Boggs attorney who engaged Tate & Lyle and Ingredion, met with the Sugar Plaintiffs' expert witness and co-lead attorney.  (Pape Decl. ¶¶ 12, 14-16;

Burlingame Decl. ¶ 9.)  The ethical screening was thus not "timely" imposed.  *Cf.*, *In re County of Los Angeles*, 223 F.3d at 996-97 (finding a timely and effective ethical wall had been imposed where the law firm had removed all files concerning the pending case *before* the conflicted lawyer joined the firm; all attorneys had been instructed not to discuss the case with him, and he did not have access to the case file); *see also Concat*, 350 F. Supp. 2d at 822 (disqualifying the law firm, explaining that even if an ethical wall could have prevented a conflict, it was not implemented until three months after the dispute was initiated, and was thus, too late to be effective).

Accordingly, although erecting an ethical wall after the fact can prevent future breaches of confidence, it cannot rebut the presumption of shared confidences here, particularly where a conflicted SPB attorney consulted with an another SPB attorney representing the adverse parties about this case prior to the implementation of formal ethical screens.  *See, e.g., j2Global Comm'n, Inc. v. EasyLink Servs. Int'l*, No. 09-04189, 2012 WL 6618609, at *10 (C.D. Cal. Dec. 19, 2012) (Pregerson, J.) (concluding the presumption of shared confidences was irrebuttable, and thus disqualification was mandatory, where the conflicted attorney was not timely screened).

Moreover, belated ethical walls and separation of documents cannot restore Tate & Lyle's legitimate expectation of loyalty, which is the "essential basis for trust and security in the attorney-client relationship."  *SpeeDee Oil*, 20 Cal. 4th at 1147; *see also Concat,* 350 F. Supp. 2d at 822 (finding an ethical wall could do nothing to mitigate or cure a conflict arising from the concurrent representation of adverse clients because the purpose of the prohibition against such relationship is to preserve the attorney's paramount duty of loyalty, not confidentiality).

### ii.    *HFCS Manufacturing Stipulation*

Plaintiffs agree to stipulate that all Defendants (other than CRA) manufacture various formulations of HFCS, consistent with the description in the

1    Geraldine June Letter.  This stipulation does not mitigate the problem that Patton

2    Boggs advised Ingredion in 2009 regarding the Geraldine June Letter, and SPB is

3    presumed to have confidential information that could be used against Ingredion in

4    the present action.  Advice rendered in connection with the Geraldine June Letter

5    certainly went beyond the mere manufacturing process of HFCS.  This stipulation

6    likewise does not mitigate SPB's breach of its duty of loyalty to Tate & Lyle.

7                   **b.      SPB's Breached Duty of Loyalty**

8         Because Tate & Lyle was a current client of SPB, and it simultaneously

9    represented the adverse Sugar Plaintiffs, SPB breached its duty of undivided

10   loyalty to Tate & Lyle.  SPB offers that, at trial in this case, no SPB lawyer will

11   examine any Tate & Lyle or Ingredion witness.  Additionally, no SPB attorneys

12   will make arguments or address documents that came from either Tate & Lyle or

13   Ingredion.

14        SPB's offer could help mitigate the impact of its breached duty of loyalty to

15   Tate & Lyle.  But while Tate & Lyle witnesses will not be examined by SPB

16   attorneys at trial, its adversaries are still represented by the same law firm that

17   dropped Tate & Lyle after it raised the conflict.  The duty of loyalty SPB owed to

18   Tate & Lyle was compromised in favor of the duties SPB owes to the Sugar

19   Plaintiffs.  Even putting that aside, SPB would still owe a duty of confidentiality

20   to Tate & Lyle, and as set forth above, ethical screens were not implemented

21   before the Patton Boggs attorney who signed the engagement letter for Tate &

22   Lyle met with co-lead attorney and an expert witness for the Sugar Plaintiffs.

23        Mindful that the "paramount concern must be to preserve public trust in the

24   scrupulous administration of justice and the integrity of the bar" and that the duty

25   of loyalty is fundamental to the attorney-client relationship, SPB's proposal is not

26   sufficient to overcome a rule of automatic disqualification resulting from its

27   concurrent representation of Tate & Lyle and the Sugar Plaintiffs.  *See SpeeDee*

28   *Oil,* 20 Cal. 4th at 1145.

1    In sum, the Court finds that the proposed alternatives do not mitigate the

2    conflicts and resulting ethical violations for the Court to order the proposed

3    alternatives in lieu of disqualification.  Still sensitive to the hardship that would

4    surely result if Plaintiffs lost their trusted counsel in this four-year litigation with

5    trial nearing, the Court considers whether any other alternatives short of

6    disqualification could suffice.

7    **D.    Other Alternatives to Disqualification**

8    A disqualification motion may involve considerations such as a client's

9    right to chosen counsel and the possibility that tactical abuse underlies the

10   disqualification motions.  *SpeeDee Oil*, 20 Cal. 4th at 1145.  The Court balances

11   the need to maintain ethical standards of professional responsibility, preservation

12   of public trust in the scrupulous administration of justice, and the integrity of the

13   bar against a client's right to chosen counsel, and the burden on the client if its

14   counsel were disqualified.  *See Kirk*, 183 Cal. App. 4th at 807-08; *UMG*

15   *Recordings, Inc. v. MySpace, Inc.*, 526 F. Supp. 2d 1046, 1059 (C.D. Cal. 2007)

16   (Matz, J.).

