UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE CONSUELO B. MARSHALL

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

WESTERN SUGAR COOPERATIVE, et al.,      )
                                        )
                    Plaintiffs,         )
                                        )
        vs.                             )    NO. CV 11-3473 CBM
                                        )
ARCHER-DANIELS-MIDLAND COMPANY,         )
et al.,                                 )
                                        )
                    Defendants.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY FOUR

LOS ANGELES, CALIFORNIA

FRIDAY, NOVEMBER 6, 2015

VOLUME II - 12:22 P.M.

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
(213) 894-2665

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFFS:**

    THE LANIER LAW FIRM
    BY:  W. MARK LANIER
        Attorney at Law
    6810 FM 1960 West
    Houston, Texas 77069
    (713) 659-5200

**FOR THE DEFENDANTS:**

    WINSTON & STRAWN LLP
    BY:  DAN K. WEBB
    BY:  NEIL MURPHY
        Attorneys at Law
    35 West Wacker Drive
    Chicago, Illinois 60601-9703
    (312) 558-5600

**UNITED STATES DISTRICT COURT**

**I N D E X**

**WITNESS NAME**                                                    **PAGE**

Don Hoffman (Video Deposition)                                      5

**EXHIBIT**                                        **I.D.**        **IN EVID.**

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; FRIDAY, NOVEMBER 6, 2015**

**12:22 P.M.**

**- - - - -**

THE COURTROOM DEPUTY CLERK:  Please rise and come to order.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY CLERK:  You may be seated.

(Pause in proceedings.)

THE COURTROOM DEPUTY CLERK:  Please rise and come to order.  This court is again in session.

THE COURT:  Thank you.  You may be seated.

So we're ready to hear from another witness.  And could counsel tell us just approximately how long you think the next video will be?

MR. LANIER:  With joy in my heart, Your Honor.  We had a 2-hour-and-11-minute play for Mr. Hoffman.  And when you said that we would sit for another hour today, we went out and gave Mr. Hoffman a severe haircut, and we have cut out over half of that.  So our play at this point is 1 hour, 3 minutes, and 24 seconds.  It includes the plays of both parties.

THE COURT:  All right.  Very good then.  We should be able to finish it.  Thank you.

MR. LANIER:  Yes, Your Honor.  And if I might just alert the Court that Mr. Gene Egdorf will be asking the questions in this video so everybody doesn't have to put up

**UNITED STATES DISTRICT COURT**

with me.  Mr. Egdorf is one of our lawyers who is not in the courtroom right now, but they'll see him periodically.

THE COURT:  All right.  Thank you.

MR. LANIER:  Thank you.

(The video deposition of Don Hoffman was played.)

MR. WEBB:  Can we stop it for a minute?

THE COURT:  Yes.

MR. WEBB:  I think we've spotted a mistake, so I'd like to call it to Mr. Lanier's attention.

THE COURT:  We can go off the record.

(Counsel conferred off the record.)

(The video deposition of Don Hoffman continued playing.)

MR. WEBB:  Your Honor, I think another mistake is being made.  I need to call -- I just need to explain it to you.  You're playing materials that shouldn't be played.

THE COURT:  All right.  You can talk off the record --

MR. WEBB:  We'll be off the record.

THE COURT:   -- and see if you can resolve it.

(Counsel conferred off the record.)

MR. LANIER:  Your Honor, may we keep playing?  It's fine.  May we keep playing?

THE COURT:  Sure.

MR. LANIER:  Thank you.

(The video deposition of Don Hoffman continued playing.)

MR. LANIER:  And that concludes the tender from both sides of Don Hoffman, Your Honor.

THE COURT:  Thank you.  So just before I excuse the jury for the day, I want to read to the jury just a rule of law that concerns witnesses who are outside of a hundred miles from the courthouse.  So if you remember, there was some reference to this in opening statements in an effort to explain why you would be listening to deposition testimony.  And so the rule says, "A subpoena may command a person to attend a trial within a hundred miles of where the person resides, is employed, or regularly transacts business in person."  And there was some reference that some of these witnesses that were testifying by deposition lived outside of that range.  So the law doesn't require -- or permit those persons to be subpoenaed.