17   SPB and Plaintiff Sugar Association contend that Ingredion and Tate &

18   Lyle filed their Motions to obtain an improper tactical advantage in this litigation.

19   The merger was highly publicized, and counsel for Sugar Plaintiffs, Mr.

20   Burlingame, opines that the Motions have been filed by Defendants to "gain a

21   tactical advantage both by delaying this [a]ction and by removing The Sugar

22   Association's chosen and experienced counsel."  (Burlingame Decl. ¶ 6.)  At

23   various depositions, Defendants' counsel never raised the prospect that the merger

24   would create any conflict.  (*See* Fox Decl. ¶ 4; Burlingame Decl. ¶ 10; Elkins

25   Decl. ¶ 3.)  Similarly, on June 2, 2014, SPB filed and served a notice, reflecting

26   the firm's name change, and no one called the legacy Squire Sanders lawyers to

27   raise any issue upon the filing.  (Dkt. No. 180.)  It was not until July 23, 2014, that

28   Tate & Lyle's counsel first raised the conflict.  (Waltz Decl. ¶ 7.)

The Court does not conclude from the evidence provided that the Motions were brought for tactical reasons.  The Motions were filed days after Tate & Lyle's counsel met and conferred with SPB's counsel and after it became clear that Tate & Lyle would not consent to the existing conflict.  SPB cannot minimize its breach of ethical duties owed to its clients by placing the burden on them to identify and raise the conflicts sooner.  *See Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1089 (1995).

In *UMG Recordings v. MySpace,* the district court fashioned an alternative remedy to disqualification.  The *UMG Recordings* court conditioned denial of the plaintiff's motion to disqualify the defendant's counsel on reimbursement of fees and costs incurred in the disqualification dispute and preclusion of discovery or claims relating to an affirmative defense that was substantially similar to a matter in which the law firm had previously represented the plaintiff.  526 F. Supp. 2d at 1065.

Unlike in *UMG Recordings*, where there was no dispute that the affirmative defense and discovery relating to it was a "very tiny tail on a much bigger dog. . . ." *id*. at 1065, here, SPB's representation of Ingredion regarding the characterization of HFCS as "natural" is an issue that goes to the heart of this lawsuit.  (*See* SAC (Dkt. No. 55) ¶¶ 30, 32; 59-61; (Dkt. No. 91) ¶ 74.)

Unlike in *UMG Recordings*, where the law firm's representation of the defendant did not commence until *after* its representation of the plaintiff had ended, *id*. at 1065, here, SPB *concurrently* represented the Sugar Plaintiffs and Tate & Lyle.  Also unlike in *UMG Recordings*, where the law firm implemented an ethical wall some seven months *before* the events that led plaintiff to complain of the conflict, *id*. at 1064, here, SPB implemented a formal ethical wall *after* the motions to disqualify were filed, and *after* counsel for the Sugar Plaintiffs met with Mr. Pape, the attorney who engaged both Tate & Lyle and Ingredion.

Additionally, in *UMG Recordings*, the law firm made "crystal clear" that it

1    would not agree to represent the plaintiff UMG unless it agreed to waive any

2    conflict that would prevent the law firm from representing an adverse party in

3    cases concerning infringement of intellectual property rights on the internet.  *Id*. at

4    1065.  Plaintiff UMG signed the waiver that put it on notice that its law firm might

5    represent a specific party (like the defendant), even if UMG were still an active

6    client of the law firm.  *Id*.  Here, the advanced waivers contained in Patton Boggs'

7    Standard Terms of Engagement is a generalized advanced waiver with no

8    specificity and could not have put Ingredion or Tate & Lyle on notice of the

9    conflicts it was agreeing to waive.

10         The Sugar Plaintiffs have a right to their counsel of choice, and declare that

11   they have relied on SPB as their trusted counsel, who have become "case experts"

12   on "extraordinarily complex issues" central to this litigation.  (*See* Briscoe Decl.

13   ¶¶ 3, 14.)  Indeed, disqualification at this late stage would undoubtedly impose

14   hardship on Plaintiffs.  The parties have engaged in extensive discovery and

15   motion practice, and Plaintiffs have incurred over $12 million in fees from Squire

16   Sanders/SPB in this matter, reflecting over 20,000 hours of professional time,

17   demonstrating the depth of the firm's involvement.  (Sugar Assoc. Inc.'s Opp'n at

18   9:6-14.)  The Sugar Plaintiffs contend that no replacement firm could master these

19   issues without near-identical effort.  (*Id*.)

20         Having considered the competing interests of Plaintiffs' right to chosen

21   counsel and the prejudice they would face if SPB were disqualified against the

22   paramount concern of preserving public trust in the scrupulous administration of

23   justice and the integrity of the bar, the Court finds that no alternative short of

24   disqualification will suffice.  *SpeeDee Oil*, 20 Cal. 4th at 1145.  While the Court is

25   mindful that this outcome imposes hardship on the Sugar Plaintiffs, "the important

26   right to counsel of one's choice must yield to ethical considerations that affect the

27   fundamental principles of our judicial process."  *Id*.

28

## V.   CONCLUSION

The Court hereby **GRANTS** Tate & Lyle's and Ingredion's Motion to Disqualify Squire Patton Boggs LLP.

All pending motions, including motions before Magistrate Judge Nagle, are hereby stayed until further order from the Court.  The parties are ordered to appear for a status conference on May 5, 2015 at 10:00 a.m.  The parties shall file a status report with the Court no later than April 28, 2015.

**IT IS SO ORDERED.**

DATED:  February 13, 2015

_____
Honorable Consuelo B. Marshall
United States District Judge