And the Court -- to the extent that the jurors focused on this, the Court instructs that you should draw no negative or adverse inference from the absence live here in court of such witnesses.  That concludes the instruction, and the Court will just remind you of the admonition not to talk about the case, permit anyone to talk to you about the case, anyone involved in the case or any subject matter of the case and not to do any independent research.

As I indicated before, that does mean -- and you may see some articles in the newspaper or you may hear some coverage on radio or television about the case or subject of the case,

someone involved in the case.  So those were things that you would not read or you would not listen to them.

If you should inadvertently do so, you'll bring those to the Court's attention by advising the courtroom deputy.  If it's printed material, you would bring that in with you, but not discuss it with any of the other members of the panel.  You would give it to the courtroom deputy.  She'll give it to me.  I'll read it and question you if I think it's necessary.  If it's aural -- radio, television, a statement of that type -- then don't discuss that with any of the other jurors, but advise our courtroom deputy.  She'll advise me.  I'll question you if I think it's necessary.

You are excused at this time.  Enjoy your weekend, and we'll see you on Monday at eight o'clock.

THE COURTROOM DEPUTY CLERK:  Please rise.

(The jury exited the courtroom.)

THE COURT:  The statement that the Court just made -- and you may be seated -- to the jury is in lieu of the defendant's request for curative instruction.  It doesn't quite go as far as defendants' request requested, but the Court thinks that admonition was appropriate.

We should talk about Monday, the witnesses who are going to be called, time estimates, exhibits to be used.  And I hope that counsel have already discussed this among yourselves and you each know what's going to be done on Monday.  But for

purposes of the Court being advised, why don't we put something on the record now.

MR. LANIER:  Your Honor, we anticipate that Monday will be consumed with the adverse witness Chris Cuddy.  In that regard, Your Honor, because he is an adverse witness, we have not shared which exhibits we'll use to cross-examine him on. The parties have agreed that cross-examination exhibits do not need to be shared in advance, but direct examination exhibits do need to be.  I expect I will be getting those from Mr. Webb because Mr. Webb is also going to do his direct examination of Mr. Cuddy while he is here.

And as for time, I have suspected he would go all day.  I think I will probably take at least two and a half or three hours with him.  That's my anticipation.

THE COURT:  So that we not have to disrupt the jury, if any of the exhibits that either side is planning on using are exhibits to which the other side has objected and the Court's going to need to rule on those, then the Court needs the exhibit and needs the objection to the exhibit.  And I'm just speaking exhibits generally.  Because otherwise, if you're not disclosing the exhibits to the other side, when you're ready to use an exhibit, then if there's an objection, then that's going to be disruptive.  And my -- usually what I will do with that is not permit the exhibit to be published --

MR. LANIER:  Ouch.

THE COURT:  -- until the Court can actually rule on the receipt.

So that may be disruptive if the other side doesn't know or if they have not objected because they don't know.  And I see it not running very smoothly.

MR. LANIER:  Okay.  A concern that I had expressed with Mr. Webb was on this point.  I had suggested that we do a meet and confer to go through these exhibits and figure out which ones would be acceptable and which would not, with an effort to cull down the list considerably.  Because of my concern over how the exhibits might need to be used during cross-examination, obviously it's to great detriment of any party to hand the other side the weekend before, "Here's a list of the exhibits that I plan on using with your witness in cross-examination."  It enables the prep to be very different, and so I had hoped that we would get through all of the exhibits.

Mr. Webb can speak for himself, but his -- the position that I was urged to accept and to take was one where we just share those direct exhibits the night before, as opposed to the cross exhibits -- or two days before, maybe it was, for the direct exhibits.  And not necessarily the cross-examination exhibits, and we would try to proceed.

I know that Mr. Webb and I neither make petty objections, so I do not suggest that Mr. Webb would simply object to an

exhibit because it hurts his position or helps mine; I think he would only make real objections. But I do think that some procedure needs to be in place to keep it from being disruptive. And what that may be, I'm not sure what Mr. Webb has in mind. Obviously it's something that would be affecting both of us because we both will be cross-examining.

MR. WEBB: So here's my suggestion or -- first of all, let's -- we have a standing, stipulated order on direct examination exhibits, so I think it's 5:00 p.m. on Saturday night, tomorrow night. I have to give notice that Mr. Cuddy is being called, which he already knows, but -- and I have to turn over all the exhibits that I would use during direct examination to counsel by 8:00 a.m. the following morning -- I think it's 8:00 a.m. You have to give me your objections to my direct examination exhibits. And then once I get those objections on the direct exam exhibits, Mr. Lanier and I will meet and confer to try to resolve objections we have.

To the extent we cannot resolve objections, I would suggest that we be in court at 7:30 a.m. on Monday morning to deal with any objections that are remaining on my direct examination exhibits. And that's what's in the standing order right now that we have.

Number two, on cross-examination exhibits, I actually -- Mr. Lanier did not feel that we should be disclosing cross-examination exhibits in advance, and that's what he just

**UNITED STATES DISTRICT COURT**

repeated.  And the way I've normally done it when this happens is that when he's ready to use an exhibit on cross, before he just puts it up on the screen or hands it to the witness, he walks over to counsel table and he shows us the document that he's going to use at that point.  We will have a system in place, it may take 30 seconds or a few seconds.  We need to look at it to make sure that we don't have an objection, and then I'll immediately say "no objection" and the exhibit will be used.  If I do have an objection, I will have to come to a sidebar and have it addressed.

The only other way we can do it, which I'm willing to do but I don't -- but I agreed, by the way, that was fine.  That procedure's fine with me.  Neither side prints off the cross-examination exhibits in advance for strategic reasons. If Your Honor wants us to disclose cross-examination exhibits in advance, that's not in our standing order.  We didn't put that in there because we -- Mr. Lanier and I agreed we would follow that procedure I just described.  If Your Honor wants a different procedure, we'll have to do it.

THE COURT:  I'm not asking for a different procedure.  I'm willing to abide by the agreement that you've come to.  I just put you on notice that if the Court needs time to hear the objection or review the exhibit or has some questions about it, then it cannot be published.

And so at our break with the jury, the Court will have had

the exhibit and will understand the reason the objection therefor.  So it may be we would just have a short discussion at the break, but I just wanted to put you on notice of that.

MR. LANIER:  Your Honor, in that regard, perhaps I might suggest the following.  And that is, if we're going to meet with you at 7:30 to discuss any objections to direct examination exhibits, maybe Monday morning or the morning -- each morning, Mr. Webb and I meet at seven o'clock, and I show him at that point in time which cross exhibits I plan on using. We'll see which ones he has an objection to, and perhaps we can get those in front of you at 7:30 as well so that you've got a chance to look at them.

We can go smoothly.  I will have them in the order I anticipate using them, so it ought to buy us through, hopefully the day, but if not, at least until the first break when you might have a chance to look at additional exhibits.  We ought to be able to make this smoother and still give each other the strategy benefit of not letting the other one spend the weekend woodshedding a witness.

THE COURT:  That's fine with the Court.

MR. WEBB:  I can work -- I'm willing to try that. Between seven o'clock and 7:30, because I have to get into a van and come over here, I don't have much time to look at anything, but I'll try to make it work.  I'm willing to -- the answer's yes.

MR. LANIER:  Good.  We'll meet here at 7:00.  I know your courtroom's not unlocked, but we'll just meet in an attorney room at seven o'clock.

THE COURT:  And we can unlock the courtroom for you at 7:00 if you want to meet here.  Otherwise, you'll meet in the attorney conference room.

MR. LANIER:  I feel like we've abused your staff so much, I don't want to ask them to unlock it at 7:00.  But we'll find a place to meet at seven o'clock.  We will try and get that in front of you by 7:30 so that this is smooth and the jury's time is honored.

THE COURT:  All right.  Let's try it and see how it works.

MR. LANIER:  Thank you, Judge.

THE COURT:  And so the time estimate for the direct exam for the defense of this witness?

MR. WEBB:  About -- I'm going to estimate about two hours, Your Honor.  I haven't really had a chance -- I didn't know until today that I was going to be doing a direct on Monday, but I'm going to give you an estimate of two hours, a good faith estimate.

THE COURT:  All right.  So it sounds like that witness would consume the day on Monday.  And so who is the witness for Tuesday?

MR. LANIER:  Your Honor, Tuesday we've got two lined

up, Dr. Katz, K-A-T-Z, and Dr. Kessler, K-E-S-S-L-E-R.

Now, there is a question about Dr. Kessler and what is the scope that I will be allowed to ask him in light of the Court's rulings.  And that's something that at some point when the Court's ready, we should discuss.  I -- my intention would be to use him in line with his report.  I know that he's been in limine'd out on misbranding, and so I'm not going to try and get into misbranding.  I may need to do a proffer for the Court, but I don't even think I'm going to do that at this point.

What I do anticipate, though -- Dr. Kessler was the head of the FDA during that time period when the FDA put out its definition of natural.  He actually signed it and to some degree as a percipient witness on what that is.  Additionally, I believe he should be able to testify on issues relevant to Mr. Webb's opening where Mr. Webb said in his opening, with slides that I'll show to the Court and provide, that the product is natural -- the product being HFCS -- because it meets the FDA definition of natural.  Here is the FDA definition of natural.

And so to that degree that Mr. Webb injected that in this case, and Mr. Webb also put up the letter from the FDA person that said, "We don't have an objection to it being natural," that person's boss was David Kessler.  And he's in a position to explain that that letter was not FDA policy, that letter was

an opinion of that person.

And so that's what we anticipate doing with Dr. Kessler, talking about what sugar is, what high fructose corn syrup is, and specifically trying to negate some things that were brought up by Mr. Webb in his opening.

MR. WEBB:  So --

THE COURT:  Oh, excuse me.

MR. WEBB:  No, I didn't mean to interrupt you, Your Honor.

THE COURT:  No, it's fine.

MR. WEBB:  I was just going to tell Your Honor that based on the proffer I just heard about what Dr. Kessler would testify to on direct, I can tell Your Honor that based on a Daubert ruling that Your Honor entered and two different motion in limine rulings, none of those -- none of that testimony's allowed in from an expert in this case based on your rulings.

In order to avoid Tuesday being a short day without enough witnesses here -- because I will go ahead and file by tomorrow morning -- I mean, as fast as I can, I will file a motion to exclude that testimony and brief it so that at least by Monday -- I'm not asking you to work over the -- I will get that on file because I don't believe that's admissible, and Your Honor will want a chance to consider that.

Because if it's not admissible, then maybe sometime on Monday we're going to have to argue that out because otherwise

you're not going to have -- you're not going to fill the day on Tuesday.  If I'm right and none of that's admissible, you won't fill the day on Tuesday.

THE COURT:  Why not have another witness just in case?

MR. LANIER:  We will, Your Honor.

THE COURT:  So that if that should occur, then we would have a witness, and we wouldn't lose time with the jury.

MR. LANIER:  We will, Your Honor.  And I'll designate such a witness as soon as I check everybody's schedule.  If I could have until tomorrow to designate?  Or I can put it into a range.  It will either be Dr. Courtney Gaine, or it will be Dr. Simonson, Itamar Simonson.  One of those two I believe.

THE COURT:  All right.  And what is the time estimate, just based on what you expect to ask Drs. Katz and Kessler?

MR. LANIER:  Dr. Katz I reckon will take about 90 minutes.  Dr. Kessler I reckon will take about -- about an hour to 90 minutes, 60 to 90 minutes.  Dr. Gaine I reckon will take about -- she said five minutes, but that's wishful thinking.  I reckon we'll take about 30 minutes.  Dr. Simonson is probably about an hour and a half.

THE COURT:  I just don't want us to run out of witnesses, so as long as you have other witnesses that could be

called if some witness's testimony is shorter than you expected in the time estimate.

MR. LANIER:  Okay.  I will not run out of soap.

THE COURT:  Okay.  So let me ask the defense counsel then this question.  So it is true in your opening you did raise this issue about -- or address the FDA policy and "natural."  And if the Court understands your theory, that because you have to show that you acted willfully and intentionally, then you should be able to show that you looked to that FDA definition, I guess, in using the word "natural."

Now, that may not be a good description of the testimony, but if that is what you plan to do -- and maybe you aren't ready to disclose it yet -- but who would you be calling to ask those questions?  Somebody must be testifying that there was a policy or something that was issued by the FDA that used this word "natural."

MR. WEBB:  Yes.  We will only use -- because of the ruling -- Your Honor did a ruling that no expert witness can actually opine on the FDA rules and regulations, it will only be -- this is the motion to clarify that we filed that Your Honor ruled on earlier this week.  We will only bring it out -- we will only address the -- we'll only address through fact witnesses factually what our witnesses knew based on information received from the FDA.  So we're only going to use fact witnesses, and no expert witness will address the FDA

**UNITED STATES DISTRICT COURT**

rules.

THE COURT:  And we will have time on Monday afternoon to have further discussions on these issues.  But when the two of you are working together, I'm sure you want to not inconvenience any of the witnesses, to the extent that you can avoid that.  So I expect that you'll continue your conversation, but yes, for Tuesday's witnesses we will be able to have a session after the jury leaves on Monday to make proffers, to argue whatever counsel wants to argue.

And the Court, of course, has copies of all of the orders that were issued, both on the Daubert motions and the motions in limine.  So I have those all in a notebook, and it would be very easy for me to turn to those.  So I don't want you to have to spend time doing briefing that's not necessary, but if it's helpful to file a brief on it, then certainly you'll do that.

MR. WEBB:  Yes, Your Honor.

THE COURT:  All right.  I think that now I have some indication of what we're doing on Monday and possibly on Tuesday.

The other question I wanted to raise with the parties -- two questions.  Yesterday the rest of us talked so much that the two lawyers who were working on the elements instruction never had an opportunity to address the Court.  Now -- and they may not need to address the Court.  I suggested that we could proceed in the following way.  If you agreed on a so-called

**UNITED STATES DISTRICT COURT**

elements instruction and other instructions that may be necessary to define the words that are used in the elements instruction, you would just give me that.  If there's an agreement, then I would plan to use it at this point.  And you would give me the source, the support for those instructions.

If you're in disagreement, what would help the Court is if you each gave me your proposed instruction, elements and other words that need to be defined, words of art, the authority for that, and then it's something that I could be working on.

MR. WEBB:  Your Honor, my understanding is that both sides have agreed to the vast majority of an instruction. There's only one area of disagreement -- and I'll let others describe that -- but I think it's all been resolved except for one area.

THE COURT:  So what you could do is you could give me that instruction and pretty much tell me that.  The only disagreement is this, and then you would each give me the language that you think is the appropriate language and the sources that you're relying on.  And so if I have that, I can start working on that so that by Monday, hopefully, the Court would be able to advise the jury of the elements instruction.

MR. PROCTOR:  So, Your Honor, what we both have in our hands -- I have a defendant's proposed jury instruction, and it has all the elements as well as the issue regarding willfulness.

THE COURT:  Okay.

MR. PROCTOR:  And the plaintiffs have something that's similar.  The only distinction is the word "willfulness."  We use the word "willfulness"; it's in the Seventh Circuit version of the Lanham Act instructions.  The plaintiffs prefer using some different language -- intentionality, intentional.  And there's reasons why we think "willfulness" is the right word.  I can argue it if necessary.

THE COURT:  No, I don't think it's necessary.  What I'm asking is if you just give it to me in written form and you give me the authority that supports your position, I'll be prepared to tell you.  And any words of art -- such as willful, willfulness, or willfully or intentionally -- those words would need to be defined unless you feel that they don't have legal meanings, and so you would give me that as well.

MR. PROCTOR:  So what I have -- we have the plaintiffs' --

THE COURT:  Okay.

MR. PROCTOR:  -- we have the defendants', and I have a third one which shows the edits which shows the difference between the two.  We just did it in a red line, just for easy comparison.

THE COURT:  Okay.  So if you want to leave --

MR. PROCTOR:  If we could approach, we'll hand it -- do you want me to hand it to the courtroom deputy?

THE COURT: You can just keep it for now, and when I leave the bench you can give it to the courtroom deputy. And then I will look at those, and I'll let you know what I think. And as I said, I will advise you before I read it to the jury. So if there's something else that needs to be said, you'll have an opportunity to do that because the same instruction is going to be read again at the end of the case, so...

MR. PROCTOR: We'll be prepared to address the Court if necessary.

THE COURT: All right.

Anything else that anybody else thinks needs to be raised before we recess?

MR. WEBB: No, Your Honor.

MR. LANIER: Your Honor, the only thing I can think of, Mr. Webb and I have been looking for some extra depositions in case you just wanted reading material over the weekend.

THE COURT: Oh, no.

MR. LANIER: Thank you, Judge.

THE COURT: I'll be just fine. I think we already have one additional deposition, and I think it's been designated and counter-designated, and objections. And so we'll be prepared to issue an order on that as soon as it's been read, so whenever the parties decide to use that, you will be able to do so.

MR. LANIER: Great. Your Honor, we will --

Mr. Wilkerson will stay behind after you leave the bench if -- although it may need to be while you're on the record, actually.  At some point, we need to move into evidence the exhibits that were shown to the jury in the depositions today.  And we can move those maybe without objection, and then you don't have to be on the bench; we'll just move without objection and do that after you leave the bench?

THE COURT:  Yes.  If there's no objection, you can just simply advise the courtroom deputy that these are exhibits that both sides have agreed will be received into evidence.  And then on Monday, I'll tell the jury we have some exhibits that are in evidence now and what that means.  And so I think it can be done that way.  But I will be here until four o'clock.  At four o'clock I will leave the building.

MR. LANIER:  Okay.

MR. WEBB:  There are some exhibits that there are some objections to.

THE COURT:  And so --

MR. LANIER:  We'll sort through that.

THE COURT:  Certainly we won't move those in unless -- so I'm only speaking of those which both sides agree.

MR. WEBB:  Yes.

MR. LANIER:  Great.  And do we also have the freedom, Your Honor, to redact exhibits so that we can reach agreement?  Because I know there are some that need redaction.

THE COURT:  Sure.  Sure.

MR. LANIER:  Great.  Then we'll do that and be ready to roll.

THE COURT:  Okay.  Anything else?

MR. LANIER:  No, Your Honor.  Thank you.

THE COURT:  All right.

MR. WEBB:  Thank you, Your Honor.

THE COURT:  Have a nice weekend.  Looks like you'll be working.  I will not.  But I'll see you -- I will be back in town on Sunday --

MR. LANIER:  Safe travels.

THE COURT:  -- and so on Sunday I will be working. And so whatever you need to get to me, as long as it gets to the courthouse, then they will provide it to me and I'll be able to look at it on Sunday.  Be prepared on Monday.

MR. LANIER:  Thank you, Judge.

THE COURT:  All right.  Have a nice weekend.

MR. LANIER:  Thank you, Your Honor.

MR. WEBB:  Thank you.

THE COURTROOM DEPUTY CLERK:  This court is adjourned.  Please rise.

(The proceedings adjourned at 2:02 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                                        )
STATE OF CALIFORNIA      )


          I, SHAYNA MONTGOMERY, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:   *November 7, 2015*


                    /s/ SHAYNA MONTGOMERY
                    _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**